UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

| | | |
|---|---|---|
| JAMES MICHAEL De MAY, *et al*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | 1:08cv845 |
| | : | Judge Ellen S. Huvelle |
| MOORE & BRUCE, LLP, *et al.,* | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

COME NOW, Defendants, Moore & Bruce, LLP, Charles M. Bruce, and Jonathon R. Moore, by counsel, CARR MALONEY P.C., and pursuant to Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure, move this Court to dismiss the Complaint in its entirety.  In the alternative, Defendants respectfully request that this Court dismiss various claims and damages sought in Plaintiffs' Complaint that are not recoverable as a matter of law.  In support of the foregoing motion, Defendants respectfully refer the Court to the attached Memorandum of Points and Authorities.

Respectfully submitted,

CARR MALONEY P.C.

By:    /s/
Paul J. Maloney, #362533
Nat P. Calamis, #495680
1615 L Street, N.W.
Suite 500
Washington, D.C.  20036
(202) 310-5500 (telephone)
(202) 310-5555 (facsimile)

<u>REQUEST FOR ORAL HEARING</u>

Pursuant to LCvR 7(f), the undersigned counsel respectfully requests an oral hearing on this issues addressed in this Motion.

<u>        **/s/**                                        </u>
Nat P. Calamis

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing ***Motion to Dismiss or in the Alternative Motion for Summary Judgment*** was electronically filed and mailed, postage pre-paid, on this 18th day of July, 2008 to:

Christopher G. Hoge, Esquire
Crowley, Hoge & Fein, P.C.
1710 Rhode Island Avenue, N.W.
Seventh Floor
Washington, D.C.  20036

<u>        **/s/**                                        </u>
Nat P. Calamis

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

JAMES MICHAEL De MAY, *et al*,          :
                                        :
            Plaintiffs,                 :
                                        :
        v.                              :    1:08cv845
                                        :    Judge Ellen S. Huvelle
MOORE & BRUCE, LLP, *et al*.,           :
                                        :
            Defendants.                 :

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Plaintiffs' Complaint arises out of conduct that allegedly occurred ten years ago. Plaintiffs claim that the Defendant attorneys and their law firm committed legal malpractice and other tortious conduct related to several transactions that ultimately resulted in Plaintiff James De May consenting to two judgments with the IRS. Specifically, Defendants[1] advised Plaintiff James De May with respect to the following transactions, virtually all of which occurred between 1996 and 1998: 1) assistance in raising capital for a telecommunications software business in Munich Germany, which included formation of Optimay Corporation under the laws of the State of Delaware; 2) the formation of two trusts for the benefit of Mr. De May's wife and family and subsequent amendments to these trusts; 3) the formation of a charitable foundation the operations of which would follow Mr. De May's intentions; 4) the formation of a trust for the benefit of Optimay Corporation's employees and to serve other purposes designed by Mr. De May; and 5)

---

[1] The term "Defendants" is used throughout this Memorandum for ease of reference only. This should not be construed as an admission that the Defendant law firm or named Defendant attorneys are liable for any of the specific conduct alleged in the Complaint.

the sale of Optimay Corporation to a subsidiary of Lucent Technologies, Inc. (together, the "Completed Matters."). It is undisputed that virtually all of Defendants' work on the Completed Matters occurred between 1996 and 1998, the exception being an amendment made to the Anne Schrader De May Trust in January of 2000. *See* Complaint, ¶ 45.

As will be set forth more fully below, all of Plaintiffs' claims against Defendants in this matter are barred by the District of Columbia's three year statute of limitations for claims of legal malpractice, breach of fiduciary duty, and constructive fraud. Plaintiffs' Complaint was filed on May 15, 2008. Thus, for their claims not to be barred by the statute of limitations, Plaintiffs must allege negligent conduct, or continuous representation on the same transaction as the negligent conduct at some point after May 15, 2005. Under the discovery rule adopted by District of Columbia Courts, Plaintiff James De May ("Mr. De May") knew or should have known that he had a potential cause of action against Defendants with respect to his income tax liability by June of 2002, when he learned of the IRS's position with respect to his tax liability and when he immediately retained and began paying another law firm, McGuire Woods, to take the lead of his defense into the IRS inquiry. Mr. De May similarly knew or should have known that he had a potential cause of action against Defendants with respect to his gift tax liability by January of 2004.

Although District of Columbia Courts have adopted the continuous representation rule, this rule is inapplicable under these circumstances. Under the continuous representation rule, a cause of action for legal malpractice does not accrue until the defendant attorney's continuous representation for the **particular matter at issue** is terminated. The particular matters at issue in the present case are Defendants' representation of Plaintiffs on various transactions that allegedly resulted in Mr. De May entering into two consent judgments with the IRS. These transactions

were all completed between 1996 and 1998. One of the main policy reasons for the continuous representation rule is that it allows attorneys potentially liable for malpractice to mitigate and/or correct their supposed mistakes. In the present case, Defendants had no such opportunity as it is undisputed that McGuire Woods took the lead on the representation of Mr. De May's tax audit from July 2002 forward.

The claims asserted in the Complaint by both Anne Schrader De May and the De May Family Trust also fail as a matter of law. Ms. De May has failed to allege in the Complaint that she was unaware of a potential malpractice claim, or that Defendants continued representing her within the three year statute of limitations period. Under the express language of Rule 17 of the Federal Rules of Civil Procedure, the De May Family Trust is not a "party in interest" to the instant lawsuit, and therefore cannot state any viable claims as a Plaintiff in this lawsuit.

Plaintiffs' claims for breach of fiduciary duty and constructive fraud are both barred by the statute of limitations, as the Complaint does not allege any conduct on the part of Defendants in support of these claims that took place after May 15, 2008. Even if Plaintiffs claim for constructive fraud (Count III) were not barred by the statute of limitations, the facts alleged in support of this count fail to state a claim for which relief could be granted.

Finally, should the Court determine that Mr. De May's claims are not barred by the statute of limitations, Mr. De May is not entitled as a matter of law to a substantial portion of the damages being sought in the Complaint. Specifically, Mr. De May is not entitled to recover any of the tax liability that he actually owed to the IRS. If Mr. De May's allegations are accepted as true, he would have owed substantial taxes, and at a minimum the taxes agreed in the settlement with the IRS. Mr. De May is likewise not entitled to recover interest owed to the IRS in addition

to the tax judgment, since he has enjoyed the benefit of money owed to the U.S. Government for the period from the date the taxes would have been due through today.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      In 1995, Plaintiff James De May retained the law firm of Defendant Moore & Bruce, LLP to provide him with corporate, taxation, and estate planning advice.  *See* Complaint, ¶ 14.

2.      On September 18, 1995, with the advice and assistance of Defendant Moore & Bruce, LLP, James De May formed a Delaware Corporation named Optimay Corporation.  *See* Complaint, ¶ 17.

3.      On February 8, 1996, with the advice and assistance of Defendant Moore & Bruce, LLP, James De May created the Anne Schrader-De May Trust under the laws of Bermuda.  200,000 shares of Optimay Corporation stock were subsequently transferred to the Anne Schrader-De May Trust.  *See* Complaint, ¶ 19.

4.      On February 8, 1996, with the advice and assistance of Defendant Moore & Bruce, LLP, James De May created the De May Family Trust under the laws of Bermuda. 717,231 shares of Optimay Corporation stock were subsequently transferred to the De May Family Trust.  *See* Complaint, ¶ 21.

5.      On February 8, 1996, with the advice and assistance of Defendant Moore & Bruce, LLP, James De May created the Optimay Foundation under the laws of Barbados. 150,000 shares of Optimay Corporation stock were subsequently transferred to the Optimay Foundation.  *See* Complaint, ¶ 23.

6.      On July 10, 1996, with the advice and assistance of Defendant Moore & Bruce, LLP, James De May created the De May-Optimay Comp Trust under the laws of Bermuda.

607,231 shares of Optimay Corporation stock were subsequently transferred to the De May-Optimay Comp Trust.  *See* Complaint, ¶ 25.

7.      On April 9, 1998, with the advice and assistance of Defendant Moore & Bruce, LLP, James De May amended the Anne Schrader-De May Trust.  *See* Complaint, ¶ 34.

8.      On April 9, 1998, with the advice and assistance of Defendants Moore & Bruce, LLP, James De May amended the De May Family Trust.  *See* Complaint, ¶ 35.

9.      On April 9, 1998, with the advice and assistance of Defendants Moore & Bruce, LLP, James De May transferred the Optimay shares out of the De May-Optimay Comp Trust, and the Trust was terminated.  *See* Complaint, ¶ 36.

10.     On April 16, 1998, Optimay Corporation was sold to a subsidiary of Lucent Technologies at a price of $16.53 per share.  *See* Complaint, ¶ 40.

11.     At some point prior to the sale of Optimay Corporation, James De May prepared various detailed spreadsheets setting forth the interest of Optimay Stock controlled by each of the trusts that had been previously created with the assistance of Defendants Moore & Bruce, LLP.  *See* James De May spreadsheets, attached hereto as Exhibit 1.  Mr. De May is a sophisticated businessman, and is knowledgeable about the various trusts established by Moore & Bruce.

12.     In December of 1998 Mr. De May contacted attorney James Bridgeman of McGuire Woods[2] to obtain a second opinion regarding the efficacy of the trusts that were formed with the assistance of Defendants Moore & Bruce, LLP.  On December 9, 1998, Mr. De May participated in a conference call with Mr. Bridgeman and Mr. Bruce during which these trusts were discussed at length.  At the conclusion of the call, Mr. Bridgeman and Mr. De May both agreed with Defendant Bruce that Mr. De May should proceed with the trusts as planned.  The

---

[2] Upon information and belief, at the time of this event, the law firm of McGuire Woods was known as McGuire, Woods, Battle & Boothe.

potential of an IRS audit was discussed during this conversation as well.  *See* Charles Bruce Memo, attached hereto as Exhibit 2; *see also* Affidavit of Charles Bruce, attached hereto as Exhibit 9.

13.    In June of 1999, the IRS notified James De May that it had opened an examination of his 1993 through 1998 taxable years.  *See* Complaint, ¶ 53.

14.    On June 10, 2002, the IRS issued an Explanation of Items regarding James De May's income tax liability.  This document concluded that income realized by the De May Family Trust was includible in the gross income of James De May.  *See* June 10, 2002 Explanation of Items, attached hereto as Exhibit 3.

15.    On June 24, 2002, the IRS issued two additional Explanation of Items regarding James De May's income tax liability.  In these documents, the IRS concluded that Mr. De May was required to recognize income on the contribution of appreciated foreign stock to a foreign partnership, and that income realized by the Anne Schrader De May Trust was includible in the gross income of James De May.  *See* Complaint, ¶ 55; *see also* June 24, 2002 Explanation of Items, attached hereto as Exhibit 4.

16.    On June 25, 2002, Charles Bruce sent an e-mail to James De May advising De May of the IRS Explanation of Items.  In the e-mail, Bruce informed De May that the IRS was considering making adjustments to his taxable income.  He stated "the adjustments they are considering are very large and, if they were to make these adjustments and their position were to be upheld, the tax liability would be several million dollars."  The e-mail, further advised that penalties and interest would be added to this adjustment.  *See* June 25, 2002 e-mail from Bruce to De May, attached hereto as Exhibit 5.

17.    On July 2, 2002, the IRS issued an additional Explanation of Items regarding James De May's income tax liability.  In this document, the IRS concluded that Mr. De May was subject to excise tax due to the transfer of appreciated stock to a foreign irrevocable trust.  *See* July 2, 2002 Explanation of Items, attached hereto as Exhibit 6.

18.    On July 16, 2002, James De May sent an e-mail to Charles Bruce stating that he was going to be meeting with two other attorneys, James Bridgeman and William Donnelly, both attorneys with McGuire Woods at the time, and requesting that Bruce "hold off doing any further work" on his tax situation until after he had the opportunity to speak with these two attorneys. *See* July 16, 2002 e-mail from De May to Bruce, attached hereto as Exhibit 7.

19.    James De May retained the law firm of McGuire Woods in July of 2002.  On July 19, 2002, De May sent a letter to Charles Bruce informing him that he had engaged Douglas Charnas of McGuire Woods to also represent him in connection with the tax audit.  The letter also stated that De May had asked Charnas to "take over the primary role in communicating with the IRS on this matter".  *See* Complaint, ¶ 56; *see also* July 19, 2002 letter from De May to Bruce, attached hereto as Exhibit 8.

20.    McGuire Woods took the lead in representing James De May with respect to his tax audit from July of 2002 until the time that he eventually entered into two consent judgments with the IRS in 2005 and 2006.  From July of 2002 forward, Moore & Bruce, LLP did not control the direction of the De May tax audit representation.  McGuire Woods was the primary point of contact with respect to verbal and written correspondence with the IRS.  Moore & Bruce, LLP did not enter an appearance on behalf of De May in the ensuing U.S. Tax Court litigation.  Moore & Bruce, LLP were not consulted with respect to the ultimate decision to enter

into a consent judgment with the IRS.  *See* Affidavit of Charles M. Bruce, attached hereto as Exhibit 9; *see also* Affidavit of Jonathon R. Moore, attached hereto as Exhibit 10.

21.     In October of 2002, the IRS issued a request for James De May's gift tax returns. This request by the IRS was not forwarded to Moore & Bruce, LLP.  *See* October 15, 2002 e-mail from Moore to De May and Charnas, attached hereto as Exhibit 11.

22.     On November 8, 2002, the IRS issued an additional Explanation of Items with respect to the income tax liability of Mr. De May.  This document was sent to Douglas Charnas at McGuire Woods rather than to the Moore & Bruce Defendants.  It concluded that income realized by the Optimay Foundation and the De May-Optimay Comp Trust was includible in the gross income of James De May.  *See* November 8, 2002 Explanation of Items, attached hereto as Exhibit 12.

23.     On November 12, 2002, Doug Charnas sent an e-mail to James De May, copied to Jonathon Moore and Charles Bruce.  In this e-mail, Charnas stated that he had spoken to the IRS Revenue Agent handling James De May's case, and that she gave him some "bad news".  He informed De May that IRS National Office Attorney Bill Yates believed that the grantor trust rules should apply to the Optimay Foundation and De May-Optimay Comp Trust.  He stated "obviously this is a major development and problem.  The IRS is proposing to tax you on an additional $10,979,850 of long term capital gain for 1998."  *See* November 12, 2002 Charnas e-mail, attached hereto as Exhibit 13.

24.     On December 4, 2002 Charles Bruce prepared a draft response to the positions set forth in each of the five Explanation of Items documents, sometimes referred to as "narratives" that were issued with respect to Mr. De May's tax liability.  *See* December 4, 2002 Bruce Memo, attached hereto as Exhibit 14.

25.     On December 13, 2002, Doug Charnas e-mailed a draft response to the IRS narratives to Mr. De May, Mr. Moore, and Mr. Bruce.  Mr. Charnas stated in his e-mail that the draft was "based on the memorandum Charlie prepared,"  *See* December 13, 2002 e-mail and attachment, attached hereto as Exhibit 15.

26.     On December 15, 2002, James De May sent an e-mail commenting on the Charles Bruce memo adopted by Mr. Charnas.  Mr. De May states in the e-mail that the response "reads to be true to what occurred."  Mr. De May also states that he believes that "it is accurate and correct to discuss in **greater** detail the seemingly contradictory or strange language of the trust addressed **prophylactically** an always potential marital phenomenon, without implying this was the intent of the party."  *See* James De May e-mail, attached hereto as Exhibit 16 (emphasis in original document).

27.     On January 14, 2004, the IRS sent Douglas Charnas a "Discussion Draft" asserting a gift tax liability against James De May of $2,764,327.35.  Mr. Charnas responded to the IRS's "Discussion Draft" on April 19, 2004.  *See* January 14, 2004 Discussion Draft, and April 19, 2004 Response, attached hereto as Exhibit 17.

28.     In 2004, the IRS (Office of Chief Counsel, International) generated a 32 page Chief Counsel Advice analyzing the legal issues raised with respect to James De May's income tax liability.[3]  Defendants were never asked to rebut the arguments put forth in the Chief Counsel Advice, and in fact, neither Jonathon Moore nor Charles Bruce ever saw the Chief Counsel Advice until the initiation of the present litigation.  *See* Chief Counsel Advice, attached hereto as Exhibit 18; *see also* Exhibits 9 and 10.

---

[3] A Chief Counsel Advice is a memorandum, here prepared by the Office of the Chief Counsel International, responding to a request for assistance by another IRS agent.  *See* Exhibit 18.

29.     On July 23, 2004, the IRS issued a deficiency letter to James De May.  The IRS took the position in this letter that income realized by the Anne Schrader-De May Trust, De May Family Trust, Optimay Foundation, and De May-Optimay Comp Trust upon the sale of Optimay Corporation in April of 1998 was taxable to James De May individually.  The letter states: "If you want to contest this determination in court without making any payment, you have 90 days from the date of this letter . . .to file a petition with the United States Tax Court for a redetermination of the deficiency."  *See* July 23, 2004 deficiency letter, attached hereto as Exhibit 19.

30.     On September 17, 2004, James De May filed a petition in the United States Tax Court challenging the position set forth in the IRS's July 23, 2004 deficiency letter.  Moore & Bruce, LLP did not enter an appearance, and did not serve as counsel of record in this United States Tax Court litigation.  *See* September 17, 2004 Petition, attached hereto as Exhibit 20.

31.     On September 28, 2004, Mr. Charnas sent an e-mail to Jonathon Moore stating that the IRS was "sticking with its position" set forth in its January 2004 "Discussion Draft" with respect to Mr. De May's gift tax liability.  Mr. Charnas states in this e-mail that he had spoken to Mr. De May about these developments.  Mr. Moore responded by disagreeing with the IRS position, but indicating that he would do nothing further pending Mr. Charnas's evaluation.  *See* September 28, 2004 e-mails, attached hereto as Exhibit 21.

32.     On August 31, 2005, the IRS issued a second deficiency letter to James De May with respect to his gift tax liability.  *See* Complaint, ¶ 60.

33.     On November 22, 2005, James De May filed a petition in the United States Tax Court challenging the position set forth in the IRS's August 31, 2005 deficiency letter regarding his gift tax liability.  Moore & Bruce, LLP did not enter an appearance, and did not serve as

counsel of record in this United States Tax Court litigation. *See* November 22, 2005 petition, attached hereto as Exhibit 22.

34.     In November of 2005, upon the advice of Mr. Charnas, James De May entered into a consent judgment with the IRS for income tax liability in the amount of $6 million. *See* Complaint, ¶ 68. Mr. De May did not consult with Moore & Bruce, LLP on the advisability of entering into this consent judgment. *See* Exhibits 9 and 10.

35.     On July 18, 2006, upon the advice of Mr. Charnas, James De May entered into a consent judgment with the IRS with respect to his gift tax liability. No monetary damages were imposed against Mr. De May corresponding to the gift tax judgment. *See* Complaint, ¶ 69. Mr. De May did not consult with Moore & Bruce, LLP on the advisability of entering into this consent judgment. *See* Exhibits 9 and 10.

36.     The entirety of the monetary damages assessed by the IRS against James De May (with the exception of interest and penalties) arose out of transactions that occurred between 1996 and 1998.

37.     The Complaint does not allege that James De May has actually paid any of the taxes, interest or penalties resulting from his entry into these consent judgments.

38.     The Complaint does not allege that Anne Schrader-De May has ever been found liable for any taxes, interest, or penalties arising from Defendants' legal advice.    39.    The Complaint does not allege that the De May Family Trust has ever been found liable for any taxes, interest, or penalties arising from Defendants' legal advice.

40.     The Complaint does not allege that Defendants engaged in any negligent and/or tortious conduct at any point after May 15, 2005.

## <u>LEGAL STANDARDS ON MOTIONS TO DISMISS</u><br><u>AND MOTIONS FOR SUMMARY JUDGMENT</u>

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests whether the facts stated in a Complaint support a claim for relief. The United States Supreme Court recently refined the standard for deciding a Rule 12(b)(6) motion in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). In *Twombly*, the Supreme Court held that a plaintiff must allege a "plausible entitlement to relief" by setting forth "a set of facts consistent with the allegations." *Id.* at 1969.

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must accept plaintiff's factual allegations as true. *Albright v. Oliver*, 510 U.S. 266, 114 S. Ct. 807, 810 (1994). However, conclusory allegations or legal conclusions masquerading as factual allegations will not suffice to prevent a motion to dismiss. *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004); *Bender v. Suburban Hosp., Inc.,* 159 F.3d 186, 192 (4th Cir. 1998).

Pursuant to Rule 12(d) of the Federal Rules of Civil Procedure, the Court may choose to treat the instant motion as one for summary judgment. Rule 12(d) states in pertinent part:

> If, on a motion under Rule 12(b)(6), matters outside the pleadings are presented to and not excluded by the Court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given reasonable opportunity to present all the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d).

Under the applicable rules of this Court, summary judgment is properly granted when, considering the pleadings and discovery on file in the case, it clearly appears "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(c).

The United States Supreme Court addressed the procedural mechanics of summary judgment in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S. Ct. 2548 (1986). In *Celotex,* the

Court held that a defendant moving for summary judgment meets its initial burden of production simply by indicating an absence of evidence in the record to support the plaintiff's claim. 477 U.S. at 325. The burden then shifts to the non-moving party, who must "go beyond the pleadings" to designate specific facts which show there is a genuine triable issue. *Id.* at 324. The rule set forth by *Celotex* is consistent with the plain language of Fed. R. Civ. P. 56:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must- by affidavits or as otherwise provided in this rule- set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e)(2)(emphasis added).

As set forth below, Plaintiffs' claims for legal malpractice, breach of fiduciary duty, and constructive fraud fail as a matter of law, therefore, this motion should be granted and judgment entered in favor of Defendants.

## **ARGUMENT**

I.    <u>District of Columbia Law Applies.</u>

Plaintiffs allege diversity of citizenship as the basis for federal jurisdiction in this matter. *See* Complaint, ¶ 7. "A federal court sitting in diversity jurisdiction applies the choice of law rules of the forum state (or district or territory) . . .". *Nationwide Mut. Ins. Co. v. Richardson*, 270 F. 3d 948, 953 (D.C. Cir. 2001)(internal citations omitted). The District of Columbia Court of Appeals recently addressed its choice of law analysis in *Drs. Groover, Christie & Merritt v. Burke*, 917 A. 2d 1110 (D.C. 2007). "In determining which jurisdiction's law to apply in a tort case, we use the 'governmental interests' analysis, under which we

evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review." *Burke*, 917 A. 2d at 1117.  District of Columbia Courts also look to the four factors enumerated in the Restatement (Second) of Conflicts § 145 [1971]: (a) the place where the injury occurred; (b) the place where the alleged conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (d) the place where the relationship was centered. *Id.*  "When both jurisdictions have an interest in applying their own laws to the facts of the case, the forum law will be applied unless the foreign [jurisdiction] has a greater interest in the controversy." *Id.* (internal citations omitted).

In the instant case, Defendants Jonathon R. Moore and Charles M. Bruce both have residences in the District of Columbia.[4]  Defendant Moore & Bruce, LLP's principal office is located in the District of Columbia[5].  Plaintiff James De May retained Defendants in the District of Columbia to provide legal services for them.  The alleged conduct causing injury to Plaintiffs occurred in the District of Columbia.  The relationship between the parties was centered in the District of Columbia.  Weighing these factors in their totality, District of Columbia law applies to this situation.  Under District of Columbia law, the statute of limitations for a legal malpractice action is three years.  D.C. Code, § 12-301(8).  Plaintiffs' Complaint in the instant matter was filed on May 15, 2008.

II.  <u>Mr. De May's Claims Relating to His Income Tax Liability in Count I of the Complaint Are Barred By the Statute of Limitations.</u>

A.  *Mr. De May was on inquiry notice of potential claims against Defendants relating to his income tax liability by June-July of 2002.*

---

[4] Defendant Charles Bruce, since August 2004, has also resided and worked in London, England.
[5] Moore & Bruce, LLP currently maintains an office in London, England, however this office did not exist at the time Defendants were working on the Completed Matters.

While the statute of limitations is three years under District of Columbia law, District of Columbia Courts apply the discovery rule to claims of legal malpractice.  *See, e.g. Knight v. Furlow*, 553 A. 2d 1232, 1234 (D.C. 1989).  Pursuant to this theory, the statute of limitations "will not begin to run until the plaintiff either has actual notice of the cause of action or- given the obligation to discover the discoverable- has 'inquiry notice' as of the time a reasonable investigation would have led to actual notice."  *Wagner v. Sellinger*, 847 A. 2d 1151, 1154 (D.C. 2004)(internal citations omitted).  "In short, knowledge is deemed sufficient if the plaintiff has reason to suspect that the defendant did something wrong, even if the full extent of the wrongdoing is not yet known."  *Id*.  (internal citations omitted).  With respect to the statute of limitations "[t]he doctrine of fraudulent concealment does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim."  *Galucci v. Schaffer*, 507 F. Supp 2d 85, 91 (D.D.C. 2007)

It should be stated at the outset that Mr. De May is an extremely sophisticated businessman who was always kept apprised of the transactions Defendants entered into on his and his family's behalf.[6]  Mr. De May first received notice in June of 1999 that the IRS had opened an examination of his income tax liabilities for the 1993 through 1998 tax years.  *See* Complaint, ¶ 53.  Over the next few years, Mr. De May continued to receive notice of a potential income tax liability, as he received numerous Information Document Requests

---

[6] For example, Mr. De May personally prepared and maintained on an updated basis a very detailed spreadsheet setting forth the respective shares of Optimay owned by each of the respective trusts prior to the sale of Optimay to Lucent Technologies, Inc., how voting rights were controlled in each instance, and other critical information that could only be presented if the author understood a great deal about the trusts involved.  *See,* Spreadsheet, attached hereto as Exhibit 1.  As early as December of 1998, Mr. De May sought the opinion of a separate attorney at McGuire Woods regarding the efficacy of the trusts created by the Defendants.  *See* Charles Bruce memo, attached hereto as Exhibit 2.  Even after the IRS had set forth its position with respect to his income tax liability in December of 2002, Mr. De May clearly demonstrated that he had an understanding as to why the transactions were structured in the manner that they were.  *See* December 15, 2002 e-mail from Mr. De May to Messrs. Charnas and Bruce, attached hereto as Exhibit 16.

("IDR's") from the IRS scrutinizing his affairs and business transactions for the taxable years under audit. *See* Complaint, ¶ 54[7]. On June 24, 2002, the IRS issued an Explanation of Items which clearly set forth that the IRS was taking a position adverse to Mr. De May with respect to his income tax liability.[8] *See* Complaint, ¶ 55; *see also* Exhibit 4. Mr. Bruce advised Mr. De May of this IRS Explanation of Items the following day, and specifically stated in an e-mail to Mr. De May that if the IRS's position were upheld, his income tax liability would be several million dollars, plus interest and penalties. *See* Exhibit 5.

Perceiving the gravity of his situation, Mr. De May immediately sought the advice of other counsel, and in fact retained Douglas Charnas of McGuire Woods in July of 2002 to take the lead on his defense into the IRS inquiry. *See* Exhibits 7 and 8. McGuire Woods is a substantial international law firm, with over 900 lawyers practicing out of 17 offices worldwide. According to its website, www.mcguirewoods.com, it has a sophisticated tax practice, with particular expertise in international tax matters. In switching counsel after nearly a decade of representation in multiple matters involving his business, tax, and family interests, including the Completed Matters, Mr. De May sought McGuire Woods' advice on the merits of the IRS position expressed in the explanations and narratives. It is apparent that by July 2002, Mr. De May viewed his controversy with the IRS as a separate and distinct matter from the prior representation provided to him by Defendants.

The Court of Appeals of Michigan dealt with an analogous situation in the case of *Seebacher, M.D. v. Fitzgerald, Hodgman, Cawthorne and King, P.C.*, 181 Mich. App. 642, 449 N.W. 2d 673 (1989). In that case, a client sued his former attorney for legal malpractice

---

[7] In total, 13 IDR's were issued by the IRS with respect to Mr. De May's tax liability from June 9, 1999 through November 26, 2002.

[8] The IRS also issued Explanations of Items setting forth a an adverse position with respect to Mr. De May's income tax liability on June 10, 2002, July 2, 2002, and November 8, 2002. *See* Exhibits 3, 6, and 12.

arising out of an IRS finding adverse to the client with respect to his tax liability. In holding that the Plaintiff's claims were barred by the statute of limitations, the Court stated:

> Plaintiff learned of the possible cause of action when he received the IRS notice. Within two weeks, he had hired a new attorney to establish whether the advice was correct. We reject his contention that that the claim is not discovered until the date of the assessment, when the full amount of damages was known.

*Id.* at 647; *see also Leonhart v. Atkinson*, 265 Md. 219, 289 A. 2d 1 (1972)(in accounting malpractice action, date of accrual for statute of limitations purposes was date plaintiff received notice of a tax deficiency from the IRS). Here, as in *Seebacher*, Mr. De May learned of his possible cause of action against when he received notice from the IRS of his tax deficiency, not when he ultimately entered into consent judgments with the IRS.

Mr. De May had inquiry notice, if not actual notice, of a potential claim against Defendants by June of 2002 upon receipt of the IRS Explanation of Items. After Mr. De May was specifically informed that he was facing a potential multi-million dollar tax deficiency, he "had reason to suspect that defendant[s] did something wrong". *Wagner*, 847 A. 2d at 1154. That Mr. De May had notice of a potential claim is further evidenced by the fact that he engaged a separate law firm to take the lead in his defense of the tax matter going forward. District of Columbia Courts have specifically held that the statute of limitations for legal malpractice actions begins to run when the client begins to suffer damages by paying attorney's fees resulting from the alleged negligence. *See, e.g. Knight v. Furlow*, 553 A. 2d 1232, 1235-36 (D.C. 1989); *see also Williams v. Mordofsky*, 901 F. 2d 158,162 (D.C. Cir. 1990). The three year statute of limitations for Mr. De May's potential claims against Defendants therefore clearly began to run in July of 2002 when he began incurring additional attorneys' fees by retaining McGuire Woods. The May 15, 2008 filing of Plaintiffs'

Complaint in this matter occurred almost six years after Mr. De May had actual notice of his potential cause of action relating to his income tax liability.

But even if the Court were to find that Mr. De May did not have actual or inquiry notice of potential claims against Defendants relating to his income tax liability in June or July of 2002, there are other events, also outside of the statute of limitations period, that by any reasonable standard would have given notice to Mr. De May of potential claims against Defendants. Specifically:

- In November of 2002, Mr. De May's new counsel Douglas Charnas sent him an e-mail informing him that the IRS was proposing to tax him an additional $10,979,850 of long term capital gain for 1998. *See* Exhibit 13.

- On July 23, 2004, Mr. De May received a deficiency letter from the IRS assessing unpaid taxes, interest and penalties against Mr. De May totaling $12,438,365. *See* Complaint, ¶58; *see also* Exhibit 19.

- On September 17, 2004, Mr. De May, through counsel McGuire Woods, filed a petition in United States Tax Court challenging the IRS's June 23, 2004 deficiency letter. *See* Exhibit 20.

In each instance, Mr. De May was advised by separate counsel as to the merits of the IRS position with respect to the advice he had followed from the Defendants. Any of these events--separately or in the aggregate--were sufficient to put Mr. De May on notice of a potential claim against Defendants. All of these events occurred more than three years prior to Mr. De May's May 15, 2008 filing of the instant Complaint.

     B.    *The Continuous Representation Rule is Inapplicable Under These Circumstances.*

District of Columbia Courts have adopted an exception to the above-described discovery rule in cases of legal malpractice that is known as the continuous representation rule. *See, e.g. R.D.H. Commons v. Winston*, 700 A. 2d 766, 768 (D.C. 1997). Under this rule,

"when the injury to the client may have occurred during the period the attorney was retained, the malpractice cause of action does not accrue until the attorney's representation concerning **the particular matter in issue** is terminated." *Bradley v. NASD Dispute Resolution, Inc.*, 433 F. 3d 846, 850 (D.C. Cir. 2005)(emphasis added). One of the critical policy reasons behind the continuous representation rule is to allow the allegedly negligent attorney "the opportunity to remedy, avoid, or establish that there was no error or attempt to mitigate damages." *R.D.H. Commons*, 700 A. 2d at 769.

In the instant case, the continuous representation rule is inapplicable for two reasons. First, "the particular matter[s] at issue", i.e., the alleged negligent representation on the part of Defendants with respect to the Completed Matters, all terminated in the time frame between 1996 and 1998. Second, the above stated policy rationale underlying the continuous representation rule is not present in the instant case, since Defendants did not have the opportunity to mitigate and or correct their alleged mistakes once McGuire Woods took over the representation of Mr. De May's tax audit defense in July of 2002. They simply assisted McGuire Woods in its efforts with the IRS.

       1.      <u>Defendants' representation of Mr. De May within the past three years was limited to matters other than the Completed Matters.</u>

Mr. De May's alleged damages relating to his income tax liability arise from a purported finding by the IRS that income realized by the Anne Schrader-De May Trust, De May Family Trust, Optimay Foundation, and De May-Optimay Comp Trust upon the sale of Optimay Corporation in April of 1998 was taxable to Mr. De May individually. Mr. De May ultimately consented to a $6 million judgment, as well as interest and penalties on this judgment as a result of this determination by the IRS. As admitted in the Complaint at ¶ 68, ". . . in or about November of 2005, after full and thorough discussions with **Charnas**, De May entered

into a consent judgment." (Emphasis added).  It is Mr. De May's position that Defendant's negligent and/or tortious conduct in advising him on the formation and subsequent amendments to these trusts and the foundation caused his claimed damages.

Turning to the particulars of the Completed Matters, the Anne Schrader De May Trust was formed in February of 1996, and subsequently amended in April of 1998.  *See* Complaint, ¶¶ 19, 34.  The De May Family Trust was formed in February 1996 and subsequently amended in April of 1998.  *See* Complaint, ¶¶ 21, 35.  The Optimay Foundation was created in February of 1996.  *See* Complaint, ¶ 23.  The De May-Optimay Comp Trust was created in July of 1996 and terminated in April of 1998.  *See* Complaint, ¶¶ 25, 36.  Defendants' representation of Mr. De May with respect to each of the Completed Matters terminated when the transactions were completed, i.e., when the formation and amendment documents were executed.  *See, e.g. Wagner*, 847 A. 2d at Fn. 9. ("when an attorney negligently drafts a document, such as a contract or settlement agreement that fails to protect the client's interest, the negligence is typically completed before ensuing litigation confirms the inevitable.")

Mr. De May alleges in the Complaint that Defendants continued representing him "through at least November of 2005."  *See* Complaint, ¶ 57.  While it is true that Defendants did continue providing general legal representation to Mr. De May through November of 2005, this fact is irrelevant for purposes of the continuous representation rule since the alleged negligent representation occurred and was completed between 1996 and 1998.  Stated differently, the representation referred to which continued through "at least November of 2005" involved discrete matters separate from the Completed Matters which gave rise to the allegations contained in Count I of the Complaint.

Courts in other jurisdictions have looked at this issue and found that continued general representation does not toll the statute of limitations when the continued representation is separate from the alleged negligent representation. *See, e.g. Dignelli v. Berman*, 293 A.D. 2d 565 (N.Y. 2002) (continuous representation rule inapplicable when defendant continued general representation of plaintiff on matters unrelated to the alleged negligence); *Shipman v. Kruck*, 267 Va. 495, 593 S.E. 2d 319 (2004) ("the proper inquiry is not whether a general attorney client relationship has ended, but instead, when the attorney's work on the particular undertaking at issue has ceased."). In *Economy Housing Company, Inc. v. Rosenberg*, 239 Neb. 267, 475 N.W. 2d 899 (1991), the Supreme Court of Nebraska, despite previously adopting the continuous representation rule, held that the rule was inapplicable to the Plaintiff's particular claims for legal malpractice. In so holding, the Court stated:

> [Plaintiff] may not avail itself of the continuous representation rule, as the tort committed was not continuous nor unlikely to be discovered prior to the termination of the professional relationship. To hold otherwise would merely encourage clients to sit on their hands, with full knowledge of negligence on the part of the professional who is serving them, knowing that the clock would not start to run on their claim until they actually fired the practitioner.

*Id.* at 269. As in *Rosenberg*, the alleged negligence committed by Defendants in the instant case was not continuous or unlikely to be discovered prior to the termination of the professional relationship. The alleged negligence all occurred between 1996 and 1998, and Mr. De May discovered the alleged negligence as early as June of 2002. Should this Court apply the continuous representation rule under these circumstances, it would encourage plaintiffs such as Mr. De May to sit on their rights with full knowledge of a potential claim against their attorneys. This would be contrary to the purposes of the continuous representation rule, and indeed, the public policy behind the statute of limitations itself.

The Supreme Court of South Dakota analyzed a similar issue in *Greene v. Morgan, Theeler, Cogley & Petersen*, 575 N.W. 2d 457 (S.D. 1998).  In that case, the Plaintiff sued his former attorney for alleged negligence in drafting a prenuptial agreement.  Although the alleged negligence occurred outside of South Dakota's three year statute of limitations, the Plaintiff argued that the continuous representation rule applied because the defendant attorney continued providing him with legal advice concerning asset protection and estate planning, in addition to representing him in his divorce proceeding.  *Id.* at 460.  In rejecting this argument, the Court stated:

> [Plaintiff] and [Defendant] had an ongoing, continuous relationship; however, this relationship was not related to the alleged negligent act involving the antenuptial agreement.  [Plaintiff] has made broad statements that the agreement was part of his larger asset protection plans.  While this may be true, to apply the continuous representation doctrine in such an attenuated fashion would be improper.

*Id.*  As with the attorney in *Greene*, the Defendants in the present case had an ongoing, continuous relationship with Mr. De May that was part of Mr. De May's larger asset protection plans, but did not specifically relate to the alleged negligence committed by Defendants; i.e., the formation and amendment of the trusts.  As in *Greene*, therefore, it would be improper for the Court to apply the continuous representation rule in such an attenuated fashion as the present case.

In analyzing the continuous representation rule, District of Columbia Courts have also set "an outer bound on the duration of a 'specific dispute'—it does not include appeals." *Bradley*, 443 F. 3d at 851; *see also R.D.H. Commons,* 700 A. 2d at 770-771*; see also Knight*, 553 A. 2d at 1235.  Any work performed by Defendants after May 15, 2005 with respect to Mr. De May's tax audit was work done on an administrative appeal since it was work focused on challenging the IRS's position or determination regarding Mr. De May's income and gift tax liability as set forth

in the IRS's January 14, 2004 "Draft Discussion" and its July 23, 2004 deficiency letter.  Under the analysis of the above-cited cases, work on subsequent appeals is not covered by the continuous representation rule.

Since the continued representation provided by Defendants to Mr. De May through "at least November of 2005" was separate from the alleged negligent acts committed by Defendants from 1996 through 1998, and since any continued representation on Mr. De May's tax audit constitutes work on a subsequent appeal, the continuous representation rule does not overcome the statute of limitations defects in Count I of the Complaint. Mr. De May's claims in Count I are therefore barred by the statute of limitations.

2.    <u>The policy rationale underlying the continuous representation rule is inapplicable under these circumstances.</u>

The continuous representation rule also does not apply because the policy basis underlying the rule does not exist under the present circumstances.  A primary policy rationale for the rule is to permit attorneys who have allegedly acted negligently an opportunity to correct and/or mitigate their mistakes.  *R.D.H. Commons*, 700 A. 2d at 768; *see also Cawdrey v. Hanson Baker Ludlow Drumheller*, 129 Wash. App. 810, 819, 120 P. 3d 605 (2005) ("the purpose of the rule is to give attorneys the opportunity to remedy their errors, establish that there was no error, or attempt to mitigate the damages caused by their errors, while still allowing the aggrieved client the right to later bring a malpractice action.")  In the instant case, Defendants were denied the opportunity to correct and/or mitigate any of their alleged mistakes.  It is undisputed that:

- Mr. De May retained McGuire Woods to become lead counsel with respect to his IRS defense in July of 2002.  *See* Complaint, ¶ 56; *see also* Exhibit 8.

- From the point that Mr. De May retained McGuire Woods forward, Defendants were merely providing back up support in the defense of Mr. De May's case with the IRS. *See* Exhibits 9 and 10.

- Defendants did not control direction of Mr. De May's representation. *Id.*

- Defendants did not receive correspondence or otherwise communicate directly with the IRS on behalf of Mr. De May. *Id.*

- Defendants did not take part in the ultimate decision by Mr. De May to settle his claims with the IRS. *Id.*

Thus, since Defendants had no opportunity to mitigate or correct any alleged mistakes that were made with respect to the representation of Mr. De May, the continuous representation rule does not apply to them.

III.    Mr. De May's Claim Relating to His Gift Tax Liability in Count I of the Complaint is Barred by the Statute of Limitations.[9]

Mr. De May had inquiry notice of a potential claim against Defendants arising out of his gift tax liability by January of 2004.  On January 14, 2004 the IRS sent Mr. Charnas a "Discussion Draft" stating that the IRS believed that Mr. De May had a gift tax liability of $2,764,327.35.  *See* Exhibit 17.  At the very latest, from this point forward, Mr. De May clearly had "reason to suspect" potential negligence on the part of Defendants.  Obviously, this event occurred more than three years prior to the May 15, 2008 filing of the Complaint in this matter.  If the IRS January 14, 2004 "Discussion Draft" cannot be said to conclusively establish that Mr. De May received inquiry notice of a potential claim against Defendants, that notice was emphatically delivered by September 28, 2004, after which McGuire Woods

---

[9]As an initial matter, it is important to note that although Mr. De May entered into a consent judgment with the IRS relating to his gift tax liability; no monetary damages were assessed against Mr. De May as a result of this judgment.  *See* Complaint, ¶ 69.  Despite this, the Complaint alleges that Mr. De May suffered damages related to his gift tax liability in the form of attorney's fees to McGuire Woods in defense of the IRS inquiry, and a diminution of his lifetime gift and estate tax exemption.  *Id.*  As to the latter, it is complete speculation whether the estate tax will continue to exist or be repealed or, if not repealed, what levels of exemption will apply in the future.

counsel informed Mr. De May that the IRS examining agent was "sticking with her initial position" set forth in the "Discussion Draft".    *See* September 28, 2004 Charnas e-mail, attached hereto as Exhibit 21.

As with Mr. De May's income tax liability, the continuous representation rule is inapplicable to his claims against Defendants relating to his gift tax liability for two reasons. First, there is no allegation in the Complaint that Defendants continued representing or advising Mr. De May with respect to gift tax liability within the three year statute of limitations period.  The IRS took the position that Mr. De May owed additional gift taxes for the years 1996 and 1999.  *See* Complaint, ¶ 60.  Any wrongdoing on the part of Defendants' relating to advice on Mr. De May's gift tax liability was thus terminated when Mr. De May submitted his returns for those taxable years, and the continuous representation rule therefore does not apply to Mr. De May's gift tax liability.

Moreover, the continuous representation rule does not apply to Defendants with respect to Mr. De May's gift tax liability because Defendants were not given the opportunity to mitigate and/or correct any alleged mistakes.  It is undisputed that McGuire Woods took the lead in representing Mr. De May with respect to the IRS inquiry into his gift tax liability.  *See* Exhibits 9 and 10.  It is undisputed that Mr. De May did not seek the advice or consent of Defendants prior to settling the IRS inquiry into his gift tax liability.  *See* Exhibits 9 and 10. Since Defendants had no opportunity to mitigate or correct any alleged mistakes relating to advice given to Mr. De May regarding his gift tax liability, the purpose for the continuous representation rule would be defeated, and the rule therefore should not be applied under these circumstances.

IV.    <u>Anne Schrader De May's Claims in Count I of the Complaint Are Barred by the Statute of Limitations.</u>

As an initial matter, it is important to note that the IRS audited, assessed a deficiency, and ultimately entered into two consent judgments regarding the income and gift tax liability of **James De May**. There was never a similar inquiry or assessment of deficiency relating to the tax liability of Mr. De May's wife, Anne Schrader De May. In fact, the only allegation of damages set forward by Ms. De May in the Complaint is that she was injured as a result of diminishment of the funds of the De May Family Trust, and she was injured by the expense of creating and repeatedly amending the Anne Schrader De May trusts. *See* Complaint, ¶ 75.

The Anne Schrader De May Trust and the De May Family Trust were initially created with the advice of Defendants in February of 1996. *See* Complaint, ¶¶19, 21. Amendments were made to the Anne Schrader De May Trust and De May Family Trust with the advice of Defendants in April of 1998. *See* Complaint, ¶¶ 34, 35. The Complaint alleges that Defendants made additional amendments to the Anne Schrader De May Trust in December of 1998 and January of 2000. *See* Complaint, ¶ 44, 45. Thus all of the actions taken by Defendants which allegedly caused damage to Ms. De May occurred from 1996 to 2000, years prior to the expiration of the May 15, 2005 statute of limitations threshold in this matter. The Complaint does not allege that Ms. De May was unaware of potential wrongdoing on the part of Defendants until after May 15, 2005. Similarly, the Complaint does not allege that Defendants continued representing her until some point after May 15, 2005.

The Plaintiff bears the burden of pleading and proving the applicability of the continuous representation rule. *Svenska Finans Int'l BV v. Scolaro, Shulman, Cohen Lawler, & Burstein, P.C.*, 37 F. Supp. 2d 178 (N.D.N.Y. 1999). In the instant case, Ms. De May has failed to meet her burden of pleading either that: 1) she was not aware of potential damage allegedly cause to her by Defendants until after May 15, 2005, or 2) Defendants continued to

represent her after May 15, 2005.  As such, Ms. De May's claims against Defendants are barred by the statute of limitations.

V.    All of the De May Family Trust's Claims Should Be Disregarded Since It Is Not a Proper Party In Interest

All of the De May Family Trust's claims in this matter should be dismissed because the De May Family Trust is not a proper party in interest to this lawsuit.  Fed. R. Civ. P. 17(a) provides: "An action must be prosecuted in the name of the real party in interest.  The following may sue in their own names without joining the person for whose benefit the action is brought: (a) an executor; (b) and administrator; (c) a guardian; (d) a bailee; (e) **a trustee of an express trust** . . .". (emphasis added).  It is **the De May Family Trust**, however, that is named as a plaintiff in this action rather than the **trustee** for the De May Family Trust.  Under the express provisions of Rule 17(a), the De May Family Trust cannot be a proper party in interest to this litigation.  As such, this Court should strike the De May Family Trust as a Plaintiff in this matter.  To the extent that Plaintiffs are permitted to amend the Complaint to add the trustee of the De May Family Trust as the proper party in interest, Defendants respectfully request the opportunity to address the trustee's standing to bring such a claim.

VI.    Plaintiffs Counts for Breach of Fiduciary Duty and Constructive Fraud Fail as a Matter of Law.

A.    *Counts II and III of Plaintiffs' Complaint are Barred by the Statute of Limitations.*

Under District of Columbia law, the statute of limitations for claims of fraud and breach of fiduciary duty is three years.  *See, e.g. Farmer v. Mount Vernon Realty, Inc.*, 720 F. Supp 223, 224 (D.D.C. 1989)(citing D.C. Code Ann. § 12-301).  Plaintiffs' claim for breach of fiduciary duty is only alleged as to Defendant Charles Bruce.  For this claim to survive, Plaintiffs' must establish the existence of a fiduciary duty owed by Defendant Bruce, and a breach of that duty.  *See Nevius v. Africa Inland Mission International*, 511 F. Supp 2d 114

(D.D.C. 2007).  Since the statute of limitations for a breach of fiduciary duty claim is three

years, Plaintiffs must establish that Defendant Bruce's supposed breach of duty occurred **at

some point after May 15, 2005**.  There is no allegation in the Complaint that any of

Defendant Bruce's conduct giving rise to a potential breach of fiduciary duty occurred after

May 15, 2005.  *See generally* Complaint, ¶¶ 80-84.  There is no allegation in the Complaint

that Plaintiffs did not discover a potential claim of breach of fiduciary duty against Defendant

Bruce until some point after May 15, 2005.  *Id.*  In fact, it appears that the claims constituting

Plaintiffs' breach of fiduciary duty Count arise out of the same Completed Transactions that

occurred between 1996 and 1998.  As such, Plaintiffs' claim for breach of fiduciary duty

against Defendant Bruce (Count II of the Complaint) is barred by the statute of limitations.

Similarly, Plaintiffs constructive fraud claim is barred by the statute of limitations.

Plaintiffs' fraud count (Count III of the Complaint) is alleged as to all Defendants.  As stated,

the statute of limitations for fraud in the District of Columbia is three years.  Therefore, to

prevail on a claim of fraud, Plaintiffs must establish that the alleged fraudulent conduct on the

part of Defendants occurred **at some point after May 15, 2005**.  There is no such allegation in

the Complaint.[10]  *See generally* Complaint, ¶ 85-92.  Nor is there an allegation in the

Complaint that Plaintiffs did not discover a potential claim for fraud against Defendants until

some point after May 15, 2005.  *Id.*  As such, Plaintiffs' claim for constructive fraud against

Defendants is barred by the statute of limitations.

---

[10] The Complaint alleges that "Defendants continued to make the aforementioned representations [regarding Mr. De May's tax liability] after the IRS had issued documents demonstrating that they were false."  *See* Complaint, ¶ 89. As stated above, however, Mr. De May was unquestionably on notice that the IRS was taking a position adverse to him with respect to tax liability not later than June of 2002.  *See* Exhibit 5.  Mr. De May retained separate counsel to represent him with respect to this tax audit in July of 2002.  *See* Exhibit 8.

B.      *Plaintiffs Have Failed to Sufficiently Plead a Cause of Action for Constructive Fraud*

Plaintiffs' claim for constructive fraud against Defendants is redundant, superfluous, and unnecessarily inflammatory.  The gravamen of Plaintiffs' Complaint is professional malpractice on the part of Defendants.  The attempt to couch such a cause of action in the language and style of "constructive fraud" is a red herring meant to distract this Court's attention to the true issues of this case.  Even if the Court should find that Count II of the Complaint is not barred by the statute of limitations, Plaintiffs have not alleged facts with sufficient specificity to support their allegations of fraud, therefore the Count must be dismissed pursuant to Rule 12(b)(6).  Pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, "in all averments of fraud or mistake, the circumstances surrounding the fraud or mistake shall be stated with particularity."  There are numerous policy reasons for this pleading requirement.  *See generally, Federal Practice and Procedure*, Wright and Miller, §1296, 2004 Edition (setting forth in detail policy rationale for Rule 9(b)).  Plaintiffs have failed to meet their burden of pleading their Count of constructive fraud with particularity.

This Court recently analyzed the elements necessary for establishing a claim for fraud pursuant to District of Columbia law.  "A plaintiff must prove '(1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation.'"  *3D Global Solutions, Inc. v. MVM, Inc.*, 2008 WL 2009877 at 5 (D.D.C. 2008), citing *Hercules & Co. v. Shama Restaurant Corp.*, 613 A. 2d 916, 923 (D.C. 1992).  Plaintiffs have not pled and cannot establish any of the above-referenced elements.

The crux of the allegations contained in Plaintiffs' constructive fraud Count is that Defendants provided James De May with faulty legal advice with respect to his tax liability upon the sale of Optimay Corporation. *See* Complaint, ¶¶ 85-92. Even if Plaintiffs' premise that the advice provided by Defendants was wrong, this wrong advice would simply represent an incorrect legal position with respect to Mr. De May's tax liability. It most certainly does not constitute a false representation on the part of Defendants.

Further, even if Defendants legal advice to Mr. De May regarding his tax liability could be said to constitute false representations, there is no allegation that Defendants acted with intent to deceive Mr. De May, and Mr. De May did not act solely in reliance on Defendants representations. There is no dispute that Mr. Bruce specifically told Mr. De May in June of 2002 that he was potentially liable for millions of dollars in tax liability, plus interest and penalties. *See* Exhibit 5. If Defendants intended to deceive Mr. De May, this statement would not have been made. Moreover, Mr. De May is an extremely sophisticated businessman who had intimate knowledge of each of the Completed Transactions set up by Defendants from 1996 to 1998. Prior to the sale of Optimay Corporation, Mr. De May personally prepared a very detailed spreadsheet setting forth the respective shares of Optimay owned by each of the respective trusts set up by Defendants. *See* Exhibit 1. As early as December of 1998, Mr. De May sought the opinion of a separate attorney at McGuire Woods regarding the efficacy of the trusts created by the Defendants. *See* Exhibit 2. Even after the IRS had set forth its position with respect to his income tax liability in December of 2002, Mr. De May clearly demonstrated that he had an understanding as to why the transactions were structured in the manner that they were. *See* Exhibit 16. Finally and most importantly, Mr. De May, through his separate counsel McGuire Woods, adopted Defendants' legal position with respect to his income tax

liability when he responded to various IRS narratives in December of 2002, and when he filed a petition with the U.S. Tax Court in 2004 challenging the IRS's deficiency letter. *See* Exhibits 15 and 20.[11]  For all of these reasons, Plaintiffs do not even come close to establishing a cause of action against Defendants for constructive fraud.  Therefore, Count III of Plaintiffs' Complaint should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim for which relief can be granted.

VII.   Mr. De May Is Not Entitled to Recover Damages for Taxes Actually Owed, or Interest on Those Taxes.

Even if the Court were to find that the claims asserted by Mr. De May in Count I of the Complaint are not barred by the statute of limitations, a substantial portion of the damages being sought by Mr. De May cannot properly be recovered.  The Complaint is seeking as damages the $6,000,000 that was assessed by the IRS against Mr. De May when he entered into a consent judgment regarding his income tax liability.  *See* Complaint, ¶ 79a.  Under District of Columbia law, a "plaintiff may recover only that portion of damages which resulted proximately from the defendant's negligence."  *Cooper v. Berzin*, 621 A. 2d 395, 400 (D.C. 1993) (citing Standardized Jury Instructions for the District of Columbia, § 12.02.)

In the instant case, Mr. De May's income tax liability was not proximately caused by the Defendants' negligence.  Simply stated, Mr. De May would have owed these taxes regardless of whether or not Defendants had ever represented him.  According to Mallen & Smith, "[a] client, who pays taxes that were not avoidable, cannot claim that sum as damages."  *See* Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice, 2008 Edition, § 24:27.  Courts in other jurisdictions have also reached this conclusion. *See, e.g. Stone v. Kirk*, 8 F. 3d 1079, 1093 (6th

---

[11] If Defendants' advice with respect to Mr. De May's tax liability was in fact false, it logically follows that the position asserted by Mr. De May through his counsel McGuire Woods in the litigation in United States Tax Court was likewise false.

Cir. 1993); *see also Alpert v. Shea Gould Climeko & Casey*, 160 A. 2d 67, 559 N.Y.S. 2d 312, 315 (N.Y.A.D. 1990).  Mr. De May does not allege in his Complaint that the taxes assessed by the IRS with respect to his 1996 through 1998 income taxes were avoidable, and in fact, by consenting to a $6,000,000 judgment, he has conceded that they were not.  By law, Mr. De May is not entitled to recover these amounts as damages in this case.

Similarly, Mr. De May is not entitled to recover as damages any interest paid to the IRS.  Several Courts from other jurisdictions have reached this conclusion based on the theory that the taxpayer benefited from the use of funds rightfully belonging to the United States Treasury during the period of time in which payment to the IRS was delayed.  *See, e.g. Stone*, 8 F. 3d at 1093; *see also Freschi v. Grand Coal Venture*, 767 F. 2d 1041, 1051 (2d Cir. 2985)(vacated on other grounds); *see also DCD Programs, Ltd. v. Leighton*, 90 F. 3d 1442, 1451 (9th Cir. 1996).  Like the taxpayers in the above cases, Mr. De May benefited, and continues to benefit from the use of money owed to the IRS for taxes he has not paid.  Such interest is not recoverable as damages in this action.

Since Mr. De May, as a matter of law, is not permitted to recover taxes that he could not avoid and interest on those taxes, the $6 million of claimed damages set forth in ¶ 79a of the Complaint, plus interest owed on this amount, should be dismissed as a matter of law.

## CONCLUSION

James De May is a highly sophisticated businessman who was aware of, consented to, and actively participated in the transactions as to which Defendants advised on his and his family's behalf from 1996 to 1998.  Mr. De May was well aware of a potential claim against Defendants arising out of their representation from 1996 to 1998 when he began receiving IRS explanations and narratives setting forth a position adverse to his own with respect to tax liability

in June of 2002. This is clearly evidenced by the fact that Mr. De May retained McGuire Woods to take the lead in his tax representation in July of 2002 immediately after he began receiving these IRS narratives. Defendants did nothing to try to conceal Mr. De May's potential tax liability from him. To the contrary, Mr. Bruce specifically told Mr. De May in June of 2002 of a potential tax liability of several million dollars, plus penalties and interest. *See* Exhibit 5.

The continuous representation rules does not apply in these circumstances since Defendants' alleged negligent representation of Plaintiffs' all terminated in the time frame from 1996 through 1998. The fact that Defendants continued providing Plaintiffs with general legal advice unrelated to the alleged negligent advice does not trigger the continuous representation rule. Further, the policy reasons underlying the continuous representation rule are not present under the instant circumstances, since Defendants were not accorded the opportunity to mitigate or correct any alleged mistakes after Mr. De May retained McGuire Woods in July of 2002. Since James De May had knowledge of a potential claim against Defendants by June of 2002, and since the continuous representation rule does not apply under these circumstances, his claims are barred by the District of Columbia's three year statute of limitations applicable to claims of legal malpractice, breach of fiduciary duty, and constructive fraud.

The nominal damages claimed by Anne Schrader De May in this matter are also barred by the statute of limitations. All of the damages alleged by Ms. De May arise out of acts taken by Defendants from 1996 through 2000. Ms. De May has failed to establish her burden of pleading that she was not aware of a potential claim against Defendants until after May 15, 2005, and she has also failed to allege that Defendants continued representing her after May 15, 2005. As such, her Complaint is barred by the District of Columbia's three year statute of limitations with respect to claims of legal malpractice, breach of fiduciary duty, and constructive fraud.

Under the express language of Rule 17(a) of the Federal Rules of Civil Procedure, the De May Family Trust is not a proper party in interest to this litigation, thus any claims alleged by the De May Family Trust should be stricken from the Complaint.

Finally, even if it is found that Mr. De May's claims are not barred by the statute of limitations, he is precluded by law from recovering as damages taxes actually owed to the IRS, as well as interest owed on those taxes.

Respectfully submitted,

CARR MALONEY P.C.

By:     /s/
Paul J. Maloney, #362533
Nat P. Calamis, #495680
1615 L Street, N.W.
Suite 500
Washington, D.C.  20036
(202) 310-5500 (telephone)
(202) 310-5555 (facsimile)

# EXHIBIT 1

# Equity

| NAME | Total No. of Shares Issued (Jan-96) | As of February 7, 1996 — No. of New Shares | Total No. of Shares | % of Shares Authoriz'd | % of Voting Shares Issued or Controlled | Establish Anne & De May Family Trust & Optimay Charitable Foundation ("OCF") (as of Feb. 8, 1996) — No. of New Shares | Total No. of Shares | % of Total Shares | % of Voting Shares Issued or Controlled | Post Dispersion to Employees & Commissions and Royalties Feb 10, 1996 — No. of New Shares | Total No. of Shares | % of Shares Authorized |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Optimay Corporation (all authorized shares) | 875,100 | 2,124,900 | 3,000,000 | 100.000% | 100.000% | 0 | 3,000,000 | 100.000% | 100.000% | -562,499 | 3,000,000 | 100.000% |
| Authorized, Unissued not in Jim's Control | 0 | 1,132,769 | 1,132,769 | 37.759% | 0.000% | 0 | 1,132,769 | 37.759% | 0.000% | -562,499 | 570,270 | 19.009% |
| The Goodser Trust | 0 | 0 | 0 | 0.000% | 0.000% | 0 | 0 | 0.000% | 0.000% | 0 | 0 | 0.000% |
| James Michael De May | 875,100 | 992,131 | 1,867,231 | 62.241% | 100.000% | -1,067,231 | 800,000 | 26.667% | 42.844% | 0 | 800,000 | 26.667% |
| De May Family Trust | 0 | 0 | 0 | 0.000% | 0.000% | 717,231 | 717,231 | 23.908% | 38.411% | 0 | 717,231 | 23.908% |
| Anne Schrader-DeMay Trust | 0 | 0 | 0 | 0.000% | 0.000% | 200,000 | 200,000 | 6.667% | 10.711% | 0 | 200,000 | 6.667% |
| Optimay Foundation ("Jim's Charitable Trust") | 0 | 0 | 0 | 0.000% | 0.000% | 150,000 | 150,000 | 5.000% | 8.033% | 0 | 150,000 | 5.000% |
| DeMay-Optimay Comp Trust | 0 | 0 | 0 | 0.000% | 0.000% | 0 | 0 | 0.000% | 0.000% | 0 | 0 | 0.000% |
| Employee Comp Plan | 0 | 0 | 0 | 0.000% | 0.000% | 0 | 0 | 0.000% | 0.000% | 562,499 | 562,499 | 18.750% |
| Jim's Controlling Interest of voting shares | 875,100 | 992,131 | 1,867,231 | 62.241% | 100.000% | 0 | 1,867,231 | 62.241% | 100.000% | 0 | 1,867,231 | 62.241% |
| Jim & Family's pure Fiduciary Interest | 875,100 | 992,131 | 1,867,231 | 62.241% | 100.000% | 0 | 1,867,231 | 62.241% | 91.967% | 0 | 1,867,231 | 62.241% |
| Jim's Fiduciary & Optimay Foundation | 875,100 | 992,131 | 1,867,231 | 62.241% | 100.000% | -150,000 | 1,717,231 | 57.241% | 100.000% | 0 | 1,717,231 | 57.241% |
| Total for Employees | 0 | 0 | 0 | 0.000% | 0.000% | 0 | 0 | 0.000% | 0.000% | 562,499 | 562,499 | 18.750% |
| Total for Investors | | | | | | | | | | | | |
| Equity to Sam Goodser | | | | | | | | | | | | |
| Initial Public Offering | | | | | | | | | | | | |
| Industrial Partners | | | | | | | | | | | | |
| Conversion of "other" Options @ IPO | | | | | | | | | | | | |
| Total Authorized not in Jim's Control | 0 | 1,132,769 | 1,132,769 | 37.759% | 60.666% | 0 | 1,132,769 | 37.759% | 60.666% | 0 | 1,132,769 | 37.759% |
| Total Issued not in Jim's control | 0 | 0 | 0 | 0.000% | 0.000% | 0 | 0 | 0.000% | 0.000% | 0 | 562,499 | 18.750% |
| Total Voting Shares (issued or controlled) | 875,100 | 992,131 | 1,867,231 | 62.241% | 100.000% | 0 | 1,867,231 | 62.241% | 100.000% | 562,499 | 2,429,730 | 80.991% |
| Total Voting Shares not in Jim's Control | 0 | 0 | 0 | 0.000% | 0.000% | 0 | 0 | 0.000% | 0.000% | 0 | 562,499 | 18.750% |
| Check: sum of voting shares | 0 | 1,867,231 | 1,867,231 | | | 1,867,231 | 1,867,231 | | | | 2,429,730 | |
| Verification of all authorized Optimay shares | | 3,000,000 | 3,000,000 | | | 3,000,000 | 3,000,000 | | | | 3,000,000 | 100.000% |

Optimay-JMD Equity Spread Sheet 970922.1

# Equity

| NAME | % of Voting Shares Issued or Controlled (version of (as of |
|---|---|
| Optimay Corporation (all authorized shares) | |
| Authorized, Unissued not in Jim's Control | 0.000% |
| The Goodner Trust | 32.925% |
| James Michael De May | 29.519% |
| De May Family Trust | |
| Anne Schrader-DeMay Trust | 8.231% |
| Optimay Foundation ("Jim's Charitable Trust") | 6.174% |
| DeMay-Optimay Comp Trust | 0.000% |
| Employee Comp Plan | |
| Jim's Controlling Interest of voting shares | **76.849%** |
| Jim & Family's pure Fiduciary Interest | 70.676% |
| Jim's Fiduciary & Optimay Foundation | 76.849% |
| Total for Employees | |
| Total for Investors | 23.151% |
| Industrial Partners | |
| Equity to Sam Goodner | |
| Initial Public Offering | |
| Conversion of "other" Options @ IPO | 46.621% |
| Total Authorized not in Jim's Control | |
| Total Issued not in Jim's control | 23.151% |
| Total Voting Shares (issued or controlled) | |
| Total Voting Shares not in Jim's Control | 23.151% |
| Check sum of voting shares | 100.000% |
| Verification of all authorized Optimay shares | |

# Equity

| NAME | Creation of the Sam Employee Plan ("SEP") (as of June 8, 1996) | | | | Post Completion of First Stage Financing (as of June 17, 1996) | | | | Establishment of Optimay Employee Comp Foundation (OEC) (as of July 10, 1996) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | No. of New Shares | Total No. of Shares | % of Shares Authoriz'd | % of Voting Shares Issued or Controlled | No. of New Shares | Total No. of Shares | % of Shares Authoriz'd | % of Voting Shares Issued or Controlled | No. of New Shares | Total No. of Shares | % of Shares Authoriz'd | % of Voting Shares Issued or Controlled |
| Optimay Corporation (all authorized shares) | 3,000,000 | 3,000,000 | 100.000% | | | 3,000,000 | 100.000% | | | 3,000,000 | 100.000% | |
| Authorized, Unissued (not in Jim's Control) | -300,000 | 270,270 | 9.009% | 9.009% | | 270,270 | 9.009% | 9.009% | | 270,270 | 9.009% | 9.009% |
| The Goodner Trust | 300,000 | 300,000 | 10.000% | 10.990% | | 300,000 | 10.000% | 10.990% | | 300,000 | 10.000% | 10.990% |
| James Michael De May | 800,000 | 800,000 | 26.667% | 29.307% | | 800,000 | 26.667% | 29.307% | -607,231 | 192,769 | 6.426% | 7.062% |
| De May Family Trust | 717,231 | 717,231 | 23.908% | 26.275% | | 717,231 | 23.908% | 26.275% | | 717,231 | 23.908% | 26.275% |
| Anne Schrader-DeMay | 200,000 | 200,000 | 6.667% | 7.327% | | 200,000 | 6.667% | 7.327% | | 200,000 | 6.667% | 7.327% |
| Optimay Foundation ("Jim's Charitable Trust") | 150,000 | 150,000 | 5.000% | 5.495% | | 150,000 | 5.000% | 5.495% | | 150,000 | 5.000% | 5.495% |
| DeMay-Optimay Comp Trust | 0 | 0 | 0.000% | 0.000% | | 0 | 0.000% | 0.000% | 607,231 | 607,231 | 20.241% | 22.245% |
| Employee Comp Plan | 0 | 0 | 0.000% | 0.000% | | 0 | 0.000% | 0.000% | | 0 | 0.000% | 0.000% |
| Jim's Controlling Interest of voting shares | | 2,167,231 | 72.241% | 79.394% | | 2,167,231 | 72.241% | 79.394% | | 2,167,231 | 72.241% | 79.394% |
| Jim & Family's pure Fiduciary Interest | | 1,717,231 | 57.241% | 62.908% | | 1,717,231 | 57.241% | 62.908% | -607,231 | 1,110,000 | 37.000% | 40.663% |
| Jim's Fiduciary & Optimay Foundation | | 1,867,231 | 62.241% | 68.404% | | 1,867,231 | 62.241% | 68.404% | -607,231 | 1,260,000 | 42.000% | 46.158% |
| Total for Employees | 0 | 0 | 0.000% | 0.000% | | 0 | 0.000% | 0.000% | 607,231 | 607,231 | 20.241% | 22.245% |
| Total for Investors | | 562,499 | 18.750% | 20.606% | | 562,499 | 18.750% | 20.606% | | 562,499 | 18.750% | 20.606% |
| Industrial Partners | 0 | 0 | 0.000% | 0.000% | | 0 | | | | 0 | | |
| Equity to Sam Goodner | 0 | 0 | | | | 0 | | | | 0 | | |
| Initial Public Offering | | | | | | 270,270 | | | | 270,270 | | |
| Conversion of "other" Options @ IPO | | | | | 270,270 | 270,270 | | | | 270,270 | 9.009% | |
| Total Authorized not in Jim's Control | | 832,769 | 27.759% | 30.507% | | 832,769 | 27.759% | 30.507% | | 832,769 | 27.759% | 30.507% |
| Total Issued not in Jim's control | 0 | 562,499 | 18.750% | 20.606% | | 562,499 | 18.750% | 20.606% | | 562,499 | 18.750% | 20.606% |
| Total Voting Shares (issued or controlled) | 0 | 2,729,730 | 90.991% | | | 2,729,730 | 90.991% | | | 2,729,730 | 90.991% | |
| Total Voting Shares not in Jim's Control | 0 | 562,499 | 18.750% | 20.606% | | 562,499 | 18.750% | 20.606% | | 562,499 | 18.750% | 20.606% |
| Check sum of all voting shares | 0 | 2,729,730 | 100.000% | 100.000% | | 2,729,730 | 100.000% | | | 2,729,730 | 100.000% | |
| Verification of all authorized Optimay shares | 3,000,000 | 3,000,000 | | | | 3,000,000 | | | 3,000,000 | 3,000,000 | | |

Equity

| NAME | Post Conversion of Employee Debt (hypothetically July 15, 1996) | | | | Post Completion of B Investors Financing (hypothetically August 15, 1996) | | | | Employee Comp Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | No. of New Shares | Total No. of Shares | % of Shares Authoriz'd | % of Voting Shares Issued or Controlled | No. of New Shares | Total No. of Shares | % of Total Shares | % of Voting Shares Issued or Controlled | No. of New Shares | Total No. of Shares | % of Total Shares | % of Voting Shares Issued or Controlled |
| Optimay Corporation (all authorized shares) | 0 | 3,000,000 | 100.000% | | 0 | 3,000,000 | 100.000% | | 300000 | 3,300,000 | 100.000% | |
| Authorized, Unissued not in Jim's Control | 0 | 270,270 | 9.009% | 9.009% | 0 | 270,270 | 9.009% | 9.009% | 0 | 270,270 | 8.190% | 8.190% |
| The Goodner Trust | 0 | | | | 0 | 0 | 0.000% | | 0 | 0 | 0.000% | |
| James Michael De May | +150,000 | 150,000 | 5.000% | 5.495% | 0 | 150,000 | 5.000% | 5.495% | 19,277 | 169,277 | 4.545% | 4.951% |
| De May Family Trust | 0 | 192,769 | 6.426% | 7.062% | 0 | 192,769 | 6.426% | 7.062% | 19,277 | 212,046 | 6.426% | 6.999% |
| Anne Schrader-DeMay Trust | 0 | 717,231 | 23.908% | 26.275% | 0 | 717,231 | 23.908% | 26.275% | 71,723 | 788,954 | 23.908% | 26.040% |
| Optimay Foundation ('Jim's Charitable Trust') | 0 | 200,000 | 6.667% | 7.327% | 0 | 200,000 | 6.667% | 7.327% | 20,000 | 220,000 | 6.667% | 7.261% |
| DeMay-Optimay Comp Trust | 0 | 150,000 | 5.000% | 5.495% | 0 | 150,000 | 5.000% | 5.495% | 15,000 | 165,000 | 5.000% | 5.446% |
| Employee Comp Plan | 0 | 607,231 | 20.241% | 22.245% | 0 | 607,231 | 20.241% | 22.245% | -126,000 | 481,231 | 14.583% | 15.884% |
| Jim's Controlling Interest of voting shares | -150,000 | 2,017,231 | 67.241% | 73.899% | 0 | 2,017,231 | 67.241% | 73.899% | 300,000 | 2,317,231 | 70.219% | 76.483% |
| Jim & Family's pure Fiduciary Interest | 0 | 1,110,000 | 37.000% | 40.663% | 0 | 1,110,000 | 37.000% | 40.663% | 111,000 | 1,221,000 | 37.000% | 40.301% |
| Jim's Fiduciary & Optimay Foundation | 0 | 1,260,000 | 42.000% | 46.158% | 0 | 1,260,000 | 42.000% | 46.158% | 126,000 | 1,386,000 | 42.000% | 45.747% |
| Total for Employees | 150000 | 712499 | 23.750% | 26.101% | 0 | 712499 | 23.750% | 26.101% | 0 | 712,499 | 21.597% | 23.517% |
| Total for Investors | 0 | 270,270 | 9.009% | 9.009% | 0 | 462,975 | 15.433% | 15.433% | 0 | 462,975 | 14.030% | 14.039% |
| Equity to Sam Goodner | | | | | | | | | | | | |
| Initial Public Offering | | | | | | | | | | | | |
| Conversion of "other" Options @ IPO | | | | | | | | | | | | |
| Industrial Partners | | | | | | | | | | | | |
| Total Authorized not in Jim's Control | 150,000 | 982,769 | 32.759% | 36.002% | 0 | 982,769 | 32.759% | 36.002% | | 982,769 | 29.781% | 32.438% |
| Total Issued not in Jim's control | 150,000 | 712,499 | 23.750% | 26.101% | 0 | 712,499 | 23.750% | 26.101% | 0 | 712,499 | 21.597% | 23.517% |
| Total Voting Shares (issued or controlled) | 0 | 2,729,730 | 90.991% | | 0 | 2,729,730 | 90.991% | | 300,000 | 3,029,730 | 91.810% | |
| Check sum of voting shares | 150,000 | 712,499 | 23.750% | 26.101% | 0 | 712,499 | 23.750% | 26.101% | 0 | 712,499 | 23.750% | 23.517% |
| Total Voting Shares not in Jim's Control | | 2,729,730 | | | | 2,729,730 | | | | 3,029,730 | | |
| Verification of all authorized Optimay shares | | 3,000,000 | 100.000% | 100.000% | | 3,000,000 | 100.000% | 100.000% | | 3,300,000 | 100.000% | 100.000% |

# Equity

| NAME | Fund Raising with Industrial Partners | | | | Conversion of 1% Equity Option to Sam Goodeer (April 1997) | | | | IPO, Options, Debentures and Debenture Interest Conversion (hypothetically Aug 15, 1997) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | No. of New Shares | Total No. of Shares | % of Total Shares | % of Voting Shares Issued or Controlled | No. of New Shares | Total No. of Shares | % of Total Shares | % of Voting Shares Issued or Controlled | No. of New Shares | Total No. of Shares | % of Total Shares | % of Voting Shares Issued or Controlled |
| Optimay Corporation (all authorized shares) | 500,000 | 3,800,000 | 100.000% | | 32,297 | 3,832,297 | 100.000% | | 1,580,628 | 5,412,925 | 100.000% | |
| Authorized, Unissued not in Jim's Control | 0 | 270,270 | 7.112% | | 2,297 | 272,567 | 7.112% | | -272,567 | 0 | 0.000% | |
| The Goodter Trust | 0 | 150,000 | 3.947% | 4.250% | -10,378 | 139,622 | 3.643% | 3.922% | | 139,622 | 2.579% | 2.579% |
| James Michael De May | 0 | 212,046 | 5.580% | 6.007% | 1,802 | 213,848 | 5.580% | 6.007% | | 213,848 | 3.951% | 3.951% |
| De May Family Trust | 0 | 788,954 | 20.762% | 22.352% | 6,705 | 795,660 | 20.762% | 22.352% | | 795,660 | 14.699% | 14.699% |
| Anne Schrader-DeMay Trust | 0 | 220,000 | 5.789% | 6.233% | 1,870 | 221,870 | 5.789% | 6.233% | | 221,870 | 4.099% | 4.099% |
| Optimay Foundation ("Jim's Charitable Trust") | 0 | 165,000 | 4.342% | 4.675% | 0 | 165,000 | 4.306% | 4.635% | | 165,000 | 3.048% | 3.048% |
| DeMay-Optimay Comp Trust | 0 | 481,231 | 12.664% | 13.634% | 0 | 481,231 | 12.557% | 13.519% | | 481,231 | 8.890% | 8.890% |
| Employee Comp Plan | 0 | 300,000 | 7.895% | 8.499% | 0 | 300,000 | 7.828% | 8.428% | | 300,000 | 5.542% | 5.542% |
| Jim's Controlling Interest of voting shares | 0 | 2,317,231 | 60.980% | 65.649% | 0 | 2,317,231 | 60.465% | 65.096% | | 2,317,231 | 42.809% | 42.809% |
| Jim & Family's pure Fiduciary Interest | 0 | 1,221,000 | 32.132% | 34.592% | 0 | 1,231,378 | 32.132% | 34.592% | | 1,231,378 | 22.749% | 22.749% |
| Jim's Fiduciary & Optimay Foundation | 0 | 1,386,000 | 36.474% | 39.269% | 10,378 | 1,396,378 | 36.437% | 39.227% | | 1,396,378 | 25.797% | 25.797% |
| Total for Employees | 0 | 712,499 | 18.750% | 20.186% | 0 | 712,499 | 18.592% | 20.016% | | 712,499 | 13.163% | 13.163% |
| Total for Investors | 0 | 462,975 | 12.184% | 13.165% | 2,297 | 465,272 | 12.141% | | 55,356 | 520,628 | 9.618% | 9.618% |
| Industrial Partners | 500,000 | 500,000 | 13.158% | 14.165% | | | | | | 0 | 0.000% | 0.000% |
| Equity to Sam Goodeer | | | | | 30,000 | 30,000 | 1.000% | 0.843% | | 30,000 | 0.554% | 0.554% |
| Initial Public Offering | | | | | 0 | 0 | 0.000% | 0.000% | 1,000,000 | 1,000,000 | 18.474% | 18.474% |
| Conversion of "other" Options @ IPO | | | | | | | | | 60,000 | 60,000 | 1.108% | 1.108% |
| Total Authorized not in Jim's Control | 500,000 | 1,482,769 | 39.020% | 42.008% | 30,000 | 1,515,066 | 39.534% | 42.561% | 1,000,000 | 3,095,694 | 57.191% | 57.191% |
| Total Issued not in Jim's control | 500,000 | 1,212,499 | 31.908% | 34.351% | 30,000 | 1,242,499 | 32.422% | 34.904% | 1,000,000 | 3,095,694 | 57.191% | 57.191% |
| Total Voting Shares (issued or controlled) | 500,000 | 3,529,730 | 92.888% | 100.000% | 30,000 | 3,559,730 | 92.888% | 100.000% | 1,853,195 | 5,412,925 | 100.000% | 100.000% |
| Total Voting Shares not in Jim's Control | 500,000 | 1,212,499 | 31.908% | 34.351% | 30,000 | 1,242,499 | 32.422% | 34.904% | 1,853,195 | 3,095,694 | 57.191% | 57.191% |
| Check sum of voting shares | 500,000 | 3,529,730 | 92.888% | 100.000% | 30,000 | 3,559,730 | 92.888% | | | 5,412,925 | | |
| Verification of all authorized Optimay shares | | 3,800,000 | 100.000% | | | 3,832,297 | | | | 5,412,925 | 100.000% | 100.000% |

# Equity

| NAME | To be moved into DeMay Family Trust |
|------|------|
| Optimay Corporation (all authorized shares) | |
| Authorized, Unissued not in Jim's Control | |
| The Goodier Trust | 11.470% |
| James Michael De May | 2.579% |
| De May Family Trust | |
| Anne Schrader-DeMay Trust | |
| Optimay Foundation ("Jim's Charitable Trust") | |
| DeMay-Optimay Comp Trust | 8.890% |
| Employee Comp Plan | |
| Jim's Controlling Interest of voting shares | |
| Jim & Family's pure Fiduciary Interest | |
| Jim's Fiduciary & Optimay Foundation | |
| Total for Employees | |
| Total for Investors | |
| Industrial Partners | |
| Equity to Sam Goodier | |
| Initial Public Offering | |
| Conversion of "other" Options @ IPO | |
| Total Authorized not in Jim's Control | |
| Total Issued not in Jim's control | |
| Total Voting Shares (issued or controlled) | |
| Total Voting Shares not in Jim's Control | |
| Check sum of all authorized shares | |
| Verification of all authorized Optimay shares | |

Optimay-JMD Equity Spread Sheet 970922.1

## Equity

| NAME | Jan-96 | As of February 7, 1996 | | | | Establish Anne & De May Family Trust & Optimay Charitable Foundation ("OCF") (as of Feb. 8, 1996) | | | | Post Dispersion to Employees & Co... Commissions and Royalties Feb 10,1996 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total No. of Shares Issued | No. of New Shares | Total No. of Shares | % of Shares Authoriz'd | % of Voting Shares Issued or Controlled | No. of New Shares | Total No. of Shares | % of Total Shares Issued or Controlled | % of Voting Shares Issued or Controlled | No. of New Shares | Total No. of Shares | % of Shares Authoriz'd |
| Michael R. King | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 147,000 | 147,000 | 4.900% |
| Moti Malek | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 100,768 | 100,768 | 3.359% |
| Michael Cronin | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 100,768 | 100,768 | 3.359% |
| Michael John Lawrie | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 67,179 | 67,179 | 2.239% |
| Francis Cagney | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 25,192 | 25,192 | 0.840% |
| Ulrich Walter | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 25,192 | 25,192 | 0.840% |
| Markku Niinanen | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 10,749 | 10,749 | 0.358% |
| Klaus Niitamen | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 16,795 | 16,795 | 0.560% |
| Volker Klein | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 8,397 | 8,397 | 0.280% |
| Michael Wege | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 8,397 | 8,397 | 0.280% |
| Oliver Kastl | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 8,397 | 8,397 | 0.280% |
| Sunniva Darcy | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 8,397 | 8,397 | 0.280% |
| Noel Canning | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 8,397 | 8,397 | 0.280% |
| John Obergruller | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 8,397 | 8,397 | 0.280% |
| Niels Drejer | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 6,718 | 6,718 | 0.224% |
| Frank Sluewin | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 6,718 | 6,718 | 0.224% |
| Alois Nock | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 6,718 | 6,718 | 0.224% |
| Goran Budevic | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 2,239 | 2,239 | 0.075% |
| David Akin | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 2,239 | 2,239 | 0.075% |
| Christian Sprenger | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 2,239 | 2,239 | 0.075% |
| Schwarzenbach (April 10,1996) | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 0 | 0 | 0.000% |
| Nehring (April 16, 1996) | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 0 | 0 | 0.000% |
| A Investors (June 17, 1996) | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 0 | 0 | 0.000% |
| B Investors (hypothetically, August 15, 1996) | 0 | | | 0.000% | | 0 | 0 | 0.000% | 0.000% | 0 | 0 | 0.000% |

Equity

| NAME | % of Voting Shares Issued or Controlled (aversion of (as of |
|---|---|
| Michael R. King | 6.050% |
| Moni Malek | 4.147% |
| Michael Cronin | 4.147% |
| Michael John Lawrie | 2.765% |
| Francis Cagney | 1.037% |
| Ulrich Walter | 1.037% |
| Markku Niiranen | 0.442% |
| Klaus Niiranen | 0.691% |
| Volker Klein | 0.346% |
| Michael Wege | 0.346% |
| Oliver Kastl | 0.346% |
| Sunitva Darcy | 0.346% |
| Noel Canning | 0.346% |
| John Oberpriller | 0.276% |
| Niels Drejer | 0.276% |
| Frank Sherwin | 0.276% |
| Alois Nock | 0.092% |
| Goran Budovic | 0.092% |
| David Akin | 0.092% |
| Christian Sprenger | 0.000% |
| Schwarzenbach (April 10, 1996) | |
| Nehring (April 16, 1996) | |
| A Investors (June 17, 1996) | |
| B Investors (hypothetically August 15, 1996) | |

## Equity

| NAME | Creation of the Sun Employee Plan ('SEP') (as of June 8, 1996) | | | | Post Completion of First Stage Financing (as of June 17,1996) | | | | Establishment of Optimay Employee Comp Foundation (OEC) (as of July 10, 1996) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | No. of New Shares | Total No. of Shares | % of Shares Authoriz'd | % of Voting Shares Issued or Controlled | No. of New Shares | Total No. of Shares | % of Shares Authoriz'd | % of Voting Shares Issued or Controlled | No. of New Shares | Total No. of Shares | % of Shares Authoriz'd | % of Voting Shares Issued or Controlled |
| Michael R. King | 0 | 147,000 | 4.900% | 5.385% | 0 | 147,000 | 4.900% | 5.385% | 0 | 147,000 | 4.900% | 5.385% |
| Mozi Malek | 0 | 100,768 | 3.359% | 3.692% | 0 | 100,768 | 3.359% | 3.692% | 0 | 100,768 | 3.359% | 3.692% |
| Michael Cronin | 0 | 100,768 | 3.359% | 3.692% | 0 | 100,768 | 3.359% | 3.692% | 0 | 100,768 | 3.359% | 3.692% |
| Michael John Lawrie | 0 | 67,179 | 2.239% | 2.461% | 0 | 67,179 | 2.239% | 2.461% | 0 | 67,179 | 2.239% | 2.461% |
| Francis Cagney | 0 | 25,192 | 0.840% | 0.923% | 0 | 25,192 | 0.840% | 0.923% | 0 | 25,192 | 0.840% | 0.923% |
| Ulrich Walter | 0 | 25,192 | 0.840% | 0.923% | 0 | 25,192 | 0.840% | 0.923% | 0 | 25,192 | 0.840% | 0.923% |
| Markku Niiranen | 0 | 10,749 | 0.358% | 0.394% | 0 | 10,749 | 0.358% | 0.394% | 0 | 10,749 | 0.358% | 0.394% |
| Klaus Niiranen | 0 | 16,795 | 0.560% | 0.615% | 0 | 16,795 | 0.560% | 0.615% | 0 | 16,795 | 0.560% | 0.615% |
| Volker Klein | 0 | 8,397 | 0.280% | 0.308% | 0 | 8,397 | 0.280% | 0.308% | 0 | 8,397 | 0.280% | 0.308% |
| Michael Wege | 0 | 8,397 | 0.280% | 0.308% | 0 | 8,397 | 0.280% | 0.308% | 0 | 8,397 | 0.280% | 0.308% |
| Oliver Kastl | 0 | 8,397 | 0.280% | 0.308% | 0 | 8,397 | 0.280% | 0.308% | 0 | 8,397 | 0.280% | 0.308% |
| Sumitra Darcy | 0 | 8,397 | 0.280% | 0.308% | 0 | 8,397 | 0.280% | 0.308% | 0 | 8,397 | 0.280% | 0.308% |
| Noel Canning | 0 | 8,397 | 0.280% | 0.308% | 0 | 8,397 | 0.280% | 0.308% | 0 | 8,397 | 0.280% | 0.308% |
| John Oberpriller | 0 | 6,718 | 0.224% | 0.246% | 0 | 6,718 | 0.224% | 0.246% | 0 | 6,718 | 0.224% | 0.246% |
| Niels Dreijer | 0 | 6,718 | 0.224% | 0.246% | 0 | 6,718 | 0.224% | 0.246% | 0 | 6,718 | 0.224% | 0.246% |
| Frank Sherwin | 0 | 6,718 | 0.224% | 0.246% | 0 | 6,718 | 0.224% | 0.246% | 0 | 6,718 | 0.224% | 0.246% |
| Aleis Nook | 0 | 2,239 | 0.075% | 0.082% | 0 | 2,239 | 0.075% | 0.082% | 0 | 2,239 | 0.075% | 0.082% |
| Goran Budevic | 0 | 2,239 | 0.075% | 0.082% | 0 | 2,239 | 0.075% | 0.082% | 0 | 2,239 | 0.075% | 0.082% |
| David Akin | 0 | 2,239 | 0.075% | 0.082% | 0 | 2,239 | 0.075% | 0.082% | 0 | 2,239 | 0.075% | 0.082% |
| Christian Sprenger | 0 | 0 | 0.000% | 0.000% | 0 | 0 | 0.000% | 0.000% | 0 | 0 | 0.000% | 0.000% |
| Schwarzenbach (April 10,1996) | 0 | 0 | 0.000% | 0.000% | 30,030 | 30,030 | 1.001% | | 30,030 | 30,030 | 1.001% | |
| Neuling (April 16, 1996) | 0 | 0 | 0.000% | 0.000% | 15,015 | 15,015 | 0.501% | | 15,015 | 15,015 | 0.501% | |
| A Investors (June 17, 1996) | 0 | 0 | 0.000% | 0.000% | 225,225 | 225,225 | 7.508% | | 225,225 | 225,225 | 7.508% | |
| B Investors (hypothetically August 15, 1996) | 0 | 0 | 0.000% | 0.000% | 0 | 0 | 0.000% | 0.000% | 0 | 0 | 0.000% | 0.000% |

# Equity

| NAME | Post Conversion of Employee Debt (hypothetically July 15, 1996) | | | | Post Completion of B Investors Financing (hypothetically August 15, 1996) | | | | Employee Comp Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | No. of New Shares | Total No. of Shares | % of Shares Authorized | % of Voting Shares Issued or Controlled | No. of New Shares | Total No. of Shares | % of Total Shares | % of Voting Shares Issued or Controlled | No. of New Shares | Total No. of Shares | % of Total Shares | % of Voting Shares Issued or Controlled |
| Michael R. King | 38,242 | 147,000 | 4.900% | 5.385% | 0 | 147,000 | 4.900% | 5.385% | 0 | 147,000 | 4.852% | 4.852% |
| Moni Malek | 27,843 | 139,010 | 4.634% | 5.092% | 0 | 139,010 | 4.634% | 5.092% | 0 | 139,010 | 4.588% | 4.588% |
| Michael Cronin | 27,843 | 128,611 | 4.287% | 4.711% | 0 | 128,611 | 4.287% | 4.711% | 0 | 128,611 | 4.245% | 4.245% |
| Michael John Lawrie | 5,042 | 72,221 | 2.407% | 2.646% | 0 | 72,221 | 2.407% | 2.646% | 0 | 72,221 | 2.384% | 2.384% |
| Francis Cagney | 9,410 | 34,602 | 1.153% | 1.268% | 0 | 34,602 | 1.153% | 1.268% | 0 | 34,602 | 1.099% | 1.142% |
| Ulrich Walter | 9,223 | 34,415 | 1.147% | 1.261% | 0 | 34,415 | 1.147% | 1.261% | 0 | 34,415 | 1.043% | 1.136% |
| Markku Niinimaa | 0 | 10,749 | 0.358% | 0.394% | 0 | 10,749 | 0.358% | 0.394% | 0 | 10,749 | 0.266% | 0.355% |
| Klaus Niiranen | 7,456 | 24,251 | 0.808% | 0.888% | 0 | 24,251 | 0.808% | 0.888% | 0 | 24,251 | 0.735% | 0.800% |
| Volker Klein | 3,634 | 12,031 | 0.401% | 0.441% | 0 | 12,031 | 0.401% | 0.441% | 0 | 12,031 | 0.365% | 0.397% |
| Michael Wege | 6,899 | 15,296 | 0.510% | 0.560% | 0 | 15,296 | 0.510% | 0.560% | 0 | 15,296 | 0.464% | 0.505% |
| Oliver Kastl | 2,593 | 10,990 | 0.366% | 0.403% | 0 | 10,990 | 0.366% | 0.403% | 0 | 10,990 | 0.333% | 0.363% |
| Sunniva Darcy | 4,850 | 13,247 | 0.442% | 0.485% | 0 | 13,247 | 0.442% | 0.485% | 0 | 13,247 | 0.401% | 0.437% |
| Noel Canning | 12,714 | 21,111 | 0.704% | 0.773% | 0 | 21,111 | 0.704% | 0.773% | 0 | 21,111 | 0.640% | 0.697% |
| John Oberprieler | 0 | 6,718 | 0.224% | 0.246% | 0 | 6,718 | 0.224% | 0.246% | 0 | 6,718 | 0.204% | 0.222% |
| Niels Drejer | 0 | 6,718 | 0.224% | 0.246% | 0 | 6,718 | 0.224% | 0.246% | 0 | 6,718 | 0.204% | 0.222% |
| Frank Sherwin | 0 | 6,718 | 0.224% | 0.246% | 0 | 6,718 | 0.224% | 0.246% | 0 | 6,718 | 0.204% | 0.222% |
| Alois Nock | 0 | 2,239 | 0.075% | 0.082% | 0 | 2,239 | 0.075% | 0.082% | 0 | 2,239 | 0.068% | 0.074% |
| Goran Badzevic | 0 | 2,239 | 0.075% | 0.082% | 0 | 2,239 | 0.075% | 0.082% | 0 | 2,239 | 0.068% | 0.074% |
| David Akin | 0 | 2,239 | 0.075% | 0.082% | 0 | 2,239 | 0.075% | 0.082% | 0 | 2,239 | 0.068% | 0.074% |
| Christian Sprenger | 22,094 | 22,094 | 0.736% | 0.809% | 0 | 22,094 | 0.736% | 0.809% | 0 | 22,094 | 0.670% | 0.729% |
| Schwarzenbach (April 10,1996) | 0 | 30,030 | 1.001% | 1.001% | 0 | 30,030 | 1.001% | 1.001% | 0 | 30,030 | 0.910% | 0.910% |
| Nething (April 11, 1996) | 0 | 15,015 | 0.501% | 0.501% | 0 | 15,015 | 0.501% | 0.501% | 0 | 15,015 | 0.455% | 0.455% |
| A Investors (June 16, 1996) | 0 | 225,225 | 7.508% | | | 225,225 | 7.508% | | | 225,225 | 6.823% | |
| B Investors (hypothetically August 15, 1996) | 0 | 0 | 0.000% | | | 192,705 | 6.424% | | | 192,705 | 5.840% | |

Optimay-JMD Equity Spread Sheet 970922.1

# Equity

| NAME | Fund Raising with Industrial Partners | | | | Conversion of 1% Equity Option to Sam Goodier (April 1997) | | | | IPO, Options, Debentures and Debenture Interest Conversion (hypothetically Aug 15, 1997) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | No. of New Shares | Total No. of Shares | % of Total Shares | % of Voting Shares Issued or Controlled | No. of New Shares | Total No. of Shares | % of Total Shares | % of Voting Shares Issued or Controlled | No. of New Shares | Total No. of Shares | % of Total Shares | % of Voting Shares Issued or Controlled |
| Michael R. King | 0 | 147,000 | 3.868% | 4.165% | 0 | 147,000 | 3.836% | 4.130% | 0 | 147,000 | 2.716% | 2.716% |
| Noal Malka | 0 | 139,010 | 3.658% | 3.938% | 0 | 139,010 | 3.627% | 3.905% | 0 | 139,010 | 2.568% | 2.568% |
| Michael Cronin | 0 | 128,611 | 3.385% | 3.644% | 0 | 128,611 | 3.356% | 3.613% | 0 | 128,611 | 2.376% | 2.376% |
| Michael John Lawrie | 0 | 72,221 | 1.901% | 2.046% | 0 | 72,221 | 1.885% | 2.029% | 0 | 72,221 | 1.334% | 1.334% |
| Francis Caguey | 0 | 34,602 | 0.911% | 0.980% | 0 | 34,602 | 0.903% | 0.972% | 0 | 34,602 | 0.639% | 0.639% |
| Ulrich Walter | 0 | 34,415 | 0.906% | 0.975% | 0 | 34,415 | 0.898% | 0.967% | 0 | 34,415 | 0.636% | 0.636% |
| Markku Niinimon | 0 | 10,749 | 0.283% | 0.305% | 0 | 10,749 | 0.280% | 0.302% | 0 | 10,749 | 0.199% | 0.199% |
| Klaus Niirunen | 0 | 24,251 | 0.638% | 0.687% | 0 | 24,251 | 0.633% | 0.681% | 0 | 24,251 | 0.448% | 0.448% |
| Volker Klein | 0 | 12,031 | 0.317% | 0.341% | 0 | 12,031 | 0.314% | 0.338% | 0 | 12,031 | 0.222% | 0.222% |
| Michael Wege | 0 | 15,296 | 0.403% | 0.433% | 0 | 15,296 | 0.399% | 0.430% | 0 | 15,296 | 0.283% | 0.283% |
| Oliver Kasil | 0 | 10,990 | 0.289% | 0.311% | 0 | 10,990 | 0.287% | 0.309% | 0 | 10,990 | 0.203% | 0.203% |
| Sunniva Darcy | 0 | 13,247 | 0.349% | 0.375% | 0 | 13,247 | 0.346% | 0.372% | 0 | 13,247 | 0.245% | 0.245% |
| Noel Canning | 0 | 21,111 | 0.556% | 0.598% | 0 | 21,111 | 0.551% | 0.593% | 0 | 21,111 | 0.390% | 0.390% |
| John Oberpriller | 0 | 6,718 | 0.177% | 0.190% | 0 | 6,718 | 0.175% | 0.189% | 0 | 6,718 | 0.124% | 0.124% |
| Niels Dreger | 0 | 6,718 | 0.177% | 0.190% | 0 | 6,718 | 0.175% | 0.189% | 0 | 6,718 | 0.124% | 0.124% |
| Frank Shervin | 0 | 6,718 | 0.177% | 0.190% | 0 | 6,718 | 0.175% | 0.189% | 0 | 6,718 | 0.124% | 0.124% |
| Alois Nock | 0 | 2,239 | 0.059% | 0.063% | 0 | 2,239 | 0.058% | 0.063% | 0 | 2,239 | 0.041% | 0.041% |
| Goran Badovic | 0 | 2,239 | 0.059% | 0.063% | 0 | 2,239 | 0.058% | 0.063% | 0 | 2,239 | 0.041% | 0.041% |
| David Akin | 0 | 2,239 | 0.059% | 0.063% | 0 | 2,239 | 0.058% | 0.063% | 0 | 2,239 | 0.041% | 0.041% |
| Christian Sprenger | 0 | 22,094 | 0.581% | 0.626% | 0 | 22,094 | 0.577% | 0.621% | 0 | 22,094 | 0.408% | 0.408% |
| | | | | | 0 | | | | | | | |
| Schwarzenbach (April 10, 1996) | 0 | 30,030 | 0.790% | | 255 | 30,285 | 0.790% | | 4,946 | 35,232 | 0.651% | 0.651% |
| Nehring (April 16, 1996) | 0 | 15,015 | 0.395% | | 128 | 15,143 | 0.395% | | 2,473 | 17,616 | 0.325% | 0.325% |
| A. Investors (June 17, 1996) | 0 | 225,225 | 5.927% | | 1,914 | 227,139 | 5.927% | | 34,447 | 261,586 | 4.833% | 4.833% |
| B Investors (hypothetically August 15, 1996) | 0 | 192,705 | 5.071% | | 0 | 192,705 | 5.028% | | 13,489 | 206,195 | 3.809% | 3.809% |

# Equity

| NAME | To be moved into DeMay Family Trust |
|------|------|
| Michael R. King | |
| Moni Malek | |
| Michael Cronin | |
| Michael John Lawrie | |
| Francis Caguray | |
| Ulrich Walter | |
| Markku Niiranen | |
| Klaus Niiranen | |
| Volker Klein | |
| Michael Wege | |
| Oliver Kastl | |
| Sumiva Darcy | |
| Noel Canning | |
| John Oberpriller | |
| Niels Diepier | |
| Frank Sherwin | |
| Alois Noek | |
| Goran Budevic | |
| David Akin | |
| Christian Sprenger | |
| Schwarzenbach (April 10, 1996) | |
| Nehring (April 16, 1996) | |
| A Investors (June 17, 1996) | |
| B Investors (hypothetically August 15, 1996) | |

# Initial Share Balances

| Calculation of Jim's needed share balance on February 7, 1996 | | | | |
|---|---|---|---|---|
| Jim's initial shares | | | | 875,100 |
| Treasury Reserve for Sam Goodner | | 150,000 | | |
| Employee Conversion | | 150,000 | | |
| Jim's Sam Employee Plan ("SEP") | | | 300,000 | |
| Schwarzenbach | 30,030 | | | |
| Netching | 15,015 | | | |
| A Investors | 225,225 | | | Init. inv. = 270,270 |
| Initial employees | 562,499 | | | |
| Sum of initial investors and initial employees | | | 832,769 | |
| All initially authorized and unissued shares | | | 1,132,769 | |
| Sum of Jim's initial & all unissued shares | | | | 2,007,869 |
| Shares to be issued to Jim as of Feb 7 = 3,000,000 less the above sum | | | | 992,131 |

# Initial Optimay Comp plan

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | **Jim's Total No. of Shares** | | | **1,867,231** | |
| | 42% of all authorized shares | | | 1,260,000 | 42.000% |
| | The difference to go into OEC | | | 607,231 | 20.241% |

# B Investors

## Statement of Given and Parameters:

| | | |
|---|---|---|
| number of old shares | | 3,000,000 |
| number of shares to be authorized at the time of conversion for the B Investors | "$x_1$" | "=$1,500,000/$z_1$" |
| total number of shares | "$y$" | "=3,000,000+$x_1$" |
| value of B Investor's share price | "$z_1$" | "=$1,500,000/$x_1$" |
| alternative calculation of B Investor's share price | "$z_2$" | "=$25,000,000/$y$" |
| external value of company at the time of the B Investors debenture | | $25,000,000 |
| Value of B Investor's Investment | | $1,500,000 |
| alternative calculation of number of shares to be authorized at the time of conversion for the B Investors | "$x_2$" | "=6%*$y$" |

## Initial Calculation of x,y & z:

| | | |
|---|---|---|
| "$y$"= | "=3,000,000+$1,500,000/($25,000,000/$y$)" | 3,191,489 |
| "$x$"= | "=3,000,000+$1,500,000/($25,000,000/$y$)" | 191,489 |
| "$z$"= | "=$1,500,000/($25,000,000/3,000,000)" | $7.83 |
| B Investor % | "=$1,500,000/($25,000,000/3,000,000)=3,000,000)" | 6.000% |
| | "=3,000,000/(1-1.5/$25,000,000)" | |

## Notes and Assumptions:

In earlier recursive calculations, such as the bulking up of the A Investors so they were not diluted for Sam's options, the calculation was much more straight forward than in the following case.

In those cases there was a limit ( such as Sam's 30,000 shares) which made it possible to iterate directly on the equity spreadsheet and see when one hit the desired limit.

In the following calculation, we do not have a limit to hit, so we must calculate until the effect is negligible.

The initial values used are the total share amounts for the non B Investors just prior to the conversion of the B Investors. These values are properly adjusted for previous dilution and bulking.

At IPO there is other dilution, which is shown on the spreadsheet, independent of this calculation.

The initial "Total No. of Shares" shows the sum of the last value on the equity sheet prior to the B Investors converting and the above initial calculation of the number of shares needed for the B Investors.

## Recursive Calculations of Bulking of Non-B Investors:

### Calculation to initially Bulk up the Non-B Investors::

| | B's % before old Bulking | % of Shares to be maintained | No. of New Shares | Total No. of Shares | % of Shares Authoriz'd | B's % after Bulking for Non-B's |
|---|---|---|---|---|---|---|
| Totals Before Bulking | 6.000% | | | 3,191,489 | | 5.969% |
| Schwarzenbach | 30,030 | 1.001% | 1,917 | 31,947 | | 1.001% |
| Netting | 15,015 | 0.501% | 958 | 15,015 | | 0.501% |
| A Investors | 225,225 | 7.508% | 14,376 | 239,601 | | 7.508% |
| Totals after Bulking | | | 17,251 | 3,208,741 | | |

# B Investors

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2nd Recursive Calculation:** | | | | | | |
| | B's % before Bulking | old | % of Shares to be maintained | No. of New Shares | Total No. of Shares | % of Shares Authoriz'd | B's % after Bulking for Non-B's |
| B Investors | 5.968% | 191,489 | 6.000% | 1,035 | 192,524 | 5.998% | 5.995% |
| Schwarzenbach | | 31,947 | 1.001% | 173 | 32,119 | 1.000% | |
| Nehring | | 15,973 | 0.501% | 86 | 16,060 | 0.500% | |
| A Investors | | 239,601 | 7.508% | 1,295 | 240,896 | 7.501% | |
| Totals after Bulking | | | | 2,589 | | | 3,211,330 |
| | **3rd Recursive Calculation:** | | | | | | |
| | B's % before Bulking | old | % of Shares to be maintained | No. of New Shares | Total No. of Shares | % of Shares Authoriz'd | B's % after Bulking for Non-B's |
| B Investors | 5.995% | 192,524 | 6.000% | 155 | 192,680 | 6.005% | 5.999% |
| Schwarzenbach | | 32,119 | 1.001% | 26 | 32,145 | 1.001% | |
| Nehring | | 16,060 | 0.501% | 13 | 16,073 | 0.500% | |
| A Investors | | 240,896 | 7.508% | 194 | 241,091 | 7.507% | |
| Totals after Bulking | | | | 389 | | | 3,211,719 |
| | **4th Recursive Calculation:** | | | | | | |
| | old | % of Shares Authoriz'd | No. of New Shares | Total No. of Shares | % of Shares Authoriz'd | % of Shares Authoriz'd | B's % after Bulking for Non-B's |
| B Investors | 5.999% | 192,680 | 6.000% | 23 | 192,703 | 6.000% | 6.000% |
| Schwarzenbach | | 32,145 | 1.001% | 4 | 32,149 | 1.001% | |
| Nehring | | 16,073 | 0.501% | 2 | 16,075 | 0.500% | |
| A Investors | | 241,091 | 7.508% | 29 | 241,120 | 7.507% | |
| Totals after Bulking | | 0 | | 35 | | | 3,211,754 |
| | **5th Recursive Calculation:** | | | | | | |
| | old | % of Shares Authoriz'd | No. of New Shares | Total No. of Shares | % of Shares Authoriz'd | % of Shares Authoriz'd | B's % after Bulking for Non-B's |
| B Investors | 6.000% | 192,703 | 6.000% | 2 | 192,705 | 6.000% | 6.000% |
| Schwarzenbach | | 32,149 | 1.001% | 0 | 32,150 | 1.001% | |
| Nehring | | 16,075 | 0.501% | 0 | 16,075 | 0.501% | |
| A Investors | | 241,120 | 7.508% | 3 | 241,122 | 7.508% | |
| Totals after Bulking | | | | 3 | | | 3,211,757 |

The following shares must be authorized when the B Investors convert. The shares for the non B Investors protects them from dilution. If the B Investors never convert, then the company does not authorize these shares.

For this reason, these shares were not entered into the equity sheet earlier, as we would not know if they would be needed until the B conversion.

The baseline for this calculation are the share values at the time of the B Investor's **subscription**. The circular bulking between the As and Bs must be calculated as from this time.

| | | | | | | |
|---|---|---|---|---|---|---|
| **Total for A Investors** | **15,897** | | At an assumed $25M external evaluation, this would mean the B Investors obtain: | | | |
| **Total for Schwarzenbach** | **2,120** | | Number of shares: | | 192,705 | |
| **Total for Nehring** | **1,060** | | at a Share Price of: | | $7.7839 | |
| **Total for B Investors** | **192,705** | | This equity represents the following percent equity of the company at the time of the subscription: | | | |
| **Total increase** | **211,782** | | % Equity: | | 6.000% | |

Dilution

| Is the row to be diluted for the column? | Jim & Family's interests | De May - Optimay Comp Trust | Sam Bartosik's 1% | Employees initial 18.75% | Employee conversion 5% | A Investors | B Investors | 1% or 30,000 shares to the A Directors | Optimay Employee Comp Plan | Moses Tsang | BT Alex. Brown |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Jim & Family's interests | *** | NO | NO | NO | NO | NO | NO | NO | ? | depends on DeMay-Optimay trust | depends on DeMay-Optimay trust |
| De May - Optimay Comp Trust | NO | *** | ? | NO | YES | YES | YES | YES | ? | YES | YES |
| Sam Bartosik's 1% co at IPO contractually | NO | NO | *** | NO | NO | NO | ? | ? | ? | ? | ? |
| Employees initial 18.75% | NO | NO | ? | *** | NO | NO | YES | YES | ? | YES | YES |
| Employee conversion 5% | NO | NO | ? | NO | *** | NO | YES | YES | ? | YES | YES |
| A Investors | | | ? | NO | NO | *** | NO | ? | ? | | YES |
| B Investors | | | | | NO | | *** | ? | ? | | YES |
| 30,000 stock options to the A Directors | | | | | | | | *** | ? | | |
| Optimay Employee Comp Plan | | | | NO | NO | NO | NO | ? | *** | ? | ? |
| Moses Tsang | | | | | | | | ? | ? | *** | ? |
| BT Alex. Brown | | | | | | | YES | ? | ? | | *** |
| Conversion of Sam's Options | | | | NO | NO | NO | YES | ? | ? | | YES |
| Conversion of Ed's Options | | | | | | | YES | ? | ? | | YES |
| Conversion of Jonathon's Options | | | | | | | | ? | ? | | |
| Conversion of employee options | | | | | | | | ? | ? | | |
| Conversion of Director's | | | | | | | | ? | ? | | |
| IPO | NO | NO | ? | NO | NO | ? | ? | ? | ? | NO | NO |

Dilution

| Is the row to be diluted for the column? | Conversion of Sam's Options | Conversion of Ed's Options | Conversion of Jonathon's Options | Conversion of employee options | Conversion of employee options | IPO |
|---|---|---|---|---|---|---|
| Jim & Family's interests | NO - SEP | depends on DeMay-Optimay trust | depends on DeMay-Optimay trust | depends on DeMay-Optimay trust | | depends on DeMay-Optimay trust |
| De May - Optimay Comp Trust | NO | ? | ? | ? | | YES |
| Sam Bartosik's 1% co at IPO contractually | ? | ? | ? | ? | | ? |
| Employees initial 18.75% | ? | ? | ? | ? | | YES |
| Employee conversion 5% | YES | ? | ? | ? | | YES |
| A Investors | NO | ? | ? | ? | | YES |
| B Investors | YES | ? | ? | ? | | YES |
| 30,000 stock options to the A Directors | | ? | ? | ? | | |
| Optimay Employee Comp Plan | NO | ? | ? | ? | | YES |
| Moses Tsang | | ? | ? | ? | | |
| BT Alex. Brown | YES | ? | ? | ? | | YES |
| Conversion of Sam's Options | *** | ? | ? | ? | | YES |
| Conversion of Ed's Options | | ? | ? | ? | | YES |
| Conversion of Jonathon's Options | | ? | ? | ? | | YES |
| Conversion of employee options | | ? | ? | ? | | YES |
| Conversion of Director's | | | | | | |
| IPO | YES, for conversions | ? | ? | ? | | *** |

Page 18

# EXHIBIT 2

**MOORE & BRUCE, LLP**
**1072 Thomas Jefferson Street, NW**
**Washington, DC**
**Telephone +1-202-965-5300**
**Facsimile +1-202-965-7745**

## M E M O R A N D U M

**TO:**         File (JMD)

**FROM:**     Charles M. Bruce

**RE:**         Telephone Conversation with Jim De May and Jim Bridgeman (MWB&B)

**DATE:**     11/16/1998 12:14 PM

On Wednesday, Dec. 9, 1998, I had occasion to speak with Jim De May and Jim Bridgeman Re: the De May family trusts.

Jim De may have sent in Jim Bridgeman copies of the trusts and some of our correspondence, and he had reviewed these.

Jim De May and I had been speaking about these trusts. He told me he had sent some of the background information to Jim Bridgeman; and Jim Bridgeman had some questions or concerns.

I tried to set up a conference call right away, but Jim Bridgeman was away from his desk. Later Jim Bridgeman called me back, and I tried to add Jim De May but was unsuccessful. In the meantime, Jim Bridgeman and I had a brief discussion about his points.

Jim Bridgeman said he had 2 concerns:

1.  Regarding the De May family trusts, did Anne De May really cause the distribution to her of all the assets of the old De May family trust and the settlement of the new De May family trust. He said that Jim told him that he did not know anything about this transaction at the time it took place – or words that effect.

2.  Also regarding the De May family trust, was the distribution and settlement a transaction that would be respected or would it be set aside under some theory such as "sham transaction" or "collapsible transaction". He also said that there might be an argument that there had been an indirect transfer of assets from Jim De May to the new De May family trust -- by putting together the original transaction in February 1996 with the transactions in 1998.

Jim Bridgeman and I discussed these concerns for about 15-20 minutes. Then Jim De May called me and I was able to add him to the conversation.

In summary, my points were as follows:

1. As a factual matter, Anne De May most definitely participated in the decisions and actions leading to the distribution of assets to her and the contribution of assets to the new De May family trust. I had communicated with her directly on a number of topics in January 1998. Among other things, at Jim De May's request, I advised her on the pros and cons of selling the Optimay

shares; and included in that analysis was a discussion of the trusts and how the trusts might be handled. I noted that she had been directly involved in the migration of the trusts -- at least her trust -- from Bermuda to the Isle of Man. (She signed the notice to the Bermuda Trustee.) She is the Chairman of the Advisory Committee for her trust. There had been a number of telephone conference calls in early August 1998 concerning the family's move from Germany to the United States and the need to do a number of things relating to the trusts, various bank accounts, etc. Some of the bank accounts belonged to the family. Others belonged to the De May family trust. My memory is that as to some of those telephone conversations Mrs. De May was literally standing next to Jim De May. Additionally, my contemporaneous notes and Memoranda disclose exactly what transpired. Copies of these Memoranda were sent to Jim De May and to the trustee (Valmet Isle of Man Limited).

2.  As to the sham or collapsible transaction issue, I noted that these are very broad concepts and their application can vary according to the context. Here, it's my view that the first transaction is a completed distribution to Anne De May. The fact that the transfer went from the old De May family trust to Moore & Bruce's trust account and from there to an account benefiting the new De May family trust, should make no difference. In fact, the funds came to rest in Moore & Bruce's trust account for approximately five days. Obviously, she could have decided in the interim to redirect the funds to wherever she wished. (In fact, I recall that this was a point made by Jim De May—in a not entirely lighthearted way.) With respect to the "indirect transfer" argument, it is true that this concept can have broad implications. However, in this case, the initial transaction (in February 19906) was certainly not in contemplation of any subsequent step or steps.

Jim De May asked a number of questions. Jim Bridgeman and I, in effect, debated the issues. In the course of the discussions, Jim De May did not say that he had no recollection of these activities; to the contrary, he began to recall more and more of the details as his memory was refreshed. I pointed out that, of course, several million dollars would not have gone out of the Charles Schwab De May Family Trust account into the law firm's account without us discussing it in considerable detail! I have contemporaneous memoranda describing the details of a transaction. These memoranda were sent to Jim De May and to the trust. My partner Jonathan Moore and I, understandably, also discussed the transaction in some detail.

The concern was expressed that Anne might not remember any of this if asked about it in the course of, say, an audit. My response was that, in my view, this does not pose a problem. It is not at all unusual for a client not to remember the details of a transaction like this one. There are several trusts. Their terms are complicated. Trusts had been set up and then terminated -- here, I am thinking of the compensation trusts for some of the employees at Optimay Corporation. The De May family trust and the Anne Schrader De May trust had been migrated. The trust indentures had been amended and restated. The De May family had had to pick up all its belongings and the four children and move to the United States -- just at the time when these transactions were taking place. It is no surprise that a Mrs. De May does not have a clear memory.

At the end of the discussion, Jim Bridgeman agreed with me -- and Jim De May agreed with both of us -- that the taxpayers should continue on the road taken. Or, in the words used, we should not stop the train or get off of the train. This was the consensus arrived at.

[Dictated but not reviewed by CMB.]

I:\Files\00862\File Memos\M&B MEMO 12-14-98

# EXHIBIT 3



# FAX

## Confidentiality Notice

This communication is intended for the sole use of the individual to whom it is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If the reader of this communication is not the intended recipient, or the employee or agent for delivering the communication to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication may be strictly prohibited.

If you have received this communication in error, please notify the sender immediately by telephone call and return the communication to the fax number you will be given, then destroy the document(s). Thank you!

Department of the Treasury
Internal Revenue Service



| Date | June 10, 2002 |
|---|---|

| Number of pages including cover sheet | 8 |
|---|---|

*TO:* Jonathon Moore

| *FROM:* | Monica Garcia |
|---|---|
| | Internal Revenue Service |
| | ID # 85-00735 |
| | 5338 Montgomery Blvd NE |
| | Albuquerque, NM  87109 |

| Phone | (202) 965-5300 |
|---|---|
| Fax Phone | (202) 965-7745 |

*CC:*

| Phone | (505) 837-5572 |
|---|---|
| Fax Phone | (505) 837-5654 |

*REMARKS:*   ☐ Urgent    ☐ For your review    ☐ Reply ASAP    ☐ Please Comment

RE:  James De May

Mr. Moore,

Attached is the narrative we discussed. I will forward additional items as we complete them. Please give me a call before 6/24/02 to discuss the statute of limitations.

Thanks!

Monica Garcia

| Form 886-A | U.S. Treasury Department-Internal Revenue Service EXPLANATION OF ITEMS | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer James M. De May | | Years Ended 12/31/97, 12/31/98 |

| | 1997 | 1998 |
|---|---|---|
| Long-Term Capital Gain Income per Examination | $10,035,696 | $4,016,052 |
| Long-Term Capital Gain Income per Tax Return | -0- | $2,711,052 |
| Adjustments | $10,035,696 | $1,305,000 |

### Issue

Is income realized by the De May Family Trust includible in the gross income of Mr. James M. De May?

### Facts

On September 13, 1985 Mr. James De May, a U.S. citizen, married Anne Schrader, a German citizen. Shortly thereafter Mr. De May established German residency.

On July 10, 1986 Mr. De May formed a German corporation, Optimay GmbH. Initially, Optimay GmbH was created as a means for Mr. De May to conduct his software consulting business. Overtime the business of Optimay GmbH grew into software development for semiconductor manufacturers targeting the market for cellular telephones based on the Global System for Mobile Communications (GSM) protocol. In order to finance the growth of Optimay GmbH Mr. De May had to personally borrow funds for the German company.

On the advice of investment bankers and venture capitalists Mr. De May decided to raise capital to support Optimay GmbH by forming a U.S. corporation. The U.S. corporation would issue debt instruments and hold the shares of Optimay GmbH. On September 18, 1995 Mr. De May formed a Delaware company, Optimay Corporation. Initially Mr. De May was the sole shareholder of the new company.

Beginning in February 1996 Optimay Corporation started selling 7% Convertible Subordinated Debentures to unrelated investors. The debentures were convertible to Optimay Corporation stock. The conversion price of $6.66 per share was set to value the conversion rights upon maturity of the convertible debt three years later. The debentures paid the investors interest at the rate of 7% per annum through

| Form **886-A** | U.S. Treasury Department-Internal Revenue Service **EXPLANATION OF ITEMS** | Schedule No. or **Exhibit** |
|---|---|---|
| Name of Taxpayer  James M. De May | | Years Ended 12/31/97, 12/31/98 |

maturity.  At maturity the investors had the option to receive interest in cash or in shares of Optimay Corporation common stock.

On February 7, 1996 Mr. De May sold Optimay GmbH to Optimay Corporation in exchange for 100 shares of Optimay Corporation stock and assumption of the debt he had personally incurred in maintaining the operations of Optimay GmbH.

On February 8, 1996 Mr. De May established the De May Family Trust.  This trust was formed under the laws of Bermuda and, according to the trust instrument "shall be treated as a GRANTOR TRUST under Sections 671 to 678 (inclusive) of the Code."  The beneficiaries of the trust were listed as:

1. Anne Schrader De May, Mr. De May's wife
2. Henning Sean De May, the grantor's son
3. Marlin Kimberly De May, the grantor's daughter
4. Lindsay Morgan De May, the grantor's daughter
5. Anneliese Schrader residing in Cuxhaven, Germany
6. Mathias Schrader residing in Cuxhaven, Germany
7. Christian Schrader residing in Ahrensburg, Germany
8. Gilbert H. De May, residing in Fort Lauderdale, Florida
9. Dorothy E. De May residing in Fort Lauderdale, Florida
10. Janet Groppel residing in St. Cloud, Florida
11. Mr. De May, the grantor
12. The Optimay Foundation, a Bermuda foundation formed by Mr. De May on February 8, 1996.

Also on February 8, 1996 the Optimay Corporation issued 717,231 shares of its stock to the De May Family Trust.

On February 12, 1996 Mr. De May renounced any power to expand or contract the class of beneficiaries and any interest that he might have, including any contingent or remainder interest, in the De May Family Trust.

On July 11, 1997 Ruben James De May, son of the grantor, was born and added to the list of beneficiaries of the De May Family Trust.

On December 18, 1997 Mr. De May and the De May Family Trust invested in Risk Capital Bermuda Fund, L.P., a Bermuda limited partnership.  Mr. De May transferred 172,769 shares of Optimay Corporation stock to the partnership for an 11.14772% interest in the partnership.  The partnership valued the Optimay Corporation

| Form 886-A | U.S. Treasury Department-Internal Revenue Service EXPLANATION OF ITEMS | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>James M. De May | | Years Ended 12/31/97, 12/31/98 |

common stock at $16 per share. The De May Family Trust transferred 627,231 shares of Optimay Corporation stock with a value of $16 per share to the partnership for a 40.46075% interest in the partnership.

According to the taxpayer one of the purposes of the transfer of the trust's shares of Optimay Corporation to the partnership was diversification of assets. The partnership agreement lists the Risk Capital Bermuda Fund, L.P. partners and their contributions as follows:

| Partner | Initial Contribution | Initial Capital | Partnership Interest |
|---|---|---|---|
| James M. De May | 172,769 shares of Optimay Corp. plus US$1,000 | US$2,765,304 | 11.14772% |
| De May Family Trust | 627,231 shares of Optimay Corp. plus US$1,000 | US$10,036,696 | 40.46075 |
| Peter M. Bond | US$1,000 | US$1,000 | .00403 |
| TMC (Holdings) Limited | 1 share of TMC Trading International, Ltd. plus US$1,000 | US$12,001,000 | 48.37539 |
| Rockwell Bransom Bean | US$1,000 | US$1,000 | .00403 |

After the transfer of Optimay Corporation shares to the partnership by the De May Family trust the Trust continued to hold 90,000 shares of Optimay Corporation common stock.

On April 9, 1998 the De May Family Trust was migrated from Bermuda to the Isle of Man.

On April 16, 1998 a wholly owned subsidiary of Lucent Technologies International, Inc. purchased Optimay Corporation for $16.53 per share. The purchase included the provision that the price could be adjusted up to $16.69 for post closing receivables. In addition, $1.625 per share of the purchase price was to be held in escrow pending potential claims. One-half of the escrowed funds were to be released 12 months after closing. The remaining portion of the escrowed funds

Department of the Treasury – Internal Revenue Service

Form 886-A
Page 3

| Form **886-A** | U.S. Treasury Department-Internal Revenue Service<br>**EXPLANATION OF ITEMS** | Schedule No. or<br>**Exhibit** |
|---|---|---|
| Name of Taxpayer<br><br>James M. De May | | Years Ended<br>12/31/97, 12/31/98 |

were to be released 18 months after closing except for $300,000 (about 7.5 cents per share) which were to be held until 18 months after closing.

As a result of the purchase by Lucent of Optimay Corporation in 1998 the De May Family Trust received $14.50 per share for the 90,000 shares of Optimay Corporation stock it held outside the Risk Capital Bermuda Fund, L.P. partnership. The trust also received $14.013235 per share for the 627,231 shares held within the partnership. The reduced price per share through the partnership ($14.013235 per share rather than $14.50 per share) resulted from negotiations and a settlement between Mr. De May and the unrelated partners.

In August 1998 all of the assets of the De May Family Trust were distributed to Anne Schrader De May and the trust was dissolved.

## LAW

Internal Revenue Code Section 679(a) states:

> *In general.* A United States person who directly or indirectly transfers property to a foreign trust (other than a trust described in section 6048(a)(3)(B)(ii)) shall be treated as the owner for his taxable year of the portion of such trust attributable to such property if for such year there is a United States beneficiary of any portion of such trust.

Internal Revenue Code Section 721(a) states the general rule that gain or loss is not recognized on the contribution of property to a partnership in exchange for an interest in the partnership. Section 721(b) provides the special rule that subsection (a) shall not apply to gain realized on the transfer of property to a partnership if the partnership would be treated as an investment company (within the meaning of section 351) if the partnership were incorporated.

Internal Revenue Code Section 351(e)(1) specifies that the determination of whether a company is an investment company shall be made by taking into account all stock and securities held by the corporation. Money and stocks and other equity interests in a corporation are treated as stocks and securities under this section.

| Form 886-A | U.S. Treasury Department-Internal Revenue Service **EXPLANATION OF ITEMS** | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer  James M. De May | | Years Ended 12/31/97, 12/31/98 |

## GOVERNMENT'S POSITION

Internal Revenue Code Section 679 states that a United States person that directly or indirectly transfers property to a foreign trust shall be treated as the owner of the portion of the trust attributable to the transferred property if the trust has a United States beneficiary. The De May Family Trust had United States beneficiaries from its inception in February 1996 through the date it was dissolved in August 1998. The grantor of the trust, Mr. James De May, is a United States citizen and a beneficiary of the trust. In addition, Mr. De May's children, Henning Sean De May, Marlin Kimberly, Lindsay Morgan, and Ruben James, are dual citizens of the United States and Germany. Other U.S. beneficiaries of the trust are Gilbert H. De May, Dorothy E. De May, and Janet Groppel. The De May Family Trust has eight United States beneficiaries and therefore, under the provisions of Section 679 Mr. De May is treated as owning the portion of the trust attributed to the property he directly or indirectly transferred to the trust. The property transferred to the trust by Mr. De May was 717,231 shares of the common stock of Optimay Corporation.

The trust subsequently transferred 627,231 shares of Optimay Corporation to Risk Capital Bermuda Fund, L.P., a Bermuda limited partnership, on December 18, 1997. The trust continued to hold the remaining 90,000 shares until Optimay Corporation was purchased by a subsidiary of Lucent Technologies on April 16, 1998.

The transfer of Optimay Corporation stock by the trust to the Risk Capital Bermuda Fund partnership is a taxable event recognizable by Mr. De May as owner of the grantor trust. Ordinarily gain or loss is not recognized on the contribution of property to a partnership in exchange for a partnership interest under the provisions of Internal Revenue Code Section 721(a). Section 721(b), however, specifies that the gain nonrecognition of section 721(a) does not apply if the partnership would be treated as an investment company (as defined by section 351) if it were incorporated.

Internal Revenue Code Section 351(e) specifies that the determination of whether a company is an investment company shall be made by taking into account all stock and securities held by the company and by treating money, stock, and other equity interests in a corporation as stocks and securities.

Income Tax Regulation Section 1.351-1(c) states:

> (1) The general rule of section 351 does not apply, and consequently gain or loss will be recognized, where property is transferred to an investment company

| Form 886-A | U.S. Treasury Department-Internal Revenue Service EXPLANATION OF ITEMS | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer James M. De May | | Years Ended 12/31/97, 12/31/98 |

*after June 30, 1967. A transfer of property after June 30, 1967, will be considered to be a transfer to an investment company if --*

*(i)    The transfer results, directly or indirectly, in diversification of the transferors' interests, and*

*(ii)    The transferee is (a) a regulated investment company, (b) a real estate investment trust, or (c) a corporation more than 80 percent of the value of whose assets (excluding cash and non-convertible debt obligations from consideration) are held for investment and are readily marketable stocks or securities, or interests in regulated investment companies or real estate investment trusts.*

Regulation Section 1.351-1(c)(5) states that a transfer results in diversification if two or more persons transfer non-identical assets to a corporation in the exchange.

The Taxpayer Relief Act of 1997 (TRA '97) subsequently broadened the definition of an investment company as stated in Income Tax Regulation Section 1.351-1(c). The regulation, which has not yet been updated, limited the assets of corporations for investment company treatment to readily marketable stocks or securities. Section 1002 of TRA '97 and Internal Revenue Code Section 351(e), as amended, specify that the determination of an investment company shall be made by taking into account all stock and securities held by the company, whether readily marketable or not, and by treating money as a security.

The Risk Capital Bermuda Fund, L.P. partnership is an investment company under the provisions of sections 351(e) and 721(b). The first test is whether the transfer to the partnership in exchange for a partnership interest resulted in diversification of the transferors' interests. The taxpayer's stated purpose of the transfer to the partnership was diversification. This purpose succeeded under the definition of Income Tax Regulation Section 1.351-1(c)(5) because more than two persons transferred non-identical assets to the partnership. After contributions by the various partners the partnership held $5,000 plus 800,000 shares of Optimay Corporation stock valued at $12,800,000 plus 1 share of TMC (Holdings) Limited valued at $12,000,000. Clearly, the first test of an investment company was met.

The second test is whether more than 80% of the value of the partnership is stocks and securities. As listed above, over 99.9% of the assets of the partnership was stock. Moreover, the remaining $5,000 in cash qualified as securities. The second test of investment company status was met.

| Form 886-A | U.S. Treasury Department-Internal Revenue Service **EXPLANATION OF ITEMS** | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer James M. De May | | Years Ended 12/31/97, 12/31/98 |

The De May Family Trust is considered a grantor trust under the provisions of section 679 and as such the assets of the grantor trust are treated as owned by Mr. De May. The trust contributed shares of Optimay Corporation with a value of $10,035,696 to the Risk Capital Bermuda Fund limited partnership in December 1997. The De May Family Trust had no basis in the common shares of Optimay Corporation stock it held and transferred to the partnership because these shares were transferred to the trust without consideration at the time Optimay Corporation was formed. The transfer to the partnership is taxable under the provisions of sections 721(b) and 351(e) because the partnership is treated as an investment company. Therefore, Mr. De May as owner of the trust was required to recognize $10,035,696 of long-term capital gain from the contribution of the stock to the partnership on his 1997 income tax return.

The 90,000 shares of Optimay Corporation held by the trust outside the partnership were sold when Lucent Technologies purchased Optimay Corporation in 1998. Initially the trust received $14.50 per shares with additional amounts to be paid out of escrowed funds in future years. As the grantor of the De May Family Trust under the provisions of section 679 Mr. De May is treated as the owner of the assets of the trust. The De May Family Trust had no basis in the common shares of Optimay Corporation stock it held. Therefore, Mr. De May was required to recognize $1,305,000 of long-term capital gain from the sale of Optimay Corporation shares held by the trust on his 1998 income tax return.

## CONCLUSION

It was determined that the De May Family Trust was a grantor trust under the provisions of Internal Revenue Code Section 679. It was also determined that Mr. De May, the grantor of the De May Family Trust, was required to recognize income relating to the disposition of shares of Optimay Corporation stock held by the trust. Long-term capital gain in the amount of $10,035,696 was required to be included in Mr. De May's gross income for the 1997 taxable year under the provisions of Internal Revenue Code Sections 721(b) and 351(e) due to the contribution of stock to a partnership treated as an investment company. Additional long-term capital gain in the amount of $1,305,000 was required to be included in Mr. De May's gross income for the 1998 taxable year due to the disposition of shares of Optimay Corporation by the trust. Mr. De May did not report capital gain income for the 1997 taxable year. He reported long-term capital gain income unrelated to the De May Family Trust on his 1998 tax return of $2,711,052.

---

Department of the Treasury – Internal Revenue Service

Form 886-A
Page 7

# EXHIBIT 4



**Internal Revenue Service**

Jonathon R. Moore
Moore & Bruce, LLP
1072 Thomas Jefferson St., NW
Washington D.C. 20007

**Department of the Treasury**

Taxpayer Identification Number:
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
Person to Contact/ID Number:
Monica Garcia / Badge # 85-00735
Contact Telephone Number:
(505) 837-5572

Date: June 24, 2002

Dear  Mr. Moore,

We are sending you the enclosed material under the provisions of your power of attorney or other authorization on file with us. For your convenience, we have listed the name of the taxpayer to whom this material relates.

If you have any questions, please call the contact person at the telephone number shown in the heading of this letter.

Thank you for your cooperation.

Sincerely,

Monica Garcia

Enclosures:
☐  Letter(s)
☐  Report(s)
☒  Other

Taxpayer's Name

James M. De May

Letter 937 (Rev. 8-2000)
Cat. No. 30760X

# FAX

Department of the Treasury

Internal Revenue Service

## Confidentiality Notice

This communication is intended for the sole use of the individual to whom it is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If the reader of this communication is not the intended recipient, or the employee or agent for delivering the communication to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication may be strictly prohibited.

If you have received this communication in error, please notify the sender immediately by telephone call and return the communication to the fax number you will be given, then destroy the document(s). Thank you!

| Date | June 24, 2002 |

| Number of pages including cover sheet | 21 |

| *TO:* Jonathon Moore | | *FROM:* | Monica Garcia |
| | | | Internal Revenue Service |
| | | | ID # 85-00735 |
| | | | 5338 Montgomery Blvd NE |
| | | | Albuquerque, NM 87109 |

| **Phone** | (202) 965-5300 |
| **Fax Phone** | (202) 965-7745 |

| **Phone** | (505) 837-5572 |
| **Fax Phone** | (505) 837-5654 |

*CC:*

**REMARKS:**   ☐ Urgent   ☐ For your review   ☐ Reply ASAP   ☐ Please Comment

RE: James De May

Mr. Moore,

Attached are two additional narratives prepared by our International Examiner. Originals will follow by mail.

Monica Garcia

| Form 886-A | U.S. Treasury Department-Internal Revenue Service EXPLANATION OF ITEMS | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer  James M. De May | | Years Ended 12/31/97, 12/31/98 |

|  | 1997 | 1998 |
|---|---|---|
| Long-Term Capital Gain Income-Risk Capital Bermuda Fund, L.P. per Examination | $2,764,304 | $0 |
| Long-Term Capital Gain Income-Risk Capital Bermuda Fund, L.P. per Tax Return | $0 | $2,421,052 |
| Adjustments | $2,764,304 | ($2,421,052) |

### Issue

Is Mr. James M. De May required to recognize income on the contribution of appreciated stock to a foreign partnership under the provisions of Internal Revenue Code Section 721(b)?

### Facts

On September 13, 1985 Mr. James De May, a U.S. citizen, married Anne Schrader, a German citizen. Less than a year later, on July 10, 1986, Mr. De May organized a German corporation, Optimay GmbH. Initially, Optimay GmbH was formed as a means for Mr. De May to conduct his software consulting business. Over time the business of Optimay GmbH grew into software development for semiconductor manufacturers targeting the market for cellular telephones based on the Global System for Mobile Communications (GSM) protocol. In order to finance the growth of Optimay GmbH Mr. De May personally borrowed funds for the company.

On the advice of investment bankers and venture capitalists Mr. De May decided to raise additional capital to support Optimay GmbH by starting a U.S. corporation. The U.S. company would issue debt instruments and would hold the shares of Optimay GmbH. On September 18, 1995 Mr. De May formed Optimay Corporation, a Delaware company. In February 1996 Optimay Corporation began selling 7% Convertible Subordinated Debentures to unrelated investors.

Department of the Treasury – Internal Revenue Service

Form 886-A
Page 1

| Form<br>**886-A** | U.S. Treasury Department-Internal Revenue Service<br>**EXPLANATION OF ITEMS** | Schedule No. or<br>**Exhibit** |
|---|---|---|
| Name of Taxpayer<br><br>James M. De May | | Years Ended<br>12/31/97, 12/31/98 |

On February 7, 1996 Mr. De May transferred Optimay GmbH to Optimay Corporation in exchange for 100 shares of Optimay Corporation stock and assumption of the debt he had personally incurred in maintaining the operations of Optimay GmbH.

On February 8, 1996, after having transferred shares of Optimay Corporation to two foreign trusts and a foreign private foundation, Mr. De May had 192,769 shares of Optimay Corporation stock remaining, including the 100 shares he received on the sale of Optimay GmbH.  As founder of Optimay Corporation Mr. De May received his shares in the company without cost.

On December 18, 1997 Mr. De May invested in a Bermuda limited partnership, Risk Capital Bermuda Fund, L.P.  According to the taxpayer one of the purposes of this investment was diversification of his investment assets.  In exchange for $1,000 and 172,769 shares of Optimay Corporation stock Mr. De May received an 11.14772% interest in the foreign partnership.  The partnership valued the Optimay Corporation common stock at $16 per share for purposes of the partnership contribution.  Mr. De May's total direct investment in the partnership, including the value of the stock and cash he gave, was $2,765,304.

The partnership agreement lists the Risk Capital Bermuda Fund, L.P. partners and their respective capital contributions as follows:

| Partner | Initial Contribution | Initial Capital | Partnership Interest |
|---|---|---|---|
| James M. De May | 172,769 shares of Optimay Corp. plus US$1,000 | US$2,765,304 | 11.14772% |
| De May Family Trust | 627,231 shares of Optimay Corp. plus US$1,000 | US$10,036,696 | 40.46075 |
| Peter M. Bond | US$1,000 | US$1,000 | .00403 |
| TMC (Holdings) Limited | 1 share of TMC Trading International, Ltd. plus US$1,000 | US$12,001,000 | 48.37539 |
| Rockwell Bransom Bean | US$1,000 | US$1,000 | .00403 |

| Form 886-A | U.S. Treasury Department-Internal Revenue Service EXPLANATION OF ITEMS | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer James M. De May | | Years Ended 12/31/97, 12/31/98 |

On April 16, 1998 a wholly owned subsidiary of Lucent Technologies, Inc. purchased Optimay Corporation for $16.53 per share. The terms of the purchase designated that most of the proceeds of the sale would be paid immediately but that a portion would be held in escrow to be paid 12 and 18 months after closing. Accordingly, the foreign partnership received $14.50 per share of Optimay Corporation stock in 1998 and the remaining $2.03 was to be paid in 1999 and 2000.

According to the taxpayer, after the sale of Optimay Corporation to Lucent most of the reason for investing in the partnership no longer existed. In unwinding the partnership Mr. De May and the other partners agreed on a distribution plan for the proceeds from the Lucent sale on May 6, 1998. In this agreement Mr. De May accepted $2,421,052 as his share of the 1998 sale proceeds and an additional $350,721 from escrow funds to be paid in 1999 and 2000. Mr. De May reported long-term capital gains on his 1998 income tax return of $2,711,052 consisting of $2,421,052 from the partnership and $290,000 from 20,000 shares of Optimay Corporation stock he held outside the partnership.

## LAW

Internal Revenue Code Section 721(a) provides the general rule that gain or loss is not recognized on the contribution of property to a partnership in exchange for an interest in the partnership.

Internal Revenue Code Section 721(b) provides the special rule that subsection (a) shall not apply to gain realized on the transfer of property to a partnership if partnership would be treated as an investment company (within the meaning of section 351) if the partnership were incorporated.

Internal Revenue Code Section 351(e)(1) states that the determination of whether a company is an investment company shall be made by taking into account all stock and securities held by the corporation. Money and stocks and other equity interests in a corporation are treated as stocks and securities under this section.

## GOVERNMENT'S POSITION

The transfer of Optimay Corporation stock by Mr. De May to the Risk Capital Bermuda Fund partnership was a taxable event which should have been reported by Mr. De May in his 1997 income tax return. Ordinarily, under the provisions of

| Form<br>**886-A** | U.S. Treasury Department-Internal Revenue Service<br>**EXPLANATION OF ITEMS** | Schedule No. or<br>**Exhibit** |
|---|---|---|
| Name of Taxpayer<br><br>James M. De May | | Years Ended<br>12/31/97, 12/31/98 |

section 721(a), gain or loss is not recognized on the contribution of property to a partnership in exchange for a partnership interest. Section 721(b), however, specifies that the gain nonrecognition provisions of section 721(a) do not apply if the partnership would be treated as an investment company (as defined by section 351) if it were incorporated.

Internal Revenue Code Section 351(e) specifies that the determination of whether a company is an investment company shall be made by taking into account all stock and securities held by the company and by treating money, stock, and other equity interests in a corporation as stocks and securities.

Income Tax Regulation Section 1.351-1(c) states:

> *(1) The general rule of section 351 does not apply, and consequently gain or loss will be recognized, where property is transferred to an investment company after June 30, 1967. A transfer of property after June 30, 1967, will be considered to be a transfer to an investment company if –*
>
> > *(i) The transfer results, directly or indirectly, in diversification of the transferors' interests, and*
> > *(ii) The transferee is (a) a regulated investment company, (b) a real estate investment trust, or (c) a corporation more than 80 percent of the value of whose assets (excluding cash and non-convertible debt obligations from consideration) are held for investment and are readily marketable stocks or securities, or interests in regulated investment companies or real estate investment trusts.*

For purposes of Income tax Regulation 1.351-1(c), Income Tax Regulation Section 1.351-1(c)(5) defines diversification as a transfer in which two or more persons transfer non-identical assets to a corporation in the exchange.

The Taxpayer Relief Act of 1997 (TRA '97) subsequently broadened the definition of an investment company as stated by Income Tax Regulation Section 1.351-1(c). The regulation, which has not yet been updated, limited the assets of corporations for investment company treatment to readily marketable stocks or securities. Section 1002 of TRA '97 and Internal Revenue Code Section 351(e), as amended, specify that the determination of an investment company shall be made by taking into account all stock and securities held by the company, whether readily marketable or not, and by treating money as a security.

---

Department of the Treasury – Internal Revenue Service

Form 886-A
Page 4

| Form 886-A | U.S. Treasury Department-Internal Revenue Service EXPLANATION OF ITEMS | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer James M. De May | | Years Ended 12/31/97, 12/31/98 |

The first test of whether the Risk Capital Bermuda Fund, L.P. partnership should be treated as an investment company under the provisions of sections 721(b) and 351(e) is whether the transfer of stock to the partnership in exchange for a partnership interest resulted in diversification of the transferors' interests.

One of the taxpayer's stated purposes of the transfer to the partnership was diversification. This objective is demonstrative by the result of the transfer and formation of the partnership. After the partnership was organized it had five investors and the assets contributed, besides a small amount of cash, were 800,000 shares of Optimay Corporation stock valued at $12,800,000 and one share of TMC (Holdings) Limited (later replaced with TMC Trading Ltd.) valued at $12,000,000. As stated above, section 1.351-1(c)(5) defines diversification for this purpose as occurring when more than two persons transfer non-identical assets to a partnership. Clearly, the first test of an investment company was met.

The second test is whether more than 80% of the value of the partnership consists of stocks and securities. According to the partnership agreement the assets of the partnership were valued at $24,805,000. The 800,000 shares of Optimay Corporation stock made up 51.60% of this amount and the TMC (Holdings) Ltd. stock was 48.38% of the total value. Clearly, the second test of investment company status was met.

Having met both the diversification and valuation tests, the Risk Capital Bermuda Fund, L.P. partnership is treated as an investment company under the provisions of sections 721(b) and 351(e). Therefore, Mr. De May is required to recognize gain on the transfer of 172,769 shares of Optimay Corporation stock to the partnership on December 18, 1997 valued at $2,764,304.

Mr. De May reported long-term capital gain from the sale of 172,769 shares of Optimay Corporation stock through the partnership on his 1998 income tax return in the amount of $2,421,052. As a result of the recognition of gain on the contribution of these shares to the partnership in 1997 it is necessary to reduce the capital gain income Mr. De May reported in 1998 by $2,421,052.

## CONCLUSION

It was determined that Mr. James M. De May made a taxable transfer of shares of corporate stock to a foreign partnership under the provisions of Internal Revenue Code Sections 721(b) and 351(e) in 1997. The value of the shares transferred in the

| Form **886-A** | U.S. Treasury Department-Internal Revenue Service<br>**EXPLANATION OF ITEMS** | Schedule No. or<br>**Exhibit** |
|---|---|---|
| Name of Taxpayer<br><br>James M. De May | | Years Ended<br>12/31/97, 12/31/98 |

amount of $2,764,304 is includible in Mr. De May's gross income for the 1997 taxable year as long-term capital gain.  Also, as a result of the taxable transfer it is necessary to reduce the long-term capital gain reported by Mr. De May on his 1998 income tax return by $2,421,052.

| Form 886-A | U.S. Treasury Department-Internal Revenue Service EXPLANATION OF ITEMS | Schedule No. or Exhibit |
|---|---|---|

| Name of Taxpayer James M. De May | Years Ended 12/31/98 |
|---|---|

|  | 1998 |
|---|---|
| Long-Term Capital Gain from the Anne Schrader De May Trust per Examination | $2,900,000 |
| Long-Term Capital Gain from the Anne Schrader De May Trust per Tax Return | 0 |
| Adjustment | $2,900,000 |

## Issue

Is income realized by the Anne Schrader De May Trust includible in the gross income of Mr. James M. De May?

## Facts

On September 13, 1985 Mr. James De May, a U.S. citizen, married Anne Schrader, a German citizen. Less than a year later, on July 10, 1986, Mr. De May formed a German corporation, Optimay GmbH. Initially, Optimay GmbH was formed as a means for Mr. De May to conduct his software consulting business. Over time the business of Optimay GmbH grew into software development for semiconductor manufacturers targeting the market for cellular telephones based on the Global System for Mobile Communications (GSM) protocol. In order to finance the growth of Optimay GmbH Mr. De May personally borrowed funds for the company.

On the advice of investment bankers and venture capitalists Mr. De May decided to further raise capital to support Optimay GmbH by organizing a U.S. corporation. The U.S. corporation would issue debt instruments and would hold the shares of Optimay GmbH. On September 18, 1995 Mr. De May formed a Delaware company, Optimay Corporation. In February 1996 Optimay Corporation began selling 7% Convertible Subordinated Debentures to unrelated investors.

On February 7, 1996 Mr. De May sold Optimay GmbH to Optimay Corporation in exchange for 100 shares of Optimay Corporation stock and assumption of the debt he had personally incurred in maintaining the operations of Optimay GmbH.

On February 8, 1996 Mr. De May established the Anne Schrader De May Trust and arranged for the Optimay Corporation to issue 200,000 shares of its stock to the trust.

| Form<br>886-A | U.S. Treasury Department-Internal Revenue Service<br>**EXPLANATION OF ITEMS** | Schedule No. or<br>**Exhibit** |
|---|---|---|
| Name of Taxpayer<br><br>James M. De May | | Years Ended<br>12/31/98 |

The Anne Schrader De May Trust was formed under the laws of Bermuda and, according to paragraph 4.2 of Article IV (Situs, Irrevocability, and Grantor Status) of the trust instrument "shall be treated as a GRANTOR TRUST under Sections 671 to 678 (inclusive) of the Code."

Article V (Trust Distributions) of the trust instrument provided that the trustee, Grosvenor Trust Company Limited of Bermuda, may, in its sole discretion, make payment of the net income or the capital of the trust to Beneficiary Number 1 during the initial trust period. The initial trust period was defined as the sooner of twenty years or the death of Beneficiary Number 1.

Schedule 2 of the trust document specifically named Beneficiary Number 1 as Anne Schrader De May. The schedule named the Optimay Foundation, a Bermuda charitable foundation established by Mr. De May as Beneficiary Number 2. No other specific beneficiaries were named but the trust instrument (Article I) defined the term "Beneficiaries" to be those persons specifically named by Schedule 2 of the instrument and those persons later added. Mr. De May, in conjunction with the trustee, reserved the power to expand or contract the class of beneficiaries under Article VI (Powers Retained by Settlor).

Paragraph 5.2 of Article V (Trust Distributions) also designated that on expiration of the initial trust period, if Mr. De May is living, then the trustee has the discretion to extend the initial trust period or may terminate the trust and pay the principal and accrued income to Mr. De May. If on expiration of the initial trust period neither Mr. De May nor Mrs. Anne Schrader De May (Beneficiary 1) are living then the principal and accrued income will be paid to the De May Family Trust (paragraph 5.5). The De May Family Trust is a Bermuda trust created by Mr. De May that named Mr. De May's family members, both U.S. and foreign, as beneficiaries.

As described above, Article VI (Powers Retained by Settlor) stated that Mr. De May and the trustee had the right to expand or contract the class of trust beneficiaries. Under this article Mr. De May also maintained the power to vote any shares of the Optimay Corporation held by the trust.

On February 12, 1996 Mr. De May renounced powers and interests in the Anne Schrader De May Trust with the following statement:

---

| Form 886-A | U.S. Treasury Department-Internal Revenue Service EXPLANATION OF ITEMS | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer James M. De May | | Years Ended 12/31/98 |

*The Settlor hereby renounces any power to expand or contract the class of beneficiaries and any interest whatsoever that he might have, including any contingent or remainder interest, in the Trust.*

*It is his intention that the transfer of Optimay shares be a completed gift and the provisions of the Trust be construed accordingly.*

On April 9, 1998 the Anne Schrader De May Trust was amended and migrated from Bermuda to the Isle of Man. The trustee was changed from Grosvenor Trust Company Limited of Bermuda to Valmet Isle of Man Limited.

After amendment of the trust instrument Article IV, which had previously stated that the trust would be a grantor trust under Internal Revenue Code Sections 671 to 678, now specified that the trust would not be a grantor trust. The amended Article IV (Situs, Irrevocability, Nongrantor Trust Status) declared that "it is the intention of the Settlor that this Settlement not be a grantor trust under Sections 671 to 679 (inclusive) of the Code and its provisions be construed accordingly."

The trustee's ability and discretion to make distributions under Article V (Trust Distributions) was not reduced when the trust instrument was amended. The specified trust beneficiaries, Anne Schrader De May and the Optimay Foundation, also did not change. Paragraph 5.2 of Article V (Trust Distributions) was changed, however, to designate that on the expiration of the initial trust period Mrs. Anne Schrader De May, rather than Mr. De May, would receive the trust principal and accrued income.

Also, paragraph 5.3 stated that if, on expiration of the initial trust period Mrs. Anne Schrader De May was not living, then the De May Family Trust would receive the trust principal and accumulated income provided it is not a U.S. person as defined in section 679. Paragraph 5.4 designated that any portion of the trust not disposed of by paragraphs 5.2 and 5.3 would then be distributed to the Optimay Foundation.

A new paragraph 5.8 was added to Article V as follows:

*NOTWITHSTANDING ANY OTHER PROVISION HEREOF, no named beneficiary or other person who might be construed as a beneficiary or holder of a power or interest hereunder shall be a United States person as defined for purposes of section 679 of the Code or a spouse described in sections 672(e) or 677 of the Code and no part of the income or corpus of the trust shall be paid to or accumulated for the benefit of such person. Should either named beneficiary be disfranchised at any*

Department of the Treasury – Internal Revenue Service

| Form 886-A | U.S. Treasury Department-Internal Revenue Service EXPLANATION OF ITEMS | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer  James M. De May | | Years Ended 12/31/98 |

*time by this Clause, the other shall take in her or its stead, and should both be disfranchised, the Trustee shall expand the class of Beneficiaries to include one or more charitable organizations that are not U.S. persons, which charitable organization(s) shall be benefited or possessed of the subject power or interest.*

Article VI was altered to state that Mr. De May had not reserved any power to act with respect to the trust or the trust fund and shall be consulted but shall not be entitled to instruct with respect to the voting of the shares of the Optimay Corporation held by the trust. Also, Beneficiary 2 shall have the power to vest income of the trust in itself.

On April 16, 1998 a wholly owned subsidiary of Lucent Technologies, Inc. purchased Optimay Corporation for $16.53 per share. The terms of the purchase designated that most of the proceeds of the sale would be paid immediately but that a portion would be held in escrow to be paid 12 and 18 months after closing. As a result of the purchase the Anne Schrader De May Trust received $2,900,000 in 1998 calculated as $14.50 per share for the 200,000 shares of Optimay Corporation stock it held with the balance to be received in 1999 and 2000.

On December 31, 1998 the trustee of the Anne Schrader De May Trust transferred all of the assets of the trust to Mrs. Anne Schrader De May and the Anne Schrader De May Trust was dissolved.

**LAW**

Internal Revenue Code Section 675(4) states that the grantor of a trust shall be treated as the owner of the trust if he retains certain general powers of administration. These powers include the right to vote or direct the voting of stock or other securities of a corporation in which the holdings of the grantor and the trust are significant from the viewpoint of voting control.

Internal Revenue Code Section 679(a) states:

*In general. A United States person who directly or indirectly transfers property to a foreign trust (other than a trust described in section 6048(a)(3)(B)(ii)) shall be treated as the owner for his taxable year of the portion of such trust attributable to such property if for such year there is a United States beneficiary of any portion of such trust.*

Department of the Treasury – Internal Revenue Service

Form 886-A
Page 4

| Form **886-A** | U.S. Treasury Department-Internal Revenue Service **EXPLANATION OF ITEMS** | Schedule No. or **Exhibit** |
|---|---|---|
| Name of Taxpayer James M. De May | | Years Ended 12/31/98 |

Internal Revenue Code Section 679(c) designates that a trust shall be treated as having a United States beneficiary unless:

(1) under the terms of the trust, no part of the income or corpus of the trust may be paid or accumulated during the taxable year to or for the benefit of a United States person, and

(2) if the trust were terminated at any time during the taxable year, no part of the income or corpus of such trust could be paid to or for the benefit of a United States person.

Income Tax Regulation 1.679-2(c)(2) describes the treatment of a U.S. transferor when a trust under section 679 ceases to have a U.S. beneficiary as follows:

If, for any taxable year of a U.S. transferor, a foreign trust that has received a transfer of property from the U.S. transferor ceases to be treated as having a U.S. beneficiary, the U.S. transferor ceases to be treated as the owner of the portion of the trust attributable to the transfer beginning in the first taxable year following the last taxable year of the U.S. transferor during which the trust was treated as having a U.S. beneficiary (unless the U.S. transferor is treated as an owner therof pursuant to section 673 through 677). The U.S. transferor is treated as making a transfer of property to the foreign trust on the first day of the first taxable year following the last taxable year of the U.S. transferor during which the trust was treated as having a U.S. beneficiary. The amount of the property deemed to be transferred to the trust is the portion of the trust attributable to the prior transfer to which paragraph (a)(1) of this section applied. For rules regarding the recognition of gain on transfers to foreign trusts, see section 684.

Income Tax Regulation Section 1.679-1(b) regarding interaction of section 679 with sections 673 through 678 states:

The rules of this section apply without regard to whether the U.S. transferor retains any power or interest described in sections 673 through 677. If a U.S. transferor would be treated as the owner of a portion of a foreign trust pursuant to the rules of this section and another person would be treated as the owner of the same portion of the trust pursuant to section 678, then the U.S. transferor is treated as the owner and the other person is not treated as the owner.

The general rule of Internal Revenue Code Section 678(a) states that a person other than the grantor shall be treated as the owner of any portion of a trust with respect to which such person has a power exercisable solely by himself to vest the corpus or

---

| Form<br>886-A | U.S. Treasury Department-Internal Revenue Service<br>**EXPLANATION OF ITEMS** | Schedule No. or<br>**Exhibit** |
|---|---|---|
| Name of Taxpayer<br><br>James M. De May | | Years Ended<br>12/31/98 |

the income therefrom in himself. Subsection 678(b) states that 678(a) shall not apply if the grantor of the trust or a transferor (to whom section 679 applies) is otherwise treated as the owner.

Income Tax Regulation Section 1.678(b)-1 states:

*Section 678(a) does not apply with respect to a power over income, as originally granted or thereafter modified, if the grantor of the trust is treated as the owner under sections 671 to 677, inclusive.*

Internal Revenue Code Section 672(e) states:

*(1) In general. For purposes of this subpart, a grantor shall be treated as holding any power or interest held by –*
> *(A) any individual who was the spouse of the grantor at the time of the creation of such power or interest, or*
> *(B) any individual who became the spouse of the grantor after the creation of such power or interest, but only with respect to periods after such individual became the spouse of the grantor.*

Internal Revenue Code Section 677 (a) states (in part): *the grantor shall be treated as the owner of any portion of a trust, whether or not he is treated as such owner under section 674, whose income without the approval or consent of any adverse party is, or, in the discretion of the grantor or a nonadverse party, or both, may be –*

> *(1) distributed to the grantor or the grantor's spouse; or*
> *(2) held or accumulated for future distribution to the grantor or the grantor's spouse.*

Internal Revenue Code Section 672(a) defines an adverse party as any person having a substantial beneficial interest in the trust which would be adversely affected by the exercise or nonexercise of the power which he possesses respecting the trust. A nonadverse party is defined as any person who is not an adverse party.

Internal Revenue Code Section 684 states that:

*Except as provided in regulations, in the case of any transfer of property by a United States person to a foreign estate or trust or to a nonresident alien, for purposes of this subtitle, such transfer shall be treated as a sale or exchange for an amount*

| Form 886-A | U.S. Treasury Department-Internal Revenue Service **EXPLANATION OF ITEMS** | Schedule No. or **Exhibit** |
|---|---|---|
| Name of Taxpayer  James M. De May | | Years Ended 12/31/98 |

equal to the fair market value of the property transferred, and the transferor shall recognize as gain the excess of –
   (1) the fair market value of the property so transferred, over
   (2) the adjusted basis (for purposes of determining gain) of such property in the hands of the transferor.

Example (1) of Income Tax Regulation 1.684-2(e) in which A is a U.S. citizen and FT is a foreign trust illustrates the interactions of sections 679 and 684 as follows:

(i)   On January 1, 2001, A transfers property, which has a fair market value of 1000X and an adjusted basis of 400X, to FT. At the time of the transfer, FT has a U.S. beneficiary within the meaning of § 1.679-2, and A is treated as owning FT under § 679. Under § 1.684-3(a), § 1.684-1 does not cause A to recognize gain at the time of the transfer.

(ii)  On July 1, 2003, FT ceases to have a U.S. beneficiary as defined in § 1.679-2(c) and as of that date neither A nor any other person is treated as owning any portion of FT. Pursuant to § 1.679-2(c)(2), if FT ceases to be treated as having a U.S. beneficiary, A will cease to be treated as owner of FT beginning on the first day of the first taxable year following the last taxable year in which there was a U.S. beneficiary. Thus, on January 1, 2004, A ceases to be treated as owner of FT. On that date, the fair market value of the property is 1200X and the adjusted basis is 350X. Under paragraph (e)(1) of this section, A is treated as having transferred the property to FT on January 1, 2004, and must recognize 850X of gain at that time under § 1.684-1.

## GOVERNMENT'S POSITION

There is no question that the Anne Schrader De May Trust was a grantor trust as it was originally created.

Article IV as originally written states that it is the intention of the settlor that it will be considered a grantor trust under the provisions of sections 671 to 678 (inclusive). In keeping with this intention Mr. De May retained powers that required that he be treated as the owner of the trust and the property it held. He could determine who received the principal and income of the trust by designating who the beneficiaries of the trust were (Article IV). This power required him to be treated as owner of the

| Form<br>886-A | U.S. Treasury Department-Internal Revenue Service<br>**EXPLANATION OF ITEMS** | Schedule No. or<br>**Exhibit** |
|---|---|---|
| Name of Taxpayer<br><br>James M. De May | | Years Ended<br>12/31/98 |

trust under section 677. He could vote the shares of the Optimay Corporation (Article IV). This right required him to be treated as owner of the trust under section 675(4).

The trust instrument also contained provisions that granted Mr. De May or his wife the right to trust principal and accumulated income resulting in him being treated as the owner of the trust under sections 672(e) and 677. Mrs. Anne Schrader De May was named as the principal beneficiary of the trust and was eligible to receive distributions from the trust under Article V. Also, Mr. De May was to receive the principal and accumulated income of the trust when it was terminated (Article V).

The property held by the Anne Schrader De May Trust consisting of 200,000 shares of Optimay Corporation stock was sold on April 16, 1998 to Lucent Technologies. The question relevant to whether the income realized on this sale should be recognized by Mr. De May is whether the Anne Schrader De May Trust remained a grantor trust after it was amended on April 9, 1998.

To answer this question we first consider whether the Anne Schrader De May Trust should be treated as owned by Mr. De May under the provisions of Internal Revenue Code Section 679.

Section 679(a) provides that a United States person who directly or indirectly transfers property to a foreign trust shall be treated as the owner of the trust for his taxable year if the foreign trust has a U. S. beneficiary for such year. Section 679(c) states that a trust will be treated as having a U.S. beneficiary for the taxable year unless under the terms of the trust no part of the income or corpus of the trust may be paid to or accumulated for the benefit of a United States person and if the trust were terminated during the taxable year none of the income or corpus can be paid to or for the benefit of a United States person.

The trust instrument as originally written did not contain a prohibition to the payment of corpus or income to or for the benefit of a United States person. To the contrary, the trust instrument gave Mr. De May, in conjunction with the trustee, the broad power to name any person as a beneficiary. Although Mr. De May renounced his power to change the beneficiaries on February 12, 1996, shortly after the trust was created, nothing in the trust instrument limited the ability of the trustee to name any person, foreign or domestic, as a trust beneficiary. Moreover, paragraph 5.2 of Article V (Trust Distributions) specifically instructed the trustee, on termination of the trust to pay the corpus and accumulated income to a U.S. person, Mr. De May. The trustee was further instructed that if neither Mr. De May nor Mrs. Anne Schrader De

| Form 886-A | U.S. Treasury Department-Internal Revenue Service EXPLANATION OF ITEMS | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer  James M. De May | | Years Ended 12/31/98 |

May were living at expiration of the initial trust period then the trustee should terminate the trust and pay the corpus and accumulated income to the De May Family Trust. Eight of the beneficiaries of the De May Family Trust (including Mr. De May) are U.S. persons. Therefore, as originally created the Anne Schrader De May Trust was a grantor trust owned by Mr. De May under the rules of sections 679(a) and (c).

When the trust was amended on April 9, 1998 certain paragraphs were changed and provisions were added with the intention of eliminating the potential for the trust to be considered a grantor trust under section 679. Article IV (Situs, Irrevocability, Nongrantor Trust Status) was revised to state that "it is the intention of the Settlor that this Settlement not be a grantor trust under Sections 671 to 679 (inclusive) of the Code and its provisions be construed accordingly.

Paragraph 5.2 of Article V (Trust Distributions) was changed. Previously this paragraph had designated that Mr. De May would receive the corpus and income of the trust on it's termination. This paragraph was changed so that on termination of the trust Mrs. Anne Schrader De May, Beneficiary 1, would receive the corpus and income of the trust. Paragraph 5.3 of this article was also changed to provide that if Mrs. Anne Schrader De May was not living on termination of the trust then the De May Family Trust would receive the corpus and income of the trust, but only if it was not considered a U.S. person as defined by Internal Revenue Code Section 679.

Perhaps the most important change to the trust instrument was the addition of paragraph 5.8 of Article V. This paragraph, which is stated above, designates that no beneficiary shall be a United States person as defined for purposes of section 679 or a spouse as described in sections 672(e) or 677. If a beneficiary should come within these definitions then another beneficiary would take the place of the disfranchised beneficiary.

On the face of it this addition to the trust instrument appears to meet the requirement of section 679(c) that requires that the terms of the trust specify that no U.S. person may receive the income or corpus of the trust during the taxable year or at termination of the trust and the trust income and corpus cannot be accumulated for a U.S. person.

For the sake of argument let us assume that paragraph 5.8 of Article V is fully operational and that the grantor trust status of the Anne Schrader De May Trust terminated on April 9, 1998 as a result of the amendment of the trust instrument. We previously made the argument that as originally formulated the trust was a

| Form 886-A | U.S. Treasury Department-Internal Revenue Service **EXPLANATION OF ITEMS** | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>James M. De May | | Years Ended 12/31/98 |

grantor trust owned by Mr. De May under section 679. This was the case because the trust document allowed for the potential for income and corpus to be paid to or accumulated for the benefit of U.S. persons and section 679(c) designates that such a trust will be treated as having a United States beneficiary for purposes of section 679(a).

If grantor trust status terminated for purposes of section 679 then the date of the cessation of grantor status is the first day of the taxable year following the last taxable year of the U.S. transferor during which the trust was treated as having a U.S. beneficiary. Section 679 states that a United States person shall be treated as the owner for his taxable year of the portion of a trust attributable to property he directly or indirectly transferred to the trust if for such year there is a United States beneficiary of any portion of the trust. During 1998 the Anne Schrader De May Trust is treated as having a United States beneficiary through April 8, 1998 when the trust instrument was amended by the provisions of section 679(c). Therefore, Mr. De May is treated as the owner of the trust through the last day of his taxable year. Mr. De May's taxable year ends on December 31st. If Mr. De May's ownership of the Anne Schrader De May Trust under section 679 ended in 1998 due to the operation of paragraph 5.8 then he is treated as the owner of the trust through December 31, 1998.

Income Tax Regulation 1.679-2(c)(2) confirms this treatment. This section titled "Trusts ceasing to have a U.S. beneficiary" states that the U.S. transferor ceases to be treated as the owner of the trust beginning in the first taxable year following the last taxable year of the U.S. transferor during which the trust was treated as having a U.S. beneficiary.

This treatment is also confirmed by Example (1) of Income Tax Regulation 1.684-2(e) as listed above. This example presents a foreign trust that is treated as owned by a U.S. citizen under section 679 beginning January 1, 2001. On July 1, 2003 the foreign trust ceases to have a U.S. beneficiary. According to the example the U.S. person will cease to be treated as the owner of the foreign trust on the first day of the first taxable year following the last taxable year in which there was a U.S. beneficiary. On January 1, 2004 the U.S. person will cease to be treated as the owner of the foreign trust.

If the Anne Schrader De May Trust ceased grantor trust status during 1998 due to new paragraph 5.8 of Article V then the income realized by the trust on the sale of the Optimay Corporation stock on April 16, 1998 is includible in the gross income of Mr. De May for his 1998 taxable year.

Department of the Treasury – Internal Revenue Service

Form 886-A
Page 10

| Form 886-A | U.S. Treasury Department-Internal Revenue Service **EXPLANATION OF ITEMS** | Schedule No. or **Exhibit** |
|---|---|---|
| Name of Taxpayer James M. De May | | Years Ended 12/31/98 |

We assumed earlier that paragraph 5.8 of Article V was operational and applied to terminate the grantor trust status of the trust during 1998. There are reasons to consider this paragraph as not functional for its intended purpose and to continue to treat Mr. De May as the owner of the trust through the end of 1998 when trust assets were distributed to Mrs. Anne Schrader De May and the trust was dissolved.

First, we note that new paragraph 5.8 is inconsistent with circumstances before and after the trust was amended and with other modifications to the trust instrument. Mrs. Anne Schrader De May was the principal beneficiary of the trust as originally created and was, at all times during the life of the trust, the wife of the grantor. Her status as beneficiary and spouse did not change before or after the trust was amended. Recall that new paragraph 5.8 stated that no beneficiary may be a United States person for purposes of section 679 or a spouse described in sections 672(e) or 677 and no part of the income or corpus of the trust may be paid to or accumulated for the benefit of such person. The declarations of paragraph 5.8 were broken when they were written. Stating that no beneficiary may be a spouse under sections 672(e) or 677 when the principal beneficiary already was the grantor's spouse means that we must either ignore the new paragraph or ignore reality. Paragraph 5.8 was violated at the instant it was added because it stated a condition that did not exist before or after the paragraph was attached.

This point is accentuated when we understand that Mrs. Anne Schrader De May gained additional powers in the modified trust. Despite paragraph 5.8 she received the right to receive the corpus and accumulated income at termination of the trust (amended paragraph 5.2 of Article V). The amendment to paragraph 5.2 that granted Mrs. Anne Schrader De May the additional right to accumulated income and trust corpus was made at the same time paragraph 5.8 was added. We may ask why Mrs. Anne Schrader De May was granted additional rights in paragraph 5.2 only to lose them, since she is the grantor's spouse under sections 672(e) and 677, in paragraph 5.8. Which paragraph prevails? Did she gain additional interests in trust assets or was she immediately disfranchised? Should we assume that the changes to paragraph 5.2 were void the instant they were made or that paragraph 5.8 never went into force? Clearly, we have reason to doubt the functionality of paragraph 5.8 and whether the trustee, Mr. De May, and Mrs. Anne Schrader De May ever meant for it to ever take effect.

The second and most important reason we have to doubt that new paragraph 5.8 ever was in force is that the trustee, Mr. De May and Mrs. Anne Schrader De May all ignored the paragraph and acted as if it were not in effect. The assets of the trust

| Form 886-A | U.S. Treasury Department-Internal Revenue Service EXPLANATION OF ITEMS | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer  James M. De May | | Years Ended 12/31/98 |

were distributed to Mrs. Anne Schrader De May and the trust was dissolved on December 31, 1998. If the trustee, Mr. De May, and Mrs. Anne Schrader De May believed that paragraph 5.8 of Article V (as amended) had force and was operative then they were bound and required to replace her with another beneficiary. Paragraph 5.8 states unequivocally that no part of the income or corpus of the trust shall be paid to or accumulated for the benefit of a person that meets the description of a spouse in sections 672(e) or 677. These sections do not use deceptive, misleading, unusual, circuitous, or difficult definitions of what a spouse is or is not. Section 672(e) simply uses the plain language that a grantor is treated as holding any power or interest of a grantor's spouse. Similarly, section 677 designates that a grantor shall be treated as the owner of a trust if income may be distributed to the grantor or the grantor's spouse. Clearly, under any definition Mrs. Anne Schrader De May was Mr. De May's spouse at all times during the life of this trust. Yet in violation of new paragraph 5.8 Mrs. Anne Schrader De May was not replaced as beneficiary and did not step aside. Knowing that she was the grantor's spouse and ignoring the terms of paragraph 5.8 she received all the assets of the trust before it was terminated. Neither the dissolution of the trust nor her receipt of the assets can now be undone. We are left to conclude that it was never intended for paragraph 5.8 to enter into force. If paragraph 5.8 was never operational then the trust continued to be owned by Mr. De May under section 679 after the trust was amended as it was before the modifications. As a result the income realized by the trust on the sale of Optimay Corporation stock on April 16, 1998 is includible in the gross income of Mr. De May for his 1998 taxable year.

There is another possibility that we have not yet considered. Recall that Article VI of the trust instrument was amended so that Beneficiary 2, the Optimay Foundation, received the power to vest the income of the trust in itself. Section 678 states that a person other than the grantor will be treated as the owner of a trust if that person has a power exercisable solely by himself to vest the corpus or the income in himself. Is Mr. De May treated as the owner of the Anne Schrader De May Trust if another person is considered the owner of the trust under section 678?

Income Tax Regulations Sections 1.678(b)-1 and 1.679-1(b) answer this question. Regulation Section 1.678(b)-1 states that section 678(a) does not apply if the grantor of a trust is treated as the owner under sections 671 to 677, inclusive. Similarly, Regulation Section 1.679-1(b) states that if a U.S. transferor would be treated as the owner of a portion of a foreign trust under the rules of section 679 and another person would be treated as the owner of the same portion of the trust under section 678 then the U.S. transferor is treated as the owner and the other person is not treated as the owner. Although the Optimay Foundation was given the power to vest

| Form 886-A | U.S. Treasury Department-Internal Revenue Service **EXPLANATION OF ITEMS** | Schedule No. or **Exhibit** |
|---|---|---|
| Name of Taxpayer James M. De May | | Years Ended 12/31/98 |

the income of the trust in itself, Mr. De May is treated as the owner of the trust under the provisions of sections 671 to 677 and section 679.

Finally, we consider whether the Anne Schrader De May Trust is treated as owned by Mr. De May under other sections of the Internal Revenue Code. As we have already described, Internal Revenue Code Section 672(e) specifies that a grantor of a foreign trust shall be treated as holding any power or interest held by the grantor's spouse. Mrs. Anne Schrader De May is a beneficiary of the Anne Schrader De May Trust and therefore Mr. De May is treated as holding this interest.

Internal Revenue Code Section 677 states that the grantor of a trust shall be treated as the owner of a trust whose income without the approval or consent of any adverse party is, or, in the discretion of the grantor or a nonadverse party, or both, may be distributed to the grantor or the grantor's spouse. The trustee of the Anne Schrader De May Trust, both before and after the amendments, had sole discretion to distribute the trust income to Mrs. Anne Schrader De May. By the provisions of sections 672(e) and 677 Mr. De May is treated as the owner of the trust. As the owner of the trust he is required to include trust income in his gross income. Therefore, the income the trust realized in the sale of Optimay Corporation stock on April 16, 1998 is includible in Mr. De May's gross income for the 1998 taxable year.

To summarize, we determined that Mr. De May owned the Anne Schrader De May Trust before the trust instrument was amended on April 9, 1998 under the provisions of Internal Revenue Code Sections 679, 672(e), and 677. We also determined that if new section 5.8 of Article V of the trust instrument operated to terminate grantor trust status during 1998 then Mr. De May is treated as the owner of the trust through the last day of his taxable year, December 31, 1998. Therefore, as owner of the trust on the date of the sale of the Optimay Corporation stock by the trust he was required to recognize income realized by the trust in 1998.

We found that there was reason to question whether new paragraph 5.8 was operative. If this paragraph did not function to discontinue grantor trust status then the trust continued to be treated as owned by Mr. De May under sections 679, 672(e), and 677 until its assets were finally distributed to Mrs. Anne Schrader De May and the trust was dissolved on December 31, 1998. As the owner of the trust through December 31, 1998 Mr. De May was required to recognize income realized by the trust in the stock sale.

| Form 886-A | U.S. Treasury Department-Internal Revenue Service EXPLANATION OF ITEMS | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer James M. De May | | Years Ended 12/31/98 |

## CONCLUSION

It was determined that Mr. De May was the owner of the Anne Schrader De May Trust under the provisions of Internal Revenue Code Sections 679, 672(e), and 677 at the time the trust disposed of 200,000 shares of the Optimay Corporation on April 16, 1998. The trust received the Optimay Corporation stock without cost and therefore had no basis in the shares. Mr. De May did not report any income relating to the transactions or activities of the trust on his 1998 income tax return. Adjustment is required to include $2,900,000 in Mr. De May's long-term capital gain income for the 1998 taxable year.

# EXHIBIT 5

**Charles Bruce**

| | |
|---|---|
| From: | Charles M. Bruce [cbruce@mooreandbruce.com] |
| Sent: | Tuesday, June 25, 2002 9:39 PM |
| To: | 'James Michael De May' |
| Cc: | 'Jonathon Moore'; 'Julie Sanford' |
| Subject: | Information Re Work To Be Done; Tax Audit; Dealing With 3 IRS Explanations of Possible Adjustments [00862-007] |

Dear Jim,

After speaking with you yesterday, we received a fax from the Revenue Agent, Ms. Garcia, attaching explanations of items as to which the IRS is considering making adjustments. The adjustments would be to your or someone else's taxable income. The then applicable tax rate for the year in question would be applied to the amount of the adjustment in order to arrive at an additional tax figure. Penalties and interest would be added. As you will see from reading the IRS's explanations, the adjustments that they are considering are very large and, if they were to make these adjustments and their position were to be upheld, the tax liability would be several million dollars. (It will take some time to summarize the positions and the possible tax effects, to which we should add interest and possible penalties.)

The purpose of this email is to let you know that we have received these items and therefore anticipate performing a significant amount of work in reviewing them, perhaps speaking with the IRS individuals to clarify their thinking (this may or may not be necessary), preparing our responses--whether this is given to the IRS in writing or not, thinking about the overall strategy for handling the audit given its current posture, probably meeting with the IRS, and doing such other things as we think likely to improve the prospects for a good outcome.

The estimates of time should not be viewed as a flat fee quote. The time actually expended can be greater or less than the amount estimated, by a large margin. This is especially true where, as at this stage of the audit, everything depends upon how many and what kind of issues the IRS raises, how they want to handle those issues, whether they "fix" upon the issues raised to date or continually add new or revised ones, etc. (We will try to narrow and "shut down" the audit. But I have noted that the IRS is already speaking about alternative approaches. This practice, by the way, is not unusual, as the agents "feel their way" along.)

Unless we hear to the contrary, we understand that we are to proceed with the work. The first thing we will do will be to try to understand the IRS's positions. This will require a good deal of research. At the same time, we will begin tracking the issues, the years and the amounts so as to watch for "cross over" effects--where the treatment of one issue can affect the treatment of another. This also helps us spot settlement opportunities. Also, as to aspects of the IRS's position, in particular those dealing with the formation of the Bermuda limited partnership, the disposition of the Optimay shares held by the partnership and the subsequent winding up of that arrangement, we will need to go through the Maguire Woods & Battle files carefully, and we might need carefully to go through the files of the Bermuda law file that helped Magure Woods with its work.

In keeping with our undertaking to keep you informed, please note the following matter:

ITEM. Review, analysis and reponse to three "Explanations of Items" sent by the IRS, as to which it would like the taxpayer's reaction. This does not include any follow-up or subsequent work on the audit.

ESTIMATED TIME:  75 hours. Unlike in the past, when Jonathon has had the laboring oar, CMB will have a significant amount of time on this work.

We are sending you copies of the IRS's most recent communications, with the Forms 886-A EXPLANATION OF ITEMS [of possible adjustment to income].

Also, we want to urge you to meet with us to discuss in detail these subjects and the handling of the audit in general. We think this would be very beneficial. The consequences are too great for you not to become involved to a high degree.

Please call if you would like to discuss this further. My contact information is shown below. Additionally, my mobile telephone number is +44 (0) 7899 925 251. And of course you can contact me through Julie Sanford. I am in the London office starting Thursday for the next several weeks.

CC:    JRM
       JMS/File

++++++++++

Charles M. Bruce
Moore & Bruce, LLP

Washington, DC Office:
1072 Thomas Jefferson Street, NW
Washington, DC 20007
Tele. +1 202 965 5300
Fax +1 202 965 7745

London Office:
40 Park Street
London W1K 2JG
Tele. +44 (0) 207 495 3842
Fax +44 (0) 207 493 4299

Email cbruce@mooreandbruce.com
URL http://www.mooreandbruce.com

# EXHIBIT 6



**Internal Revenue Service**

Jonathon R. Moore
Moore & Bruce, LLP
1072 Thomas Jefferson St., NW
Washington D.C. 20007

**Department of the Treasury**

Taxpayer Identification Number:
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
Person to Contact/ID Number:
Monica Garcia / Badge # 85-00735
Contact Telephone Number:
(505) 837-5572

Date:  July 2, 2002

Dear  Mr. Moore,

We are sending you the enclosed material under the provisions of your power of attorney or other authorization on file with us. For your convenience, we have listed the name of the taxpayer to whom this material relates.

If you have any questions, please call the contact person at the telephone number shown in the heading of this letter.

Thank you for your cooperation.

Sincerely,

Monica Garcia

Enclosures:
☐  Letter(s)
☐  Report(s)
☒  Other

Taxpayer's Name

James M. De May

Letter 937 (Rev. 8-2000)
Cat. No. 30760X

# FAX

**Department of the Treasury**
**Internal Revenue Service**

## Confidentiality Notice

This communication is intended for the sole use of the individual to whom it is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If the reader of this communication is not the intended recipient, or the employee or agent for delivering the communication to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication may be strictly prohibited.

If you have received this communication in error, please notify the sender immediately by telephone call and return the communication to the fax number you will be given, then destroy the document(s). Thank you!



**Date**   July 2, 2002

**Number of pages including cover sheet**   6

**TO:** Jonathon Moore

**FROM:**   Monica Garcia
Internal Revenue Service
ID # 85-00735
5338 Montgomery Blvd NE
Albuquerque, NM  87109

**Phone**   (202) 965-5300
**Fax Phone**   (202) 965-7745

**Phone**   (505) 837-5572
**Fax Phone**   (505) 837-5654

**CC:**

**REMARKS:**   ☐ Urgent   ☐ For your review   ☐ Reply ASAP   ☐ Please Comment

RE:  James De May

Mr. Moore,

Attached is our narrative regarding Mr. De May's transfer of stock to the Optimay Foundation.

Monica Garcia

| Form<br>**886-A** | U.S. Treasury Department-Internal Revenue Service<br>**EXPLANATION OF ITEMS** | Schedule No. or<br>**Exhibit** |
|---|---|---|
| Name of Taxpayer<br><br>James M. De May | | Years Ended<br>12/31/96 |

| | 1996 |
|---|---|
| Tax Under the Provisions of Internal Revenue Code Section 1491 per Examination | $285,600 |
| Tax Under the Provisions of Internal Revenue Code Section 1491 per Tax Return | $0 |
| Additional Tax Liability | $285,600 |

### Issue

Is Mr. James M. De May subject to excise tax under the provisions of Internal Revenue Code Section 1491 due to the transfer of appreciated stock to a foreign irrevocable trust?

### Facts

On July 10, 1986, Mr. De May, a U.S. citizen, organized a German corporation, Optimay GmbH. Initially, Optimay GmbH was formed as a means for Mr. De May to conduct his software consulting business. Over time the business of Optimay GmbH grew into software development for semiconductor manufacturers targeting the market for cellular telephones based on the Global System for Mobile Communications (GSM) protocol. In order to finance the growth of Optimay GmbH Mr. De May personally borrowed funds for the company.

On the advice of investment bankers and venture capitalists Mr. De May decided to raise additional capital to support Optimay GmbH by starting a U.S. corporation. The U.S. company would issue debt instruments and would hold the shares of Optimay GmbH. On September 18, 1995 Mr. De May formed Optimay Corporation, a Delaware company and on February 7, 1996 Optimay GmbH was sold to Optimay Corporation by Mr. De May.

In February 1996 Optimay Corporation began selling 7% Convertible Subordinated Debentures to unrelated investors. The debentures matured in three years and were convertible to Optimay Corporation common stock at $6.66 per share. At maturity the debenture holders had the option to take interest in cash or in shares of Optimay Corporation common stock.

Department of the Treasury -- Internal Revenue Service                         Form 886-A
                                                                              Page 1

| Form **886-A** | U.S. Treasury Department-Internal Revenue Service<br>**EXPLANATION OF ITEMS** | Schedule No. or<br>**Exhibit** |
|---|---|---|
| Name of Taxpayer<br><br>James M. De May | | Years Ended<br>12/31/96 |

In recognition of Mr. De May having created Optimay Corporation Mr. De May received shares of Optimay Corporation as its founder. Rather than having all of the shares issued in his name, he caused shares to be issued to two trusts for his wife and his family. He also caused 150,000 shares to be issued to Optimay Foundation on February 8, 1996.

The Optimay Foundation was created as an irrevocable trust under the laws of Barbados. The trust instrument (Article VI) specifies that the principal and income of the trust shall be held in trust by the trustees for payment or distribution to charitable organizations and for charitable purposes. The trust instrument defines charitable organization as corporations, trusts, funds, foundations, or community chests created or organized and operated exclusively for charitable purposes. In addition, no part of the net earnings of the trust shall inure or be payable to or for the benefit of any private shareholder or individual.

At the time the Optimay Foundation was formed and funded on February 8, 1996 it was not an organization described in Internal Revenue Code Section 501(c)(3). On September 21, 1999 the name of the trust was changed to Vaterstetten Foundation and on April 25, 2000 the Internal Revenue Service issued a determination letter stating that the trust was an organization described in section 501(c)(3).

Mr. De May did not file a Form 926 reporting the transfer of the shares to the Optimay Foundation and did not pay excise or other tax on the transfer.

**LAW**

Internal Revenue Code Section 1491 was repealed on August 5, 1997. Before the repeal the section read as follows:

*There is hereby imposed on the transfer of property by a citizen or resident of the United States, or by a domestic corporation or partnership, or by an estate or trust, which is not a foreign estate or trust, to a foreign corporation as paid-in surplus or as a contribution to capital, or to a foreign estate or trust, or to a foreign partnership, an excise tax equal to 35 percent of the excess of –*

*(1) the fair market value of the property so transferred, over*
*(2) the sum of –*
*(A) the adjusted basis (for determining gain) of such property in the hands of the transferor, plus*

| Form<br>886-A | U.S. Treasury Department-Internal Revenue Service<br>**EXPLANATION OF ITEMS** | Schedule No. or<br>**Exhibit** |
|---|---|---|
| Name of Taxpayer<br><br>James M. De May | | Years Ended<br>12/31/96 |

　　　　(B) the amount of the gain recognized to the transferor at the time of the transfer.

Internal Revenue Code Section 1492 was also repealed on August 5, 1997. Before the repeal the section read as follows:

*The tax imposed by section 1491 shall not apply –*

　　　*(1) If the transferee is an organization exempt from income tax under part I of subchapter F of chapter 1 (other than an organization described in section 401(a); or*
　　　*(2) To a transfer –*
　　　　　*(A) described in section 367, or*
　　　　　*(B) not described in section 367 but with respect to which the taxpayer elects (before the transfer) the application of principles similar to the principles of section 367, or*
　　　*(3) To a transfer for which an election has been made under section 1057.*

Income Tax Regulation Section 1.1494-1(a) specifies that every person making a transfer described in section 1491 shall make a return on Form 926 on the day the transfer was made and, unless the transfer is nontaxable under section 1492, pay the tax due on such transfer. Section 1.1494-1(b) provides that if the transferee is a foreign organization meeting the tests of exemption from income tax under section 501 then the transferor must file a certificate establishing the exemption with Form 926. A copy of the Commissioner's letter holding that the foreign organization is exempt from income tax may be filed with the Form 926 in lieu of the certificate.


**GOVERNMENT'S POSITION**

On February 8, 1996 Mr. De May transferred 150,000 shares of the common stock of Optimay Corporation to Optimay Foundation, a foreign trust. At the time of the transfer Internal Revenue Code Section 1491 was in force. Under this section, unless the transfer was nontaxable under section 1492, Mr. De May was required to pay an excise tax on the appreciation in value of the Optimay Corporation common shares. He did not file Form 926 to report or pay the excise tax on the transfer.

Section 1492 provides three conditions and if any one of these conditions is met then section 1491 does not apply. First, section 1491 does not apply if the transferee is an exempt organization under section 501. At the time of the transfer

---

Department of the Treasury – Internal Revenue Service　　　　　　　Form 886-A
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 3

| Form<br>886-A | U.S. Treasury Department-Internal Revenue Service<br>**EXPLANATION OF ITEMS** | Schedule No. or<br>**Exhibit** |
|---|---|---|
| Name of Taxpayer<br><br>James M. De May | | Years Ended<br>12/31/96 |

Optimay Foundation was not an exempt organization. It was not until more than four years later that the Internal Revenue Service determined that the trust (renamed Vaterstetten Foundation) was a section 501(c)(3) organization. This condition was not met at the time of the transfer.

The second condition that would disqualify section 1491 is if section 367 applies to the transfer or if the taxpayer elects to use the principles of section 367. Section 367 applies to the transfer of property by a U.S. person to a foreign corporation. More specifically, this section states that in an exchange involving sections 332, 351, 354, 356, or 361 the nonrecognition provisions of these sections will not apply and gain shall be recognized. The second condition was not met because the transfer did not involve the transfer of property to a foreign corporation and the named sections were not relevant to the transfer. Also, the taxpayer did not elect to apply the principles of section 367 and recognize gain on the transfer. This condition was not met at the time of the transfer.

The third condition allows that section 1491 will not apply if an election is made under Internal Revenue Code Section 1057. Section 1057, which was repealed on August 5, 1997, allowed taxpayers to recognize gain on the transfer of appreciated property rather than to pay the tax imposed by section 1491. This condition was not met because the taxpayer did not elect to recognize gain under section 1057 at the time of the transfer.

The tax under section 1491 applies because none of the conditions of section 1492 were met at the time of the transfer. The amount of the tax is 35% of the excess of the fair market value of the property transferred over the sum of the adjusted basis of the property plus any gain recognized by the transferor at the time of the transfer.

The fair market value of the shares of Optimay Corporation transferred can be determined by reference to the value placed on the shares by the purchasers of the 7% Convertible Subordinated Debentures. Recall that the debentures, which the company began selling to unrelated investors in February 1996, were convertible into Optimay Corporation shares at $6.66 per share. The debentures were set to mature in three years and the debenture holders had the option of receiving cash or stock at maturity. Therefore, the least the debenture holders would receive would be $6.66 three years after purchase.

If the shares were valued at more than $6.66 then debenture holders would convert their bonds into shares and receive a return higher than the 7% rate they were entitled to by the bonds. If, on the other hand, the shares were worth less than

| Form 886-A | U.S. Treasury Department-Internal Revenue Service<br>**EXPLANATION OF ITEMS** | Schedule No. or<br>**Exhibit** |
|---|---|---|
| Name of Taxpayer<br><br>James M. De May | | Years Ended<br>12/31/96 |

$6.66 at maturity of the bonds then the debenture holders would accept their 7% interest in cash rather than in shares. The only point at which debenture holders would be indifferent to receiving accumulated interest and return of their principal in cash or in Optimay Corporation shares is $6.66.

The value of the shares of Optimay Corporation stock in February 1996 is therefore the present value of a future payment of $6.66 which has been promised three years later at a discount rate of 7% per annum. This present value is calculated as $5.44. In other words, if a security is worth $5.44 in February 1996 then, at an interest rate of 7% per annum, it is worth $5.82 one year later. After another year it is worth $6.22 and after the third year it is worth $6.66. The bargain the convertible debenture purchasers made was that they would buy Optimay Corporation bonds bearing 7% per annum and at maturity, three years later, they would accept their principal plus accrued interest or a share of Optimay Corporation stock with a value of $6.66. This agreement only makes sense if the debenture purchasers believed that the stock was worth at least $5.44 in February 1996.

If the stock is valued at $5.44 per share on February 8, 1996 then the value of the shares Mr. De May transferred to the irrevocable trust was $816,000. He did not have adjusted basis in these shares because he received them without cost as founder of the company. Also, he did not recognize gain at the time of the transfer because he did not file Form 926 or otherwise report and pay gain on the transfer. Therefore, the amount on which the 35% excise tax is based is $816,000 and Mr. De May is required to pay tax on the transfer of $285,600.

## CONCLUSION

It was determined that Mr. De May made a taxable transfer under the provisions of Internal Revenue Code Section 1491. Under these provisions excise tax is imposed on Mr. De May of $285,600.

# EXHIBIT 7

exhibits

**C M Bruce**

| | |
|---|---|
| **From:** | Jim De May [gila@yellowmesa.com] |
| **Sent:** | 16 July 2002 08:47 |
| **To:** | 'Charles Bruce' |
| **Importance:** | High |

Charles,

I will be seeing Bridgemann and Bill Donnelly on Friday in DC. I would like to ask that you hold off doing any further work on my tax situation until after I have talked to Jim & Bill. I would like to coordinate our effort going forward and will be in touch with you after my DC visit. Thanks.

Jim

# EXHIBIT 8

July 19, 2002

Charles M. Bruce, Esq.
Moore & Bruce, LLP
1072 Thomas Jefferson Street, N.W.
Washington, D.C. 20007

Dear Charlie:

I wanted to let you know that I have engaged Douglas Charnas of McGuireWoods to also represent me in connection with the pending IRS audit. I have also asked Doug to take over the primary role in communicating with the IRS on this matter.

Doug will be contacting you shortly. Please co-operate fully with Doug in getting him up to speed on all developments in the audit to date. May I say thanks in advance for your working with Doug and the other McGuireWoods lawyers in a cooperative and efficient manner to bring the audit to the best possible conclusion.

If you have any questions, please give me a call.

Yours truly,

Jim DeMay

cc:    Douglas W. Charnas

# EXHIBIT 9

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

JAMES MICHAEL DeMAY, et ux,                    :
                                               :
          Plaintiffs,                          :
                                               :
    v.                                         :    1:08cv845
                                               :    Judge Ellen S. Huvelle
MOORE & BRUCE, LLP, et al.,                    :
                                               :
          Defendants.                          :
                                               :

## AFFIDAVIT OF CHARLES M. BRUCE

I, Charles M. Bruce, hereby swear and affirm as follows:

1.     I am over the age of 18, I am competent to provide this testimony and the testimony is based upon my own personal knowledge.

2.     I am a founding partner of the law firm of Moore & Bruce, LLP.  In 1995, Moore & Bruce, LLP began providing legal advice to Plaintiff James DeMay.  From 1996 through 1998, Moore & Bruce, LLP advised Mr. DeMay with respect to a series of transactions with the goal of organizing Mr. DeMay's interest in a telecommunications software business for the benefit of Mr. DeMay, his wife, and his family.  This representation included the formation and amendment of various trusts domiciled and administered outside of the United States.

3.     To the best of my recollection, on Wednesday December 9, 1998, I discussed the above-referenced trusts with Mr. DeMay, and at Mr. DeMay's request, with James Bridgeman, a tax attorney working for McGuire, Woods, Battle & Boothe at that time.  I dictated a memorandum using voice activated software following this conversation which is included as Exhibit 2 to Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment.  There are typographical errors in the memorandum to include the date in the heading.  I seldom used the voice activated software, which accounts for these errors; however, the substance of the memorandum reflects the conversation that occurred on that date.

4.     In June of 1999, Mr. DeMay received notice that the IRS was initiating an audit of his income tax returns for the years 1993 through 1998.  Initially, Jonathon Moore, another partner in Moore & Bruce, LLP, provided Mr. DeMay with assistance in responding to several Information Document Requests ("IDRs") issued by the IRS as part of its investigation into Mr. DeMay's tax liability.

5.     Beginning in June of 2002, my law firm began receiving various "narratives" (written descriptions of issues) from the IRS indicating that the agency would assert that Mr. DeMay had substantially underpaid his income taxes for the years 1996 through 1998. In June of 2002, I

informed Mr. DeMay that if the position of the IRS in these "narratives" were upheld, he would be liable for millions of dollars in back taxes, plus interest and penalties.

6.      In July of 2002, shortly after I advised Mr. DeMay as to his potential income tax liability, Mr. DeMay informed me that he had retained Douglas Charnas of McGuire Woods to take the lead in his defense of the IRS audit.

7.      After Mr. DeMay retained Mr. Charnas and McGuire Woods, Moore & Bruce, LLP no longer controlled the direction of Mr. DeMay's representation. From this point forward, my law firm's role in Mr. DeMay's defense of the tax audit was to provide backup assistance and information to McGuire Woods. Following Mr. DeMay's engagement of Mr. Charnas as his counsel in the tax audit, Mr. Charnas was the primary point of communication with the IRS, both orally and for correspondence. For example, until the initiation of the present litigation, I was not aware of the fact that a Chief Counsel Advice had been issued in connection with Mr. DeMay's tax audit.

8.      The IRS also opened an audit of Mr. DeMay's gift tax liability. From the outset, Mr. Charnas and McGuire Woods handled Mr. DeMay's representation in defense of this gift tax audit, with minimal assistance from Moore & Bruce, LLP. My role was limited to providing support on discrete and narrow factual matters where I was more familiar with Mr. Charnas with the underlying factual background. Again, Mr. Charnas was the primary liaison with both the IRS and Mr. DeMay.

9.      On September 17, 2004 Mr. DeMay, through counsel at McGuire Woods, filed a petition in the United States Tax Court challenging the IRS's position with respect to his income tax liability. McGuire Woods submitted all of Mr. DeMay's filings with respect to that litigation, and neither I nor my firm entered an appearance on behalf of Mr. DeMay in that matter.

10.     On November 22, 2005 Mr. DeMay, through counsel at McGuire Woods, filed a petition in the United States Tax Court challenging the IRS's position with respect to his gift tax liability. McGuire Woods submitted all of Mr. DeMay's filings with respect to that litigation, and neither I nor my law firm entered an appearance on behalf of Mr. DeMay in that matter.

11.     Mr. DeMay eventually consented to judgments with the IRS with respect to the income tax and gift tax matters. Mr. DeMay did not seek my opinion prior to entering into these consent judgments. I did not advise Mr. DeMay to enter into these consent judgments.

12.     Attached as exhibits to Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment is various correspondence and memorandum. These documents were all located in Moore & Bruce, LLP's files, as they are kept in the ordinary course of business, with the exception of the 2004 Chief Counsel Advice which was obtained from counsel for Plaintiff, and U.S. Tax Court filings available to the public.

I DO SOLEMNLY DECLARE AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE ABOVE FOREGOING STATEMENTS ARE TRUE AND CORRECT TO THE BEST OF MY PERSONAL KNOWLEDGE, INFORMATION AND BELIEF.

Charles M. Bruce

# EXHIBIT 10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

| | |
|---|---|
| JAMES MICHAEL De MAY, *et ux*, | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | :   1:08cv845 |
| | :   Judge Ellen S. Huvelle |
| MOORE & BRUCE, LLP, *et al.*, | : |
| | : |
| Defendants. | : |

## AFFIDAVIT OF JONATHON R. MOORE

I, Jonathon R. Moore, hereby swear and affirm as follows:

1.     I am over the age of 18, I am competent to provide this testimony and the testimony is based upon my own personal knowledge.

2.     I am a founding partner of the law firm of Moore & Bruce, LLP. In 1995, Moore & Bruce, LLP began providing legal advice to Plaintiff James De May. From 1996 through 1998, Moore & Bruce, LLP advised Mr. De May with respect to a series of transactions with the goal of protecting Mr. De May's interest in a telecommunications software business for the benefit of Mr. De May, his wife and his family. This representation included the formation and amendment of various trusts domiciled and administered outside of the United States.

3.     In June of 1999, Mr. De May received notice that the IRS was opening an audit into his income tax liability for the years 1993 through 1998. Initially, I provided Mr. De May with assistance in responding to several Information Document Requests ("IDRs") issued by the IRS as part of their investigation into Mr. De May's tax liability.

4.     Beginning in June of 2002, my law firm began receiving various narratives from the IRS indicating that the agency would assert that Mr. De May had substantially underpaid his income taxes for the years 1996 through 1998. In June of 2002, my partner, Charles M. Bruce, informed Mr. De May that if the position of the IRS in these narratives were upheld, he would be liable for millions of dollars in back taxes, plus interest and penalties.

5.     In July of 2002, shortly after Mr. Bruce advised Mr. De May as to his potential income tax liability, Mr. De May informed Mr. Bruce that he had retained Douglas Charnas of McGuire Woods to take the lead in his defense of the IRS audit.

6.    After Mr. De May retained Mr. Charnas and McGuire Woods, Moore & Bruce, LLP no longer controlled the direction of Mr. De May's representation. From this point forward, my law firm's role in Mr. De May's defense of the tax audit was to provide backup assistance and information to McGuire Woods. Following Mr. De May's engagement of Mr. Charnas as his counsel in the tax audit, Mr. Charnas was the primary point of communication with the IRS, both orally and for correspondence. For example, until the initiation of the present litigation, I was not aware of the fact that a Chief Counsel Advice had been issued in connection with Mr. De May's tax audit.

7.    The IRS also opened an investigation into Mr. De May's gift tax liability. From the outset, Mr. Charnas and McGuire Woods handled Mr. De May's representation in defense of this gift tax audit, with minimal assistance from Moore & Bruce, LLP. My role was limited to providing support on discrete and narrow factual matters where I was more familiar with Mr. Charnas with the underlying factual background. Again, Mr. Charnas was the primary liaison with both the IRS and Mr. De May.

8.    On September 17, 2004 Mr. De May, through counsel at McGuire Woods, filed a petition in the United States Tax Court challenging the IRS's position with respect to his income tax liability. McGuire Woods submitted all of Mr. De May's filings with respect to that litigation, and neither I nor my firm entered an appearance on behalf of Mr. De May in that matter.

9.    On November 22, 2005 Mr. De May, through counsel at McGuire Woods, filed a petition in the United States Tax Court challenging the IRS's position with respect to his gift tax liability. McGuire Woods submitted all of Mr. De May's filings with respect to that litigation, and neither I nor my firm entered an appearance on behalf of Mr. De May in that matter.

10.   Mr. De May eventually consented to judgments with the IRS with respect to the income tax and gift tax matters. Mr. De May did not seek my opinion prior to entering into these consent judgments. I did not advise Mr. De May to enter into these consent judgments.

11.   Attached as exhibits to Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, are various correspondence and memoranda. These documents were all located in Moore & Bruce, LLP's files, as they are kept in the ordinary course of business, with the exception of the 2004 Chief Counsel Advice, which was obtained from counsel for Plaintiff, and U.S. Tax Court filings available to the public.

I DO SOLEMNLY DECLARE AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE ABOVE FOREGOING STATEMENTS ARE TRUE AND CORRECT TO THE BEST OF MY PERSONAL KNOWLEDGE, INFORMATION AND BELIEF.

_____
Jonathon R. Moore

July 17, 2008
_____
Date

# EXHIBIT 11

## Jonathon Moore

| | |
|---|---|
| From: | Jonathon Moore [jmoore@mooreandbruce.com] |
| Sent: | Tuesday, October 15, 2002 11:25 AM |
| To: | James M. De May (E-mail); Douglas Charnas Esq. (E-mail) |
| Cc: | Charles M. Bruce, Esq. (E-mail) |
| Subject: | IRS Request for Gift Tax Returns |

Charles mentioned that a request for gift tax returns has been received from the IRS. We do not appear to have received this request, and therefore would appreciate your faxing a copy of the request to us.

REGARDS!!!!!!!!!!

Jonathon R. Moore
Moore & Bruce, LLP
1072 Thomas Jefferson Street, N.W.
Washington, D.C. 20007
Tel: 202-965-7747
Fax: 202-965-7745

Email: jmoore@mooreandbruce.com <mailto:jmoore@mooreandbruce.com>

*************************************************************************************************

This electronic mail message contains information from the law firm of Moore & Bruce, LLP and is intended only for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, proprietary or exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination or distribution of this communication to other that the intended recipient is strictly prohibited. If you have received this communication in error, please notify us immediately by collect telephone at (202) 965-5300 or electronic mail (jsanford@mooreandbruce.com <mailto:jsanford@mooreandbruce.com>). Thank you.

For more information about Moore & Bruce, LLP, please visit our website at <http://www.mooreandbruce.com/>.

*************************************************************************************************

1

# EXHIBIT 12

# FAX

## Confidentiality Notice

This communication is intended for the sole use of the individual to whom it is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If the reader of this communication is not the intended recipient, or the employee or agent for delivering the communication to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication may be strictly prohibited.

If you have received this communication in error, please notify the sender immediately by telephone call and return the communication to the fax number you will be given, then destroy the document(s). Thank you!

## Department of the Treasury
## Internal Revenue Service

**Date**    November 8, 2002

**Number of pages including cover sheet**    8

| | |
|---|---|
| **TO: Douglas Charnas** | **FROM:** Monica Garcia |
| | Internal Revenue Service |
| | ID # 85-00735 |
| | 5338 Montgomery Blvd NE |
| | Albuquerque, NM 87109 |

**Phone**        (202) 857-1757

**Fax Phone**    (202) 857-1737

**Phone**        (505) 837-5572

**Fax Phone**    (505) 837-5654

**CC:**

**REMARKS:**    ☐ Urgent    ☐ For your review    ☐ Reply ASAP    ☐ Please Comment

RE: James De May

Mr. Charnas,

Attached is the change to our draft regarding the Foundation. It also includes a discussion of another trust.

Monica Garcia

| Form<br>886-A | U.S. Treasury Department-Internal Revenue Service<br>**EXPLANATION OF ITEMS** | Schedule No. or<br>**Exhibit** |
|---|---|---|
| Name of Taxpayer<br><br>James M. De May | | Years Ended<br>12/31/98 |

|  | 1998 |
|---|---|
| Long-Term Capital Gain Income from the Optimay Foundation trust and the De May-Optimay Comp Trust per Examination | $10,979,850 |
| Long-Term Capital Gain Income from the Optimay Foundation trust and the De May-Optimay Comp Trust per Tax Return | 0 |
|  | $10,979,850 |

### Issue

Is income realized by the Optimay Foundation and the De May-Optimay Comp Trust includible in the gross income of Mr. James M. De May?

### Facts

On July 10, 1986, Mr. De May, a U.S. citizen, organized a German corporation, Optimay GmbH. Initially, Optimay GmbH was formed as a means for Mr. De May to conduct his software consulting business. Over time the business of Optimay GmbH grew into software development for semiconductor manufacturers targeting the market for cellular telephones based on the Global System for Mobile Communications (GSM) protocol. In order to finance the growth of Optimay GmbH Mr. De May personally borrowed funds for the company.

On the advice of investment bankers and venture capitalists Mr. De May decided to raise additional capital to support Optimay GmbH by starting a U.S. corporation. The U.S. company would issue debt instruments and would hold the shares of Optimay GmbH. On September 18, 1995 Mr. De May formed Optimay Corporation, a Delaware company and on February 7, 1996 Optimay GmbH was sold to Optimay Corporation by Mr. De May. In recognition of Mr. De May having created Optimay Corporation Mr. De May received shares of Optimay Corporation as its founder.

On February 8, 1996 Mr. De May created a Barbados trust, the Optimay Foundation. As settlor and grantor of this trust, Mr. De May arranged for the Optimay Corporation to issue 160,000 shares of its common stock to the Optimay Foundation.

Department of the Treasury – Internal Revenue Service                Form 886-A
                                                                     Page 1

| Form 886-A | U.S. Treasury Department-Internal Revenue Service **EXPLANATION OF ITEMS** | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>James M. De May | | Years Ended 12/31/98 |

On July 10, 1996 Mr. De May created the De May-Optimay Comp Trust, a Bermuda trust. As settlor and grantor of this trust, Mr. De May arranged for the Optimay Corporation to issue 607,231 shares of its common stock to the De May-Optimay Comp Trust.

The Optimay Foundation was created as an irrevocable trust under the laws of Barbados. The trust instrument (Article VI) specifies that the principal and income of the trust shall be held in trust by the trustees for payment or distribution to charitable organizations and for charitable purposes. The trust instrument defines charitable organization as corporations, trusts, funds, foundations, or community chests created or organized and operated exclusively for charitable purposes. In addition, no part of the net earnings of the trust shall inure or be payable to or for the benefit of any private shareholder or individual. The trust instrument does not specify beneficiaries for the trust.



At the time the Optimay Foundation was formed and funded on February 8, 1996 it was not an organization described in Internal Revenue Code Section 501(c)(3). On September 21, 1999 the name of the trust was changed to Vaterstatten Foundation and on April 25, 2000 the Internal Revenue Service issued a determination letter stating that the trust was an organization described in section 501(c)(3).

The De May-Optimay Comp Trust was formed and funded on July 10, 1996 as a Bermuda trust. The trust's initial beneficiaries were the Optimay Foundation and an employee compensation plan to be created by the Optimay Corporation. The employee compensation plan was established on April 26, 1997 in the United States as a U.S. entity. On March 20, 1998, it was decided that the Optimay Corporation shares held by the trust would be distributed. The Optimay Foundation would receive 224,731 shares and the Optimay Corporation would receive the remaining 382,500 shares. No shares were to be transferred to the newly created employee compensation plan. The Optimay Corporation share transfer ledger does not contain any record that the De May-Optimay Comp Trust actually transferred shares to either the Optimay Foundation or to the Optimay Corporation.

On April 16, 1996 a wholly owned subsidiary of Lucent Technologies, Inc. purchased Optimay Corporation for $16.53 per share. The terms of the purchase designated that $14.50 would be paid immediately and the remaining $2.03 would be held in escrow to be paid 12 and 18 months after closing.

Department of the Treasury -- Internal Revenue Service        Form 886-A
Page 2

| Form 886-A | U.S. Treasury Department-Internal Revenue Service EXPLANATION OF ITEMS | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer | | Years Ended 12/31/98 |
| James M. De May | | |

Mr. De May did not include the proceeds of the sale of shares held by Optimay Foundation or the De May-Optimay Comp Trust in his 1998 income tax return.

**LAW**

Internal Revenue Code Section 679(a) states:

*In general. A United States person who directly or indirectly transfers property to a foreign trust (other than a trust described in section 6048(a)(3)(B)(ii)) shall be treated as the owner for his taxable year of the portion of such trust attributable to such property if for such year there is a United States beneficiary of any portion of such trust.*

Income Tax Regulation Section 1.679-2(a) in referring to the existence of U.S. beneficiaries specifies that a foreign trust is treated as having a U.S. beneficiary unless during the taxable year of the U.S. transferor –

    (i)   No part of the income or corpus of the trust may be paid or accumulated to or for the benefit of, directly or indirectly, a U.S. person; and

    (ii)   If the trust is terminated at any time during the taxable year, no part of the income or corpus of the trust could be paid to or for the benefit of, directly or indirectly, a U.S. person.

Income Tax Regulation Section 1.679-2(b) referring to indirect U.S. beneficiaries states:

(1) Certain foreign entities. For purposes of paragraph (a)(1) of this section, an amount is treated as paid or accumulated to or for the benefit of a U.S. person if the amount is paid to or accumulated for the benefit of –

(i)    A controlled foreign corporation, as defined in section 957(a);
(ii)   A foreign partnership, if a U.S. person is a partner of such partnership; or
(iii)  A foreign trust or estate, if such trust or estate has a U.S. beneficiary (within the meaning of paragraph (a)(1) of this section).

(2) Other indirect beneficiaries. For purposes of paragraph (a)(1) of this section, an amount is treated as paid or accumulated to or for the benefit of a U.S. person if the amount is paid to or accumulated for the benefit of a U.S. person through an

| Form<br>886-A | U.S. Treasury Department-Internal Revenue Service<br>**EXPLANATION OF ITEMS** | Schedule No. or<br>**Exhibit** |
|---|---|---|
| Name of Taxpayer<br><br>James M. De May | | Years Ended<br>12/31/98 |

Intermediary, such as an agent or nominee, or by any other means where a U.S. person may obtain an actual or constructive benefit.

Income Tax Regulation Section 1.679-1(c)(2) states that the term "United States person" means a United States person as defined in section 7701(a)(30), a nonresident alien individual who elects under section 6013(g) to be treated as a resident of the United States, and an individual who is a dual resident taxpayer within the meaning of § 301.7701(b)-7(a).

Internal Revenue Code Section 7701(a)(30) provides that the term "United States person" means:

    (A) a citizen or resident of the United States,
    (B) a domestic partnership,
    (C) a domestic corporation,
    (D) any estate other than a foreign estate, and
    (E) any trust if a court within the United States is able to exercise primary
        supervision over the administration of the trust and one or more U.S. persons
        have the authority to control all substantial decisions of the trust.

## GOVERNMENT'S POSITION

### Optimay Foundation:

Under the provisions of Internal Revenue Code Section 679 the Optimay Foundation trust was owned by Mr. De May on April 16, 1998 at the time it realized income from the sale of 150,000 shares of Optimay Corporation stock to Lucent Technologies. As the owner of the trust Mr. De May was required to include this income in his 1998 income tax return.

Internal Revenue Code Section 679(a) provides that a United States person who directly or indirectly transfers property to a foreign trust shall be treated as the owner of the trust for his taxable year if the foreign trust has a U. S. beneficiary for such year. Income Tax Regulation Section 1.679-2(a) states that a trust will be treated as having a U.S. beneficiary for the taxable year unless under the terms of the trust no part of the income or corpus of the trust may be paid to or accumulated, directly or indirectly, for the benefit of a United States person and if the trust were terminated during the taxable year none of the income or corpus can be paid to or for the benefit of, directly or indirectly, a U.S. person.  Under section 7701(a)(30) a U.S.

Department of the Treasury – Internal Revenue Service

Form 886-A
Page 4

| Form 886-A | U.S. Treasury Department-Internal Revenue Service  EXPLANATION OF ITEMS | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer  James M. De May | | Years Ended 12/31/98 |

person is defined as a U.S. citizen or resident, a domestic partnership, a domestic corporation, a domestic trust or estate.

While the stated purpose of the Optimay Foundation trust was to make charitable distributions and the trust instrument did not name specific beneficiaries, the trustees were not prohibited from paying or accumulating part of the income or corpus of the trust for the direct or indirect benefit of U.S. persons. The application of section 679 does not require that a foreign trust actually have U.S. beneficiaries. It is sufficient that the trust have the potential for direct or indirect beneficiaries. The Optimay Foundation trust clearly had the potential for direct or indirect U.S. beneficiaries. Therefore, Mr. De May, the grantor, is treated as owning the Optimay Foundation Trust on April 16, 1998 when the trust realized income from the sale of 150,000 shares of Optimay Corporation stock to Lucent Technologies.

*only distributions cant set up trust that will? U.S. rules?*

The income realized by the Optimay Foundation Trust was $2,479,500 with $2,175,000 to be received during 1998 and the balance of $304,500 to be received during 1999 and 2000.

### De May-Optimay Comp Trust:

Under the provisions of Internal Revenue Code Section 679 the De May-Optimay Comp Trust was owned by Mr. De May on April 16, 1998 at the time it realized income from the sale of 607,231 shares of Optimay Corporation stock to Lucent Technologies. As the owner of the trust Mr. De May was required to include this income in his 1998 income tax return.

The De May-Optimay Comp Trust comes within the purview of Internal Revenue Code Section 679 for two reasons. First, the trust is treated as having a U.S. beneficiary. As discussed above Internal Revenue Code Section 679(a) provides that a United States person who directly or indirectly transfers property to a foreign trust shall be treated as the owner of the trust for his taxable year if the foreign trust has a U. S. beneficiary for such year. Under Income Tax Regulation 1.679-2(a) a foreign trust will be treated as having a U.S. beneficiary unless the terms of the trust no part of the income or corpus of the trust may be paid to or accumulated, directly or indirectly, for the benefit of a U.S. person. The trust instrument did not prohibit the transfer of income or property to a U.S. person. To the contrary, one of the named beneficiaries was the employee compensation plan to be created by the Optimay Corporation. When the employee compensation plan was created on April 26, 1997 it was a U.S. person. Therefore, the De May-Optimay Comp Trust not only

| Form<br>886-A | U.S. Treasury Department-Internal Revenue Service<br>**EXPLANATION OF ITEMS** | Schedule No. or<br>Exhibit |
|---|---|---|
| Name of Taxpayer<br><br>James M. De May | | Years Ended<br>12/31/98 |

had a U.S. beneficiary, this potential was realized when the employee compensation plan was formed in 1997.

The second reason the De May-Optimay Comp Trust is treated as owned by Mr. De May is because one of its beneficiaries was a foreign trust that was, itself, treated as having a U.S. beneficiary. Income Tax Regulation 1.679-2(b) specifies that an amount is treated as paid or accumulated to or for the benefit of a U.S. person if the amount is paid to or accumulated for the benefit of a foreign trust and that trust has a U.S. beneficiary within the meaning of section 1.679-2(a)(1).

The Optimay Foundation trust was a beneficiary of the De May-Optimay Comp Trust. As discussed above, the Optimay Foundation trust had the potential for U.S. beneficiaries and under Income Tax Regulation Section 1.679-2(a) is treated as having a U.S. beneficiary. Therefore, the De May-Optimay Comp Trust is subject to section 679 because it had a beneficiary that was a foreign trust treated as having a U.S. beneficiary.

It had been intended that the De May-Optimay Comp Trust would distribute the shares it owned in the Optimay Corporation to the Optimay Foundation and to the Optimay Corporation. There is no indication in the Optimay Corporation share transfer ledger that these distributions were ever made. Therefore, Mr. De May, the grantor, is treated as owning the De May-Optimay Comp Trust on April 16, 1998 when the trust realized income from the sale of 607,231 shares of Optimay Corporation stock to Lucent Technologies.

The income realized by the De May-Optimay Comp Trust was $10,037,528 with $8,804,850 to be received during 1998 and the balance of $1,232,678 to be received during 1999 and 2000.

## CONCLUSION

It was determined that Mr. De May was the owner of the Optimay Foundation trust and the De May-Optimay Comp Trust under the provisions of Internal Revenue Code Section 679 and Income Tax Regulation Sections 1.679-2(a) and (b) during 1998. The Optimay Foundation trust disposed of 150,000 shares of Optimay Corporation stock on April 16, 1998 and received income of $2,175,000 during 1998. The De May-Optimay Comp Trust disposed of 607,231 shares of Optimay Corporation stock on April 16, 1998 and received income of $8,804,850 during 1998.

Department of the Treasury – Internal Revenue Service

Form 886-A
Page 6

| Form<br>886-A | U.S. Treasury Department-Internal Revenue Service<br>**EXPLANATION OF ITEMS** | Schedule No. or<br>**Exhibit** |
|---|---|---|
| Name of Taxpayer<br><br>James M. De May | | Years Ended<br>12/31/98 |

Mr. De May did not report any income relating to the transactions or activities of the trusts on his 1998 income tax return. Adjustments are required to include $10,979,850 in Mr. De May's long-term capital gain income for the 1998 taxable year.

# EXHIBIT 13

### Jonathon Moore

| | |
|---|---|
| **From:** | dcharnas@mcguirewoods.com |
| **Sent:** | Tuesday, November 12, 2002 6:14 PM |
| **To:** | gila@yellowmesa.com |
| **Cc:** | cbruce@mooreandbruce.com; jmoore@mooreandbruce.com |
| **Subject:** | Telephone Conversation with Monica Garcia [Our File No. 2037000-0001] |

Dear Jim,

Monica Garcia, the IRS Revenue Agent, called me on Friday. (I was out on travel yesterday.) She told me that she had not yet received an official response from the National Office to her Field Service Request. She then told me that she would be needing another extension of the statute of limitations before too long. The current extension expires on June 30, 2003, according to her.

She then gave me some bad news. She told me that Bill Yates, the IRS National Officer attorney, believes that the grantor trust rules should apply to the Optimay Foundation and the De May-Optimay Comp Trust. Obviously, this is a major development and problem. The IRS is proposing to tax you on an additional $10,979,850 of long-term capital gain for 1998. Monica faxed me the write-up prepared by the International Agent. I will fax it to you and Charles. We can talk about it after we have time to analyze the write up.

Charles is available to meet on Wednesday, December 4th. He has suggested we meet in his offices because he has the majority of the files. Please let me know if you can meet on December 4th. We will meet in either Charles' office or my office.

I will try to call you before you read this e-mail, but I wanted to send it off in case I do not reach you and I wanted Charles and Jonathan to know of this latest development.

Regards, Douglas

Douglas W. Charnas, Esq.
McGuireWoods LLP
Washington Square
1050 Connecticut Avenue, N.W.
Suite 1200
Washington, DC 20036-5317
202.857.1757 (Direct Line)
202.828.2980 (Direct Fax)
dcharnas@mcguirewoods.com
www.mcguirewoods.com

*This e-mail may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

# EXHIBIT 14

Moore & Bruce, LLP

1072 Thomas Jefferson Street, NW   Tel: +1 202 965 5300
Washington, DC 20007                       Fax: +1 202 965 7745
40 Park Street                                   Tel: +44 (0) 207 495 3842
London W1K 2JG                             Fax: +44 (0) 207 629 1242

## MEMORANDUM

This memorandum comments on the issues and arguments in the Narratives dated June 10 (one Narrative), June 24 (two Narratives), July 2 (one Narrative), and November 8 (one Narrative), 2002.

The Service has not completed its initial examination and, therefore, has not proposed adjustments and explained those adjustments. The taxpayer, given these circumstances, reserves the right to argue different facts and different law, as the nature of the case may change.

### Discussion Of Specific Issues Raised By The Service In Its Five Narratives

This writing follows the order of the Narratives.

*1.    Is income realized by the De May Family Trust in 1998 includible in the gross income of James Michael De May?*

*IRS's Argument.* The first Narrative states that Section 679 (Foreign Trusts Having One Or More United States Beneficiaries) applies to any foreign trust that is created by a U.S. person and that has U.S. beneficiaries, with the result that the De May Family Trust is treated as a grantor trust and the grantor, Jim De May, is taxed as if he were the owner of the assets in the trust. "The De May Family Trust had United States beneficiaries from its inception in February 1996 through the date it was dissolved in August 1998." This is purely a legal argument.

*Provisions Relating To A Number Of Non-U.S. And U.S. Beneficiaries In The Trust And In Letters Sent By The Trustee To Them Create Specific Gifts To These Individuals.* There is no discussion of the fact that by a series of letters to a number of beneficiaries by the then trustee, around August 1996, it was provided that they were the beneficiaries of an absolute number of shares. These made clear that the provisions for specific assets to benefit named beneficiaries constitute separate trusts. The provisions for these beneficiaries in the trust and in the letters create specific gifts to these individuals. They were told that they were getting $\underline{X}$ number of Optimay shares. The De May Family Trust was holding for them. They were the settlors with respect to these shares. It should be noted that they filed their tax returns consistent with this view; that is, upon the sale to Lucent, they, the ones that were U.S., reported and paid U.S. tax.

At the time of the migration of the trust from Bermuda to the Isle of Man, provisions were added in order to make clear that there were separate trusts for each of the U.S. beneficiaries and these beneficiaries had a power to appoint corpus and income to themselves. (Clause 5.2.) If a tax were paid by Jim De May on the sales proceeds associated with these shares, the Service would have "whipsawed" the taxpayer, that is, exacted a double tax.

*Changes In The Terms Of The Trust Made It A Nongrantor Trust On Or About April 9, 1998.* At the time of the migration of the trust from Bermuda to the Isle of Man, the trust indenture was amended and restated to change a number of provisions. The changes in the renunciation document, whereby in February 1996 Jim De May renounced a number of powers retained under the original indenture, were poured into the amended and restated trust. In addition, added to the trust were blanket prohibitions on U.S. beneficiaries and spouses, as well as a grant of a power of appointment to Optimay Foundation. *See*

sections 672(e) & 677. The trust was thereby converted from a grantor trust to a nongrantor trust.  [A detailed review of these changes appears below with respect to the Anne Schrader De May Trust.]

*The Underlying Facts Provide The Rosetta Stone For Understanding The Provisions Of The Trusts.*  Jim De May believed that there was a very real possibility of his wife, Anne, leaving him and remaining in, or later returning to, Germany.  It was quite possible likely, in that opinion, that Anne would never become a U.S. person, she would cease being his spouse and his children would elect to cease being U.S. citizens under the immigration rules that permit this "choice" before age 18½.

If all that Jim De May foresaw as a possibility had come to pass, the De May Family Trust, which by its terms, after amendment, could not have a U.S. beneficiary or beneficiary who is a spouse of the grantor, would have operated smoothly in accordance with its terms.  Anne and the children could have been treated as beneficiaries when they were not U.S. persons and she was not Jim's spouse.  (It must be said that there is still the possibility that Anne and the children will return to Germany, leaving Jim.)

*The section 679 regulations should not apply.*  The section 679 regulations have provisions and examples that perhaps foreclose these results, but those regulations came in 2001 and have an August 7, 2000 effective date.  They should not be applied retroactively to this taxpayer and these provisions and events.[1]

At least seven of the De May Family Trust's provisions bear on this issue; three are emphasized here. Courts will construe the terms of the trust to carry out the intention as stated by the settlor.

> Article IV:  Situs, Irrevocability and Nongrantor Trust Status
>
> \*\*\*
>
> 4.2     Notwithstanding anything herein contained, neither the Trustee nor the Committee shall have the power to take any action during the Initial Trust Period which might result in this Settlement becoming revocable or which might in any way change the discretionary objects of the Settlement except as hereinafter provided and except to the extent the law of the situs of the Settlement permits the reformation or termination (or both) of the Settlement upon the consent of all interested parties AND it is the intention of the Settlor that this Settlement not be a grantor trust under Sections 671 to 679 (inclusive) of the Code and its provisions be construed accordingly.
>
> \* \* \* \* \*
>
> 5.2     NOTWITHSTANDING CLAUSE 5.1, the Trustee shall hold 10,000 shares of the common stock of Optimay Corporation for the exclusive benefit of Beneficiary No. 6, shall hold 3,000 shares of common stock of Optimay Corporation for the exclusive benefit of Beneficiary No. 7, shall hold 3,000 shares of common stock of Optimay Corporation for the exclusive benefit of Beneficiary No. 8, shall hold 10,000 shares of

---

[1] Section 679's enactment date is October 4, 1976.  It was amended on several occasions but most comprehensively by the Small Business Job Protection Act of 1996, the enactment date of which is August 20, 1996.  The section 679 regulations, which are specifically authorized by section 679(d) (Regulations), are legislative regulations.  Section 7805(b) (Retroactivity of Regulations) and its predecessors prohibit retroactive regulations.  There is an exception for promptly issued regulations—ones issued within 18 months of the date of enactment of the statutory provision, but this does not apply in this instance.  Here the proposed regulations providing assistance for taxpayers were published approximately 24 years after enactment of the 1976 Act and four years after enactment of the 1996 Act.

common stock of Optimay Corporation for the exclusive benefit of Beneficiary No. 9, shall hold 10,000 shares of common stock of Optimay Corporation for the exclusive benefit of Beneficiary No. 10 and shall hold 3,000 shares of common stock of Optimay Corporation for the exclusive benefit of Beneficiary No. 11.  <u>With respect to any beneficiary named in this paragraph who is a U.S. citizen or resident, the Trustee hereby declares that it holds any and all property to which he or she is entitled in a separate trust solely for the benefit of that beneficiary and subject to a power exercisable solely by such beneficiary to vest the corpus or the income therefrom in him- or herself.</u>

\* \* \* \*

<u>5.13 NOTWITHSTANDING ANY OTHER PROVISION HEREOF, with the exception of Beneficiaries No. 9, 10 and 11 as to whom Clause 5.2 pertains [as to whom separate trusts have been carved out], no named beneficiary or other person who might be construed as a beneficiary or holder of a power or interest hereunder shall be a United States person as defined for purposes of section 679 of the Code or a spouse described in sections 672(e) or 677 of the Code and no part of the income or corpus of the trust shall be paid to or accumulated for the benefit of such person.  Should any named beneficiary be disfranchised at any time by this Clause, the other beneficiaries shall take in such beneficiary's stead, and should all beneficiaries be so disfranchised, the Trustee shall</u> expand the class of Beneficiaries to include one or more charitable organizations that are <u>not U.S. persons, which charitable organization(s) shall be benefited or possessed of the subject power or interest.</u>

[Emphasis added.]

The De May Family Trust, as amended and restated, was not a grantor trust at the time of the Lucent transaction, contrary to the position described in this Narrative.  It had no U.S. beneficiaries because of the provisions prohibiting any U.S. beneficiaries or a spouse of the grantor (Jim De May).  The provisions stating that the settlor's intention was that the trust not be a grantor trust and that it terms should be construed accordingly must be respected.

2.    *Is income realized by the Anne Schrader De May Trust in 1998 taxable to James Michael De May as the owner of the assets in the trust under sections 671 and 679? Or, as worded in the Narrative at p. 8, "The question relevant to whether the income realized on this sale [the sale to Lucent] should be recognized by Mr. De May is whether the Anne Schrader De May Trust remained a grantor trust after it was amended on April 9, 1998."*

*IRS's Arguments.*  Three arguments are set forth; the second has two elements.

(a)  Under the terms of section 679(a), a trust cannot be a foreign nongrantor trust for part of the year and a section 679 trust for the remainder of the year.  (This is a legal issue.)

(b)  The provisions added at the time of the migration were not "functional" for their intended purposes, *i.e.*, should not be given legal effect, as supported by—

  (i)    the fact that they were contrary to reality at the outset (this is a legal question) and

3

      (ii)     the fact that in December 1998 assets were "distributed" to Anne (this is in part a factual question—was the transfer a distribution under applicable Isle of Man trust law—and part a legal question).

  (c) These same provisions did not limit the trustee's ability to "distribute" income to Anne, thus violating section 677 and making the trust a grantor trust. (This is a legal issue.)

*Assumption the trust started off as a grantor trust, with a completed gift made to the trust.* For purposes of this discussion, it will be assumed that the De May Family Trust and the Anne Schrader De May Trust were grantor trusts until amended and restated in April 1998. (As to argument (a), the IRS argues that even assuming that the trusts were converted from grantor trusts to nongrantor trusts by virtue of the changes made in April 1998, section 679 causes them to be treated as grantor trusts for all of 1998. As to arguments (b) and (c), the IRS argues that the conversion was not effective.)[2]

**(a) *Under the terms of section 679(a), a trust cannot be a foreign nongrantor trust for part of the year and a section 679 trust for the remainder of the year. (This is a legal issue.)***

Section 679 was enacted as part of the Tax Reform Act of 1976 and was effective as to trusts created after May 21, 1974.[3] No final regulations were promulgated under this section until July 20, 2001—approximately 27 years after the effective date of the Code provisions. T.D. 8955. Proposed regulations leading to these final regulations were published on August 7, 2000. These regulations are generally effective for transfers, and as to residency starting dates, after August 7, 2000, the date that the proposed regulations put taxpayers on notice that these rules might apply.

*The taxpayer was entitled to treat 1998 as a "split year." The section 679 regulations should not be applied retroactively.*

Section 679 addresses the tax consequences of having in place a certain type of entity—a foreign trust, created by a U.S. person, having a U.S. beneficiary. By its terms, it deals with several situations where the status of the trust or the status of the taxpayer changes in such a way that there can be "split year" or similar effects. For example, a foreign grantor of a foreign trust can become a U.S. person, triggering section 679(a)(4). Here the starting date is the individual's residency starting date under section 7701(b)(2)(A) and there is a rule for determining how much undistributed net income is to be taken into account: The residency starting date rules can result in "split years," *i.e.*, treatment of one portion of the year one way and another portion another way. UNI as of the starting date, even if that date is in the middle of the year, is to no extent taxed to the individual; the amount of UNI, again as of that date, wherever it falls, is treated as having been transferred to the trust and thus becomes subject to section 671. A second example is a trust not having any U.S. beneficiary can become one that has a U.S. beneficiary by virtue of the fact that a foreign beneficiary becomes a U.S. person by being physically present in the

---

[2] The use of the term "functional" in this Narrative is unusual, especially in the context of interpretation of a trust instrument. Is it meant not "functional" as a matter of trust law or as a special matter of U.S. tax law? Whether the provisions are "effective" as a matter of law must be answered under the law applicable to the trust, that is, Isle of Man law. Proof of that is a factual matter; that is, proof of a rule of foreign law is proof of a fact. If a trust instrument written today states that the beneficiaries are Marie Antoinette, if alive, Julius Caesar, if alive, Napoleon Bonaparte, if alive, and the American Cancer Society, the fact that the provisions naming the first three beneficiaries are "not functional" should not cause the trust's provisions to be ignored (not respected). This conclusion, the taxpayer asserts, follows as a matter of fundamental trust law.

[3] Section 679 has been amended a number of times, most notably in 1996.

U.S. for a large number of days. Section 7701(b). In this event, the Code does not speak of starting dates but provides that the amount in the UNI account at the end of the prior year will be brought into the grantor's income all at one time, that is, in the taxable year of the change in status. (It's not clear what happens to income earned in the first portion of the year, before the change in status; this makes a difference for subsequent distribution. Also, issues of whether or not character is retained are not addressed in the statute.)

Likewise, a trust might be a section 679 foreign grantor trust at the beginning of the taxable year but cease to be such at some point during the year. For example, the one and only beneficiary, who is a 17 year-old U.S. person with dual nationality, might drop his U.S. nationality. Conversely, a trust might be a non-section 679 (nongrantor) foreign trust at the beginning of the taxable year but later during the year become a section 679 foreign grantor trust.

Section 679 says the grantor will be treated as the section 671 owner for his taxable year if certain conditions are met. The statute is silent on a number of subjects, including what happens if one of the conditions necessary for a foreign trust to be treated as a section 679 trust cease, that is, a resident alien beneficiary becomes an nonresident alien, thus causing the section 679 trust to cease being a section 679 trust and become a foreign nongrantor trust. (This is a grantor to nongrantor switch.) The statute also is silent as to what happens when the trust itself changes its character in the course of the year such that it goes from being a nongrantor foreign trust (as taxpayer asserts is the case here) to a section 679 trust, due, for example, to amendments to the trust's provisions, or *vice versa*, that is, the trust goes from being a section 679 trust to a nongrantor trust.

The regulations under section 679, which are legislative regulations, provide rules that, in effect, fill the voids left by the statute, which is normal. For example, at Reg. §1.679-2(c)(2), it is explained, with respect to a beneficiary who becomes a nonresident alien, as follows:

> (2) TRUSTS CEASING TO HAVE A U.S. BENEFICIARY. If, for any taxable year of a U.S. transferor, a foreign trust that has received a transfer of property from the U.S. transferor ceases to be treated as having a U.S. beneficiary, the U.S. transferor ceases to be treated as the owner of the portion of the trust attributable to the transfer beginning in the first taxable year following the last taxable year of the U.S. transferor during which the trust was treated as having a U.S. beneficiary (unless the U.S. transferor is treated as an owner thereof pursuant to sections 673 through 677). The U.S. transferor is treated as making a transfer of property to the foreign trust on the first day of the first taxable year following the last taxable year of the U.S. transferor during which the trust was treated as having a U.S. beneficiary. The amount of the property deemed to be transferred to the trust is the portion of the trust attributable to the prior transfer to which paragraph (a)(1) of this section applied. For rules regarding the recognition of gain on transfers to foreign trusts, see section 684.

This rule does not address the case of a trust changing its stripes, from nongrantor foreign trust to section 679 (grantor) trust or *vice versa*.

The issues to be addressed in this audit are not specifically addressed in the regulations. If the rule for status-changing or "migrating" beneficiaries, quoted above, is used as a model, then an answer is provided; the taxpayer should not split the year treating one part one way the other part another way but, instead, should treat the entire year one way or the other, *i.e.*, "annualize" the treatment. At Reg. §1.679-2(a), dealing with the existence of U.S. beneficiary—not a status-changing trust, it is said, with disarming simplicity, that, in general, "[t]he determination of whether a foreign trust has a U.S. beneficiary is made

5

on an annual basis. Again, if this is used as a model, an answer is provided; there should be not splitting of the year into two parts.

Assuming for the sake of argument that with respect to a status-changing trust, as with a status-changing beneficiary, the answer should be made on an annual basis, with the result being that if a trust is a section 679 trust for one day during the taxable year it and the grantor are treated as if the trust were a section 679 trust for the entire year, this treatment is arrived at under the rules set forth in the section 679 regulations. But these regulations have an effective date of August 7, 2000—well after the year in question, 1998. Reg. §1.679-7 (Effective Dates) ("[T]he rules of Secs. 1.679-1, 1.679-2, 1.679-3, and 1.679-4 apply with respect to transfers after August 7, 2000."). These regulations should not be applied retroactively.[4]

The taxpayer has treated the year of the change in status of the trust (1998) as a "split year," meaning that from January 1, 1998 until April 9, 1998, the trust was a grantor trust for the period April 9 through December. This treatment, in fact, matches, in some circumstances, the treatment afforded an individual who changes from a nonresident alien to a resident alien, depending upon which starting date rules apply. For example, if A were a nonresident alien at the beginning of the year in question but became a resident alien during the year, by virtue of his obtaining a "greencard" holder and entering the U.S. on July 1, then he would treat that year as a "split year"; as to the first half of the year he would be taxed as a nonresident alien, *i.e.*, generally not subject to U.S. tax, and as to the second half he would be taxed as a resident alien, *i.e.*, subject to tax the same as a U.S. citizen. Absent the regulations saying differently, it would appear that "split year" treatment makes as much sense as "annualized" treatment, which is the treatment provided by the section 679 regulations.

*Section 684 and the regulations thereunder are inapplicable.* The Narratives cite section 684 and the regulations thereunder, as well as section 679 and the section 679 regulations.

Section 684 was enacted in Taxpayer Relief Act of 1997 and was effective on August 5, 1997. Proposed and final regulations were published under this section at the same times as those under section 679.

Section 684 addresses certain transfers, not a certain type of entity. Since transfers to foreign trusts and estates are to be treated as a taxable sale or exchange, on its face it did not have to deal with changes in the status of a grantor, beneficiary or the trust itself. It does deal with the situation of a trust that migrates from the U.S. to outside the U.S., but this is merely treated as a form of transfer of the underlying assets of the U.S. trust.

The regulations under section 684, as cited in the Narratives, provide rules for when a change in status of the foreign trust will cause a transferor to a foreign trust, which was at the time of transfer a foreign grantor trust, to be deemed to have made a transfer subject to the section 684 "gain recognition" treatment.

This rule, however, applies in the context of section 684, not sections 679. The rules address a change in status of a beneficiary, which, in turn, causes a change in status of a trust, which, in turn, "triggers" a

---

[4] The Service, in taxpayer's view, should not argue that the section 679 regulations should be applicable retroactively to transactions before their effective date. This augment only serves to highlight the fact that it took it approximately 24 years after enactment to finalize the regulations. If the regulations were made retroactive to all situations covered by section 679, this would reach back to May 21, 1974, since the code provisions themselves were made retroactive from date of enactment, October 4, 1976, to this date over two years in the past. Frankly, it is hard to imagine a Court determining that these complicated and convoluted rules, made clearer by regulations finalized on July 20, 2001, should apply back to spring of 1974.

deemed transfer for purposes of what amounts to a deemed sale.[5] The section 684 regulations, like the section 679 regulations, are applicable to transfers after August 7, 2000, over two years after the events in question. Here the Service would apply retroactively regulations applying to another section of the Code in order to arrive at a result under the section that is applicable to the subject occurrences, that is, section 679.

(b) *The provisions added at the time of the migration were not "functional" for their intended purposes (i.e., should not be given legal effect) because (i) the provisions were contrary to reality at the outset (this is a legal question) and (ii) the fact that in December 1998 assets were "distributed" to Anne (this is in part a factual question—was the transfer a distribution under applicable Isle of Man trust law or, for example, was the transfer to her followed by her settlement of a U.S. trust with essentially the same terms not a distribution under Manx law, since the assets remained in trust—and in part a legal question.)*

    (i)    The provisions should be given legal effect. They were drafted with a real set of circumstances in mind, and had events unfolded as Jim De May thought they might, all of the provisions would have been entirely appropriate and effective for the purpose intended. Understandably the provisions seem strange to an observer, especially one who is not aware of the underlying facts. They were not at all contrary to reality.

    (ii)    The fact that assets were transferred to Anne in December 1998 is used to support the assertion that the she was a beneficiary while still Jim's spouse, and thus the trust was a grantor trust under sections 672(e) and 677. This transfer, however, we believe, in fact is not a distribution, and we believe we can prove this by testimony of a witness who is expert on matters of Isle of Man trust law. The assets that were transferred to her remained in trust.

*(c) These same provisions did not limit the trustee's ability to "distribute" income to Anne, thus violating section 677 and making the trust a grantor trust. (This is partly a factual question and partly a legal issue.)*

In this context, as with the argument at paragraph (b)(ii) above, the fact that assets were transferred to Anne at the end of 1998 is used to support the assertion that the trustee must have had the sole discretion to distribute trust income to Anne, who was Jim De May's spouse, in violation of section 677. Again, this transfer, we believe, in fact is not a distribution, and we believe we can prove this by testimony of an expert witness. The assets that were transferred to her remained in trust.

**3.**     *Is Jim De May subject to the excise tax under section 1491 as in effect in 1996 as a result of the creation of the Optimay Foundation?*

*IRS's Argument.* This Narrative recites the provisions of sections 1491 and 1492, prior to their repeal in 1997, and states that as by their terms they apply, the transfer of shares was subject to the 35% excise tax on the excess of fair market value of the shares at the time of transfer over the adjusted basis for the shares, which is presumed to be zero. The fair market value is derived by reference to the offering of the Convertible Subordinated Debentures in February 1996. As discussed below, this position is clearly inconsistent with the position taken in the Narrative dated November 8, 2002.

Section 1491 provided as follows:

---

[5] This approach, as is obvious, is quite attenuated.

7

Section 1491 IMPOSITION OF TAX.

There is hereby imposed on the transfer of property by a citizen or resident of the United States, or by a domestic corporation or partnership, or by an estate or trust which is not a foreign estate or trust, to a foreign corporation as paid-in surplus or as a contribution to capital, or to a foreign estate or trust, or to a foreign partnership, an excise tax equal to 35 percent of the excess of--

    (1) the fair market value of the property so transferred, over

    (2) the sum of--

        (A) the adjusted basis (for determining gain) of such property in the hands of the transferor, plus

        (B) the amount of the gain recognized to the transferor at the time of the transfer. If a trust which is not a foreign trust becomes a foreign trust, such trust shall be treated for purposes of this section as having transferred, immediately before becoming a foreign trust, all of its assets to a foreign trust.

Section 1492, which set forth a number of exceptions, provided in part as follows:

Section 1492. NONTAXABLE TRANSFERS.

The tax imposed by section 1491 shall not apply--

    (1) If the transferee is an organization exempt from income tax under part 1 of subchapter F of chapter 1 (other than an organization described in section 401(a)); or

    (2) To a transfer--

        (A) described in section 367, or

        (B) not described in section 367 but with respect to which the taxpayer elects (before the transfer) the application of principles similar to the principles of section 367, or

    (3) To a transfer for which an election has been made under section 1057.

Section 1494, which deals with payment and collection of the section 1491 tax, provides as follows:

Section 1494 PAYMENT AND COLLECTION.

(a) TIME FOR PAYMENT.--The tax imposed by section 1491 shall, without assessment or notice and demand, be due and payable by the transferor at the time of the transfer, and shall be assessed, collected, and paid under regulations prescribed by the Secretary.

8

(b) ABATEMENT OR REFUND.--Under regulations prescribed by the Secretary, the tax may be abated, remitted, or refunded if the taxpayer, after the transfer, elects the application of principles similar to the principles of section 367.

(c) PENALTY.--In the case of any failure to file a return required by the Secretary with respect to any transfer described in section 1491, the person required to file such return shall be liable for the penalties provided in section 6677 in the same manner as if such failure were a failure to file a notice under section 6048(a).

At the relevant time, section 6677 read:

Section 6677. FAILURE TO FILE INFORMATION RETURNS WITH RESPECT TO CERTAIN FOREIGN TRUSTS.

(a) CIVIL PENALTY.--In addition to any criminal penalty provided by law, any person required to file a return under section 6048 who fails to file such return at the time provided in such section or who files a return which does not show the information required pursuant to such section, shall pay a penalty equal to 5 percent of the amount transferred to a trust (or, in the case of a failure with respect to section 6048(c), equal to 5 percent of the value of the corpus of the trust at the close of the taxable year), but not more than $1,000, unless it is shown that such failure is due to reasonable cause.

At the relevant time, section 6048(a) read:

Section 6048. RETURNS AS TO CERTAIN FOREIGN TRUSTS.

(a) GENERAL RULE.--On or before the 90th day (or on or before such later day as the Secretary may by regulations prescribe) after--

(1) the creation of any foreign trust by a United States person, or

(2) the transfer of any money or property to a foreign trust by a United States person, the grantor in the case of an inter vivos trust, the fiduciary of an estate in the case of a testamentary trust, or the transferor, as the case may be, shall make a return in compliance with the provisions of subsection (b).

No Form 926 was filed in connection with the creation of the Optimay Foundation.

Taxpayer submits that the excise tax does not apply where the transfer is to a charitable organization. Alternatively, if section 1491 were to apply, the amount of the excise tax would be nil because the fair market value of the shares at the time of the transfer was negligible.

*4.    Is income realized by the Optimay Foundation and the De May-Optimay Comp Trust includible in the gross income of Mr. James M. De May?*

*(a) Optimay Foundation is an organization described in section 501(c)(3), as confirmed by the Director, Exempt Organizations, IRS, in his determination letter in 2000.*

9

*IRS's Argument.* The Narrative dated November 8, 2002, describes Jim De May as having arranged for the transfer of Optimay shares to the Optimay Foundation and the Foundation as not being a organization described in section 501(c)(3) of the Code. The fact that it was not an organization described in section 501(c)(3) is merely stated and not explained. In its discussion of the issue, the Service says "While the stated purpose of the Optimay Foundation trust was to make charitable distributions and the trust instrument did not name specific beneficiaries, the trustees were not prohibited form paying or accumulating part of the income or corpus of the trust for the direct or indirect benefit of U.S. persons." It concludes that the Foundation falls within section 679, because the trustees were not prohibited from paying or accumulating income or corpus for the benefit of U.S. persons, and, therefore, Jim De May is taxable on the proceeds from the sale of the Optimay shares in 1998 under section 671.

> While the stated purpose of the Optimay Foundation trust was to make charitable distributions and the trust instrument did not name specific beneficiaries, the trustees were not prohibited from paying or accumulating part of the income or corpus of the trust for the direct or indirect benefit of U.S. person. The application of section 679 does not require that a foreign trust actually have U.S. beneficiaries. It is sufficient that the trust have the potential for direct or indirect U.S. beneficiaries.

There is no mention of provisions in the section 679 regulations that deal specifically with foreign trusts with charitable purposes, which are discussed below. Nor is there any mention of the fact that this position is fundamentally inconsistent with the position taken with respect to the section 1491 excise tax: The excise tax cannot apply where there is a transfer to a grantor trust.[6]

The Optimay Foundation, which is a trust under Barbados law, created on February 8, 1998, is irrevocable. Its purposes are charitable as defined in section 501(c)(3) of the Code and in Barbados law. *See* Article VI of the trust agreement. "It is intended that the organization(s) described in this paragraph (b) shall be entitled to exemption from the United States federal income tax under Section 501(c)(3) of the Code...." Article V, para. (b). The applicable terms contain all the standard prohibitions on private inurnment and other things prohibited by the Code rules applicable to private foundations. Both the definition of "charitable" and the provisions prohibiting certain things, such as, self-dealing, specifically reference the Code language and parrot almost word-for-word that language. Thus, the principal and income of all property placed in the Trust could only be used for charitable purposes and could not be paid to any private person.

There were no letters of wishes or side agreements with respect to the Foundation, and the Trustees have strictly complied with the terms of the trust instrument. Payments by the Foundation have only been made to Barbadian charitable organizations, in the early years, and, more recently, the Santa Fe Pro Musica Endowment Foundation.

Section 679 generally provides as follows:

> A United States person who directly or indirectly transfers property to a foreign trust (other than a trust described in section 6048(a)(3)(B)(ii)) shall be treated as the owner for

---

[6] The IRS for many years asserted the applicability of the section 1491 35% excise tax on a transfer to a foreign trust, even if that trust was taxed as a "grantor trust" with the U.S. person being taxed as the grantor. Rev. Rul. 69-450, 1969-2 C.B. 168; Rev. Rul. 80-318, 1980-2 C.B. 245. The IRS, in 1987, reversed its position and announced that no section 1491 excise tax would apply on a transfer of appreciated assets to a foreign trust so long as that trust is a "grantor trust" and the grantor is a U.S. person. Rev. Rul. 87-61, 1987-2 C.B. 219.

his taxable year of the portion of such trust attributable to such property if for such year there is a United States beneficiary of any portion of such trust.

Section 6048(a)(3)(B)(ii) provides as follows:

    (3) REPORTABLE EVENT
    For purposes of this subsection--
            * * *
      (B) EXCEPTIONS
            * * *
        (ii) DEFERRED COMPENSATION AND CHARITABLE TRUSTS
            Subparagraph (A) shall not apply with respect to a trust which is --
            (I) described in section 402(b), 404(a)(4), or 404A, or
            (II) determined by the Secretary to be described in section 501(c)(3).

There are no new regulations, final, proposed or temporary, reflecting the 1996 Act changes in section 6048.

In 1997, the Service published a lengthy Notice (Notice 97-34, 1997-1 CB 422, June 2, 1997) explain the workings of Code section 6048. This Notice provides in part as follows:

    E. Deferred Compensation and Charitable Trusts

    Without regard to whether a transfer to a foreign trust is gratuitous or nongratuitous, transfers to foreign trusts described in sections 402(b), 404(a)(4) , 404A , or 501(c)(3) are exempt from reporting under section 6048(a) . Section 6048(a)(3)(B)(ii). For purposes of this provision, a trust will be considered described in section 501(c)(3) only if it has a determination letter from the Service that has not been revoked recognizing its status as exempt from income taxation under section 501(a).

Further guidance on this subject is provided by the 2001 Instructions for Form 3520 (Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts). The Instructions provide the following exception from the requirement to file under section 6048: "Transfers to foreign trusts that have a current determination letter from the IRS recognizing their status as exempt from income taxation under section 501(c)(3)."

The proposed regulations under section 679, published in August 2000, provide, in part, as follows:

    Sections 1.679-4 Exceptions to General Rule

    Pursuant to sections 679(a)(1) and (a)(2), sections 1.679- 4(a) provides the following four exceptions to the general rule of sections 1.679-1: (i) transfers to a foreign trust by reason of the death of the transferor; (ii) transfers to a foreign trust described in sections 402(b), 404(a)(4), or 404A; (iii) transfers to a foreign trust that has received a ruling or determination letter, which has been neither revoked nor modified, from the Internal Revenue Service recognizing the trust's tax exempt status under section 501(c)(3); and (iv) transfers to the extent they are for fair market value.

11

The Service received a number of comments concerning this language in the proposed regulations.[7] These comments are reported in the preamble to the final regulations, and the final regulations are amended accordingly. The preamble states:

> Comments Relating to Section 1.679-4: Exceptions to General Rule -- Transfers to Trusts Described in Section 501(c)(3)
>
> Section 1.679-4(a)(3) of the proposed regulations provides an exception to the general rule of section 1.679-1 for transfers to a foreign trust that has already received a ruling or determination letter from the IRS recognizing the trust's tax exempt status under section 501(c)(3), provided that the letter has been neither revoked nor modified. Commenters questioned the requirement that a foreign trust obtain a ruling or determination letter from the IRS recognizing the trust's tax exempt status under section 501(c)(3). They assert that the requirement may interfere with a U.S. person's ability to make contributions to a foreign charitable entity that may not be familiar with U.S. tax laws and may not have any reason to obtain a determination letter from the IRS. They suggest that the final regulations require only that the U.S. transferor disclose to the IRS, at such time and in such manner as the IRS may provide, that the transfer has been made and that the transferor believes the transferee is an organization described in section 501(c)(3).
>
> In response to commenters' concerns, the final regulations eliminate the requirement that the foreign trust receive a ruling or determination letter from the IRS recognizing the trust's tax-exempt status under section 501(c)(3). The final regulations provide instead that the general rule of section 1.679-1 does not apply to any transfer of property to a foreign trust that is described in section 501(c)(3). However, taxpayers should be aware that, under Notice 97- 34 (1997-1 C.B. 422), the U.S. transferor has a reporting obligation on Form 3520 with respect to such a transfer, unless the foreign trust has received a ruling or determination letter from the IRS recognizing the trust's tax exempt status under section 501(c)(3). Moreover, if the IRS subsequently determines that the foreign trust is not described in section 501(c)(3), the exception will not apply for any taxable year of the U.S. transferor, and the U.S. transferor may be subject to interest and penalties, if applicable.

The final regulations, changing the rule set forth in the proposed regulations, provides as follows:

> Section 1.679-4 Exceptions to general rule.
> (a) In general. Section 1.679-1 does not apply to --
>
>     * * *

---

[7] Taxpayer's attorney, Charles Bruce, submitted written comments and testified at the IRS hearing on the section 679 regulations. In his written comments he said:

The exception for transfers to a foreign charity should not require that the recipient have a determination letter at the time of the making of the transfer. The regulations should permit the foreign trust to obtain a determination within a reasonable time. Also, it should be recognized that transferors can make a "contingent" transfer; that is, if the recipient does not obtain a determination letter, the transfer is nullified and the funds or other assets are returned promptly without tax consequence. In addition, the U.S. in appropriate instances should provide in bilateral treaties that qualified charities under the law of the other contracting state are treated as described in section 501(c)(3).

(3) Any transfer of property to a foreign trust described in section 501(c)(3) (without regard to the requirements of section 508(a) [relating to the filing requirement for section 501(c)(3) organizations])....

*The Optimay Foundation is an organization described in section 501(c)(3).* Any fair reading of the instrument, taken as a whole, leads to the conclusion that the trustees <u>were</u> prohibited form paying or accumulating part of the income or corpus of the trust for the direct or indirect benefit of U.S. persons in any manner that would be inconsistent with its charitable status. The document contains prohibitions on any form of private inurnment benefiting any person, regardless of tax residency or any other factor. A prohibition on payments for the direct or indirect benefit of U.S. persons would have barred U.S. persons, including U.S. charities, from receiving grants, which obviously would make no sense whatsoever. Barbados law, which governs the interpretation of the provisions of the instrument, will support the taxpayer's interpretation of the trust agreement. Also, the taxpayer should not be held responsible for a reporting requirement that did not materialize until the section 679 regulations were finalized in 2001. (Vaterstetten Foundation (Optimay Foundation changed its name to Vaterstetten Foundation on November 10, 1999), obtained an IRS determination of its tax exempt status by letter dated April 25, 2000, effective November 10, 1999.)

The conclusion that the Optimay Foundation is an organization described in section 501(c)(3) is supported by the IRS's having determined it to be such an organization, relying upon a trust agreement that is almost identical to the original trust agreement. Only clerical and conforming changes, necessary to reflect the name change, were made in the Amended and Restated version dated September 24, 1999. If the Narrative is correct, the Director, Exempt Organizations, Internal Revenue Service, was wrong in granting tax exempt status in 2000.

**(b) Jim De May is not taxable as the owner of the proceeds of the Lucent transaction attributable to Optimay shares that at one time were in the De May-Optimay Comp Trust but had been removed prior to closing of the Lucent transaction.**

*IRS's Arguments.* In the Narrative, the IRS states that section 679 applies to the De May-Optimay Comp Trust because it had a U.S. beneficiary (the U.S. compensation plan) and it had a beneficiary, the Optimay Foundation, that itself should be seen as having a U.S. beneficiary.

*The Optimay Foundation is not a section 679 trust.* The latter point, based on the Optimay Foundation having a U.S. beneficiary, is addressed above. The Optimay Foundation is properly categorized as a non-section 479 trust.

*The De May-Optimay Comp Trust ceased to exist prior to the closing of the Lucent transaction.* As to the former point, as a result of intense pressure brought to bear immediately prior to the Optimay-Lucent transaction, the Comp Trust was wound-up prior to the completion of that transaction. The Company, the other shareholders, Lucent, and especially the employees wanted make sure that Jim De May and his family did not some how, in any fashion, benefit from the shares that were in the Comp Trust. Of the 607,231 shares placed in the Comp Trust, Optimay Corporation, through its Board of Directors, the buyer, Lucent, and the Trustees of the Comp Trust all agreed that 224,731 shares would be treated as owned by the Foundation and the remainder (382,500) as owned by the Compensation Plan benefiting the employees. This agreement is evidenced a Stockholders Agreement dated April 8, 1998; pursuant to the terms of that Agreement, the Comp Trust transferred 224,731 shares to the Optimay Foundation and 300,000 shares to Optimay Corporation, to be reserved corporate purposes including for issuances under the Optimay Stock Option Plan, and an additional 82,500 shares, to be reserved for issuances for purposes

13

deemed by the Board to be beneficial to the company. As a result, the Comp Trust ceased to exist, as it had no remaining assets. The conclusion that it was no longer in existence is arrived at under Bermuda law, the law of the Comp Trust, and can be proven.

00862\Tax Audit\Response To Narratives 021204

# EXHIBIT 15

**Jonathon Moore**

| | |
|---|---|
| **From:** | dcharnas@mcguirewoods.com |
| **Sent:** | Friday, December 13, 2002 5:16 PM |
| **To:** | gila@yellowmesa.com; jmoore@mooreandbruce.com |
| **Cc:** | cbruce@mooreandbruce.com |
| **Subject:** | Response to IRS Narratives [Our File No. 2037001-0001] |

Dear Jim and Jonathan,

    I am attaching for your review a letter to Monica Garcia that responds to the IRS Narratives. It is based on the memorandum Charlie prepared. I tried to prepare a blackline that compares the attached letter to Charlie's memorandum, but we are having problems with the program that does the comparison. I will try to get you a blackline on Monday.

    Regards, Douglas

    <<TAX-AND-EMPBENEFIT-114961-v1-Letter - Monica Garcia Response to Narratives.DOC>>

Douglas W. Charnas, Esq.
McGuireWoods LLP
Washington Square
1050 Connecticut Avenue, N.W.
Suite 1200
Washington, DC 20036-5317
202.857.1757 (Direct Line)
202.828.2980 (Direct Fax)
dcharnas@mcguirewoods.com
www.mcguirewoods.com

*This e-mail may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

Douglas W. Charnas
Direct: 202.857.1757

dcharnas@mcguirewoods.com
Direct Fax: 202.828.2980

December 16, 2002

**Via Federal Express**

Ms Monica Garcia
Internal Revenue Service
5338 Montgomery Boulevard, NE
Albuquerque, NM  87109

      Re:    James M. De May
              SSN: 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

Dear Ms. Garcia:

      This letter provides comments on the issues and arguments in the Narratives prepared by the Internal Revenue Service ("Service" or "IRS") dated June 10 (one Narrative), June 24 (two Narratives), July 2 (one Narrative), and November 8 (one Narrative), 2002.

      The Service has not completed its initial examination and, therefore, has not proposed adjustments and explained those adjustments.  The above referenced taxpayer ("Taxpayer"), given these circumstances, reserves the right to argue different facts and different law, as the nature of the case may change.  The comments follow the order of the Narratives.

1.      *Is Mr. James M. De May required to recognize income on the contribution of appreciated stock to a foreign partnership under the provisions of Internal Revenue Code Section 721(b)?*

      *IRS's Argument.*   The first Narrative states that Risk Capital Bermuda Fund, L.P. partnership is treated as an investment company under the provisions of Sections 721(b) and 351(e)[1] because it meets both the diversification and valuation tests.

      *The Diversification test is not met.*   Jim De May and the Grosvenor Trust Company, Limited, as Trustees for the De May Family Trust, entered into a limited partnership agreement dated December 12, 1997, as limited partners to form a Bermuda Exempted Limited Partnership named "Risk Capital Bermuda Fund, L.P." (the "Partnership").  Valmet (Bermuda) Limited was the general partner, and the other limited partners were TMC (Holdings) Limited, Mr. Peter M. Bond, and Mr. Rockwell Bransom Bean.

      The Partnership was never designed or intended to provide the type of diversification that would cause it to be treated as an investment company if it were a corporation.  Section 2.5

---

[1] Unless otherwise provided, all section references are to sections of the Internal Revenue Code of 1986, as amended ("Code").

December 16, 2002
Page 2

of the Partnership Agreement specifically states that "the Partnership will not make any investment or engage in any activity that would cause the Partnership to be treated as an 'investment company' pursuant to Section 721(b) of the Code . . . ."

The Partnership was formed to address issues that had arisen in the operation and management of Optimay Corporation. By forming the partnership and transferring Optimay Stock to it, a "major disposition" had occurred under a certain agreement then in place. This disposition allowed Jim De May to take certain actions with regard to Optimay Corporation that he otherwise could not have taken. Although diversification may have been stated as a reason for the transfer to the partnership to certain Optimay Corporation shareholders and employers, Jim De May's reason for the transfer was to trigger a "major disposition."

It was clear from the manner in which the partners treated the Partnership assets that the Partnership was never intended to provide diversification of assets. When the Lucent stock was sold by the Partnership in April, 1998, just months after the Partnership was formed, all the gain from the sale was allocated to Jim De May and The De May Family Trust *and, upon liquidation, the proceeds from the sale were allocated to Mr. De May and The De May Family Trust*. There was no diversification from investments. The income and gain from the specific property, the Lucent stock, was allocated to Jim De May and the De May Family Trust.

**2.    Is income realized by the De May Family Trust in 1998 includible in the gross income of James Michael De May?**

*IRS's Argument*. The second Narrative states that Section 679 (Foreign Trusts Having One Or More United States Beneficiaries) applies to any foreign trust that is created by a U.S. person and that has U.S. beneficiaries, with the result that the De May Family Trust is treated as a grantor trust and the grantor, Jim De May, is taxed as if he were the owner of the assets in the trust. "The De May Family Trust had United States beneficiaries from its inception in February 1996 through the date it was dissolved in August 1998." This is purely a legal argument.

*Provisions Relating To A Number Of Non-U.S. And U.S. Beneficiaries In The Trust And In Letters Sent By The Trustee To Them Create Specific Gifts To These Individuals*. There is no discussion of the fact that by a series of letters to a number of beneficiaries by the then trustee, around August, 1996, it was provided that they were the beneficiaries of an absolute number of shares. These made clear that the provisions for specific assets to benefit named beneficiaries constitute separate trusts. The provisions for these beneficiaries in the trust and in the letters create specific gifts to these individuals. They were told that they were getting X number of Optimay shares. The De May Family Trust was holding the shares for them. They were the settlors with respect to these shares. It should be noted that they filed their tax returns consistent with this view; that is, upon the sale to Lucent, they, the ones that were U.S. citizens, reported and paid U.S. tax.

At the time of the migration of the trust from Bermuda to the Isle of Man, provisions were added to make clear that there were separate trusts for each of the U.S. beneficiaries and these beneficiaries had a power to appoint corpus and income to themselves. (Clause 5.2.) If a tax were paid by Jim De May on the sales proceeds associated with these shares, the Service would have "whipsawed" the Taxpayer, that is, exacted a double tax.

December 16, 2002
Page 3

*Changes In The Terms Of The Trust Made It A Nongrantor Trust On Or About April 9, 1998.* At the time of the migration of the trust from Bermuda to the Isle of Man, the trust indenture was amended and restated to change a number of provisions. The changes in the renunciation document, whereby in February, 1996, Jim De May renounced a number of powers retained under the original indenture, were poured into the amended and restated trust. In addition, added to the trust were blanket prohibitions on U.S. beneficiaries and spouses, as well as a grant of a power of appointment to Optimay Foundation. *See* Sections 672(e) and 677. The trust was thereby converted from a grantor trust to a nongrantor trust. [A detailed review of these changes appears below with respect to the Anne Schrader De May Trust.]

*The Provisions Of The Trusts Provided Flexibility.* At first blush, some of the trust provisions relating to beneficiaries may appear difficult to understand or even contradictory. The reason for this is that the trust was designed to operate smoothly under a number of potential contingencies regarding the beneficiaries, including their status as a U.S. person verses a non-U.S. person and their status as a spouse of a U.S. person or non-U.S. person. For example, had Jim De May and his family continued to reside in Germany, his children could elect to cease being U.S. citizens under the immigration rules that permit this "choice" before age 18½.

*The Section 679 regulations should not apply.* The Section 679 regulations have provisions and examples that perhaps foreclose these results, but those regulations came in 2001 and have an August 7, 2000, effective date. They should not be applied retroactively to the Taxpayer and these provisions and events.

At least seven of the De May Family Trust's provisions bear on this issue; three are emphasized here. Courts will construe the terms of the trust to carry out the intention as stated by the settlor.

Article IV:  Situs, Irrevocability and Nongrantor Trust Status

\*\*\*

4.2    Notwithstanding anything herein contained, neither the Trustee nor the Committee shall have the power to take any action during the Initial Trust Period which might result in this Settlement becoming revocable or which might in any way change the discretionary objects of the Settlement except as hereinafter provided and except to the extent the law of the situs of the Settlement permits the reformation or termination (or both) of the Settlement upon the consent of all interested parties AND <u>it is the intention of the Settlor that this Settlement not be a grantor trust under Sections 671 to 679 (inclusive) of the Code and its provisions be construed accordingly.</u>

\* \* \* \* \*

5.2    NOTWITHSTANDING CLAUSE 5.1, the Trustee shall hold 10,000 shares of the common stock of Optimay Corporation for the exclusive benefit of Beneficiary No. 6, shall hold 3,000 shares of common stock of Optimay Corporation for the exclusive benefit of Beneficiary No. 7, shall hold 3,000 shares of common stock of Optimay Corporation for the exclusive benefit of Beneficiary

December 16, 2002
Page 4

No. 8, shall hold 10,000 shares of common stock of Optimay Corporation for the exclusive benefit of Beneficiary No. 9, shall hold 10,000 shares of common stock of Optimay Corporation for the exclusive benefit of Beneficiary No. 10 and shall hold 3,000 shares of common stock of Optimay Corporation for the exclusive benefit of Beneficiary No. 11. <u>With respect to any beneficiary named in this paragraph who is a U.S. citizen or resident, the Trustee hereby declares that it holds any and all property to which he or she is entitled in a separate trust solely for the benefit of that beneficiary and subject to a power exercisable solely by such beneficiary to vest the corpus or the income therefrom in him- or herself.</u>

* * * * *

<u>5.13    NOTWITHSTANDING ANY OTHER PROVISION HEREOF, with the exception of Beneficiaries No. 9, 10 and 11 as to whom Clause 5.2 pertains [as to whom separate trusts have been carved out], no named beneficiary or other person who might be construed as a beneficiary or holder of a power or interest hereunder shall be a United States person as defined for purposes of section 679 of the Code or a spouse described in sections 672(e) or 677 of the Code and no part of the income or corpus of the trust shall be paid to or accumulated for the benefit of such person. Should any named beneficiary be disfranchised at any time by this Clause, the other beneficiaries shall take in such beneficiary's stead, and should all beneficiaries be so disfranchised, the Trustee shall expand the class of Beneficiaries to include one or more charitable organizations that are not U.S. persons, which charitable organization(s) shall be benefited or possessed of the subject power or interest.</u>

[Emphasis added.]

The De May Family Trust, as amended and restated, was not a grantor trust at the time of the Lucent transaction, contrary to the position described in this Narrative. It had no U.S. beneficiaries because of the provisions prohibiting any U.S. beneficiaries or a spouse of the grantor (Jim De May). The provisions stating that the settlor's intention was that the trust not be a grantor trust and that it terms should be construed accordingly must be respected.

**3.    *Is income realized by the Anne Schrader De May Trust in 1998 taxable to James Michael De May as the owner of the assets in the trust under sections 671 and 679? Or, as worded in the Narrative at p. 8, "The question relevant to whether the income realized on this sale [the sale to Lucent] should be recognized by Mr. De May is whether the Anne Schrader De May Trust remained a grantor trust after it was amended on April 9, 1998."***

*IRS's Arguments.* Three arguments are set forth; the second has two elements.

(a) Under the terms of Section 679(a), a trust cannot be a foreign nongrantor trust for part of the year and a Section 679 trust for the remainder of the year. (This is a legal issue.)

(b) The provisions added at the time of the migration were not "functional" for their intended purposes, *i.e.*, should not be given legal effect, as supported by—

December 16, 2002
Page 5

       (i)     the fact that they were contrary to reality at the outset (this is a legal question) and

       (ii)    the fact that in December, 1998, assets were "distributed" to Anne (this is in part a factual question—was the transfer a distribution under applicable Isle of Man trust law—and part a legal question).

(c) These same provisions did not limit the trustee's ability to "distribute" income to Anne, thus violating Section 677 and making the trust a grantor trust. (This is a legal issue.)

*Assumption the trust started off as a grantor trust, with a completed gift made to the trust.* For purposes of this discussion, it will be assumed that the De May Family Trust and the Anne Schrader De May Trust were grantor trusts until amended and restated in April, 1998. (As to argument (a), the Service argues that even assuming that the trusts were converted from grantor trusts to nongrantor trusts by virtue of the changes made in April, 1998, Section 679 causes them to be treated as grantor trusts for all of 1998. As to arguments (b) and (c), the Service argues that the conversion was not effective.)[2]

**(a) *Under the terms of Section 679(a), a trust cannot be a foreign nongrantor trust for part of the year and a Section 679 trust for the remainder of the year. (This is a legal issue.)***

Section 679 was enacted as part of the Tax Reform Act of 1976 and was effective as to trusts created after May 21, 1974.[3] No final regulations were promulgated under this section until July 20, 2001—approximately 27 years after the effective date of the Code provisions. T.D. 8955. Proposed regulations leading to these final regulations were published on August 7, 2000. These regulations are generally effective for transfers, and as to residency starting dates, after August 7, 2000, the date that the proposed regulations put taxpayers on notice that these rules might apply.

*The Taxpayer was entitled to treat 1998 as a "split year." The Section 679 regulations should not be applied retroactively.*

Section 679 addresses the tax consequences of having in place a certain type of entity - a foreign trust - created by a U.S. person, having a U.S. beneficiary. By its terms, it deals with several situations in which the status of the trust or the status of the taxpayer changes in such a way that there can be "split year" or similar effects. For example, a foreign grantor of a foreign trust can become a U.S. person, triggering Section 679(a)(4). Here the starting date is the individual's residency starting date under Section 7701(b)(2)(A) and there is a rule for

---

[2] The use of the term "functional" in this Narrative is unusual, especially in the context of interpretation of a trust instrument. Is it meant not "functional" as a matter of trust law or as a special matter of U.S. tax law? Whether the provisions are "effective" as a matter of law must be answered under the law applicable to the trust, that is, Isle of Man law. Proof of that is a factual matter; that is, proof of a rule of foreign law is proof of a fact. If a trust instrument written today states that the beneficiaries are Marie Antoinette, if alive, Julius Caesar, if alive, Napoleon Bonaparte, if alive, and the American Cancer Society, the fact that the provisions naming the first three beneficiaries are "not functional" should not cause the trust's provisions to be ignored (not respected). This conclusion, the Taxpayer asserts, follows as a matter of fundamental trust law.

[3] Section 679 has been amended a number of times, most notably in 1996.

determining how much undistributed net income ("UNI") is to be taken into account: The residency starting date rules can result in "split years," *i.e.*, treatment of one portion of the year one way and another portion another way. UNI as of the starting date, even if that date is in the middle of the year, is to no extent taxed to the individual; the amount of UNI, again as of that date, wherever it falls, is treated as having been transferred to the trust and thus becomes subject to Section 671. A second example is a trust not having any U.S. beneficiary can become one that has a U.S. beneficiary by virtue of the fact that a foreign beneficiary becomes a U.S. person by being physically present in the U.S. for the requisite number of days. Section 7701(b). In this event, the Code does not speak of starting dates, but provides that the amount in the UNI account at the end of the prior year will be brought into the grantor's income all at one time, that is, in the taxable year of the change in status. (It is not clear what happens to income earned in the first portion of the year, before the change in status; this makes a difference for subsequent distribution. Also, issues of whether or not character is retained are not addressed in the statute.)

Likewise, a trust might be a Section 679 foreign grantor trust at the beginning of the taxable year but cease to be such at some point during the year. For example, the one and only beneficiary, who is a 17 year-old U.S. person with dual nationality, might drop his U.S. nationality. Conversely, a trust might be a non-Section 679 (nongrantor) foreign trust at the beginning of the taxable year but later during the year become a Section 679 foreign grantor trust.

Section 679 says the grantor will be treated as the Section 671 owner for his taxable year if certain conditions are met. The statute is silent on a number of subjects, including what happens if one of the conditions necessary for a foreign trust to be treated as a Section 679 trust ceases; that is, a resident alien beneficiary becomes a nonresident alien, thus causing the Section 679 trust to cease being a Section 679 trust and become a foreign nongrantor trust. (This is a grantor to nongrantor switch.) The statute also is silent as to what happens when the trust itself changes its character in the course of the year such that it goes from being a Section 679 foreign trust to a nongrantor (as Taxpayer asserts is the case here), due, for example, to amendments to the trust's provisions, or *vice versa;* that is, the trust goes from being a nongrantor trust to a Section 679 trust.

The regulations under Section 679, which are legislative regulations, provide rules that, in effect, fill the voids left by the statute, which is normal. For example, at section 1.679-2(c)(2) of the Income Tax Regulations, it is explained, with respect to a beneficiary who becomes a nonresident alien, as follows:

> (2) TRUSTS CEASING TO HAVE A U.S. BENEFICIARY. If, for any taxable year of a U.S. transferor, a foreign trust that has received a transfer of property from the U.S. transferor ceases to be treated as having a U.S. beneficiary, the U.S. transferor ceases to be treated as the owner of the portion of the trust attributable to the transfer beginning in the first taxable year following the last taxable year of the U.S. transferor during which the trust was treated as having a U.S. beneficiary (unless the U.S. transferor is treated as an owner thereof pursuant to sections 673 through 677). The U.S. transferor is treated as making a transfer of property to the foreign trust on the first day of the first taxable year following the last taxable year of the U.S. transferor during which the trust was treated as having a U.S. beneficiary. The amount

December 16, 2002
Page 7

of the property deemed to be transferred to the trust is the portion of the trust attributable to the prior transfer to which paragraph (a)(1) of this section applied. For rules regarding the recognition of gain on transfers to foreign trusts, see section 684.

This rule does not address the case of a trust changing its stripes, from nongrantor foreign trust to Section 679 (grantor) trust.

The issues to be addressed in this audit are not specifically addressed in the regulations. If the rule for status-changing or "migrating" beneficiaries, quoted above, is used as a model, then an answer is provided; the taxpayer should not split the year treating one part one way the other part another way but, instead, should treat the entire year one way or the other, *i.e.*, "annualize" the treatment. At section 1.679-2(a) of the Income Tax Regulations, dealing with the existence of U.S. beneficiary - not a status-changing trust - it is said, with disarming simplicity, that, in general, "[t]he determination of whether a foreign trust has a U.S. beneficiary is made on an annual basis." Again, if this is used as a model, an answer is provided; there should be no splitting of the year into two parts.

Assuming, for the sake of argument, that, with respect to a status-changing trust, as with a status-changing beneficiary, the answer should be made on an annual basis, with the result being that if a trust is a Section 679 trust for one day during the taxable year it and the grantor are treated as if the trust were a Section 679 trust for the entire year, this treatment is arrived at under the rules set forth in the Section 679 regulations. But these regulations have an effective date of August 7, 2000 - well after the year in question, 1998. Treas. Reg. §1.679-7 (Effective Dates) ("[T]he rules of Secs. 1.679-1, 1.679-2, 1.679-3, and 1.679-4 apply with respect to transfers after August 7, 2000."). These regulations should not be applied retroactively.[4]

The taxpayer has treated the year of the change in status of the trust (1998) as a "split year," meaning that from January 1, 1998, until April 9, 1998, the trust was a grantor trust and for the period April 9 through December 31, 1998, it was a nongrantor trust. This treatment, in fact, matches, in some circumstances, the treatment afforded an individual who changes from a nonresident alien to a resident alien, depending upon which starting date rules apply. For example, if <u>A</u> were a nonresident alien at the beginning of the year in question but became a resident alien during the year, by virtue of his obtaining a "greencard" holder and entering the U.S. on July 1, then he would treat that year as a "split year"; as to the first half of the year he would be taxed as a nonresident alien, *i.e.*, generally not subject to U.S. tax, and as to the second half he would be taxed as a resident alien, *i.e.*, subject to tax the same as a U.S. citizen. Absent the regulations saying differently, it would appear that "split year" treatment makes as much sense as "annualized" treatment, which is the treatment provided by the Section 679 regulations.

---

[4] The Service, in Taxpayer's view, should not argue that the Section 679 regulations should be applicable retroactively to transactions before their effective date. This augment only serves to highlight the fact that it took it approximately 24 years after enactment to finalize the regulations. If the regulations were made retroactive to all situations covered by Section 679, this would reach back to May 21, 1974, since the Code provisions themselves were made retroactive from date of enactment, October 4, 1976, to this date over two years in the past. Frankly, it is hard to imagine a Court determining that these complicated and convoluted rules, made clearer by regulations finalized on July 20, 2001, should apply back to Spring of 1974.

December 16, 2002
Page 8

*Section 684 and the regulations thereunder are inapplicable.*  The Narratives cite Section 684 and the regulations thereunder, as well as Section 679 and the Section 679 regulations.

Section 684 was enacted in Taxpayer Relief Act of 1997 and was effective on August 5, 1997.  Proposed and final regulations were published under this section at the same times as those under Section 679.

Section 684 addresses certain transfers, not a certain type of entity.  Since transfers to foreign trusts and estates are to be treated as a taxable sale or exchange, on its face it did not have to deal with changes in the status of a grantor, beneficiary or the trust itself.  It does deal with the situation of a trust that migrates from the U.S. to outside the U.S., but this is merely treated as a form of transfer of the underlying assets of the U.S. trust.

The regulations under Section 684, as cited in the Narratives, provide rules for when a change in status of the foreign trust will cause a transferor to a foreign trust, which was at the time of transfer a foreign grantor trust, to be deemed to have made a transfer subject to the Section 684 "gain recognition" treatment.

This rule, however, applies in the context of Section 684, not Section 679.  The rules address a change in status of a beneficiary, which, in turn, causes a change in status of a trust, which, in turn, "triggers" a deemed transfer for purposes of what amounts to a deemed sale.[5] The Section 684 regulations, like the Section 679 regulations, are applicable to transfers after August 7, 2000, over two years after the events in question.  Here the Service would apply retroactively regulations applying to another section of the Code in order to arrive at a result under the section that is applicable to the subject occurrences, that is, Section 679.

**(b)    The provisions added at the time of the migration were not "functional" for their intended purposes (i.e., should not be given legal effect) because (i) the provisions were contrary to reality at the outset (this is a legal question) and (ii) the fact that in December, 1998, assets were "distributed" to Anne Schrader De May (this is in part a factual question - was the transfer a distribution under applicable Isle of Man trust law or, for example, was the transfer to her followed by her settlement of a U.S. trust with essentially the same terms not a distribution under Isle of Man law, since the assets remained in trust - and in part a legal question.)**

(i)    The provisions should be given legal effect.  They were drafted with a real set of circumstances in mind, and to provide for the smooth operation of the trust under a number of potential contingencies regarding the beneficiaries, including their status as a U.S. person verses a non-U.S. person and their status as a spouse of a U.S. person or non-U.S. person.  For example, had Jim De May and his family continued to reside in Germany, his children could elect to cease being U.S. citizens under the immigration rules that permit this "choice" before age 18½.  Had events unfolded under one of these potential contingencies, all of the provisions would have been entirely appropriate and effective for the purpose intended.  Understandably, the provisions seem strange to an observer, especially one who is not aware of the underlying facts.  They were not at all contrary to reality.

---

[5] This approach, as is obvious, is quite attenuated.

December 16, 2002
Page 9

(ii)    The fact that assets were transferred to Anne Schrader De May in December, 1998, is used to support the assertion that she was a beneficiary while still Jim De May's spouse, and thus the trust was a grantor trust under Sections 672(e) and 677. This transfer, however, we believe, in fact, is not a distribution, and we believe we can prove this by testimony of a witness who is expert on matters of Isle of Man trust law. The assets that were transferred to her remained in trust.

**(c) These same provisions did not limit the trustee's ability to "distribute" income to Anne Schrader De May, thus violating Section 677 and making the trust a grantor trust. (This is partly a factual question and partly a legal issue.)**

In this context, as with the argument at paragraph (b)(ii) above, the fact that assets were transferred to Anne Schrader De May at the end of 1998 is used to support the assertion that the trustee must have had the sole discretion to distribute trust income to Anne, who was Jim De May's spouse, in violation of Section 677. Again, this transfer, we believe, in fact, is not a distribution, and we believe we can prove this by testimony of an expert witness. The assets that were transferred to her remained in trust.

**4.    Is Jim De May subject to the excise tax under Section 1491 as in effect in 1996 as a result of the creation of the Optimay Foundation?**

*IRS's Argument.* This Narrative recites the provisions of Sections 1491 and 1492, prior to their repeal in 1997, and states that as by their terms they apply, the transfer of shares was subject to the 35 percent excise tax on the excess of fair market value of the shares at the time of transfer over the adjusted basis for the shares, which is presumed to be zero. The fair market value is derived by reference to the offering of the Convertible Subordinated Debentures in February 1996. As discussed below, this position is clearly inconsistent with the position taken in the Narrative dated November 8, 2002.

Section 1491 provided as follows:

Section 1491 IMPOSITION OF TAX.

There is hereby imposed on the transfer of property by a citizen or resident of the United States, or by a domestic corporation or partnership, or by an estate or trust which is not a foreign estate or trust, to a foreign corporation as paid-in surplus or as a contribution to capital, or to a foreign estate or trust, or to a foreign partnership, an excise tax equal to 35 percent of the excess of--

(1) the fair market value of the property so transferred, over

(2) the sum of--

(A) the adjusted basis (for determining gain) of such property in the hands of the transferor, plus

(B) the amount of the gain recognized to the transferor at the time of the transfer.

December 16, 2002
Page 10

> If a trust which is not a foreign trust becomes a foreign trust, such trust shall be treated for purposes of this section as having transferred, immediately before becoming a foreign trust, all of its assets to a foreign trust.

Section 1492, which set forth a number of exceptions, provided in part as follows:

> Section 1492. NONTAXABLE TRANSFERS.
>
> The tax imposed by section 1491 shall not apply--
>
> > (1) If the transferee is an organization exempt from income tax under part I of subchapter F of chapter 1 (other than an organization described in section 401(a)); or
> >
> > (2) To a transfer--
> >
> > > (A) described in section 367, or
> > >
> > > (B) not described in section 367 but with respect to which the taxpayer elects (before the transfer) the application of principles similar to the principles of section 367, or
> >
> > (3) To a transfer for which an election has been made under section 1057.

Section 1494, which deals with payment and collection of the Section 1491 tax, provides as follows:

> Section 1494 PAYMENT AND COLLECTION.
>
> (a) TIME FOR PAYMENT. --The tax imposed by section 1491 shall, without assessment or notice and demand, be due and payable by the transferor at the time of the transfer, and shall be assessed, collected, and paid under regulations prescribed by the Secretary.
> (b) ABATEMENT OR REFUND. --Under regulations prescribed by the Secretary, the tax may be abated, remitted, or refunded if the taxpayer, after the transfer, elects the application of principles similar to the principles of section 367.
>
> (c) PENALTY. --In the case of any failure to file a return required by the Secretary with respect to any transfer described in section 1491, the person required to file such return shall be liable for the penalties provided in section 6677 in the same manner as if such failure were a failure to file a notice under section 6048(a).

At the relevant time, Section 6677 read:

December 16, 2002
Page 11

Section 6677.  FAILURE TO FILE INFORMATION RETURNS WITH RESPECT TO CERTAIN FOREIGN TRUSTS.

(a) CIVIL PENALTY. --In addition to any criminal penalty provided by law, any person required to file a return under section 6048 who fails to file such return at the time provided in such section or who files a return which does not show the information required pursuant to such section, shall pay a penalty equal to 5 percent of the amount transferred to a trust (or, in the case of a failure with respect to section 6048(c), equal to 5 percent of the value of the corpus of the trust at the close of the taxable year), but not more than $1,000, unless it is shown that such failure is due to reasonable cause.

At the relevant time, Section 6048(a) read:

Section 6048. RETURNS AS TO CERTAIN FOREIGN TRUSTS.

(a) GENERAL RULE. --On or before the 90th day (or on or before such later day as the Secretary may by regulations prescribe) after--

(1) the creation of any foreign trust by a United States person, or

(2) the transfer of any money or property to a foreign trust by a United States person, the grantor in the case of an inter vivos trust, the fiduciary of an estate in the case of a testamentary trust, or the transferor, as the case may be, shall make a return in compliance with the provisions of subsection (b).

No Form 926 was filed in connection with the creation of the Optimay Foundation.

*The Section 1491 excise tax does not apply.*  The Taxpayer submits that the excise tax does not apply where the transfer is to a charitable organization.  Alternatively, if Section 1491 were to apply, the amount of the excise tax would be nil because the fair market value of the shares at the time of the transfer was negligible.

**5.     Is income realized by the Optimay Foundation and the De May-Optimay Comp Trust includible in the gross income of Mr. James M. De May?**

**(a) Optimay Foundation is an organization described in Section 501(c)(3), as confirmed by the Director, Exempt Organizations, IRS, in his determination letter in 2000.**

*IRS's Argument.*  The Narrative dated November 8, 2002, describes Jim De May as having arranged for the transfer of Optimay shares to the Optimay Foundation and the Foundation as not being an organization described in Section 501(c)(3).  The fact that it was not an organization described in Section 501(c)(3) is merely stated and not explained.  In its discussion of the issue, the Service says "While the stated purpose of the Optimay Foundation trust was to make charitable distributions and the trust instrument did not name specific beneficiaries, the trustees were not prohibited form paying or accumulating part of the income or corpus of the trust for the direct or indirect benefit of U.S. persons."  It concludes that the Foundation falls within Section 679, because the trustees were not prohibited from paying or accumulating

December 16, 2002
Page 12

income or corpus for the benefit of U.S. persons, and, therefore, Jim De May is taxable on the proceeds from the sale of the Optimay shares in 1998 under Section 671.

> While the stated purpose of the Optimay Foundation trust was to make charitable distributions and the trust instrument did not name specific beneficiaries, the trustees were not prohibited from paying or accumulating part of the income or corpus of the trust for the direct or indirect benefit of U.S. person. The application of Section 679 does not require that a foreign trust actually have U.S. beneficiaries. It is sufficient that the trust have the potential for direct or indirect U.S. beneficiaries.

There is no mention of provisions in the Section 679 regulations that deal specifically with foreign trusts with charitable purposes, which are discussed below. Nor is there any mention of the fact that this position is fundamentally inconsistent with the position taken with respect to the Section 1491 excise tax: The excise tax cannot apply where there is a transfer to a grantor trust.[6]

The Optimay Foundation, which is a trust under Barbados law, created on February 8, 1998, is irrevocable. Its purposes are charitable as defined in Section 501(c)(3) and in Barbados law. *See* Article VI of the trust agreement. "It is intended that the organization(s) described in this paragraph (b) shall be entitled to exemption from the United States federal income tax under Section 501(c)(3) of the Code...." Article V, para. (b). The applicable terms contain all the standard prohibitions on private inurement and other things prohibited by the Code rules applicable to private foundations. Both the definition of "charitable" and the provisions prohibiting certain things, such as, self-dealing, specifically reference the Code language and parrot almost word-for-word that language. Thus, the principal and income of all property placed in the Optimay Foundation could only be used for charitable purposes and could not be paid to any private person. These provisions clearly demonstrate that, from its inception, the Optimay Foundation has been an organization described in Section 501(c)(3).

There were no letters of wishes or side agreements with respect to the Foundation, and the Trustees have strictly complied with the terms of the trust instrument. Payments by the Foundation have only been made to Barbadian charitable organizations, in the early years, and, more recently, to Section 501(c)(3) public charities in the United States.

Section 679 generally provides as follows:

A United States person who directly or indirectly transfers property to a foreign trust (other than a trust described in section 6048(a)(3)(B)(ii)) shall be treated as the owner for his taxable year of the portion of such trust attributable to such property if for such year there is a United States beneficiary of any portion of such trust.

---

[6] The Service for many years asserted the applicability of the Section 1491 35% excise tax on a transfer to a foreign trust, even if that trust was taxed as a "grantor trust" with the U.S. person being taxed as the grantor. Rev. Rul. 69-450, 1969-2 C.B. 168; Rev. Rul. 80-318, 1980-2 C.B. 245. The Service, in 1987, reversed its position and announced that no Section 1491 excise tax would apply on a transfer of appreciated assets to a foreign trust so long as that trust is a "grantor trust" and the grantor is a U.S. person. Rev. Rul. 87-61, 1987-2 C.B. 219.

December 16, 2002
Page 13

Section 6048(a)(3)(B)(ii) provides as follows:

> (3) REPORTABLE EVENT
> For purposes of this subsection--
>        * * *
> > (B) EXCEPTIONS
> >        * * *
> > > (ii) DEFERRED COMPENSATION AND CHARITABLE TRUSTS
> > > Subparagraph (A) shall not apply with respect to a trust which is--
> > > (I) described in section 402(b), 404(a)(4), or 404A, or
> > > (II) determined by the Secretary to be described in section 501(c)(3).

There are no new regulations, final, proposed or temporary, reflecting the 1996 Act changes in Section 6048.

In 1997, the Service published a lengthy Notice (Notice 97-34, 1997-1 CB 422, June 2, 1997) explain the workings of Section 6048. This Notice provides, in part, as follows:

> E. Deferred Compensation and Charitable Trusts
>
> Without regard to whether a transfer to a foreign trust is gratuitous or nongratuitous, transfers to foreign trusts described in sections 402(b), 404(a)(4), 404A , or 501(c)(3) are exempt from reporting under section 6048(a) . Section 6048(a)(3)(B)(ii). For purposes of this provision, a trust will be considered described in section 501(c)(3) only if it has a determination letter from the Service that has not been revoked recognizing its status as exempt from income taxation under section 501(a).

Further guidance on this subject is provided by the 2001 Instructions for Form 3520 (Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts). The Instructions provide the following exception from the requirement to file under section 6048: "Transfers to foreign trusts that have a current determination letter from the IRS recognizing their status as exempt from income taxation under section 501(c)(3)."

The proposed regulations under Section 679, published in August 2000, provide, in part, as follows:

> Sections 1.679-4 Exceptions to General Rule
>
> Pursuant to sections 679(a)(1) and (a)(2), sections 1.679- 4(a) provides the following four exceptions to the general rule of sections 1.679-1: (i) transfers to a foreign trust by reason of the death of the transferor; (ii) transfers to a foreign trust described in sections 402(b), 404(a)(4), or 404A; (iii) transfers to a foreign trust that has received a ruling or determination letter, which has been neither revoked nor modified, from the Internal Revenue Service recognizing the trust's tax exempt status under section 501(c)(3); and (iv) transfers to the extent they are for fair market value.

December 16, 2002
Page 14

The Service received a number of comments concerning this language in the proposed regulations.[7] These comments are reported in the preamble to the final regulations, and the final regulations are amended accordingly. The preamble states:

> Comments Relating to Section 1.679-4: Exceptions to General Rule -- Transfers to Trusts Described in Section 501(c)(3)
>
> Section 1.679-4(a)(3) of the proposed regulations provides an exception to the general rule of section 1.679-1 for transfers to a foreign trust that has already received a ruling or determination letter from the IRS recognizing the trust's tax exempt status under section 501(c)(3), provided that the letter has been neither revoked nor modified. Commenters questioned the requirement that a foreign trust obtain a ruling or determination letter from the IRS recognizing the trust's tax exempt status under section 501(c)(3). They assert that the requirement may interfere with a U.S. person's ability to make contributions to a foreign charitable entity that may not be familiar with U.S. tax laws and may not have any reason to obtain a determination letter from the IRS. They suggest that the final regulations require only that the U.S. transferor disclose to the IRS, at such time and in such manner as the IRS may provide, that the transfer has been made and that the transferor believes the transferee is an organization described in section 501(c)(3).
>
> In response to commenters' concerns, the final regulations eliminate the requirement that the foreign trust receive a ruling or determination letter from the IRS recognizing the trust's tax-exempt status under section 501(c)(3). The final regulations provide instead that the general rule of section 1.679-1 does not apply to any transfer of property to a foreign trust that is described in section 501(c)(3). However, taxpayers should be aware that, under Notice 97- 34 (1997-1 C.B. 422), the U.S. transferor has a reporting obligation on Form 3520 with respect to such a transfer, unless the foreign trust has received a ruling or determination letter from the IRS recognizing the trust's tax exempt status under section 501(c)(3). Moreover, if the IRS subsequently determines that the foreign trust is not described in section 501(c)(3), the exception will not apply for any taxable year of the U.S. transferor, and the U.S. transferor may be subject to interest and penalties, if applicable.

The final regulations, changing the rule set forth in the proposed regulations, provides as follows:

---

[7] Taxpayer's attorney, Charles Bruce, submitted written comments and testified at the Service hearing on the Section 679 regulations. In his written comments he said:

> The exception for transfers to a foreign charity should not require that the recipient have a determination letter at the time of the making of the transfer. The regulations should permit the foreign trust to obtain a determination within a reasonable time. Also, it should be recognized that transferors can make a "contingent" transfer; that is, if the recipient does not obtain a determination letter, the transfer is nullified and the funds or other assets are returned promptly without tax consequence. In addition, the U.S. in appropriate instances should provide in bilateral treaties that qualified charities under the law of the other contracting state are treated as described in section 501(c)(3).

> Section 1.679-4 Exceptions to general rule.
> (a) In general. Section 1.679-1 does not apply to --
>
> * * *
>
> (3) Any transfer of property to a foreign trust described in section 501(c)(3) (without regard to the requirements of section 508(a) [relating to the filing requirement for section 501(c)(3) organizations])....

*The Optimay Foundation is an organization described in Section 501(c)(3).* Any fair reading of the instrument, taken as a whole, leads to the conclusion that the trustees were prohibited form paying or accumulating part of the income or corpus of the trust for the direct or indirect benefit of U.S. persons in any manner that would be inconsistent with its charitable status. The document contains prohibitions on any form of private inurement benefiting any person, regardless of tax residency or any other factor. A prohibition on payments for the direct or indirect benefit of U.S. persons would have barred U.S. persons, including U.S. charities, from receiving grants, which obviously would make no sense whatsoever. Barbados law, which governs the interpretation of the provisions of the instrument, will support the Taxpayer's interpretation of the trust agreement. Also, the Taxpayer should not be held responsible for a reporting requirement that did not materialize until the Section 679 regulations were finalized in 2001. (Vaterstetten Foundation (Optimay Foundation changed its name to Vaterstetten Foundation on November 10, 1999), obtained an IRS determination of its tax-exempt status by letter dated April 25, 2000, effective December 22, 1999.)

The conclusion that the Optimay Foundation is an organization described in Section 501(c)(3) is supported by the Service having determined it to be such an organization, relying upon a trust agreement that is almost identical to the original trust agreement. Only clerical and conforming changes, necessary to reflect the name change, were made in the Amended and Restated version dated September 24, 1999. If the Narrative is correct, the Director, Exempt Organizations, Internal Revenue Service, was wrong in granting tax-exempt status in 2000.

**(b) Jim De May is not taxable as the owner of the proceeds of the Lucent transaction attributable to Optimay shares that at one time were in the De May-Optimay Comp Trust but had been removed prior to closing of the Lucent transaction.**

*IRS's Arguments.* In the Narrative, the Service states that Section 679 applies to the De May-Optimay Comp Trust because it had a U.S. beneficiary (the U.S. compensation plan) and it had a beneficiary, the Optimay Foundation, that itself should be seen as having a U.S. beneficiary.

*The Optimay Foundation is not a Section 679 trust.* The latter point, based on the Optimay Foundation having a U.S. beneficiary, is addressed above. The Optimay Foundation is properly categorized as a non-Section 679 trust.

*The De May-Optimay Comp Trust ceased to exist prior to the closing of the Lucent transaction.* As to the former point, as a result of intense pressure brought to bear immediately prior to the Optimay-Lucent transaction, the Comp Trust was wound-up prior to the completion of that transaction. The Company, the other shareholders, Lucent, and especially the employees wanted make sure that Jim De May and his family did not some how, in any fashion, benefit from the shares that were in the Comp Trust. Of the 607,231 shares placed in the Comp Trust,

December 16, 2002
Page 16

Optimay Corporation, through its Board of Directors, the buyer, Lucent, and the Trustees of the Comp Trust all agreed that 224,731 shares would be treated as owned by the Foundation and the remainder (382,500) as owned by the Compensation Plan benefiting the employees. This agreement is evidenced by a Stockholders Agreement dated April 8, 1998; pursuant to the terms of that Agreement, the Comp Trust transferred 224,731 shares to the Optimay Foundation and 300,000 shares to Optimay Corporation, to be reserved for corporate purposes, including for issuances under the Optimay Stock Option Plan, and an additional 82,500 shares, to be reserved for issuances for purposes deemed by the Board to be beneficial to the company. As a result, the Comp Trust ceased to exist, as it had no remaining assets. The conclusion that it was no longer in existence is arrived at under Bermuda law, the law of the Comp Trust, and can be proven.


Please call me if you have any questions.

Very truly yours,


Douglas W. Charnas

Enclosures
cc: Mr. James M. De May
    Charles M. Bruce, Esq.
    Jonathan R. Moore, Esq.

# EXHIBIT 16

## Jonathon Moore

| | |
|---|---|
| **From:** | Jim De May [gila@yellowmesa.com] |
| **Sent:** | Sunday, December 15, 2002 7:04 PM |
| **To:** | dcharnas@mcguirewoods.com; jmoore@mooreandbruce.com |
| **Cc:** | cbruce@mooreandbruce.com |
| **Subject:** | RE: Response to IRS Narratives [Our File No. 2037001-0001] |
| **Importance:** | High |

Dear Doug,
Dear Charlie,
Dear Jonathon,

This narrative reads to be true to what occurred.

In those sections on page 9 and page 10 where we discuss circumstances in Germany, I believe it is accurate and correct to discuss in **_greater_** detail that the seemingly contradictory or strange language of the trust addressed **prophylactically** an always potential marital phenomenon, without implying this was the intent of any party. This inclusion of such language was only normal, because one of the parties was a non-resident alien and the family was married and living under German law. The consequences of any change of marital status would have required further explanation, which appears in the trust. In retrospect, since everyone is living still married, living in the US and no circumstance arose, the paragraphs seem superfluous and misplaced. However, I believe it is possible to shed some light on the reasoning behind the text of the trust from a hypothetical point of view. The fact that the trustee provided for these various eventualities seems prudent in retrospect. No negative or divisive intent of any party need be implied by the inclusion of this language.

I did not understand the legal citations of the last few pages.

Thanks to all of you.

Regards,
Jim

> -----Original Message-----
> **From:** dcharnas@mcguirewoods.com [mailto:dcharnas@mcguirewoods.com]
> **Sent:** Friday, December 13, 2002 15:16
> **To:** gila@yellowmesa.com; jmoore@mooreandbruce.com
> **Cc:** cbruce@mooreandbruce.com
> **Subject:** Response to IRS Narratives [Our File No. 2037001-0001]
>
> Dear Jim and Jonathan,
>
> I am attaching for your review a letter to Monica Garcia that responds to the IRS Narratives. It is based on the memorandum Charlie prepared. I tried to prepare a blackline that compares the attached letter to Charlie's memorandum, but we are having problems with the program that does the comparison. I will try to get you a blackline on Monday.
>
> Regards, Douglas
>
> <<TAX-AND-EMPBENEFIT-114961-v1-Letter - Monica Garcia Response to Narratives.DOC>>
>
> Douglas W. Charnas, Esq.

McGuireWoods LLP
Washington Square
1050 Connecticut Avenue, N.W.
Suite 1200
Washington, DC 20036-5317
202.857.1757 (Direct Line)
202.828.2980 (Direct Fax)
dcharnas@mcguirewoods.com
www.mcguirewoods.com

*This e-mail may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

# EXHIBIT 17

McGuireWoods LLP
Washington Square
1050 Connecticut Avenue N.W.
Suite 1200
Washington, DC 20036-5317
Phone: 202.857.1700
Fax: 202.857.1737
www.mcguirewoods.com

Douglas W. Charnas
Direct: 202.857.1757

**McGuireWoods**

dcharnas@mcguirewoods.com
Direct Fax: 202.828.2980

April 19, 2004

*Was Scott*

Benita M. Alexandre, Esq.
Estate Tax Attorney
Internal Revenue Service
5338 Montgomery Blvd, NE
Albuquerque, NM  87109

Re:    James M. De May
SSN: 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

Dear Ms. Alexandre:

By letter dated January 14, 2004 (copy enclosed), you sent me a discussion draft showing the recomputed gift tax liability for James M. De May.  I have reviewed the discussion draft, and my comments follow.

I.    **1999 GIFT**

In February, 1999, Mr. De May purchased a condominium in Florida for his parents.  Under the Warranty Deed for the condominium, Mr. De May's parents have a life estate with Mr. De May holding a remainder interest.  In my January 7, 2003, letter to you, I stated that I calculated the value of this gift to be $84,564, and that two annual exclusions applied to it.  If I am correctly reading your discussion draft with respect to the 1999 gift, we are in agreement on the value of this gift.

III.    **1996 GIFTS**

A.    **Optimay's Financial Situation**

We agree that Mr. De May's transfer of stock to the Anne Schrader De May Trust and the De May Family Trust constituted gifts in 1996.  We substantially disagree, however, with the value the discussion draft places on the Optimay shares in 1996.

As I explained in my January 7, 2003, letter, Optimay had chronic financial problems during 1995, 1996, and 1997.  The dyer financial situation of the company during this period is reflected in the audited financial statement by Price Waterhouse LLP (now PriceWaterhouseCoopers) dated May 12, 1997.  In its report, Price Waterhouse stated:

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern.  As discussed in Note 3 to the financial statements, the Company has suffered recurring losses from operations

April 19, 2004
Page 2

and has a net capital deficiency that raise substantial doubt about its ability to
continue as a going concern.

The above-statement was the result of substantial negotiations between Optimay management
and Price Waterhouse, an international accounting firm.  Price Waterhouse's initial conclusion
was that, given Optimay's financial situation, it would not be able to continue as a going
concern.  While the less severe language agreed to by Price Waterhouse was important to
keep Optimay's operations from being suspended or terminated under German law, the less
severe language had no practical effect on the value of the stock.  It is obvious from the above-
statement that Price Waterhouse considered Optimay to be without marketable value.  It is also
significant to note that the audit financial statement was issued more than a year after the gifts
to the trusts, and that matters had not improved from the time of the gifts to the completion of
the financial statement.

       We believe the audited financial statement by Price Waterhouse is compelling evidence
for the position that Optimay had no marketable value at the time of the gifts of the Optimay
stock.  An analysis of Optimay's balance sheet, the statement of income (loss), and statement
of cash flow for 1994 – 1996, shows a company that was insolvent in every sense of the word.

       The severity of Optimay's financial situation is understated by the language in the
audited financial statement.  Optimay was not paying its bills.  Creditors were actively pursuing
collection efforts.  Some creditors opted for self help, and showed up at Optimay's offices in an
effort to repossess office furniture and other assets.  In addition to creditors, Mr. De May was
having serious problems with Optimay's board, management, and employees.  Each day there
was a question whether Optimay would survive another day.

       B.      **$6.66 Value Placed on Optimay Stock is Erroneous**

       The $6.66 value placed on the Optimay stock in the discussion draft is the conversion
value of the 7 percent Convertible Subordinated Debentures Optimay sold from April, 1996,
through January, 1997.  Optimay would have preferred to borrow the money or sell stock, and it
made serious efforts to do both.  It was unsuccessful in its efforts to borrow money.  Its effort to
sell stock also failed.  It was told by various underwriters with whom it met that its stock had no
market value.  Accordingly no one would undertake an offering of its stock.  It was advised that
it might be able to raise cash through an offering of convertible debentures, which it ultimately
did.

       The $6.66 conversion value for the Debentures has no relationship to the value of the
company at the time the Debentures were issued or when the gifts to the trusts were made.
The Debentures were for three years, and the conversion value was a highly optimistic estimate
of the value of the Optimay stock when the Debentures matured in 1999.  The conversion value
was based on an optimistic projection of Optimay's growth and earnings during the three-year
period beginning when the Debentures were issued.  Optimay, which had negative value when
the Debentures were issued, would have had to increase to a value of at least $20 million
before any of the Debenture holders would have exercised the conversion feature.  The $6.66
estimated value was based on optimistic projections three years down the road.  It did not
reflect the value of the stock at the time of the gifts, and would be an inappropriate value to use
for the stock at the time of the gift.

April 19, 2004
Page 3

When you examine the facts, there is no basis upon which to assign any value to the Optimay stock. Every indicator in 1996 showed a company with no value. Accordingly, we disagree with the value assigned the Optimay stock for purposes of determine the amount of the gift to the two trusts.

Very truly yours,

Douglas W. Charnas

Enclosure
cc:    James M. De May
       Charles M. Bruce, Esq.
       Jonathon R. Moore, Esq.

Internal Revenue Service

Department of the Treasury
5338 Montgomery Blvd. NE
Albuquerque, NM  87109

Telephone Number:
(505) 837-5558

Mr. Douglas W. Charnas, Esq.
McGuireWoods LLP
1050 Connecticut Avenue N.W.
Suite 1200
Washington, DC   20036-5317

Fax: (505) 837-5651

Date: January 14, 2004

Employee ID#:  85-00752

RE: Gift of James M. De May

Dear Mr. Charnas:

Enclosed is a copy of a discussion draft showing the recomputed gift tax liability in the above matter on the basis of one (or more) of the factual assumptions and/or legal theories we recently discussed. It is being provided to you as a means of facilitating our discussions as we work towards a timely resolution of the case.

*This is neither an examination report nor a proposal to settle the case for the amounts or according to the approaches shown therein.* Additional evidence may be developed during the course of my examination, which would result in a substantially different final recommendation.

Since the accrued interest on any gift tax deficiency finally determined is approximately a percent of that deficiency, please give your prompt attention to this matter.

If you have any questions in this matter, please feel free to call me at the number shown above.

Sincerely,

Benita M. Alexandre
Estate Tax Attorney

Enclosures:
Discussion Draft

Form 3231A
(Rev. 8/86)

Department of the Treasury - Internal Revenue Service

## PRELIMINARY STATEMENT

| Donor | | | Social Security Number | Return Type |
|---|---|---|---|---|
| James M. De May | | | 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 | [X] Gift Tax |

| Period of Gift | Tax Previously Assessed | Correct Tax Liability | Increase <Decrease> In Tax | Penalties Increase <Decrease> |
|---|---|---|---|---|
| 1996 | 0.00 | 2,747,317.15 | 2,747,317.15 | 0.00 |
| 1999 | 0.00 | 17,010.20 | 17,010.20 | 0.00 |
| | | | | |
| | | | | |
| Total | 0.00 | 2,764,327.35 | 2,764,327.35 | 0.00 |

| Net Increase (Decrease) | Agreement Secured | Name of Person With Whom Findings Were Discussed: |
|---|---|---|
| 2,764,327.35 | [ ]YES [x]NO | Douglas W. Charnas, Esq. |

Remarks

Table of Contents:

# DISCUSSION DRAFT

| Examiner's Signature (Benita M. Alexandre) | Area SBSE/Area 9 | Date 1 14 2004 |
|---|---|---|

Form 3233
(Rev. 1/99)

Department of the Treasury - Internal Revenue Service

# REPORT OF GIFT TAX EXAMINATION

| | Donor | Social Security Number | Date of Gift |
|---|---|---|---|
| | James M. De May | 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 | 1996 |

| | | Preliminary Letter | As Corrected |
|---|---|---|---|
| 1 | Total value of gifts of donor | 0.00 | 6,108,758.46 |
| 2 | Less amount attributable to spouse | 0.00 | 0.00 |
| 3 | Balance (line 1 less line 2) | 0.00 | 6,108,758.46 |
| 4 | Gifts of spouse to be included | 0.00 | 0.00 |
| 5 | Total Gifts (lines 3 plus 4) | 0.00 | 6,108,758.46 |
| 6 | Less total annual exclusions | 0.00 | 110,000.00 |
| 7 | Total included amount of gifts (line 5 less line 6) | 0.00 | 5,998,758.46 |
| 8 | Gifts to Spouse for which a MD will be claimed | 0.00 | 0.00 |
| 9 | Exclusions attributable to gifts on line 8 | 0.00 | 0.00 |
| 10 | Marital deduction (line 8 less line 9) | 0.00 | 0.00 |
| 11 | Charitable deduction (net of exclusions) | 0.00 | 0.00 |
| 12 | Total deductions (line 10 plus line 11) | 0.00 | 0.00 |
| 13 | Tentative taxable (line 7 less line 12) | 0.00 | 5,998,758.46 |
| 14 | Generation-skipping transfer taxes payable | 0.00 | 0.00 |
| 15 | Taxable gifts for this period (add lines 13 and 14) | 0.00 | 5,998,758.46 |
| 16 | Total taxable gifts for prior periods | 0.00 | 0.00 |
| 17 | Total taxable gifts (line 15 plus line 16) | 0.00 | 5,998,758.46 |
| 18 | Tax computed on amount in line 17 | 0.00 | 2,940,117.15 |
| 19 | Tax computed on amount in line 16 | 0.00 | 0.00 |
| 20 | Total tax payable on taxable gifts (line 18 less line 19) | 0.00 | 2,940,117.15 |
| 21 | Unified Credit from Table B | 192,800.00 | 192,800.00 |
| 22 | Unified credit against gift tax allowable for prior periods | 0.00 | 0.00 |
| 23 | Balance (line 21 less line 22) | 192,800.00 | 192,800.00 |
| 24 | 20% of amount allowed as specific exemption after Sept. 8, 1976 | 0.00 | 0.00 |
| 25 | Balance (line 23 less line 24) | 192,800.00 | 192,800.00 |
| 26 | Unified Credit (lesser of line 20 and line 25) | 0.00 | 192,800.00 |
| 27 | Credit for foreign gift taxes | 0.00 | 0.00 |
| 28 | Total credits (line 26 plus line 27) | 0.00 | 192,800.00 |
| 29 | Balance (line 20 less line 28) | 0.00 | 2,747,317.15 |
| 30 | Generation-skipping transfer taxes | 0.00 | 0.00 |
| 31 | Total tax (line 29 plus line 30) | 0.00 | 2,747,317.15 |
| 32 | Tax previously assessed (from line 31) | | 0.00 |
| 33 | Total Tax - Increase <decrease> (line 31 less line 32) | | 2,747,317.15 |
| 34 | Penalties previously assessed | | 0.00 |
| 35 | Penalties as corrected | | 0.00 |
| 36 | Net Penalties -- Increase <decrease> (line 35 less line 34) | | 0.00 |
| 37 | Increase <decrease> in tax & penalties (line 33 plus line 36) | | 2,747,317.15 |

Form 3233

DISCUSSION DRAFT

| Form 886A<br>(Rev. 1/99) | Department of the Treasury - Internal Revenue Service<br>**Explanation of Items** | | |
|---|---|---|---|

| Donor<br>James M. De May | | Social Security Number<br>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 | Date of Gift<br>1996 |
|---|---|---|---|

### Sch. A1, Gift of Donor w/out GST

| | Description | Preliminary Letter | As Corrected |
|---|---|---|---|
| 1 | Anne Schrader De May Trust<br>200,000 Shares of Optimay Corporation<br>February 12, 1996 | 0.00 | 1,332,000.00 |
| 2 | De May Family Trust<br>717,231 Shares of Optimay Corporation<br>February 12, 1996 | 0.00 | 4,776,758.46 |
| | Total of these items | 0.00 | 6,108,758.46 |
| | Preliminary Letter | | 0.00 |
| | Change to schedule | | 6,108,758.46 |

200,000 Shares of Optimay Corporation
$6.66/Share                                    $1,332,000.00

717,231 Shares of Optimay Corporation
$6.66/Share                                    $4,776,758.46

| Form 886A | Department of the Treasury - Internal Revenue Service | |
|---|---|---|
| (Rev. 1/99) | **Explanation of Items** | |

| Donor | Social Security Number | Date of Gift |
|---|---|---|
| James M. De May | 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 | 1996 |

## 6. Total annual exclusions

| | Description | Preliminary Letter | As Corrected |
|---|---|---|---|
| 1 | Anne Schrader De May Trust | 0.00 | 100,000.00 |
| 2 | De May Family Trust | 0.00 | 10,000.00 |
| | Total of these items | 0.00 | 110,000.00 |
| | Preliminary Letter | | 0.00 |
| | Change to schedule | | 110,000.00 |

Form 3233
(Rev. 1/99)

Department of the Treasury - Internal Revenue Service

**REPORT OF GIFT TAX EXAMINATION**

| Donor | Social Security Number | Date of Gift |
|---|---|---|
| James M. De May | 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 | 1999 |

| | | Preliminary Letter | As Corrected |
|---|---|---|---|
| 1 | Total value of gifts of donor | 0.00 | 84,564.00 |
| 2 | Less amount attributable to spouse | 0.00 | 0.00 |
| 3 | Balance (line 1 less line 2) | 0.00 | 84,564.00 |
| 4 | Gifts of spouse to be included | 0.00 | 0.00 |
| 5 | Total Gifts (lines 3 plus 4) | 0.00 | 84,564.00 |
| 6 | Less total annual exclusions | 0.00 | 20,000.00 |
| 7 | Total included amount of gifts (line 5 less line 6) | 0.00 | 64,564.00 |
| 8 | Gifts to Spouse for which a MD will be claimed | 0.00 | 0.00 |
| 9 | Exclusions attributable to gifts on line 8 | 0.00 | 0.00 |
| 10 | Marital deduction (line 8 less line 9) | 0.00 | 0.00 |
| 11 | Charitable deduction (net of exclusions) | 0.00 | 0.00 |
| 12 | Total deductions (line 10 plus line 11) | 0.00 | 0.00 |
| 13 | Tentative taxable (line 7 less line 12) | 0.00 | 64,564.00 |
| 14 | Generation-skipping transfer taxes payable | 0.00 | 0.00 |
| 15 | Taxable gifts for this period (add lines 13 and 14) | 0.00 | 64,564.00 |
| 16 | Total taxable gifts for prior periods | 0.00 | 5,998,758.46 |
| 17 | Total taxable gifts (line 15 plus line 16) | 0.00 | 6,063,322.46 |
| 18 | Tax computed on amount in line 17 | 0.00 | 2,975,627.35 |
| 19 | Tax computed on amount in line 16 | 0.00 | 2,940,117.15 |
| 20 | Total tax payable on taxable gifts (line 18 less line 19) | 0.00 | 35,510.20 |
| 21 | Unified Credit from Table B | 211,300.00 | 211,300.00 |
| 22 | Unified credit against gift tax allowable for prior periods | 0.00 | 192,800.00 |
| 23 | Balance (line 21 less line 22) | 211,300.00 | 18,500.00 |
| 24 | 20% of amount allowed as specific exemption after Sept. 8, 1976 | 0.00 | 0.00 |
| 25 | Balance (line 23 less line 24) | 211,300.00 | 18,500.00 |
| 26 | Unified Credit (lesser of line 20 and line 25) | 0.00 | 18,500.00 |
| 27 | Credit for foreign gift taxes | 0.00 | 0.00 |
| 28 | Total credits (line 26 plus line 27) | 0.00 | 18,500.00 |
| 29 | Balance (line 20 less line 28) | 0.00 | 17,010.20 |
| 30 | Generation-skipping transfer taxes | 0.00 | 0.00 |
| 31 | Total tax (line 29 plus line 30) | 0.00 | 17,010.20 |
| 32 | Tax previously assessed (from line 31) | | 0.00 |
| 33 | Total Tax - Increase <decrease> (line 31 less line 32) | | 17,010.20 |
| 34 | Penalties previously assessed | | 0.00 |
| 35 | Penalties as corrected | | 0.00 |
| 36 | Net Penalties -- Increase <decrease> (line 35 less line 34) | | 0.00 |
| 37 | Increase <decrease> in tax & penalties (line 33 plus line 36) | | 17,010.20 |

Form 3233

DISCUSSION DRAFT

Form 886A
(Rev. 1/99)

Department of the Treasury - Internal Revenue Service

**Explanation of Items**

| Donor | Social Security Number | Date of Gift |
|---|---|---|
| James M. De May | 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 | 1999 |

**Sch. A1, Gift of Donor w/out GST**

| | Description | Preliminary Letter | As Corrected |
|---|---|---|---|
| 1 | Gilbert De May, Father and Dorthy De May, Mother | 0.00 | 84,564.00 |
| | Condominium (Florida) | | |
| | February 1999 | | |
| | Total of these items | 0.00 | 84,564.00 |
| | Preliminary Letter | | 0.00 |
| | Change to schedule | | 84,564.00 |

Per Letter dated 01/07/03
from Douglas W. Charnas, Esq.

| Form 886A | Department of the Treasury - Internal Revenue Service | |
|---|---|---|
| (Rev. 1/99) | **Explanation of items** | |

| Donor | Social Security Number | Date of Gift |
|---|---|---|
| James M. De May | 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 | 1999 |

### 6. Total annual exclusions

| | Description | Preliminary Letter | As Corrected |
|---|---|---|---|
| 1 | Two Donees | 0.00 | 20,000.00 |
| | Total of these items | 0.00 | 20,000.00 |
| | Preliminary Letter | | 0.00 |
| | Change to schedule | | 20,000.00 |

Form 886A

# EXHIBIT 18

# Chief Counsel Advice

**Office of Chief Counsel**
**Internal Revenue Service**
# memorandum

CC:INTL:Br1:
POSTN-119372-04

Third Party Communication: None
Date of Communication: Not Applicable

UILC: 671.02-00, 672.04-00, 674.00-00, 677.01-00, 679.00-00, 684.00-00, 6048.01-00, 6677.01-00, 6677.01-02

date:

to: Rachel J. Zepeda
(CC:SB:5:PNX:1)

from: Elizabeth U. Karzon
(CC:INTL:Br1)

subject: Application of I.R.C. § 679 To Certain Foreign Trusts

This Chief Counsel Advice responds to your request for assistance. This advice may not be used or cited as precedent.

## ISSUES

Issue 1

Whether income realized on the sale of Optimay Corporation stock by Anne Schrader De May Trust on 4-16-98, is includible in the gross income of James M. De May as the owner of the trust, or whether Anne Schrader De May Trust was a nongrantor trust by reason of the amendments made to the trust documents on 4-9-98, and if so, the tax consequences of the conversion of the trust from grantor to nongrantor status?

Facts – Issue 1

On 9-18-95, the taxpayer, James M. De May a U.S. citizen, founded Optimay Corporation, a domestic corporation. As founder of Optimay Corporation, James M. De May received shares of the company and has not established that his basis in those shares is other than zero.

On 2-8-96, James M. De May established Anne Schrader De May Trust under the laws of Bermuda. The originating trust document declared the trust to be a grantor trust under I.R.C. §§ 671 to 678, inclusive. See Exhibit 1 – Article IV: Situs, Irrevocability and Grantor Trust Status.

POSTN-119372-04                    2

On the date the trust was established, James M. De May caused the Optimay Corporation to issue 200,000 shares of stock to the trust on behalf of James M. De May.

Schedule 2 of the trust instrument named two beneficiaries: Anne Schrader De May, James M. De May's wife (a nonresident alien), and Optimay Foundation, a Barbados trust established by James M. De May that carried no restrictions as to whether U.S. charities could receive distributions from it. Although no other beneficiaries were named, Article I of the trust defines beneficiaries as the specified beneficiaries and those later added. James M. De May in conjunction with the trustee, reserved the power to expand or contract the class of beneficiaries under Article VI (Powers Retained by Settlor).

On or about December 10, 1997, James M. De May began negotiating to sell the Optimay Corporation to Lucent Technologies, a domestic corporation, with the signing of a confidentiality agreement. In mid-February Year 1998 Lucent Technologies offered to acquire all of the shares of the Optimay Corporation. See page 3 of Exhibit 2.

On 4-9-98, James M. De May amended and restated Anne Schrader De May Trust. Among the changes he made at that time were:

1. The original trustee, Grosvenor Trust Company, Limited, was replaced with Valmet Isle of Man, Limited.
2. The trust was migrated from Bermuda to Country Isle of Man.
3. Article IV of the trust document was amended. Previously, this article specified that the trust was a grantor trust. Article IV was changed to state: "it is the intention of the Settlor that this Settlement not be a grantor trust under I.R.C. §§ 671 through 679 (inclusive) of the Code and its provisions be construed accordingly."
4. Clause 5.8 of Article V was amended to state:

   *NOTWITHSTANDING ANY OTHER PROVISION HEREOF, no named beneficiary or other person who might be construed as a beneficiary or holder of a power or interest hereunder shall be a United States person as defined for purposes of I.R.C.§ 679 of the Code or a spouse described in I.R.C. §§ 672(e) or 677 of the Code and no part of the income or corpus of the trust shall be paid to or accumulated for the benefit of such person. Should either named beneficiary be disfranchised at any time by this Clause, the other shall take in her or its stead, and should both be so disfranchised, the Trustee shall expand the class of Beneficiaries to include one or more charitable organizations that are not U.S. persons, which charitable organization(s) shall be benefited or possessed of the subject power or interest.*

POSTN-119372-04                           3

The 4-9-98 amendments did not remove either Optimay Foundation or Anne Schrader
De May as beneficiaries of the trust.

On 4-16-98, Optimay Corporation was sold to Lucent Technologies for $16.53 per
share. The provisions of the sale were for payment of $14.50 per share immediately
and the remaining $2.03 to be paid within 18 months of the purchase. At the time of the
Lucent Technologies purchase, Anne Schrader De May Trust directly held 200,000
shares of Optimay Corporation stock.

On 12-31-98, all of the assets of the amended and restated Anne Schrader De May
Trust were distributed to Anne Schrader De May and the trust was terminated. See
Exhibit 3. Also on 12-31-98, Anne Schrader De May created a new trust, the Anne
Schrader De May Revocable U.S. Trust. The first article of this trust instrument
designates that Anne Schrader De May shall have the power at will to alter, amend, or
revoke the trust instrument. The third article of this trust instrument designates that the
trustee shall distribute funds as Anne Schrader De May directs. See Exhibit 4.

Issue 2

Whether income realized on the sale of Optimay Corporation stock by De May Family
Trust on 4-16-98, is includible in the gross income of James M. De May as the owner of
the trust, or whether De May Family Trust was a nongrantor trust by reason of the
amendments made to the trust documents on 4-9-98, and if so, the tax consequences
of the conversion of the trust from grantor to nongrantor status?

Issue 2 - Facts

On 2-8-96, James M. De May also established De May Family Trust. De May Family
Trust was initiated as a foreign trust under the laws of Bermuda. The originating trust
document declared the trust to be a grantor trust under I.R.C. §§ 671 to 678, inclusive.
See Exhibit 5 – Article IV: Situs, Irrevocability and Grantor Trust Status.

Clause 5.1 of the trust instrument provides that the trustee may, in the trustee's sole
discretion, distribute net income and capital to the following named beneficiaries of the
trust:
   1.   Anne Schrader De May (James M. De May's wife)
   2.   Henning Sean De May (James M. De May's son)
   3.   Marlin Kimberly De May (James M. De May's daughter)
   4.   Lindsay Morgan De May (James M. De May's daughter)
   5.   Anneliese Schrader (resident of Germany)
   6.   Mathias Schrader (resident of Germany)
   7.   Christian Schrader (resident of Germany)
   8.   Gilbert H. De May (U.S. resident)

POSTN-119372-04 4

9. Dorothy E. De May (U.S. resident)
10. Janet S. Groppel (U.S. resident)
11. James M. De May (the grantor)
12. Optimay Foundation (Barbados trust)

Also, on 2-8-96, James M. De May caused Optimay Corporation to issue 717,231 shares of Optimay Corporation shares to De May Family Trust on his behalf. Clause 5.2 of Article V (Trust Distributions) of the trust instrument specified that a total of 39,000 shares of the 717,231 received were to be held by the trust for the exclusive benefit of certain specific beneficiaries. See Exhibit 6. These beneficiaries and the shares allocated to them are as follows:

1. 10,000 shares for Beneficiary Anneliese Schrader
2. 3,000 shares for Beneficiary Mathias Schrader
3. 3,000 shares for Beneficiary Christian Schrader
4. 10,000 shares for Beneficiary Gilbert H. De May
5. 10,000 shares for Beneficiary Dorothy E. De May
6. 3,000 shares for Beneficiary Janet S. Groppel[1]

On or about 12-10-97, James M. De May began negotiating to sell Optimay Corporation to Lucent Technologies with the signing of a confidentiality agreement. On 12-12-97, the Trustee for De May Family Trust entered into a limited partnership agreement, transferring to it 627,231 shares of Optimay Corporation stock. In mid-February Year 1998 Lucent Technologies offered to acquire all of the shares of Optimay Corporation. See page 3 of Exhibit 7.

On 4-9-98, James M. De May amended and restated the De May Family Trust instrument. Among the changes he made at that time were:

1. The original trustee, Grosvenor Trust Company, Limited, was replaced with Valmet Isle of Man, Limited.
2. The trust migrated from Bermuda to Country Isle of Man.
3. A new beneficiary was added, Ruben James M. De May, born 7-11-97, son of the grantor and, therefore, a U.S. citizen. See Exhibit 8 for the revised schedule of Beneficiaries.
4. Article IV of the trust document was amended. Previously this article specified that the trust was a grantor trust. Article IV was changed to state: "it is the intention of the Settlor that this Settlement not be a grantor trust under I.R.C. §§ 671 through 679 (inclusive) of the Code and its provisions be construed accordingly."

---

1 Taxpayer has indicated that Beneficiaries F through K filed and paid tax on income earned by their respective shares. The Service has no information regarding whether these individuals filed and paid any such tax except that it did not occur in the years in question.

POSTN-119372-04                    5

5.    Clause 5.2 of Article V was amended with a declaration that the shares held for Gilbert H. De May, Dorothy E. De May and Janet S. Groppel constitute separate trusts.

6.    The following Clause 5.13 was added to Article V:

NOTWITHSTANDING ANY OTHER PROVISION HEREOF, with the exception of Beneficiaries No. 9, 10, and 11 as to whom Clause 5.2 pertains, no named beneficiary or other person who might be construed as a beneficiary or holder of a power or interest hereunder shall be a United States person as defined for purposes of I.R.C. § 679 of the Code or a spouse described in I.R.C. § 672(e) or I.R.C. § 677 of the Code and no part of the income or corpus of the trust shall be paid to or accumulated for the benefit of such person. Should any named beneficiary be disfranchised at any time by this Clause, the other beneficiaries shall take in such beneficiary's stead, and should all beneficiaries be so disfranchised, the Trustee shall expand the class of Beneficiaries to include one or more charitable organizations that are not U.S. persons, which charitable organization(s) shall be benefited or possessed of the subject power or interest.

On 4-16-98, Optimay Corporation was sold to Lucent Technologies for $16.53 per share. The provisions of the sale were for payment of $14.50 per share immediately and the remaining $2.03 to be paid within 18 months of the purchase. At the time of the Lucent Technologies purchase De May Family Trust directly held 90,000 shares including the 39,000 shares designated for specific beneficiaries as listed above. Another 627,231 shares were held by the trust through Fund. Consideration of the tax treatment under I.R.C. §721(b) of the transfer of those shares by the trust to the foreign partnership is discussed under separate cover. To the extent that the transfer to the partnership is treated under I.R.C. § 721(b) as a taxable event to De May Family Trust in the year of the transfer, the gain arising from the subsequent sale of Optimay Corporation stock by the partnership on 4-16-98, would be reduced accordingly, as would De May Family Trust's allocable share of that gain.

In August 1998 all of the assets of De May Family Trust were distributed to Anne Schrader De May and the trust was dissolved. See page 6 of Exhibit 9. Anne Schrader De May then created a new De May Family Trust on 8-8-98 under the laws of Country Isle of Man. The new trust instrument maintained the same 13 beneficiaries as had the previous instrument and declared, without explanation, that the new trust was a nongrantor trust.

Issue 3

Whether income realized by Optimay Foundation on the sale of Optimay Corporation stock on 4-16-98 is includible in the gross income of James M. De May?

POSTN-119372-04          6

Issue 3 - Facts

On 2-8-96 James M. De May established Anne Schrader De May Trust under the laws of Barbados. Article VI of the trust instrument specifies that the principal and income of the trust shall be held in trust by the trustees for payment or distribution to charitable organizations and for charitable purposes. See Exhibit 10. In addition, the trust instrument provides that no part of the net earnings of the trust shall inure or be payable to or for the benefit of any private shareholder or individual. Article V states that it is anticipated that the trust may file an application to recognized as an exempt organization under United States tax law and that this filing might be made at a time when James M. De May's family's interest in Optimay Corporation is less than 20%. See Exhibit 10. The trust instrument did not name beneficiaries and contained no restrictions regarding whether U.S. persons could benefit, directly or indirectly from the trust. Paragraph (a)(1) of Article VI of Optimay Foundation trust instrument provides that the "trustee may also make payments or distributions of all or any part of the income or principal to states, territories, or possessions of the United States . . ." There were no specific charitable purposes stated, and the only potential charitable organizations even mentioned were Barbados registered charities, with the requirement that each year, at least $1,000 be paid for such one or more charitable purposes that are beneficial to the communities or inhabitants of Barbados. Article VI(b). To comply with Barbados law, the trust in all events must only commence operations prior to the greater of 21 years after the death of the Settlor (James M. De May) or 80 years after the date Optimay Foundation was created. Article V(b).

On 2-8-96, James M. De May caused Corp James M. De May to issue 150,000 shares of Optimay Corporation stock to Optimay Foundation on his behalf. On 7-10-96, James M. De May caused 607,231 shares to be transferred to another foreign trust, De May-Optimay Comp Trust (discussed below). On 4-8-98, the trustees of De May-Optimay Comp Trust agreed that 224,731 of these shares should be treated as owned by Optimay Foundation. It is not yet established whether the shares were transferred to Optimay Foundation prior to the sale of Optimay Corporation stock to Lucent Technologies.

On 4-16-98, Optimay Corporation was sold to Lucent Technologies for $16.53 per share. The provisions of the sale were for payment of $14.50 per share immediately and the remaining $2.03 to be paid within 18 months of the purchase.

Assuming the shares had been transferred from De May-Optimay Comp Trust as alleged, Optimay Foundation would have owned at the time of the sale 374,731 shares of Optimay Corporation stock including 150,000 shares Optimay Foundation received directly from James M. De May and 224,731 shares received from James M. De May through De May-Optimay Comp Trust.

POSTN-119372-04                    7

On 9-21-99, the name of Optimay Foundation was changed to Vaterstetten Foundation.
On 4-25-00 the Internal Revenue Service issued a determination letter stating that the
trust was an organization described in I.R.C. § 501(c)(3). See Exhibit 11. On 9-17-02,
the Internal Revenue Service advised the Vaterstetten Foundation that the letter of 4-
25-00 remained in effect but, based on information subsequently submitted the
organization is not classified as a private foundation. See Exhibit 12.

James M. De May did not include the proceeds of the sale of shares held by Optimay
Foundation in his Year 1998 income tax return.

### Issue 4

Whether income was realized by De May-Optimay Comp Trust on the sale of Optimay
Corporation stock, and if so, was it includible in the gross income of James M. De May?

### Issue 4 - Facts

On 7-10-96 James M. De May established De May-Optimay Comp Trust under the laws
of Barbados.

Clause 1.2 of Article I: Definitions of the trust instrument states:

> Beneficiaries means that certain employee compensation plan ("Plan")
> anticipated to be created by Optimay Corporation, Optimay Foundation, a
> Barbados trust created under indenture dated this date, and those persons
> otherwise added as hereinafter set forth. No beneficiary shall be a United States
> person. It is anticipated that the Plan will take the form of a non-United States
> trust resident outside the United States.

Clause 4.3 of Article IV: Situs; Irrevocability; Prohibition On United States Beneficiaries;
Status for United States Tax Purposes of the trust instrument states:

> No part of the income or corpus of the trust may be paid or accumulated during
> the taxable year to or for the benefit of a United States person, and should the
> trust be terminated at any time during the taxable year, no part of the income or
> corpus of the trust shall be paid to or for the benefit of a United States person.

The second schedule of the trust instrument specifies the beneficiaries of the trust to be:

> That certain employee compensation plan that is anticipated to be created by
> Optimay Corporation and Optimay Foundation, a trust organized and existing

POSTN-119372-04                          8

> under the laws of Barbados, currently with an address of Trevor A. Carmichael,
> Trustee, High Street, Bridgetown, Barbados.

On 7-10-96, James M. De May caused Optimay Corporation to issue 607,231 shares of
Optimay Corporation stock to De May-Optimay Comp Trust. The employee
compensation plan was adopted on 4-26-97, and contrary to expectations, it was not
organized as a funded foreign trust, but rather as an unfunded Stock Option Plan of
Optimay Corporation. See Exhibit 13. As evidenced by a Shareholders Agreement,
dated 8 days prior to the closing of the transaction with Lucent Technologies, and with
the consent of Lucent Technologies, the trustees of the Comp Trust agreed to transfer
300,000 shares of the 607,231 to Optimay Corporation to fund options granted under its
Stock Option Plan, and another 82,500 shares to the corporation to be used for
issuances for purposes deemed by the Board to be beneficial to the Company, including
the funding of stock options. The remaining 224,731 shares were to be transferred to
Optimay Foundation. According to the taxpayer, De May-Optimay Comp Trust then
ceased to exist for lack of assets, prior to the closing of the transaction with Lucent
Technologies.

The rationale for the transfers were twofold: the fact that the Plan was not established
as a foreign trust, which violated the intent of the terms of the trust, and the fact that "the
Company, the other shareholders, Lucent Technologies, and especially the employees
[of the Company] wanted to make sure that James M. De May and his family did not
somehow, in any fashion, benefit from the shares that were in the Comp Trust."
[December 12, 2002 letter].

### Issue 5

Whether James M. De May satisfied all the information reporting requirements with
respect to his interests in Anne Schrader De May Trust, De May Family Trust, Optimay
Foundation, and De May-Optimay Comp Trust?

### Issue 5 – Facts

James M. De May filed Forms 3520 for Anne Schrader De May Trust and De May
Family Trust for the 1996 tax year. A Form 3520 was filed for De May Family Trust for
the 1998 tax year. No other Forms 3520 or 926 were filed for Anne Schrader De May
Trust and De May Family Trust and no such forms or Forms 3520-A were filed for De
May-Optimay Comp Trust and Optimay Foundation for any taxable year.

POSTN-119372-04                          9

## CONCLUSIONS

### Issue 1

Income realized on the sale of Optimay Corporation stock by Anne Schrader De May Trust on 4-16-98, is includible in the gross income of James M. De May either because he remained the owner of the trust following the amendments to the trust instruments dated 4-9-98,

1) Because his spouse, Anne Schrader De May, received the proceeds of the trust on dissolution of the trust, causing the trust to be a grantor trust under I.R.C. § 677, despite the amendments made to the trust;

2) Because Optimay Foundation, one of the named beneficiaries of the foreign trust, was itself a foreign trust that did not preclude the possibility of a U.S. beneficiary and was not otherwise an exempt transferee under I.R.C. § 6048(a)(3)(B)(ii)(II); or

3) Because James M. De May is treated as the owner of the trust for the entire year because he is treated as the owner of the trust for a portion of his taxable year.

Alternatively, if the trust became a nongrantor trust on 4-9-98,

1) James M. De May is required to include the amount subsequently realized by the trust 8 days after 4-9-98, based on the anticipatory assignment of income doctrine; or

2) James M. De May as the owner of the trust immediately before that date, is treated as having transferred all the assets of the trust, in this case the stock of Optimay Corporation, to a new foreign nongrantor trust, and pursuant to I.R.C. § 684, is required to treat such transfer as a sale or exchange of all Optimay Corporation stock at its fair market value on that date.

### Issue 2

Income realized on the sale of Optimay Corporation stock by De May Family Trust on 4-16-98, is includible in the gross income of James M. De May either because he remained the owner of the trust following the amendments to the trust instrument dated 4-9-98,

1) Because his spouse, Anne Schrader De May, received the proceeds of the trust on dissolution of the trust, causing the trust to be a grantor trust under I.R.C. § 677, despite the amendments made to the trust;

POSTN-119372-04                    10

2) Because Optimay Foundation, one of the named beneficiaries of the foreign trust, was itself a foreign trust that did not preclude the possibility of a U.S. beneficiary and was not otherwise an exempt transferee under I.R.C. § 6048(a)(3)(B)(ii)(II); or

3) Because James M. De May is treated as the owner of the trust for the entire year because he is treated as the owner of the trust for a portion of his taxable year.

Alternatively, if the trust became a nongrantor trust on 4-9-98,

1) James M. De May is required to include the amount subsequently realized by the trust 8 days after 4-9-98, based on the anticipatory assignment of income doctrine; or

2) James M. De May as the owner of the trust immediately before that date, is treated as having transferred all the assets of the trust, in this case the stock of Optimay Corporation, to a new foreign nongrantor trust, and pursuant to I.R.C. § 684, is required to treat such transfer as a sale or exchange of all the assets at their fair market value.

### Issue 3

James M. De May is treated as the owner of Optimay Foundation and is required to include in gross income the gain on the sale of Optimay Corporation stock realized by Optimay Foundation on 4-16-98, because it was not described in I.R.C. § 6048(a)(3)(ii)(II). It did not notify the Service that it was applying for recognition of its status under I.R.C. § 508(a), nor did it obtain a determination letter that it was an organization described in I.R.C. § 501(c)(3) for the taxable period at issue, as required by Notice 97-34.

### Issue 4

James M. De May is treated as the owner of De May-Optimay Comp Trust and is required to include in gross income the gain on the sale of Optimay Corporation stock realized by De May-Optimay Comp Trust, because the trust had a U.S. beneficiary, a domestic employee stock option plan. If, however, the trust was dissolved prior to 4-16-98, and a portion of the stock of Optimay Corporation was in fact transferred to Optimay Foundation, then gain realized on the shares of Optimay Corporation stock held by Optimay Foundation would be recognized by James M. De May to the extent he is treated as owning Optimay Foundation.

POSTN-119372-04                          11

<u>Issue 5</u>

James M. De May did not satisfy all of his information reporting requirements under
I.R.C. § 6048, or alternatively under I.R.C. § 1492, and appropriate penalties under
I.R.C. § 6677 may be asserted.

## LAW

I.R.C. § 671 states, in part:

> Where it is specified in this subpart that the grantor or another person shall be
> treated as the owner of any portion of a trust there shall then be included in
> computing the taxable income and credits of the grantor or the other person
> those items of income, deductions, and credits against tax of the trust which are
> attributable to that portion of the trust to the extent that such items would be
> taken into account under this chapter in computing taxable income or credits
> against the tax of an individual.

I.R.C. § 679(a) provides that a United States person who directly or indirectly transfers
property to a foreign trust shall be treated as the owner for his taxable year of the
portion of such trust attributable to such property if for such year there is a United States
beneficiary of any portion of such trust. I.R.C. § 7701(a)(30)(A) provides in part that the
term "United States person" includes a citizen of the United States. Under I.R.C. § 679,
the term "United States beneficiary" includes a trust beneficiary who is a United States
person.

I.R.C. § 679(c)(1) states that a trust shall be treated as having a United States
beneficiary for the taxable year unless –

> (A) under the terms of the trust, no part of the income or corpus of the trust
>     may be paid or accumulated during the taxable year to or for the benefit of
>     a United States person, and
> (B) if the trust were terminated at any time during the taxable year, no part of
>     the income or corpus of such trust could be paid to or for the benefit of a
>     United States person.

I.R.C. § 679(c)(2) provides:

> For purposes of paragraph (1), an amount shall be treated as paid or
> accumulated to or for the benefit of a United States person if such amount
> is paid to or accumulated for a foreign corporation, foreign partnership, or
> foreign trust or estate, and--        ....

POSTN-119372-04                    12

> (C) in the case of a foreign trust or estate, such trust or
> estate has a United States beneficiary (within the meaning of
> paragraph (1)).

I.R.C. § 672(e) provides that for purposes of subpart E a grantor shall be treated as holding any power or interest held by any individual who was the spouse of the grantor at the time of the creation of such power or interest.

I.R.C. § 674(a) provides that the grantor shall be treated as the owner of any portion of a trust in respect of which the beneficial enjoyment of the corpus or the income there from is subject to a power of disposition, exercisable by the grantor or a nonadverse party, or both, without the approval or consent of any adverse party.

I.R.C. § 677 states that the grantor shall be treated as the owner of any portion of a trust, whether or not he is treated as such owner under I.R.C. § 674, whose income without the approval or consent of any adverse party is, or, in the discretion of the grantor or a nonadverse party, or both, may be distributed to the grantor or the grantor's spouse.

I.R.C. § 684(a), effective for transfers after August 5, 1997, states that in the case of any transfer of property by a United States person to a foreign estate or trust, for purposes of this subtitle, such transfer shall be treated as a sale or exchange for an amount equal to the fair market value of the property transferred, and the transferor shall recognize as gain the excess of the fair market value of the property so transferred over the adjusted basis of such property in the hands of the transferor. I.R.C. § 684(b) provides that I.R.C. § 684(a) shall not apply to a transfer to a trust by a United States person to the extent that any United States person is treated as the owner of such trust under I.R.C. § 671.

## ANALYSIS

It should be noted from the outset that although James M. De May did not transfer the Optimay Corporation stock directly to Anne Schrader De May Trust, De May Family Trust, De May-Optimay Comp Trust or Optimay Foundation, because James M. De May was the original founder and sole shareholder of Optimay Corporation at the time of the issuance of stock to the trusts (other than small amounts of stock issued to employees and others for past services) and because corporations do not ordinarily make gifts to trusts, the issuance of shares of Optimay Corporation stock to Anne Schrader De May Trust, De May Family Trust, De May-Optimay Comp Trust or Optimay Foundation and Optimay Foundation should be treated as an issuance of stock to James M. De May followed by a contribution of the stock by him to each trust. Accordingly, James M. De May is treated as the grantor of each of these trusts for purposes of I.R.C. § 671. See Epstein v. Commissioner, 53 T.C. 459 (U.S. Tax Ct., 1969); Percy H. Clark,

POSTN-119372-04                    13

31 B.T.A. 1082 (1935); Byers v. Commissioner, 199 F. 2d 273 (C.A. 8, 1952). The *Clark* case involved a corporate transfer of property to trusts created by a controlling stockholder for the benefit of his children. As to the issue of whether the transfer should be treated as a distribution to the controlling stockholder, the Court made the following disposition:

> The petitioner controlled the Willoughby Co. It acted solely to accommodate him in making the transfer. He enjoyed the use of the property by having it transferred for his own purposes. This was the use he wanted to make of the property. He would have enjoyed it no more had it been distributed to him directly.

Clark, at 1084-1085

See also Treas. Reg. § 1.671-2(e).

Issue 1

## Grantor Trust Status Was Not Terminated

There is no disagreement that Anne Schrader De May Trust was a grantor trust from its inception on 2-8-96 until it was amended on 4-9-98, one week prior to the sale of Optimay Corporation to Lucent Technologies. Article IV of the initiating trust document plainly states: "it is the understanding of the Settlor that this Settlement as currently constituted shall be treated as a GRANTOR TRUST under I.R.C. §§ 671 to 678 (inclusive) of the Code." The trust was a grantor trust under I.R.C. §§ 672(e) and 677, because James M. De May's spouse was a beneficiary of the trust.

As originally constituted, it also was a grantor trust under I.R.C. § 679. Anne Schrader De May Trust was a foreign trust that did not prohibit U.S. beneficiaries. In fact, Article VI of the trust instrument provided that James M. De May in conjunction with the trustee, reserved the power to expand or contract the class of beneficiaries. As owner of Anne Schrader De May Trust, items income of the trust were required to be included in Anne Schrader De May Trust's taxable income under I.R.C. § 671.

The primary issue is whether the amendments of 4-9-98, to Anne Schrader De May Trust, specifically the addition of Clause 5.8 of Article V, resulted in the termination of the trust as a grantor trust by removing all U.S. beneficiaries as well as James M. De May's spouse as a potential beneficiaries.

Clause 5.8 was clearly added to remove the taxpayer's spouse as a named beneficiary and to preclude the trust from ever having in the future a U.S. beneficiary for purposes of I.R.C. § 679. It is not clear whether there was any concern about Optimay Foundation as a beneficiary, or any other foreign charitable trust, since the new clause

POSTN-119372-04                    14

provided that if any named beneficiaries were disfranchised, that the Trustee should expand the class of beneficiaries to include other foreign charitable organizations.

> *Should either named beneficiary be disfranchised at any time by this Clause, the other shall take in her or its stead, and should both be so disfranchised, the Trustee shall expand the class of Beneficiaries to include one or more charitable organizations that are not U.S. persons, which charitable organization(s) shall be benefited or possessed of the subject power or interest.*

It is now clear, however, based on a letter dated 12-12-02, that James M. De May takes the position that if a foreign charitable organization is a beneficiary of a foreign trust, it will not cause the foreign trust itself to have a U.S. beneficiary merely because the charitable organization is able to make grants directly or indirectly for the benefit of a U.S. person, provided such grants are made in a manner consistent with its charitable purpose. The taxpayer's representative wrote that "a prohibition on payments for the direct or indirect benefit of U.S. persons would have barred U.S. persons, including U.S. charities, from receiving grants, which obviously makes no sense whatsoever."

Taxpayer also appears to argue that Optimay Foundation would not be a foreign trust to which I.R.C. § 679 should apply, because it is described in I.R.C. § 6048(a)(3)(B)(ii)(II) (a trust which is determined by the Secretary to be described in I.R.C. § 501(c)(3)) (to be discussed in Issue 3). Thus, regardless of whether Optimay Foundation is treated as having a U.S. beneficiary, it cannot be a grantor trust for I.R.C. § 679 purposes, nor should it cause another foreign trust, of which it is a beneficiary, to be a grantor trust for I.R.C. § 679 purposes.

### I.R.C. § 679

Whether Anne Schrader De May Trust remained a grantor trust under I.R.C. § 679 after 4-9-98, depends on whether the amendments effectively eliminated the possibility that the income or corpus of the trust could be paid or accumulated during the taxable year to or for the benefit of a U.S. person, or that, if the trust were terminated at any time during the taxable year, any of the income or corpus of the trust could be paid to or for the benefit of a U.S. person.

Although Clause 5.8 of Article V does not contain language identical to I.R.C. § 679(c)(1)(A) and (B), the substance of the language appears to eliminate the possibility of a U.S. person directly benefiting from the trust. And Clause 5.8 applies notwithstanding any other provision of the trust.

Under I.R.C. § 679(c)(2)(C), however, for purposes of determining whether a foreign trust has a U.S. beneficiary under I.R.C. § 679(c)(1), amounts paid or accumulated for another foreign trust will be treated as paid or accumulated for a U.S. beneficiary if that

POSTN-119372-04                    15

other foreign trust has a U.S. beneficiary. There is no exception for a trust that is described in I.R.C. § 6048(a)(3)(B)(ii)(II).

Regulations under I.R.C. § 679(c)(1)[2] provide as follows:

> A foreign trust is treated as having a U.S. beneficiary unless during the taxable year of the U.S. transferor–
>
> (i)   No part of the income or corpus of the trust may be paid or accumulated to or for the benefit of, directly or *indirectly*, a U.S. person; and
> (ii)  If the trust is terminated at any time during the taxable year, no part of the income or corpus of the trust could be paid to or for the benefit of, directly or *indirectly*, a U.S. person. (Emphasis added.)

Treas. Reg. § 1.679-2(a)(2) provides further:

> Benefit to a U.S. person--(i)  In general. For purposes of paragraph (a)(1) of this section, income or corpus may be paid or accumulated to or for the benefit of a U.S. person during a taxable year of the U.S. transferor if during that year, directly or *indirectly*, income may be distributed to, or accumulated for the benefit of, a U.S. person, or corpus may be distributed to, or held for the future benefit of, a U.S. person. This determination is made without regard to whether income or corpus is actually distributed to a U.S. person during that year, and without regard to whether a U.S. person's interest in the trust income or corpus is contingent on a future event. (Emphasis added.)

Because Optimay Foundation, a Country James M. De May trust, was not clearly removed as a beneficiary of Anne Schrader De May Trust, if Optimay Foundation was able to pay to or accumulate income for the benefit of a U.S. person, it may be considered to have a U.S. beneficiary, thereby causing Anne Schrader De May Trust to have a U.S. beneficiary.

Optimay Foundation had no named beneficiaries of any sort and prior to the sale of the stock of Optimay Corporation, it is assumed that no grants or distributions of any sort were made, since Optimay Foundation had no other assets. For purposes of this advice, we assume the trust documents, at a minimum, comport with the boilerplate language necessary for the trust to be described in I.R.C. § 501(c)(3), including the

---

[2] Treas. Reg. § 1.679-2 (a)(1). In general, the regulations under I.R.C. § 679 apply with respect to transfers after August 7, 2000. Treas. Reg. § 1.679-7. However, the final regulations on this point reflect the statute as in effect since 1976.

POSTN-119372-04                    16

required provisions prohibiting private inurement. We also assume that Optimay
Foundation trust document did not contain the specific language of I.R.C. § 679(c)(1)(A)
and (B).

On its face, because the Optimay Foundation trust document did not contain the
specific language contained in I.R.C. § 679(c)(1)(A) and (B), the trust is treated as
having a U.S. beneficiary. However, there is an argument that if Issue 3 is resolved in
favor of the taxpayer, i.e., that if the original transfer of Optimay Corporation stock to
Optimay Foundation is treated as a transfer to a foreign charitable trust that is exempt
from I.R.C. § 679, then Optimay Foundation should not be treated as having a U.S.
beneficiary for purposes of determining whether Anne Schrader Trust has a U.S.
beneficiary. As will be discussed in Issue 3, however, Optimay Foundation did not have
a determination letter at the time of the sale of Optimay Corporation stock, nor may it
have been described in I.R.C. § 501(c)(3).

Accordingly, the amendments to Anne Schrader De May Trust may not have eliminated
the possibility that a U.S. person could benefit from it, if it can be established that, with
respect to one of its named beneficiaries, Optimay Foundation, and there was no
prohibition against it benefiting a U.S. person. In that event, the grantor trust status of
Anne Schrader De May Trust would not have terminated as of 4-8-98.

### I.R.C. §§ 672(e) and 677

The 4-9-98 amendments prohibited Anne Schrader De May Trust from treating Anne
Schrader De May as a beneficiary. However, I.R.C. § 677 applies if there is a
distribution to the grantor's spouse even if the trust instrument does not authorize such
distribution to the grantor's spouse. See U.S. v. Rosales, 88 A.F.T.R. 2d 2001-5370.
Therefore, if there was a distribution to Anne Schrader De May, James M. De May
would be treated as the owner of Anne Schrader De May Trust.

James M. De May is treated as the owner of Anne Schrader De May Revocable U.S.
Trust under I.R.C. § 676 because she has the power to revoke the trust. The person
treated as the owner of a trust is considered the owner of the assets in the trust. Rev.
Rul. 85-13, 1985-1 C.B. 184. As a result, the transfer of the assets of Anne Schrader
De May Trust to the Anne Schrader De May Revocable U.S. Trust is treated as a
distribution to ADM. Therefore, there was a distribution to James M. De May's spouse
and James M. De May is treated as the owner of Anne Schrader De May Trust under
I.R.C. §§ 672(e) and 677 notwithstanding the 4-9-98 amendments.

In addition, the documents concerning the transfer of assets (Exhibits 3 and 4) indicate
that the assets of Anne Schrader De May Trust were distributed to Anne Schrader De
May then contributed to Anne Schrader De May Revocable U.S. Trust by Anne
Schrader De May.

POSTN-119372-04                    17

Therefore, there was a distribution to James M. De May's spouse and James M. De May is treated as the owner of Anne Schrader De May Trust under I.R.C. §§ 672(e) and 677.

We note that the taxpayer has suggested that expert testimony regarding Country Isle of Man law will show that no distribution was made to Anne Schrader De May under Country Isle of Man law. However, U.S. tax principles, not foreign tax principles, govern the taxation of U.S. citizens (here, James M. De May) and under U.S. tax principles, Anne Schrader De May received a distribution of the assets of Anne Schrader De May Trust. See Biddle v. Commissioner, 302 U.S. 573 (1938).

### Conversion of the Trust to Nongrantor Status Was an Anticipatory Assignment of Income

Even assuming that the 4-9-98 amendments to Anne Schrader De May Trust successfully converted the trust to a nongrantor trust, James M. De May remains taxable on the proceeds of the sale of the Optimay Corporation stock under the doctrine of anticipatory assignment of income.

The first principle of taxation is that income must be taxed to him that earned it. See Commissioner v. Culbertson, 337 U.S. 733; Helvering v. Clifford, 309 U.S. 331 (1940); National Carbide Corp. v. Commissioner, 336 U.S. 422 (1949).

This principle was well stated by the United States Supreme Court in Lucas v. Earl, 281 U.S. 111 (1930), as follows:

> But this case is not to be decided by attenuated subtleties. It turns on the import and reasonable construction of the taxing act. There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skillfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute before us and we think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew.

Also, in Helvering v. Horst, 311 U.S. 112 (1940), the Supreme Court stated:

> The taxpayer has equally enjoyed the fruits of his labor or investment and obtained the satisfaction of his desires whether he collects and uses the income to procure those satisfactions, or whether he disposes of his right to collect it as the means of procuring them.

POSTN-119372-04                    18

The idea that anticipated earnings may not be assigned to another has been upheld in the courts in the transference of securities. See Hallowell v. Commissioner, 56 T.C. 600 (U.S. Tax Ct.,1971) , and Ferguson v. Commissioner, 174 F.3d 997 ( U.S. App., 1999). In Ferguson, the Ninth Circuit Court of Appeals made the point with regard to securities as follows:

> Under the anticipatory assignment of income doctrine, once a right to receive income has "ripened" for tax purposes, the taxpayer who earned or otherwise created that right, will be taxed on any gain realized from it, notwithstanding the fact that the taxpayer has transferred the right before actually receiving the income.

Treas. Reg. § 1.671-1(c) also provides that a person who assigns his right to future income may be taxed on that income even though the assignment is to a trust over which the assignor has not maintained any of the controls specified in I.R.C. §§ 671 through 677.

In the present case, James M. De May began negotiating the sale of the stock of Optimay Corporation on or about 12-10-97, four months prior to the sale of the stock. About two months prior to the amendment of the terms of the trust, in mid-February 1998, Lucent Technologies offered to purchase all of the shares of Optimay Corporation. See page 3 of Exhibit 2. Only seven days after the terms of the trust were amended, on 4-16-98, Lucent Technologies purchased all of the shares of Optimay Corporation, including the shares held by Anne Schrader De May Trust.

Assuming that James M. De May successfully converted Anne Schrader De May Trust to nongrantor status, James M. De May was attempting to transfer a right to income that had "ripened." The ripening is best evidenced by the fact that Lucent Technologies, in negotiating with James M. De May had offered to purchase all shares of Optimay Corporation in mid-February and the sale occurred only seven days after he amended Anne Schrader De May Trust status. Under the provisions of Treas. Reg. § 1.671-1(c), James M. De May remains taxable on the assignment of his right to capital gain income on the sale of Optimay Corporation stock held by Anne Schrader De May Trust. The amount of this capital gain income is 2.9 million, calculated as a shares times $14.50 per share received in Year 1998.

James M. De May Remains Taxable on Anne Schrader De May Trust Income Through 12-31-98.

Even assuming that the 4-9-98 amendments to Anne Schrader De May Trust successfully converted the trust to a nongrantor trust, James M. De May remains

POSTN-119372-04                    19

taxable on the proceeds of the sale of the Optimay Corporation stock because he is
treated as the owner of the trust for the entire 1998 taxable year.

As discussed earlier, Anne Schrader De May Trust was a grantor trust under the
provisions of I.R.C. § 679 before it was amended on 4-9-98. I.R.C. § 679(a) states that
a United States person who transfers property to a foreign trust shall be treated as the
owner *for his taxable year* of the portion of such trust attributable to such property if *for
such year* there is a United States beneficiary of any portion of such trust.

I.R.C. § 679(c) provides that a trust will be treated as having a U.S. beneficiary *for the
taxable year* unless (1) under the terms of the trust no part of the income or corpus of
the trust may be paid or *accumulated during the taxable year* to or for the benefit of a
U.S. person, and (2) if the trust were terminated at any time *during the taxable year*, no
part of the income or corpus of the trust could be paid to or for the benefit of a U.S.
person.

Thus, if on any day during the taxable year, income or corpus of a foreign trust may be
paid or accumulated to or for the benefit of a U.S. beneficiary, the U.S. person who
transfers property to that trust will be treated as the owner for his taxable year.

James M. De May's taxable year, as an individual, begins on January 1 and ends on
December 31. The trust was treated as having a U.S. beneficiary through, at least, 4-8-
98. Therefore, James M. De May is treated as the owner of the trust for his entire
taxable year ending 12-31-98, even if the trust was successfully amended on 4-9-98 to
exclude U.S. beneficiaries. Accordingly, income earned by the trust through 12-31-98
must be included in the taxable income of James M. De May. The amount of this long-
term capital gain income is $2.9 million, calculated as a shares times $14.50 per share
received in 1998.

Taxpayer, through the 12-12-02 letter, argues that the trust should be considered a
grantor trust only for the portion of the year up until 4-9-98, prior to the sale of Optimay
Corporation stock by the trust. He takes the position that I.R.C. § 679 contemplates
"split years" in I.R.C. § 679(a)(4), in the case of a foreign grantor who becomes a U.S.
person during the taxable year. He also cites I.R.C. § 679(b), dealing with the situation
where a trust acquires a U.S. beneficiary during the year, to support the notion that
I.R.C. § 679 is silent on whether the trust is treated as a grantor trust for the entire year,
or only upon acquiring the U.S. beneficiary. Taxpayer also argues that the principles set
forth in final regulations, for example, Treas. Reg. § 1.679-2(c)(2), dealing with trusts
ceasing to have a U.S. beneficiary, are not applicable to the taxable years at issue.

As noted above, the Service does not need to rely on the final regulations to reach its
position. The general rule is that a U.S. person is treated as the owner of a trust under
I.R.C. § 679 for his entire taxable year if there is a U.S. beneficiary for any portion of the
trust on any day during the taxable year. When there is a statutory exception to this

POSTN-119372-04        20

rule, as in I.R.C. § 679(a)(4), the statute identifies the date of the transfer and the amount transferred as of that date. In the case of I.R.C. § 679(b), which addresses trusts that acquire U.S. beneficiaries, the assumption is that that I.R.C. § 679(a) would either apply or not apply for the full taxable year or for the preceding taxable year. No split years appear to be contemplated.

### James M. De May is Taxable Under I.R.C. §684 Due to the Conversion of Anne Schrader De May Trust to Nongrantor Status

Even assuming that the 4-9-98 amendments to Anne Schrader De May Trust successfully converted the trust to a nongrantor trust, James M. De May remains taxable under I.R.C. § 684 on the fair market value of the Optimay Corporation stock that he is treated as transferring on 4-9-98 to the trust after it ceased to be a grantor trust.

I.R.C. § 684 (a) specifies that a U.S. person that transfers property to a foreign trust shall recognize gain measured by the excess of the fair market value of the property over the transferor's adjusted basis in the property.

There is no dispute that Anne Schrader De May Trust was a grantor trust prior to 4-9-98 under the provisions of I.R.C. §§ 672(e), 677, and 679. Consequently, when the trust was formed on 2-8-96, there was no transfer for purposes of I.R.C. §1491 (relating to excise taxes on transfers of appreciated property by U.S. persons to foreign trusts, effective with respect to transfers prior to August 5, 1997). Rev. Rul. 87-61, 1987-2 C.B.219.

I.R.C. § 684 replaced I.R.C. § 1491 with respect to transfers to foreign trusts, when that section was repealed on August 5, 1997. I.R.C. § 684 functions in the same manner as I.R.C. § 1491 except that it imposes an income tax, in lieu of an excise tax, on the transfer of appreciated property to foreign nongrantor trusts.

If, as the taxpayer asserts, Anne Schrader De May Trust ceased to be a grantor trust on 4-9-98, then I.R.C. § 684(a) applies on the date the trust ceased to be a grantor trust, in the same manner that I.R.C. § 1491 applied when a foreign trust ceased to be a grantor trust. James M. De May a U.S. person, is treated as having transferred property to a foreign trust, and such transfer is treated as a sale or exchange. The application I.R.C. § 684 in this case does not, as taxpayer suggests, depend on the regulations issued after the deemed transfer occurs.

The gain from the transfer to the nongrantor Anne Schrader De May Trust is calculated to be the fair market value of the stock on 4-9-98, the date of the change to nongrantor status, less James M. De May's adjusted basis of the stock. The fair market value on 4-16-98, seven days after the trust was amended, was $16.53 per share based on the

21

sale of all shares of the company to Lucent Technologies on that date. Therefore, the value of the stock on 4-9-98 was also $16.53 per share. The long-term capital gain James M. De May is required to recognize on 4-9-98 is $3,306,000 calculated as 200,000 shares times $16.53 per share, assuming James M. De May has a zero basis in the stock.

Issue 2 - Analysis

Grantor Trust Status Was Not Terminated

There is no disagreement that De May Family Trust was a grantor trust from its inception on 2-8-96 until it was amended on 4-9-98. Article IV of the initiating trust document plainly states: "it is the understanding of the Settlor that this Settlement as currently constituted shall be treated as a GRANTOR TRUST under I.R.C. §§ 671 to 678 (inclusive) of the Code."

It was a grantor trust under I.R.C. § 679, because James M. De May is treated as having transferred 717,231 shares of the stock to a foreign trust and seven of the twelve named beneficiaries of the trust were United States beneficiaries.

It was a grantor trust under I.R.C. §§ 672(e) and 677 because the trustee of De May Family Trust may, in the trustee's sole discretion, distribute net income and capital to James M. De May's wife, Anne Schrader De May.

Accordingly, James M. De May was the owner of De May Family Trust at its inception. The question is whether the amendments of 4-9-98 resulted in the termination of the trust's status as a grantor trust.

Following the amendments, the revised list of beneficiaries continued to include U.S. citizens. The only change from the previous list of beneficiaries was the addition of a new son, RUBEN JAMES M. DE MAY, also a U.S. citizen. See Exhibit 8. Accordingly, absent any other amendments to the trust instrument, I.R.C. § 679 would continue to apply to the trust.

However, there were other amendments. Article IV was changed. The previous Article IV declared that the trust was a grantor trust under I.R.C. §§ 671 to 678, inclusive. The new Article IV declared that "it is the intention of the Settlor that this Settlement not be a grantor trust under I.R.C. §§ 671 through 679 (inclusive) of the Code and its provisions be construed accordingly."

In addition, Clauses 5.13 and 5.2 were added to Article V. Clause 5.13 stated that no named beneficiary or holder of a power or interest shall be a United States person for purposes of I.R.C. §§ 679 or a spouse described in I.R.C. §§ 672(e) or 677. If any

POSTN-119372-04                          22

beneficiary shall be disfranchised by this clause then other non-U.S. beneficiaries will take their place.

Clause 5.2 designated that the shares that had previously been allocated to Gilbert H. De May, Dorothy E. De May and Janet S. Groppel were to be held by the trust as separate trusts.

The effect of Clause 5.13 was to terminate the grantor trust status of the trust, unless, as in the case of Anne Schrader De May Trust, Optimay Foundation, one of the original twelve named foreign beneficiaries, could be viewed as a foreign trust that has a U.S. beneficiary.

James M. De May may claim that the effect of Clause 5.2 was to gift shares to Gilbert H. De May, Dorothy E. De May, and Janet S. Groppel and, therefore, Gilbert H. De May, Dorothy E. De May, and Janet S. Groppel were the grantors of their respective separate trusts. However, there is no documentary evidence to suggest that the shares were transferred to Gilbert H. De May, Dorothy E. De May, and Janet S. Groppel in a manner that would cause them to be the owners of the shares and thus be the grantors of their separate respective trusts. Therefore, James M. De May continues to be the grantor of De May Family Trust and any successor trusts. Clause 5.2 gives Gilbert H. De May, Dorothy E. De May, and Janet S. Groppel the power to withdraw the assets from their respective separate trusts, which would cause Gilbert H. De May, Dorothy E. De May, and Janet S. Groppel to be treated as the owners of their respective separate trusts under I.R.C. § 678. However, I.R.C. § 678(b) provides that I.R.C. § 678 does not apply if the grantor is treated as the owner under I.R.C. § 679. Because James M. De May is treated as the owner of the trusts under I.R.C. § 679 Gilbert H. De May, Dorothy E. De May, and Janet S. Groppel are not treated as the owners of their respective trusts under I.R.C. § 678.

In addition, the trust should still be considered a grantor trust under I.R.C. §§ 672(e) and 677, since, despite the fact that Anne Schrader De May was nominally disfranchised, because she ultimately received the assets on dissolution of the trust in August of 1998, four months after the sale of the Optimay Corporation stock, and she subsequently contributed them to a new De May Family Trust on 8-8-98, in Isle of Man. In the new trust instrument, she named the same 13 persons, including her, James M. De May and their four children as beneficiaries as had the previous De May Family Trust. This trust instrument, like the previous one, also declared that it was intended to be a nongrantor trust.

Thus, Anne Schrader De May, despite provisions in the trust instrument that prohibits her from being a beneficiary, not only received a distribution of all trust property resulting in the dissolution of the trust, but had the power to create a new trust with those same assets.

Therefore, considering all the facts and circumstances, De May Family Trust remained a grantor trust under the provisions of I.R.C. §§ 672(e) and 677, even after the trust instrument was amended and revised on 4-9-98. James M. De May remained the owner of the entirety of De May Family Trust. The income of the trust in 1998, including income from its allocable share of gain derived by Fund, was $10,399,849.50 calculated as 717,231 shares times $14.50 cash per share received in 1998. The character of this income is long-term capital gain. To the extent that James M. De May as owner of the trust, is required to take into account gain under I.R.C. § 721(b) on the transfer by the trust of Optimay Corporation stock to the foreign partnership, that amount should reduce the amount required to be taken into account at the time of the sale of Optimay Corporation stock to Lucent Technologies.

## Conversion of the Trust to Nongrantor Status Was an Anticipatory Assignment of Income

Even assuming that the 4-9-98 amendments to the De May Family Trust successfully converted the trust to a nongrantor trust, James M. De May James M. De May remains taxable on the proceeds of the sale of the Optimay Corporation stock under the doctrine of anticipatory assignment of income described as follows.

The first principle of taxation is that income must be taxed to him that earned it. Commissioner v. Culbertson, 337 U.S. 733; Helvering v. Clifford, 309 U.S. 331 (1940); National Carbide Corp. v. Commissioner, 336 U.S. 422 (1949).

This principle was soundly stated by the United States Supreme Court in Lucas v. Earl, 281 U.S. 111 (1930), as follows:

> But this case is not to be decided by attenuated subtleties. It turns on the import and reasonable construction of the taxing act. There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skillfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute before us and we think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew.

Also, in Helvering v. Horst, 311 U.S. 112 (1940), the Supreme Court stated:

> The taxpayer has equally enjoyed the fruits of his labor or investment and obtained the satisfaction of his desires whether he collects and uses the income

to procure those satisfactions, or whether he disposes of his right to collect it as the means of procuring them.

The idea that anticipated earnings may not be assigned to another has been upheld in the courts in the transference of securities. See Hallowell v. Commissioner, 56 T.C. 600 (1971), and Ferguson v. Commissioner, 174 F.3d 997 (1999). In Ferguson, the Ninth Circuit Court of Appeals made the point with regard to securities as follows:

> Under the anticipatory assignment of income doctrine, once a right to receive income has "ripened" for tax purposes, the taxpayer who earned or otherwise created that right, will be taxed on any gain realized from it, notwithstanding the fact that the taxpayer has transferred the right before actually receiving the income.

Treas. Reg. § 1.671-1(c) also provides that a person who assigns his right to future income may be taxed on that income even though the assignment is to a trust over which the assignor has not maintained any of the controls specified in I.R.C. §§ 671 through 677.

In the present case, James M. De May began negotiating the sale of the stock of Optimay Corporation on or about 12-10-97, four months prior to 4-9-98, when James M. De May amended the terms of De May Family Trust to convert it to a nongrantor trust to separate himself from the gain he anticipated from the sale of the stock. About two months prior to the amendment of the term of the trust, in mid-February Year 1998, Lucent Technologies offered to purchase all of the shares of Optimay Corporation. See page 3 of Exhibit 2. Only seven days after the terms of the trust were amended, on 4-16-98, Lucent Technologies purchased all of the shares of Optimay Corporation, including the shares held by Anne Schrader De May Trust.

If James M. De May successfully converted De May Family Trust to a nongrantor trust, he transferred a right to income that had "ripened". The ripening is best evidenced by the fact that Lucent Technologies, in negotiating with Optimay Corporation, had offered to purchase all shares of Optimay Corporation in mid-February and the sale occurred only seven days after he amended the terms of the De May Family Trust to make it a nongrantor trust. Under the provisions of Treas. Reg. §1.671-1(c), James M. De May remains taxable on the assignment of his right to capital gain income on the sale of Optimay Corporation stock held by De May Family Trust, either directly, or through an interest in a Bermuda partnership, Fund. The amount of this capital gain income is $10,399,849.50, calculated as 717,231 shares times $14.50 per share received in Year 1998.

<u>James M. De May Remains Taxable on De May Family Trust Income Through 12-31-98.</u>

POSTN-119372-04                                25

Even assuming that the 4-9-98 amendments to De May Family Trust successfully converted the trust to a nongrantor trust, James M. De May remains taxable on the proceeds of the sale of the Optimay Corporation stock because he is treated as the owner of the trust for the entire 1998 taxable year.

I.R.C. § 679(a) states that a United States person who transfers property to a foreign trust shall be treated as the owner *for his taxable year* of the portion of such trust attributable to such property if *for such year* there is a United States beneficiary of any portion of such trust.

I.R.C. § 679(c) provides that a trust will be treated as having a U.S. beneficiary *for the taxable year* unless (1) under the terms of the trust no part of the income or corpus of the trust may be paid or *accumulated during the taxable year* to or for the benefit of a U.S. person, and (2) if the trust were terminated at any time *during the taxable year*, no part of the income or corpus of the trust could be paid to or for the benefit of a U.S. person.

Thus, if on any day during the taxable year, income or corpus of a foreign trust may be paid or accumulated to or for the benefit of a U.S. beneficiary, the U.S. person who transfers property to that trust will be treated as the owner for his taxable year.

James M. De May's taxable year, as an individual U.S. taxpayer, begins on January 1 and ends on December 31. The trust was treated as having a U.S. beneficiary through, at least, 4-8-98. Therefore, James M. De May is treated as the owner of the trust for his entire taxable year ending 12-31-98. The income earned by the trust in 1998 was $1,305,000 calculated as 90,000 shares times $14.50 cash per share received in 1998. The character of this income is long-term capital gain.

Taxpayer, through the 12-12-02 letter, argues that the trust should be considered a grantor trust only for the portion of the year up until 4-9-98, prior to the sale of Optimay Corporation stock by the trust. He takes the position that I.R.C. § 679 contemplates "split years" in I.R.C. § 679(a)(4), in the case of a foreign grantor who becomes a U.S. person during the taxable year. He also cites I.R.C. § 679(b), dealing with the situation where a trust acquires a U.S. beneficiary during the year, to support the notion that I.R.C. § 679 is silent on whether the trust is treated as a grantor trust for the entire year, or only upon acquiring the U.S. beneficiary. Taxpayer also argues that the principles set forth in final regulations, for example, Treas. Reg. § 1.679-2(c)(2), dealing with trusts ceasing to have a U.S. beneficiary, are not applicable to the taxable years at issue.

As noted above, the Service does not need to rely on the final regulations to reach its position. The general rule is that a U.S. person is treated as the owner of a trust under I.R.C. § 679 for his entire taxable year if there is a U.S. beneficiary for any portion of the trust. When there is a statutory exception to this rule, as in I.R.C. § 679(a)(4), the

POSTN-119372-04                    26

statute identifies the date of the transfer and the amount transferred as of that date. In the case of I.R.C. § 679(b), which addresses trusts that acquire U.S. beneficiaries, the assumption is that that I.R.C. § 679(a) would either apply or not apply for the full taxable year or for the preceding taxable year. No split years appear to be contemplated.

Therefore, by the operation of I.R.C. § 679, James M. De May remained the owner of De May Family Trust through 12-31-98. If De May Family Trust terminated its grantor status on 4-9-98 then income earned by the trust through 12-31-98 must be included in the taxable income of James M. De May.

### James M. De May is Taxable Under I.R.C. § 684 Due to the Conversion of De May Family Trust to Nongrantor Status

Even assuming that the 4-9-98 amendments to De May Family Trust successfully converted the trust to a nongrantor trust, James M. De May remains taxable under I.R.C. § 684 on the fair market value of the Optimay Corporation stock that he is treated as transferring on 4-9-98 to the trust after it ceased to be a grantor trust.

I.R.C. § 684 (a) specifies that a U.S. person that transfers property to a foreign trust shall recognize gain measured by the excess of the fair market value of the property over the transferor's adjusted basis in the property.

There is no dispute that De May Family Trust was a grantor trust prior to 4-9-98 under the provisions of I.R.C. §§ 672(e), 677 and 679. Consequently, when the trust was formed on 2-8-96, there was no transfer for purposes of I.R.C. § 1491 (relating to excise taxes on transfers of appreciated property by U.S. persons to foreign trusts, effective with respect to transfers prior to August 5, 1997.) Rev. Rul. 87-61,1987-2 C.B. 219.

I.R.C. § 684 replaced I.R.C. § 1491 with respect to transfers to foreign trusts, when that section was repealed on August 5, 1997. I.R.C. § 684 functions in the same manner as I.R.C. § 1491 except that it imposes an income tax, in lieu of an excise tax, on the transfer of appreciated property to foreign nongrantor trusts.

If, as the taxpayer asserts, De May Family Trust ceased to be a grantor trust on 4-9-98, then I.R.C. § 684(a) applies on the date the trust ceased to be a grantor trust, in the same manner that I.R.C. § 1491 applied when a foreign trust ceased to be a grantor trust. James M. De May a U.S. person, is treated as having transferred property to a foreign trust, and such transfer is treated as a sale or exchange. The application I.R.C. § 684 in this case does not, as taxpayer suggests, depend on the regulations issued after the deemed transfer occurs.

POSTN-119372-04                    27

The gain from the transfer to the nongrantor De May Family Trust is calculated to be the fair market value of the stock on 4-9-98, the date of the change to nongrantor status, less James M. De May's adjusted basis of the stock, presumed to be zero. The fair market value on 4-16-98, seven days after the trust was amended, was $16.53 per share based on the sale of all shares of the company to Lucent Technologies on that date. Therefore, the value of the stock on 4-9-98 was also $16.53 per share. The long-term capital gain James M. De May is required to recognize on 4-9-98 is

The gain from the transfer to the nongrantor De May Family Trust is calculated to be the fair market value of the stock on 4-9-98, the date of the change to nongrantor status, less James M. De May's adjusted basis in the stock. The fair market value on 4-16-98, seven days after the trust was amended, was $16.53 per share based on the sale of all shares of the company to Lucent Technologies on that date. Therefore, the value of the stock on 4-9-98 was also $16.53 per share. The long-term capital gain James M. De May is required to recognize on 4-9-98, including shares held indirectly by the trust through a foreign partnership is 11,855,828.43, calculated as $16.53 per share times $14.50 shares.

Issue 3 - Analysis

As previously discussed in Issue 1, income realized by Optimay Foundation may be includible in the gross income of James M. De May under I.R.C. § 679(a), so long as the foundation does not satisfy the requirements of I.R.C. § 6048(a)(3)(B)(ii)(II). I.R.C. § 679 was amended to exempt transfers to certain charitable trusts effective with respect to transfers occurring after February 6, 1995.

I.R.C. § 6048(a)(3)(B)(ii) refers to trusts that have been "determined by the Secretary to be described in I.R.C. § 501(c)(3)." At no time during the period of 2-8-96, when the trust was established, through 4-16-98, when the trust realized income, did Optimay Foundation apply, filing Form 1023 in accordance with I.R.C. § 508(a), or receive a determination from the Internal Revenue Service that it was described in I.R.C. § 501(c)(3). In fact, there was no certainty during this time period that Optimay Foundation would even apply for or be recognized as a tax-exempt organization under U.S. law. Article V of the trust instrument specified that the trust might file an application when James M. De May's family's interest in Optimay Corporation became less than 20%. See Exhibit 10.

The statutory requirement that the trust be "determined by the Secretary to be described in I.R.C. § 501(c)(3)" was interpreted in Section III.E of Notice 97-34, 1997-1 C.B. 422 (Deferred Compensation and Charitable Trusts), issued June 23, 1997. This section provides in pertinent part:

Without regard to whether a transfer to a foreign trust is gratuitous or nongratuitous, transfers to foreign trusts described in sections 402(b), 404(a)(4), 404A, or 501(c)(3) are exempt from reporting under section 6048(a). Section 6048(a)(3)(B)(ii). For purposes of this provision, a trust will be considered described in section 501(c)(3) *only if it has a determination letter from the Service that has not been revoked recognizing its status as exempt from income taxation under section 501(a).* [Emphasis added]

James M. De May in contrast, finds support for his position in final regulations under I.R.C. § 679, issued July 20, 2001, effective for transfers after August 7, 2000, which exempt transfers that are merely described in I.R.C. § 501(c)(3) (without regard to the notification requirements in I.R.C. § 508(a)). Treas. Reg. § 1.679-4(a)(3).

James M. De May may not rely on the final regulations, however, because they were not in effect as of the date of the transfer of the stock to the trust, in Year 1996, or on 4-9-98, the date of the sale of the stock. In fact, the original transfer occurred prior to the amendment to I.R.C. § 679(a) in August, 1996, that created any exception for foreign charitable trusts. Thus, the statute and Notice alone controlled the treatment of the transfer of property to Optimay Foundation. The final regulations liberalized the rules, not to broaden the class of acceptable organizations, but rather because many foreign charitable organizations are not aware of or do not otherwise need to obtain a determination letter from the United States in order to carry out their charitable purpose. In contrast, this entity was formed by the same individual who funded the entity, and he has not established a reason for the delay in obtaining a determination, unless there was concern that one might not have been granted.

Eventually, after the sale of the Optimay Corporation stock, and after Optimay Foundation changed its name to Vaterstetten Foundation on 11-10-99, a determination letter was issued to the Vaterstetten Foundation on 4-25-00, effective 12-22-99. This determination letter did not cover the taxable period at issue.

While the 12-12-02 letter submitted by James M. De May's representative claims that there were only clerical and conforming changes to the original trust agreement made to reflect the name change, there is some doubt as to whether Optimay Foundation would have qualified for a determination letter at the time it was created. Optimay Foundation was funded solely with stock of a closely held corporation owned primarily by the Settlor, James M. De May.

Thus, Optimay Foundation did not qualify for the exception for charitable trusts under I.R.C. § 679(a)(1). It failed to notify the Service that it intended to apply for recognition of its tax exempt status and therefore, it was not "determined by the Secretary to be described in I.R.C. § 501(c)(3)". Since it could have benefited U.S. persons, it was a

POSTN-119372-04                29

grantor trust under I.RC. § 679 from its inception.   Accordingly, it was a grantor trust at the time of the sale of Optimay Corporation stock on 4-16-98.

On 4-16-98, Optimay Foundation sold 374,731 shares of Optimay Corporation stock for $16.53 per share with $14.50 paid immediately and the balance within 18 months of the sale. James M. De May should have recognized the cash proceeds received by Optimay Foundation during Year 1998 of 5,433,600 (374,731 shares times $14.50 per share) in his 1998 income tax return.

Issue 4 -Analysis

Income realized by De May-Optimay Comp Trust is includible in the gross income of James M. De May.

De May-Optimay Comp Trust comes within the purview of I.R.C. § 679 for two reasons. First, the trust had a U.S. beneficiary. Although Article I of the trust instrument contained a prohibition against U.S. beneficiaries, and the intent was for each of the named beneficiaries, Optimay Foundation and the employee compensation plan to be foreign, when the employee compensation plan was adopted by the shareholders on 14-26-97, it was "created by a U.S. corporation under U.S. law and located in the United States", and some, if not all, of the beneficiaries of the plan were U.S. employees." Therefore, the trust instrument did not prevent a U.S. person from becoming a beneficiary.

As noted in Issue 1, if Optimay Foundation is treated as a foreign trust with a U.S. beneficiary, this would provide another reason for I.R.C. § 679 to apply.

Thus, James M. De May should be treated as owning De May-Optimay Comp Trust unless it is established that, in accordance with the shareholder agreement dated 4-8-98, that the trustees in fact distributed all the trust's shares in Optimay Corporation to either Optimay Foundation or the corporation itself. There is no indication in the Optimay Corporation share transfer ledger, however, that these distributions were ever made.  Therefore, James M. De May the grantor, is treated as owning De May-Optimay Comp Trust on  4-16-98, when the trust realized income from the sale of 607,231 shares of Optimay Corporation stock to Lucent Technologies. The income realized by De May-Optimay Comp Trust was $10,037,528 with $8,804,850 to be received during 1998 and the balance of $1,232,678 to be received during 1999 and 2000.

If it is ever established that the transfers were made, however, then with respect to amounts transferred to Optimay Foundation, James M. De May would realize the gain to the extent Optimay Foundation is treated as a grantor trust.

POSTN-119372-04 30

## Issue 5 – Analysis

James M. De May is treated as having transferred property on 2-8-96 to Anne Schrader De May Trust, De May Family Trust, and Optimay Foundation. He is also treated as having transferred property to De May-Optimay Comp Trust on 7-10-96.

Transfers to foreign trusts by U.S. persons prior to August 20, 1996 were reportable under I.R.C. § 6048, as it was in effect prior to its amendment by the Small Business Job Protection Act of 1996. Under I.R.C. § 6048 prior to its amendment there was no exception to reporting with respect to trusts "determined by the Secretary to be described in I.R.C. § 501(c)(3)." Penalties were governed by I.R.C. § 6677, prior to its amendment in 1996. A U.S. person creating or transferring property to a foreign trust was required to file Form 3520 (Creation of or Transfers to Foreign Trusts) with the Philadelphia Service Center within 90 days of the creation or transfer. The penalty for failure to file the return was 5% of the amount transferred, but not to exceed $1000, unless it is shown that such failure was due to reasonable cause. I.R.C. § 6677(a), as in effect prior to August 20, 1996. Thus, James M. De May should have reported the creation and transfer of property to each of the four trusts (not just Anne Schrader De May Trust and De May Family Trust) within 90 days of their creation.

In addition, if as James M. De May alleges, Optimay Foundation was a foreign nongrantor trust described in I.R.C. § 501(c)(3), the transfer was subject to the excise tax imposed by I.R.C. § 1491, unless it was described in I.R.C. § 1492(1), which provides that I.R.C. § 1491 will not apply if the transferee is an organization exempt from income tax under part I of subchapter F of chapter 1 of the Code. Although I.R.C. §§ 1491-1494 were repealed effective August 5, 1997, the deemed transfer of Optimay Corporation stock to Optimay Foundation occurred prior to that date. In order to qualify for this exemption, Treas. Reg. § 1.1494-1(b) requires the U.S. transferor (A) to file Form 926 and attach thereto:

> "a certificate establishing the exemption of the transferee under such part I. This certificate, which shall contain, or be verified by, a written declaration that is made under the penalties of perjury, shall contain complete information showing the character of the transferee, the purpose for which it is organized, its actual activities, the source of its income and the disposition of such income, whether or not any of its income is credited to surplus or may inure to the benefit of any private shareholder or individual and in general all facts relating to its operations which affects its right to exemption. To such certificate shall be attached a copy of the charter or articles of incorporation, the by-laws of the organization, and the latest financial statement showing the assets, liabilities, receipts, and disbursements of the organization.

POSTN-119372-04           31

We have no evidence at this point that a Form 926 or the attached statement was filed by James M. De May.

Furthermore, if Anne Schrader De May Trust and De May Family Trust each ceased to be grantor trusts on 4-9-98, that would cause a separate and distinct transfer of the Optimay Corporation stock by James M. De May to each of these foreign trusts. In that event, since those transfers occurred after August 20, 1996, I.R.C. § 6048(a), as amended, and the penalties under I.R.C. § 6677, as amended, would apply to the fair market value of the property transferred. Thus, James M. De May would be required to file a Form 3520 (Annual Return To Report Transactions With Foreign Trusts And Receipt Of Foreign Gifts) for each both of these trusts (not just De May Family Trust) reporting the transfer of Optimay Corporation stock no later than the due date of his Form 1040 for Year 1998, including extensions. If he failed to file those forms, the penalty under I.R.C. § 6677 would be 35% of the fair market value of the stock held by each of these trusts on 4-9-98.

With respect to the filing of Form 3520-A (Annual Information Return Of Foreign Trust With A U.S. Owner), I.R.C. § 6048(b), as amended in 1996, was effective for taxable years beginning after December 31, 1995. I.R.C. § 6048(b)(1) provides that if, *at any time during the taxable year*, a U.S. person is the owner of a foreign trust, that U.S. person is responsible for the trust filing a return which sets forth a full and complete accounting of all trust activities and operations *for the* year. In addition, under I.R.C. § 6048(b)(2), unless the trust authorizes a U.S. agent to act as the trust's limited agent for purposes of I.R.C. §§ 7602,7603 and 7604 with respect to any request by the Secretary to examine records or produce testimony related to the proper treatment of amounts required to be taken into account under the grantor trust rules, the Secretary may determine the amounts required to be taken into account with respect to the trust under the I.R.C. § 671.

Accordingly, for the taxable year beginning in 1996 through 1998, James M. De May was responsible for ensuring that Anne Schrader De May Trust and De May Family Trust file Form 3520-A (Annual Return of Foreign Trust With U.S. Beneficiaries) by the 15th day of the 4th month following the end of the taxable year. The penalty for failure to file was 5% percent of the value of the trust corpus. I.R.C. § 6677 as amended. An additional penalty of $10,000 applies for each 30-day period (or fraction thereof) that the failure continues beyond 90 days after notice of failure. See also Notice 97-34, for certain extensions of time to file Form 3520 and 3520-A, prior to the forms being available to the public.

Moreover, unless the Forms 3520-A were filed in a timely manner (or in accordance with Notice 97-34) and a U.S. agent was authorized for purposes of I.R.C. § 6048(b)(2), the Secretary may determine the amounts required to be taken into account with respect to each trust under I.R.C. § 671.

POSTN-119372-04                    32

Similar rules apply under I.R.C. § 6048(b)(2) with respect to the filing of Forms 3520-A by Optimay Foundation and De May-Optimay Comp Trust, if they are treated as grantor trusts under I.R.C. § 679.

## CASE DEVELOPMENT, HAZARDS AND OTHER CONSIDERATIONS

This writing may contain privileged information. Any unauthorized disclosure of this writing may undermine our ability to protect the privileged information. If disclosure is determined to be necessary, please contact this office for our views.

Please call Willard Yates at (202) 622-3880) if you have any further questions.

# EXHIBIT 19

**EXHIBIT**
**1**

Department of the Treasury
Internal Revenue Service

| | |
|---|---|
| Date: **JUL 2 3 2004** | Taxpayer Identification Number: 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 |
| | Form: 1040 |
| | Person to Contact: C. Tucker |
| James M. De May | Telephone Number: (602) 207- 8339 |
| AKA James Michael De May | |
| Post Office Box 31310 | Employee Identification Number: 86-16170 |
| Santa Fe, NM | |
| 87594-1310 | Refer Reply to: Letter 531 |
| | Last Day to File a Petition With the United States Tax Court: SEP 2 1 2004 |

| Tax Year Ended: | December 31, 1996 | December 31, 1997 | December 31,1998 |
|---|---|---|---|
| **Deficiency:** | | | |
| Increase in tax | $ 12,377.00 | $ 2,569,899.00 | $ 7,490,711.00 |
| **Penalties** | | | |
| IRC 6651(a)(1) | $ 2,785.00 | $ 347,287.00 | |
| IRC 6651(a)(2) | * | * | |
| IRC 6662 | 2,475.00 | 513,980.00 | $1,499,351.00 |

*The amount of the addition cannot be determined at this time, and an addition to tax of 0.5 percent will be imposed for each additional month, or fraction thereof, of nonpayment, up to 25 percent.

## NOTICE OF DEFICIENCY

Dear Taxpayer:

We have determined that you owe additional tax or other amounts, or both, for the tax year(s) identified above. This letter is your NOTICE OF DEFICIENCY, as required by law. The enclosed statement shows how we figured the deficiency.

If you want to contest this determination in court before making any payment, you have 90 days from the date of this letter (150 days if this letter is addressed to you outside of the United States) to file a petition with the United States Tax Court for a redetermination of the deficiency. You can get a copy of the rules for filing a petition and a petition form you can use by writing to the address below:

### United States Tax Court  400 Second Street, NW   Washington, DC 20217

The Tax Court has a simplified procedure for small tax cases when the amount in dispute for each tax year is $50,000 or less. If you intend to file a petition for multiple tax years and the amount in dispute for any one or more of the tax years exceeds $50,000, this simplified procedures is not available to you. If you use this simplified procedure, you cannot appeal the Tax Court's decision. You can also get information pertaining to the simplified procedure for small case from the Tax Court by writing to the court at the address above or from the court's internet site at **www.ustaxcourt.gov**

Send the completed petition form, a copy of this letter, and copies of all statements and/or schedules you received with this letter to the Tax Court at the above address. The Court cannot consider your case if the petition is filed late. The petition is considered timely filed if the postmark date falls within the prescribed 90 or 150 day period and the envelope containing the petition is properly addressed with the correct postage.

The time you have to file a petition with the court is set by law and cannot be extended or suspended. Thus, contacting the Internal Revenue Service (IRS) for more information, or receiving other correspondence from the IRS won't change the allowable period for filing a petition with the Tax Court.

210 E. Earll Drive, Stop 4021PHX, Phoenix, AZ 85012                    Letter 531 (Rev. 12-98)

-2-

As required by law, separate notices are sent to husbands and wives. If this letter is addressed to both husband and wife, and both want to petition the Tax Court, both must sign and file the petition or each must file a separately signed petition. If more than one tax year is shown above, you may file one petition form showing all of the years you are contesting.

You may represent yourself before the Tax Court, or you may be represented by anyone admitted to practice before the Tax Court.

If you decide not to file a petition with the Tax Court, please sign the enclosed waiver form and return it to us at the IRS address found on the bottom of the first page of this letter. This will permit us to assess the deficiency quickly and can help limit the accumulation of interest.

If you decide not to sign and return the waiver, and you do not file a petition with the Tax Court within the time limit, the law requires us to assess and bill you for the deficiency after 90 days from the date of this letter (150 days if this letter is addressed to you outside the United States).

NOTE: If you are a C-Corporation, section 6621(c) of the Internal Revenue Code requires that we charge an interest rate two percent higher than the normal rate on large corporate underpayments of $100,000 or more.

If you have questions about this letter, you may write to or call the contact person whose name, telephone number, and IRS address are shown on the front of this letter. If you write, please include your telephone number, the best time for us to call you if we need more information, and a copy of this letter to help us identify your account. Keep the original letter for your records. If you prefer to call and the telephone number is outside your local calling area, there will be a long distance charge to you.

The contact person can access your tax information and help you get answers. You also have the right to contact the office of the Taxpayer Advocate. Taxpayer Advocate assistance is not a substitute for established IRS procedures such as the formal appeals process. The Taxpayer Advocate is not able to reverse legally correct tax determinations, nor extend the time fixed by law that you have to file a petition in the U.S. Tax Court. The Taxpayer Advocate can, however, see that a tax matter that may not have been resolved through normal channels gets prompt and proper handling. If you want Taxpayer Advocate assistance, please contact the Taxpayer Advocate for the IRS office that issued this notice of deficiency. See the enclosed Notice 1214, Helpful Contacts for Your "Notice of Deficiency", for Taxpayer Advocate telephone numbers and addresses.

Thank you for your cooperation.

Sincerely,

Mark W. Everson
Commissioner
By

Suzanne J. Collins
Technical Services Territory Manager Area 11

Enclosures:
Explanation of tax changes
Waiver
Notice 1214

Form 4549-A

Department of the Treasury
Internal Revenue Service

Return Form No. 1040

| James M. De May | S.S.N. or E.I.N. | Filing Status |
| Post Office Box 31310 | 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 | Married – Separate |
| Santa Fe, NM | | Schedule D |
| 87594-1310 | Examination Changes were discussed with: | Name and Title |

| 1. | | Year: 12/31/1996 | Year: 12/31/1997 | Year: 12/31/1998 |
|---|---|---|---|---|
| a. | Schedule D – Capital Gain Income | 35,361.00 | 12,800,000.00 | 26,805,082.00 |
| b. | Exemptions | 5,712.00 | 9,275.00 | |
| c. | | | | |
| d. | | | | |
| e. | | | | |
| f. | | | | |
| g. | | | | |
| h. | | | | |
| i. | | | | |
| j. | | | | |
| 2. | Total Adjustments | 41,073.00 | 12,809,275.00 | 26,805,082.00 |
| 3. | Adjusted Gross, Taxable or Tax Table Income Shown on return or as Previously Adjusted | 106,542.00 | 96,414.00 | 1,995,968.00 |
| 4. | Corrected Adjusted Gross, Taxable or Tax Table Income | 147,615.00 | 12,905,689.00 | 28,801,050.00 |
| 5. | Tax | 39,476.00 | 2,590,082.00 | 5,758,093.00 |
| 6. | Alternative Minimum Tax | 2,066.00 | 6,564.00 | 2,130,437.00 |
| 7. | Corrected Tax  (Line 5 plus Line 6) | 41,542.00 | 2,596,646.00 | 7,888,530.00 |
| 8. | Less   a. Foreign Tax Credit Credits   b.   c. | 17,627.00 | 22,957.00 | 0.00 |
| 9. | Balance (Line 7 less total of lines 8a. through 8c. | 23,915.00 | 2,573,689.00 | 7,888,530.00 |
| 10. | Plus Other Taxes  a.  b.  c. | | | |
| 11. | Total Corrected Income Tax Liability (Line 9 plus totals of lines 10a. through 10c.) | 23,915.00 | 2,573,689.00 | 7,888,530.00 |
| 12. | Total Tax Shown on Return or as previously Adjusted | 11,538.00 | 3,790.00 | 397,819.00 |
| 13. | Deficiency - Increase in Tax or (Overassessment) - Decrease in Tax (Line 11 adjusted by Line 12) | 12,377.00 | 2,569,899.00 | 7,490,711.00 |
| 14. | Adjustment to Prepayment Credits | | | (6,045.00) |
| 15. | Balance Due or (Overpayment)   (Line 13 adjusted by line 14) Not Including Interest | 12,377.00 | 2,569,899.00 | 7,496,756.00 |
| 16. | Penalties, If Any (see Explanation) IRC 6651(a)(1) IRC 6651(a)(2) IRC 6662 | 2,784.83 * 2,475.40 | 347,286.83 * 513,979.80 | 1,499,351.00 |

Other Information:

* The amount of the addition cannot be determined at this time, and an addition to tax of 0.5 percent will be imposed for each additional month, or fraction thereof, of nonpayment, up to 25 percent.

| Examiner's Signature | District | Date: June 18, 2004 |

Form 4549-A

| Form **886A** | U. S. Treasury Department-Internal Revenue Service **EXPLANATION OF ITEMS** | Schedule No. or **Exhibit** |
|---|---|---|
| Name of Taxpayer James M. De May | | Year/Period Ended December 31, 1996 December 31, 1997 December 31,1998 |

1a. Schedule D – Capital Gain Income

| Tax Period | Per Return | Per Examination | Adjustment |
|---|---|---|---|
| 1996 | $39,000.00 | $74,361.00 | $35,361.00 |
| 1997 | $0.00 | $12,800,000.00 | $12,800,000.00 |
| 1998 | $2,595,196.00 | $29,400,278.00 | $26,805,082.00 |

For the tax year ending December 31, 1996, Mr. De May's basis in Optimay GmbH should have been reported at $669,639.00 instead of the $705,000.00 reported on the return. Consequently, the gain is increased by $35,361.00.

The amount Per Examination, for the tax year ending December 31, 1997, is composed of the following:

| | |
|---|---|
| Transfer from Mr. De May to foreign partnership | $ 2,764,304.00 |
| Transfer from De May Family Trust to foreign partnership | $10,035,696.00 |
| **Total** | $12,800,000.00 |

It has been determined that for the tax year ending December 31, 1997, Mr. De May was the owner of the De May Family trust under the grantor trust provisions set forth in IRC Sections 671 through 679. It has also been determined that in the tax year ending December 31, 1997, Mr. De May and the De May Family Trust contributed property to a foreign partnership and pursuant to IRC Section 721(b) such contribution requires Mr. De May to recognize gain in the amounts of $2,764,304.00 and $10,035,696.

The amount Per Examination, for the tax year ending December 31, 1998, is composed of the following:

| | |
|---|---|
| Optimay Foundation, Sale of Optimay Shares | $ 5,433,600.00  (1) |
| Anne Schrader De May, Sale of Optimay Shares | $ 3,306,000.00  (2) |
| De May Family Trust, Sale of Optimay Shares | $ 11,855,828.00 (3) |
| De May – Optimay Compensation Trust, Sale of Shares | $ 8,804,850.00  (4) |
| **Total** | $ 29,400,278.00 |

(1) It has been determined that for the tax year ending December 31, 1998, Mr. De May is the owner of the Optimay Foundation under the grantor trust provisions set forth in IRC Sections 671 though 679 and is therefore required to recognize the gain from the sale of property held by the trust. It is therefore determined that Mr. De May's capital gain income should be increased in the amount of $5,433,600.00 for the tax year ending December 31, 1998.

(2) It has been determined that for the tax year ending December 31, 1998 Mr. De May is the owner of the Anne Schrader De May Trust under the grantor trust provisions set forth in IRC Section 671 through 679 and is therefore required to recognize the gain from the sale of property held by the trust. It is therefore determined that Mr. De May's capital gain income should be increased in the amount of $3,306,000.00 for the tax year ending December 31, 1998.

| Form **886A** | U. S. Treasury Department-Internal Revenue Service **EXPLANATION OF ITEMS** | Schedule No. or **Exhibit** |
|---|---|---|
| Name of Taxpayer James M. De May | | Year/Period Ended December 31, 1996 December 31, 1997 December 31,1998 |

Alternatively, if it is determined that the Anne Schrader De May Trust became a non grantor trust during the tax year ending December 31, 1998, Mr. De May is required to recognize income pursuant to IRC Section 684 and/or pursuant to the anticipatory assignment of income doctrine.

(3) It has been determined that for the tax year ending December 31, 1998, Mr. De May is the owner of the De May Family Trust under the grantor trust provisions set forth in IRC Sections 671 through 679 and is therefore required to recognize the gain from the sale of the property held by the trust. It is therefore determined that Mr. De May's capital gain income should be increased in the amount of $11,855,828.00 for the tax year ending December 31, 1998.

Alternatively, if it is determined that the De May Family Trust became a non grantor trust during the tax year ending December 31, 1998, Mr. De May is required to recognize income pursuant to IRC Section 684 and/or pursuant to the anticipatory assignment of income doctrine.

The income determined for Mr. De May, as the owner of the De May Family Trust will be reduced to the extent that Mr. De May recognizes gain during the tax year ending December 31, 1997, pursuant to IRC Section 721(b), on account of the contribution by the De May Family Trust of property to the partnership.

(4) It has been determined that for the tax year ending December 31, 1998, Mr. De May is the owner of the De May Compensation Trust under the grantor trust provisions set forth in IRC Section 671 through 679 and is therefore required to recognize the gain from the sale of property held by the trust. It is therefore determined that Mr. De May's capital gain income should be increased in the amount of $8,804,805.00 for the tax year ending December 31, 1998.

Alternatively, Mr. De May is required to recognize gain resulting from the transfer of stock during the tax year ending December 31, 1998, pursuant to the anticipatory assignment of income doctrine.

The income determined for Mr. De May, as owner of the De May Compensation Trust will be reduced to the extent that stock was transferred to Optimay Foundation during the tax year ending December 31, 1998 and Mr. De May recognizes the gain as the owner of the stock

For the tax year ending December 31, 1998, the capital gain income reported by Mr. De May on Schedule D will be reduced to the extent that income is recognized on the transfer from Mr. De May to a foreign partnership, in the tax year ending December 31, 1997, pursuant to IRC 721(b).

1b. Exemptions

| Tax Period | Per Return | Per Examination | Adjustment |
|---|---|---|---|
| 1996 | $5,712.00 | $0.00 | $5,712.00 |
| 1997 | $9,275.00 | $0.00 | $9,275.00 |

The amount you can claim for your exemptions is reduced if your income is more than the dollar limit for your filing status. Your income is more than that limit, so we reduced the amount you can claim.

| Form 886A | U. S. Treasury Department-Internal Revenue Service EXPLANATION OF ITEMS | Schedule No. or Exhibit |
|---|---|---|
| Name of Taxpayer James M. De May | | Year/Period Ended December 31, 1996 December 31, 1997 December 31,1998 |

6. Alternative Minimum Tax

| Tax Period | Per Return | Per Examination | Adjustment |
|---|---|---|---|
| 1996 | $1,372.00 | $2,066.00 | $694.00 |
| 1997 | $0.00 | $6,564.00 | $6,564.00 |
| 1998 | $4,456.00 | $2,130,437.00 | $2,125,981.00 |

We have adjusted your alternative minimum tax based on adjustments to your return.

For the tax year ending December 31, 1998; alternative minimum tax may be recomputed and may be reduced to the extent that income was recognized on the transfer from Mr. De May to a foreign partnership, in the tax year ending December 31, 1997, pursuant to IRC 721(b).

8a. Foreign Tax Credit

| Tax Period | Per Return | Per Examination | Adjustment |
|---|---|---|---|
| 1998 | $3,714.00 | $0.00 | ($3,714.00) |

The foreign tax credit has been disallowed based on the provisions of IRC Sections 901 and 904.

Name Of Taxpayer:  James M. De May                                        04/02/2004
Identification Number:  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              Total                        4.00.00

## 1996 - PERSONAL EXEMPTION WORKSHEET

1. Multiply $   2,550.00 by the total number of exemptions              10,200.00
   claimed on Form 1040, line 6e

2. Adjusted Gross Income                                               150,965.00

3. Limitation based on Filing Status                                    88,475.00

4. Subtract line 3 from line 2                                          62,490.00

5. Divide line 4 by $2,500                                                  0.00
   ($1,250 if married filing separate)

6. Multiply line 5 by 2% and enter the result as a decimal                 0.00

7. Multiply line 1 by line 6                                               0.00

8. Deduction for exemptions (Subtract line 7 from line 1)                  0.00

Note: If Line 4 is more than $122,500. or ($61,250. if married filling separately), a deduction for
exemptions cannot be taken.

| Name Of Taxpayer: | James M. De May | | 04/02/2004 |
| Identification Number: | 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 | Total | 4.00.00 |

## 1997 - PERSONAL EXEMPTION WORKSHEET

1. Multiply $ 2,650.00 by the total number of exemptions claimed on Form 1040, line 6e ... 13,250.00

2. Adjusted Gross Income ... 12,805,303.00

3. Limitation based on Filing Status ... 90,900.00

4. Subtract line 3 from line 2 ... 12,714,403.00

5. Divide line 4 by $2,500 ($1,250 if married filing separate) ... 0.00

6. Multiply line 5 by 2% and enter the result as a decimal ... 0.00

7. Multiply line 1 by line 6 ... 0.00

8. Deduction for exemptions (Subtract line 7 from line 1) ... 0.00

Note: If Line 4 is more than $122,500. or ($61,250. if married filing separately), a deduction for exemptions cannot be taken.

| Name Of Taxpayer: | James M. De May | | 06/04/2004 |
| Identification Number: | 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 | Total | 4.00.00 |

### 1998 - PERSONAL EXEMPTION WORKSHEET

1. Multiply $ 2,700.00 by the total number of exemptions claimed on Form 1040, line 6e

13,500.00

2. Adjusted Gross Income

28,801,104.00

3. Limitation based on Filing Status

93,400.00

4. Subtract line 3 from line 2

28,707,704.00

5. Divide line 4 by $2,500 ($1,250 if married filing separate)

0.00

6. Multiply line 5 by 2% and enter the result as a decimal

0.00

7. Multiply line 1 by line 6

0.00

8. Deduction for exemptions (Subtract line 7 from line 1)

0.00

Note: If Line 4 is more than $122,500. or ($61,250. if married filling separately), a deduction for exemptions cannot be taken.

| Name of Taxpayer: | James M. De May | | 04/13/2004 |
|---|---|---|---|
| Identification Number: | 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 | Total | 4.00.00 |

## 1996 - SCHEDULE D - CAPITAL GAINS AND LOSSES

|  |  |
|---|---|
| 1. Short-term capital gain or loss | 0.00 |
| 2. Short-term capital loss carryover | 0.00 |
| 3. Net Short-term Gain or Loss (Add line 1 and 2) | 0.00 |
| 4. Long-term capital gain or loss | 74,361.00 |
| 5. Long-term capital loss carryover | 0.00 |
| 6. Net long-term Gain or Loss (Add line 4 and 5) | 74,361.00 |
| 7. Sum of lines 3 and 6 - Net Capital Gain or Loss | 74,361.00 |
| 8. Capital loss limitation | 0.00 |
| 9. Capital Gain or Loss - As Corrected | 74,361.00 |
| 10. Capital Gain or Loss - Per Return | 39,000.00 |
| 11. Line 9 less line 10 - Adjustment to Income | 35,361.00 |

### CORRECTED CARRYOVER

|  |  |
|---|---|
| 12. Short-term Carryover to Subsequent Year | 0.00 |
| 13. Long-term Carryover to Subsequent Year | 0.00 |

### COMPUTATION OF ALTERNATIVE TAX

|  |  |
|---|---|
| 14. Taxable Income | 147,615.00 |
| 15. Lesser of Long-Term Gain or Net Capital Gain | 74,361.00 |
| 16. Form 4952, line e | 0.00 |
| 17. Line 15 less line 16 | 74,361.00 |
| 18. Line 14 less line 17 | 73,254.00 |
| 19. Alternative amount based on filing status | 20,050.00 |
| 20. Greater of line 18 or line 19 | 73,254.00 |
| 21. Line 14 less line 20 | 74,361.00 |
| 22. Tax on line 20 using     T | 18,655.00 |
| 23. Line 21 multiplied by 28% | 20,821.00 |
| 24. Line 22 plus line 23 - Alternative Capital Gain Tax | 39,476.00 |

Name of Taxpayer:    James M. De May                                                    04/13/2004
Identification Number:  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                         Total                        4.00.00

## 1997 - SCHEDULE D - CAPITAL GAINS AND LOSSES

| | |
|---|---:|
| 1. Short-term capital gain or loss | 0.00 |
| 2. Short-term capital loss carryover | 0.00 |
| 3. Net Short-term Gain or Loss (Add line 1 and 2) | 0.00 |
| 4. Long-term capital gain or loss | 12,800,000.00 |
| 5. Long-term capital gain or loss carryover | 0.00 |
| 6. Net long-term Gain or Loss (Add line 4 and 5) | 12,800,000.00 |
| 7. Sum of lines 3 and 6 - Net Capital Gain or Loss | 12,800,000.00 |
| 8. Capital loss limitation | 0.00 |
| 9. Capital Gain or Loss - As Corrected | 12,800,000.00 |
| 10. Capital Gain or Loss - Per Return | 0.00 |
| 11. Line 9 less line 10 - Adjustment to Income | 12,800,000.00 |

CORRECTED CARRYOVER

| | |
|---|---:|
| 12. Short-term Carryover to Subsequent Year | 0.00 |
| 13. Long-term Carryover to Subsequent Year | 0.00 |

COMPUTATION OF ALTERNATE TAX

| | |
|---|---:|
| 14. Taxable Income | 12,905,689.00 |
| 15. Smaller of line 6 or line 7 | 12,800,000.00 |
| 16. Form 4952, line 4e | 0.00 |
| 17. Subtract line 16 from line 15 | 12,800,000.00 |
| 18. Combine line 3 and Total 28% Rate Gain (not less than 0) | 0.00 |
| 19. Smaller of line 18 and Total 28% Rate Gain | 0.00 |
| 20. Unrecaptured Section 1250 Gain | 0.00 |
| 21. Add line 19 and 20 | 0.00 |
| 22. Subtract line 21 from line 17 (not less than 0) | 12,800,000.00 |
| 23. Subtract line 22 from line 14 (not less than 0) | 105,689.00 |
| 24. Smaller of line 14 or 20,600.00 | 20,600.00 |
| 25. Smaller of line 23 or line 24 | 20,600.00 |
| 26. Subtract line 17 from line 14 (not less than 0) | 105,689.00 |
| 27. Larger of line 25 or line 26 | 105,689.00 |
| 28. Tax on amount on line 27 | 30,082.00 |
| 29. Amount from line 24 | 20,600.00 |
| 30. Amount from line 23 | 105,689.00 |
| 31. Subtract line 30 from line 29 (not less than 0) | 0.00 |
| 32. Multiply line 31 by 10% | 0.00 |
| 33. Smaller of line 14 or line 22 | 12,800,000.00 |
| 34. Amount from line 31 | 0.00 |
| 35. Subtract line 34 from line 33 (not less than 0) | 12,800,000.00 |
| 36. Multiply line 35 by 20% | 2,560,000.00 |
| 37. Smaller of line 17 or line 20 | 0.00 |
| 38. Add lines 17 and 27 | 12,905,689.00 |
| 39. Amount from line 14 | 12,905,689.00 |
| 40. Subtract line 39 from line 38 | 0.00 |
| 41. Subtract line 40 from line 37 | 0.00 |
| 42. Multiply line 41 by 25% | 0.00 |
| 43. Amount from line 14 | 12,905,689.00 |
| 44. Add lines 27, 31, 35, and 41 | 12,905,689.00 |
| 45. Subtract line 44 from line 43 | 0.00 |
| 46. Multiply line 45 by 28% | 0.00 |
| 47. Add lines 28, 32, 36, 42, and 46 - Alternative Tax | 2,590,082.00 |

Name of Taxpayer:    James M. De May
Identification Number:  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               Total

06/04/2004
4.00.00

## 1998 - SCHEDULE D - CAPITAL GAINS AND LOSSES

| | |
|---|---:|
| 1. Short-term capital gain or loss | (368,496.00) |
| 2. Short-term capital loss carryover | 0.00 |
| 3. Net Short-term Gain or Loss (Add line 1 and 2) | (368,496.00) |
| 4. Long-term capital gain or loss | 29,400,278.00 |
| 5. Long-term capital gain or loss carryover | 0.00 |
| 6. Net long-term Gain or Loss (Add line 4 and 5) | 29,400,278.00 |
| 7. Sum of lines 3 and 6 - Net Capital Gain or Loss | 29,031,782.00 |
| 8. Capital loss limitation | 0.00 |
| 9. Capital Gain or Loss - As Corrected | 29,031,782.00 |
| 10. Capital Gain or Loss - Per Return | 2,226,700.00 |
| 11. Line 9 less line 10 - Adjustment to Income | 26,805,082.00 |

### CORRECTED CARRYOVER
| | |
|---|---:|
| 12. Short-term Carryover to Subsequent Year | 0.00 |
| 13. Long-term Carryover to Subsequent Year | 0.00 |

### COMPUTATION OF ALTERNATE TAX
| | |
|---|---:|
| 14. Taxable Income | 28,801,050.00 |
| 15. Smaller of line 6 or line 7 | 29,031,782.00 |
| 16. Form 4952, line 4e | 0.00 |
| 17. Subtract line 16 from line 15 | 29,031,782.00 |
| 18. Combine line 3 and Total 28% Rate Gain (not less than 0) | 0.00 |
| 19. Smaller of line 18 and Total 28% Rate Gain | 0.00 |
| 20. Unrecaptured Section 1250 Gain | 0.00 |
| 21. Add line 19 and 20 | 0.00 |
| 22. Subtract line 21 from line 17 (not less than 0) | 29,031,782.00 |
| 23. Subtract line 22 from line 14 (not less than 0) | 0.00 |
| 24. Smaller of line 14 or 21,175.00 | 21,175.00 |
| 25. Smaller of line 23 or line 24 | 0.00 |
| 26. Subtract line 17 from line 14 (not less than 0) | 0.00 |
| 27. Larger of line 25 or line 26 | 0.00 |
| 28. Tax on amount on line 27 | 0.00 |
| 29. Amount from line 24 | 21,175.00 |
| 30. Amount from line 23 | 0.00 |
| 31. Subtract line 30 from line 29 (not less than 0) | 21,175.00 |
| 32. Multiply line 31 by 10% | 2,118.00 |
| 33. Smaller of line 14 or line 22 | 28,801,050.00 |
| 34. Amount from line 31 | 21,175.00 |
| 35. Subtract line 34 from line 33 (not less than 0) | 28,779,875.00 |
| 36. Multiply line 35 by 20% | 5,755,975.00 |
| 37. Smaller of line 17 or line 20 | 0.00 |
| 38. Add lines 17 and 27 | 29,031,782.00 |
| 39. Amount from line 14 | 28,801,050.00 |
| 40. Subtract line 39 from line 38 | 230,732.00 |
| 41. Subtract line 40 from line 37 | 0.00 |
| 42. Multiply line 41 by 25% | 0.00 |
| 43. Amount from line 14 | 28,801,050.00 |
| 44. Add lines 27, 31, 35, and 41 | 28,801,050.00 |
| 45. Subtract line 44 from line 43 | 0.00 |
| 46. Multiply line 45 by 28% | 0.00 |
| 47. Add lines 28, 32, 36, 42, and 46 - Alternative Tax | 5,758,093.00 |

Name of Taxpayer:    James M. De May                                04/13/2004
Identification Number: 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          Total                        4.00.00

## 1996    - FORM 6251 - ALTERNATIVE MINIMUM TAX COMPUTATION

| | |
|---|---:|
| 1. Total Adjustments and Preferences | 3,350.00 |
| 2. Tax Table Income (from Form 1040, line 37) | 147,615.00 |
| 3. Net Operating Loss Deduction | 0.00 |
| 4. Itemized Deduction Limitation (from Schedule A Worksheet) | ($0.00) |
| 5. Combine lines 1 through 4 | 150,965.00 |
| 6. Alternative Tax Net Operating Loss Deduction | 0.00 |
| 7. Alternative Minimum Taxable Income | 150,965.00 |
| 8. Exemption Amount | 3,509.00 |
| 9. Subtract line 8 from line 7 (if 0 or less, enter 0) | 147,456.00 |
| 10. If line 9 is $175,000 or less ($87,500 or less if married filing separate) multiply line 9 by 26% | 39,538.00 |
| 11. Alternative Minimum Tax Foreign Tax Credit | 15,623.00 |
| 12. Tentative Minimum Tax (Subtract 11 form 10) | 23,915.00 |
| 13. Regular Tax Before Credits (less Foreign Tax Credit) | 21,849.00 |
| 14. Alternative Minimum Tax (before credit) | 2,066.00 |
| 15. Empowerment Zone Employment Credit | 0.00 |
| 16. Net Alternative Minimum Tax (line 14 less line 15) | 2,066.00 |

## EXEMPTION WORKSHEET (Line 8)

| | |
|---|---:|
| A.  Exemption amount based on filing status | 22,500.00 |
| B.  Alternative Minimum Taxable Income (line 7) | 150,965.00 |
| C.  Enter $112,500 ($150,000 if married filing jointly or qualifying widow(er), $75,000 if married filing separate) | 75,000.00 |
| D.  Subtract line C from line B | 75,965.00 |
| E.  Multiply line D by 25% | 18,991.00 |
| F.  Subtract line E from line A (if zero or less, enter 0) | 3,509.00 |

| Name of Taxpayer: | James M. De May | | 04/13/2004 |
| Identification Number: | 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 | Total | 4.00.00 |

### 1997 - FORM 6251 - ALTERNATIVE MINIMUM TAX COMPUTATION

|  |  |
|---|---|
| 1. Total Adjustments and Preferences | 3,450.00 |
| 2. Tax Table Income (from Form 1040, line 37) | 12,905,689.00 |
| 3. Net Operating Loss Deduction | 0.00 |
| 4. Itemized Deduction Limitation (from Schedule A Worksheet) | ($0.00) |
| 5. Combine lines 1 through 4 | 12,909,139.00 |
| 6. Alternative Tax Net Operating Loss Deduction | 0.00 |
| 7. Alternative Minimum Taxable Income | 12,931,639.00 |
| 8. Exemption Amount | 0.00 |
| 9. Subtract line 8 from line 7 (if 0 or less, enter 0) | 12,931,639.00 |
| 10. If line 9 is $175,000 or less ($87,500 or less if married filing separate) multiply line 9 by 26% | 2,595,109.00 |
| 11. Alternative Minimum Tax Foreign Tax Credit | 21,420.00 |
| 12. Tentative Minimum Tax (Subtract 11 form 10) | 2,573,689.00 |
| 13. Regular Tax Before Credits (less Foreign Tax Credit) | 2,567,125.00 |
| 14. Alternative Minimum Tax (before credit) | 6,564.00 |
| 15. Empowerment Zone Employment Credit | 0.00 |
| 16. Net Alternative Minimum Tax (line 14 less line 15) | 6,564.00 |

### EXEMPTION WORKSHEET (Line 8)

|  |  |
|---|---|
| A. Exemption amount based on filing status | 22,500.00 |
| B. Alternative Minimum Taxable Income (line 7) | 12,931,639.00 |
| C. Enter $112,500 ($150,000 if married filing jointly or qualifying widow(er), $75,000 if married filing separate) | 75,000.00 |
| D. Subtract line C from line B | 12,856,639.00 |
| E. Multiply line D by 25% | 3,214,160.00 |
| F. Subtract line E from line A (if zero or less, enter 0) | 0.00 |

Name of Taxpayer:    James M. De May                    06/04/2004
Identification Number:  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         Total              4.00.00

1998    - FORM 6251 - ALTERNATIVE MINIMUM TAX COMPUTATION

|  |  |
|---|---:|
|  | 0.00 |
| 1. Total Adjustments and Preferences |  |
| 2. Tax Table Income (from Form 1040, line 37) | 28,801,050.00 |
| 3. Net Operating Loss Deduction | 0.00 |
| 4. Itemized Deduction Limitation (from Schedule A Worksheet) | ($217.00) |
|  |  |
| 5. Combine lines 1 through 4 | 28,800,833.00 |
|  |  |
| 6. Alternative Tax Net Operating Loss Deduction | 0.00 |
| 7. Alternative Minimum Taxable Income | 28,823,333.00 |
| 8. Exemption Amount | 0.00 |
|  |  |
| 9. Subtract line 8 from line 7 (if 0 or less, enter 0) | 28,823,333.00 |
|  |  |
| 10. If line 9 is $175,000 or less ($87,500 or less | 7,888,530.00 |
|     if married filing separate) multiply line 9 by 26% |  |
| 11. Alternative Minimum Tax Foreign Tax Credit | 0.00 |
|  |  |
| 12. Tentative Minimum Tax (Subtract 11 form 10) | 7,888,530.00 |
| 13. Regular Tax Before Credits (less Foreign Tax Credit) | 5,758,093.00 |
| 14. Alternative Minimum Tax (before credit) | 2,130,437.00 |
| 15. Empowerment Zone Employment Credit | 0.00 |
|  |  |
| 16. Net Alternative Minimum Tax (line 14 less line 15) | 2,130,437.00 |

**EXEMPTION WORKSHEET (Line 8)**

|  |  |
|---|---:|
| A. Exemption amount based on filing status | 22,500.00 |
| B. Alternative Minimum Taxable Income (line 7) | 28,823,333.00 |
| C. Enter $112,500 ($150,000 if married filing jointly or | |
|    qualifying widow(er), $75,000 if married filing separate) | 75,000.00 |
| D. Subtract line C from line B | 28,748,333.00 |
| E. Multiply line D by 25% | 7,187,083.00 |
| F. Subtract line E from line A (if zero or less, enter 0) | 0.00 |

| Name of Taxpayer: | James M. De May | | 04/13/2004 |
|---|---|---|---|
| Identification Number: | 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 | Total | 4.00.00 |

## EXPLANATION OF THE DELINQUENCY PENALTY

Since your income tax return was not filed within the time limit prescribed by law and/or the tax was not paid, and you have not shown that such failure was due to reasonable cause, an addition to the tax is charged as shown below, in accordance with Section 6651(a)(1) and/or Section 6651(a)(2) of the Internal Revenue Code.

### 1996 - DELINQUENCY PENALTY

| | | |
|---|---|---|
| 1. Delinquency penalty abated | | 0.00 |
| 2. Date return due | 04/15/1997 | |
| 3. Date return filed | 01/07/1999 | |
| 4. Failure to File penalty rate | 0.225 | |
| 5. Failure to Pay penalty rate | 0.105 | |
| 6. Total corrected tax, Form 4549, line 11 | | 23,915.00 |
| 7. Payments on or prior to due date of return | | 0.00 |
| 8. Line 6 less line 7 | | 23,915.00 |
| 9. Failure to File Penalty - line 8 multiplied by line 4 | | 5,380.88 |
| 10. Minimum penalty if over 60 days delinquent | | 100.00 |
| 11. Failure to File Penalty - Greater of line 9 or line 10 | | 5,380.88 |
| 12. Previously assessed Failure to File Penalty | | 2,596.05 |
| 13. Net Failure to File Penalty - line 11 less line 12 | | 2,784.83 |
| 14. Failure to Pay Penalty - line 8 multiplied by line 5 | | 2,511.08 |
| 15. Previously assessed Failure to Pay Penalty | | 1,096.11 |
| 16. Net Failure to Pay Penalty - line 14 less line 15 | * | 1,414.97 |
| 17. Total Delinquency Penalty - Sum of line 13 and 16 | | 4,199.80 |

* If an amount appears as the Failure to Pay Penalty, the amount only reflects the addition to tax under Internal Revenue Code section 6651(a)(2) through the date of this notice. The addition to tax will continue to accrue from the due date of the return at a rate of 0.5 percent each month, or fraction thereof, of nonpayment, not exceeding 25 percent.

| Name of Taxpayer: | James M. De May | | 04/13/2004 |
|---|---|---|---|
| Identification Number: | 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 | Total | 4.00.00 |

### EXPLANATION OF THE DELINQUENCY PENALTY

Since your income tax return was not filed within the time limit prescribed by law and/or the tax was not paid, and you have not shown that such failure was due to reasonable cause, an addition to the tax is charged as shown below, in accordance with Section 6651(a)(1) and/or Section 6651(a)(2) of the Internal Revenue Code.

#### 1997 - DELINQUENCY PENALTY

| | | |
|---|---|---|
| 1. Delinquency penalty abated | | 0.00 |
| 2. Date return due | 10/15/1998 | |
| 3. Date return filed | 01/11/1999 | |
| 4. Failure to File penalty rate | 0.135 | |
| 5. Failure to Pay penalty rate | 0.045 | |
| 6. Total corrected tax, Form 4549, line 11 | | 2,573,689.00 |
| 7. Payments on or prior to due date of return | | 204.00 |
| 8. Line 6 less line 7 | | 2,573,485.00 |
| 9. Failure to File Penalty – line 8 multiplied by line 4 | | 347,420.48 |
| 10. Minimum penalty if over 60 days delinquent | | 100.00 |
| 11. Failure to File Penalty - Greater of line 9 or line 10 | | 347,420.48 |
| 12. Previously assessed Failure to File Penalty | | 133.65 |
| 13. Net Failure to File Penalty - line 11 less line 12 | | 347,286.83 |
| 14. Failure to Pay Penalty - line 8 multiplied by line 5 | | 115,806.83 |
| 15. Previously assessed Failure to Pay Penalty | | 14.85 |
| 16. Net Failure to Pay Penalty - line 14 less line 15 | | 115,791.98 |
| 17. Total Delinquency Penalty - Sum of line 13 and 16 | | 463,078.81 |

If an amount appears as the Failure to Pay Penalty, the amount only reflects the addition to tax under Internal Revenue Code section 6651(a)(2) through the date of this notice. The addition to tax will continue to accrue from the due date of the return at a rate of 0.5 percent each month, or fraction thereof, of nonpayment, not exceeding 25 percent.

| Name of Taxpayer: | James M. De May | | 04/13/2004 |
| Identification Number: | 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 | Total | 4.00.00 |

## SUMMARY OF THE ACCURACY-RELATED PENALTY

### 1996 - 20% PENALTY ISSUES - Section 6662(a) and 6662(b)

It has been determined that the underpayment of tax shown on line 5 below is attributable to one or more of the following elements of the accuracy-related penalty: (1) negligence or disregard of rules or regulations, (2) substantial understatement of income tax, or (3) substantial valuation overstatement, therefore, an addition to tax is imposed as provided by Section 6662(a) of the Internal Revenue Code.

1. Total tax computed with non-penalty adjustments and adjustments subject to penalty under Section 6662(b) — 12,377.00

2. Total tax computed with non-penalty adjustments only — 0.00

3. Line 1 less line 2 - Underpayment to which Section 6662(a) applies — 12,377.00

4. Allocable Prepayment Credits (other than EIC and Special Fuels Credits included in lines 1 & 2) — 0.00

5. Line 3 less line 4 - Underpayment subject to penalty — 12,377.00

6. Applicable penalty rate — 20.00%
7. Line 5 multiplied by line 6 — 2,475.40
8. Previously assessed 20% Accuracy Penalty — 0.00
9. Line 7 less line 8 - 20% Accuracy-related penalty — 2,475.40

### 1996 - 40% PENALTY ISSUES - Section 6662(h)

It has been determined that the underpayment of tax shown on line 14 below is attributable to a gross valuation misstatement, therefore, an addition to tax is imposed as provided by Section 6662(h) of the Internal Revenue Code.

10. Total tax computed with non-penalty adjustments, adjustments subject to penalty under IRC 6662(a) and adjustments subject to penalty under IRC 6662(h) — 0.00

11. Total tax from line 1 above — 12,377.00

12. Line 10 less line 11 - Underpayment to which Section 6662(h) applies — 0.00

13. Allocable Prepayment Credits (other than EIC and Special Fuels Credits included in lines 10 & 11) — 0.00

14. Line 10 less line 11 - Underpayment subject to penalty — 0.00

15. Applicable penalty rate — 0.00%
16. Line 14 multiplied by line 15 — 0.00
17. Previously assessed 40% Accuracy Penalty — 0.00
18. Line 16 less line 17 - 40% Accuracy-related penalty — 0.00
19. Line 9 plus line 18 - Total ACCURACY-RELATED PENALTY — 2,475.40

| Name of Taxpayer: | James M. De May | | 04/13/2004 |
| Identification Number: | 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 | Total | 4.00.00 |

## SUMMARY OF THE ACCURACY-RELATED PENALTY

### 1997 - 20% PENALTY ISSUES - Section 6662(a) and 6662(b)

It has been determined that the underpayment of tax shown on line 5 below is attributable to one or more of the following elements of the accuracy-related penalty: (1) negligence or disregard of rules or regulations, (2) substantial understatement of income tax, or (3) substantial valuation overstatement, therefore, an addition to tax is imposed as provided by Section 6662(a) of the Internal Revenue Code.

| | |
|---|---:|
| 1. Total tax computed with non-penalty adjustments and adjustments subject to penalty under Section 6662(b) | 2,569,899.00 |
| 2. Total tax computed with non-penalty adjustments only | 0.00 |
| 3. Line 1 less line 2 - Underpayment to which Section 6662(a) applies | 2,569,899.00 |
| 4. Allocable Prepayment Credits (other than EIC and Special Fuels Credits included in lines 1 & 2) | 0.00 |
| 5. Line 3 less line 4 - Underpayment subject to penalty | 2,569,899.00 |
| 6. Applicable penalty rate | 20.00% |
| 7. Line 5 multiplied by line 6 | 513,979.80 |
| 8. Previously assessed 20% Accuracy Penalty | 0.00 |
| 9. Line 7 less line 8 - 20% Accuracy-related penalty | 513,979.80 |

### 1997 - 40% PENALTY ISSUES - Section 6662(h)

It has been determined that the underpayment of tax shown on line 14 below is attributable to a gross valuation misstatement, therefore, an addition to tax is imposed as provided by Section 6662(h) of the Internal Revenue Code.

| | |
|---|---:|
| 10. Total tax computed with non-penalty adjustments, adjustments subject to penalty under IRC 6662(a) and adjustments subject to penalty under IRC 6662(h) | 0.00 |
| 11. Total tax from line 1 above | 2,569,899.00 |
| 12. Line 10 less line 11 - Underpayment to which Section 6662(h) applies | 0.00 |
| 13. Allocable Prepayment Credits (other than EIC and Special Fuels Credits included in lines 10 & 11) | 0.00 |
| 14. Line 10 less line 11 - Underpayment subject to penalty | 0.00 |
| 15. Applicable penalty rate | 0.00% |
| 16. Line 14 multiplied by line 15 | 0.00 |
| 17. Previously assessed 40% Accuracy Penalty | 0.00 |
| 18. Line 16 less line 17 - 40% Accuracy-related penalty | 0.00 |
| 19. Line 9 plus line 18 - Total ACCURACY-RELATED PENALTY | 513,979.80 |

| Name of Taxpayer: | James M. De May | | 06/04/2004 |
| Identification Number: | 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 | Total | 4.00.00 |

## SUMMARY OF THE ACCURACY-RELATED PENALTY

### 1998 - 20% PENALTY ISSUES - Section 6662(a) and 6662(b)

It has been determined that the underpayment of tax shown on line 5 below is attributable to one or more of the following elements of the accuracy-related penalty: (1) negligence or disregard of rules or regulations, (2) substantial understatement of income tax, or (3) substantial valuation overstatement, therefore, an addition to tax is imposed as provided by Section 6662(a) of the Internal Revenue Code.

| | |
|---|---|
| 1. Total tax computed with non-penalty adjustments and adjustments subject to penalty under Section 6662(b) | 7,496,756.00 |
| 2. Total tax computed with non-penalty adjustments only | 0.00 |
| 3. Line 1 less line 2 – Underpayment to which Section 6662(a) applies | 7,496,756.00 |
| 4. Allocable Prepayment Credits (other than EIC and Special Fuels Credits included in lines 1 & 2) | 0.00 |
| 5. Line 3 less line 4 – Underpayment subject to penalty | 7,496,756.00 |
| 6. Applicable penalty rate | 20.00% |
| 7. Line 5 multiplied by line 6 | 1,499,351.20 |
| 8. Previously assessed 20% Accuracy Penalty | 0.00 |
| 9. Line 7 less line 8 – 20% Accuracy-related penalty | 1,499,351.20 |

### 1998 - 40% PENALTY ISSUES - Section 6662(h)

It has been determined that the underpayment of tax shown on line 14 below is attributable to a gross valuation misstatement, therefore, an addition to tax is imposed as provided by Section 6662(h) of the Internal Revenue Code.

| | |
|---|---|
| 10. Total tax computed with non-penalty adjustments, adjustments subject to penalty under IRC 6662(a) and adjustments subject to penalty under IRC 6662(h) | 0.00 |
| 11. Total tax from line 1 above | 7,496,756.00 |
| 12. Line 10 less line 11 – Underpayment to which Section 6662(h) applies | 0.00 |
| 13. Allocable Prepayment Credits (other than EIC and Special Fuels Credits included in lines 10 & 11) | 0.00 |
| 14. Line 10 less line 11 – Underpayment subject to penalty | 0.00 |
| 15. Applicable penalty rate | 0.00% |
| 16. Line 14 multiplied by line 15 | 0.00 |
| 17. Previously assessed 40% Accuracy Penalty | 0.00 |
| 18. Line 16 less line 17 – 40% Accuracy-related penalty | 0.00 |
| 19. Line 9 plus line 18 - Total ACCURACY-RELATED PENALTY | 1,499,351.20 |

## Prepayment Credit Adjustment

1998

Statutory Deficiency

$7,490,711.

Correct Amount of
Prepayment Credits:

|  | Federal Income Tax With Held: | $9,725. |
|  | Estimated Tax Payments: | $580,000. |

Correct Prepayment
Credit:

$589,725.

Prepayment Credit
Claimed on Return:

|  | Federal Income Tax Withheld: | $15,770. |
|  | Estimated Tax Payments: | $580,000. |

Total Prepayment
Credits on Return:

$595,770.

Overstatement of
Prepayment Credits

$6,045.00

Net additional tax (or
net overpayment)

$7,496,756.

# EXHIBIT 20

FILED

SEP 10

## UNITED STATES TAX COURT

JAMES M. DE MAY, )
)
    Petitioner, )
)
vs. )
)
COMMISSIONER OF INTERNAL )
REVENUE, )
)
    Respondent. )
)

Docket No. _____

## 17512-04

### PETITION

    The above-named Petitioner hereby petitions for a re-determination of the deficiency of tax as set forth by the Commissioner of Internal Revenue in his Notice of Deficiency dated July 23, 2004, and as the basis for his case alleges the following:

MAIL CLERK

ADMISSIONS & SERVED

PUB. FILES

ADDRESS USED BY COURT

    1.    The Petitioner is an individual whose mailing address is P.O. Box 31310, Santa Fe, New Mexico 87594-1310. The Petitioner's taxpayer identification number is 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. The Forms 1040, United States Individual Income Tax Return at issue in the instant case were filed with the Internal Revenue Service Center located in Austin, Texas.

    2.    The Notice of Deficiency, a copy of which is attached hereto as Exhibit 1, was purportedly mailed to the Petitioner on July 23, 2004 and was issued by the Office of the Internal Revenue Service located in Phoenix, Arizona.

    3.    The deficiency, additions to tax, and penalties, as determined by the Commissioner, and all of which are in dispute, are shown below:

| Tax Year | Deficiency | Section 6651(a)(1) Addition to Tax | Section 6651(a)(2) Addition to Tax | Section 6662 Penalty |
|---|---|---|---|---|
| 1996 | $12,377.00 | $2,785.00 | Unstated | $2,475.00 |
| 1997 | $2,569,899.00 | $347,287.00 | Unstated | $513,980.00 |
| 1998 | $7,490,711.00 | $0.00 | $0.00 | $1,499,351.00 |

4.    The Commissioner's determination of tax, additions to tax, and penalty, as set forth in the Notice of Deficiency, is based upon the following errors:

A.    That for the tax year ending December 31, 1996, the Petitioner's basis in Optimay GmbH should have been reported at $669,639.00 instead of the $705,000 reported on the Petitioner's tax return, resulting in an increase to Schedule D gain in the amount of $35,361.00.

B.    That in the tax year ending December 31, 1997, the Petitioner contributed property to a foreign partnership and, pursuant to Internal Revenue Code section 721(b), is therefore required to recognize Schedule D gain in the amount of $2,764,304.00.

C.    That in the tax year ending December 31, 1997, the Petitioner was the owner of the De May Family Trust under the grantor trust provisions of Internal Revenue Code sections 671 through 679 and, pursuant to Internal Revenue Code section 721(b), is therefore required to recognize Schedule D gain in the amount of $10,035,696.00 on the

contribution of property during the tax year ending December 31, 1997 from the De May Family Trust to a foreign partnership.

D.   That in the tax year ending December 31, 1998, the Petitioner was the owner of the Optimay Foundation under the grantor trust provisions of Internal Revenue Code sections 671 through 679 and is therefore required to recognize Schedule D gain in the amount of $5,433,600.00 on the sale of property held by "the trust" during the tax year ending December 31, 1998.

E.   That for the tax year ending December 31, 1998:

1.   the Petitioner was the owner of the Anne Schrader De May Trust under the grantor trust provisions of Internal Revenue Code sections 671 through 679 and is therefore required to recognize Schedule D gain in the amount of $3,306,000.00 on the sale of property held by the Trust; or, in the alternative,

2.   if the Anne Schrader De May Trust became a nongrantor, then the Petitioner is required to recognize Schedule D gain pursuant to Internal Revenue Code section 684 and/or pursuant to the anticipatory assignment of income doctrine.

F.   That for the tax year ending December 31, 1998:

1. the Petitioner was the owner of the De May Family Trust under the grantor trust provisions of Internal Revenue Code sections 671 through 679 and is therefore required to recognize Schedule D gain in the amount of $11,855,828.00 on the sale of property held by the Trust; or, in the alternative,

2. if the De May Family Trust became a nongrantor trust then the Petitioner is required to recognize Schedule D gain pursuant to Internal Revenue Code section 684 and/or pursuant to the anticipatory assignment of income doctrine.

G. That for the tax year ending December 31, 1998:

1. the Petitioner was the owner of the De May Compensation Trust under the grantor trust provisions of Internal Revenue Code sections 671 through 679 and is therefore required to recognize Schedule D gain in the amount of $8,804,805.00 on the sale of property held by the Trust; or, in the alternative,

2. the Petitioner is required to recognize Schedule D gain pursuant to the anticipatory assignment of income doctrine.

H. That the Petitioner is not entitled to exemptions in the amount of $5,712.00 for the tax year ending December 31,

1996 on the grounds that his income exceeds the dollar limit for his filing status.

I.     That the Petitioner is not entitled to exemptions in the amount of $9,275.00 for the tax year ending December 31, 1997 on the grounds that his income exceeds the dollar limit for his filing status.

J.     That the Petitioner is subject to an adjustment to his alternative minimum tax in the amount of $694.00 for the tax year ending December 31, 1996.

K.     That the Petitioner is subject to an adjustment to his alternative minimum tax in the amount of $6,564.00 for the tax year ending December 31, 1997.

L.     That the Petitioner is subject to an adjustment to his alternative minimum tax in the amount of $2,125,981.00 for the tax year ending December 31, 1998.

M.     That the Petitioner is not entitled to a foreign tax credit in the amount of $3,714.00 pursuant to the provisions of Internal Revenue Code sections 901 and 904 for the tax year ending December 31, 1998.

N.     That the Petitioner is subject to an addition to tax pursuant to Internal Revenue Code section 6651(a)(1) in the amount of $2,785.00 for the tax year ending December 31, 1996.

O.    That the Petitioner is subject to an addition to tax pursuant to Internal Revenue Code section 6651(a)(1) in the amount of $347,287.00 for the tax year ending December 31, 1997.

P.    That the Petitioner is subject to additions to tax pursuant to Internal Revenue Code section 6651(a)(2) in unstated amounts for the tax years ending December 31, 1996 and December 31, 1997.

Q.    That the Petitioner is subject to an accuracy related penalty pursuant to Internal Revenue Code section 6662 in the amount of $2,475.00 for the tax year ending December 31, 1996.

R.    That the Petitioner is subject to an accuracy related penalty pursuant to Internal Revenue Code section 6662 in the amount of $513,980.00 for the tax year ending December 31, 1997.

S.    That the Petitioner is subject to an accuracy related penalty pursuant to Internal Revenue Code section 6662 in the amount of $1,499,351.00 for the tax year ending December 31, 1998.

5.    The facts upon which the Petitioner relies as the basis for his case are:

A.   That for the tax year ending December 31, 1996, the Petitioner's basis in Optimay GmbH was $705,000, as reported on his tax return.

B.   That for the tax year ending December 31, 1997, the Petitioner did not contribute assets to a foreign partnership causing or requiring the Petitioner to recognize Schedule D gain pursuant to Internal Revenue Code Section 721(b).

C.   That for the tax year ending December 31, 1997, the Petitioner was not the owner of the De May Family Trust under the grantor trust provisions of the Internal Revenue Code Sections 671 through 679 because the Trust did not have a United States beneficiary and no other facts exist such that under the grantor trust provisions of the Internal Revenue Code Sections 671 through 679 the Petitioner should be treated as the owner of the Trust; and the De May Family Trust did not contribute assets to a foreign partnership causing or requiring the Petitioner to recognize Schedule D gain pursuant to Internal Revenue Code section 721(b).

D.   That for the tax year ending December 31, 1998, the Petitioner was not the owner of the Optimay Foundation under the grantor trust provisions of Internal Revenue Code sections 671 through 679 because the Foundation was an

organization described in Internal Revenue Code section 501(c)(3) and the Petitioner is therefore not required to recognize Schedule D gain on the sale of property held by the Foundation; in the alternative, that the value of the stock transferred by the Foundation was \$0.00.

E.    That for the tax year ending December 31, 1998:

1.    the Petitioner was not the owner of the Anne Schrader De May Trust under the grantor trust provisions of Internal Revenue Code sections 671 through 679 because the trust did not have a United States beneficiary and no other facts exist such that under the grantor trust provisions of Internal Revenue Code sections 671 through 679 the Petitioner should be treated as the owner of the Anne Schrader De May Trust, and the Petitioner is therefore not required to recognize Schedule D gain on the sale of property held by the Trust; and

2.    the Petitioner did not anticipatorily assign the income of the Anne Schrader De May Trust prior to the sale of property held by the Trust because the trust did not assign any income and because no trust income could reasonably be anticipated at the time the purported "assignment" occurred; and Internal

Revenue Code section 684 and the Treasury Regulations promulgated thereunder are inapplicable to the instant case.

F.    That for the tax year ending December 31, 1998,

1.    the Petitioner was not the owner of the De May Family Trust under the grantor trust provisions of Internal Revenue Code sections 671 through 679 because the Trust did not have a United States beneficiary and no other facts exist such that under the grantor trust provisions of Internal Revenue Code sections 671 through 679 the Petitioner should be treated as the owner of the Trust, and the Petitioner is therefore not required to recognize Schedule D gain on the sale of property held by the Trust; and

2.    the Petitioner did not anticipatorily assign the income of the Trust prior to the sale of property held by the Trust because the Trust did not assign any income and because no Trust income could reasonably be anticipated at the time the purported "assignment" occurred; and Internal Revenue Code section 684 and the Treasury Regulations promulgated thereunder are inapplicable to the instant case.

G.    That for the tax year ending December 31, 1998,

1.    the Petitioner was not the owner of the De May
      Compensation Trust under the grantor trust provisions
      of Internal Revenue Code sections 671 through 679
      because the trust did not have a United States
      beneficiary and no other facts exist such that under
      the grantor trust provisions of Internal Revenue Code
      sections 671 through 679 the Petitioner should be
      treated as the owner of the Trust, and the Petitioner is
      therefore not required to recognize Schedule D gain
      on the sale of property held by the Trust; in the
      alternative, the value of the stock transferred was
      $0.00; and

2.    the Petitioner did not anticipatorily assign the income
      of the De May Compensation Trust prior to the sale of
      property held by the Trust because the Trust did not
      assign any income and because no Trust income
      could reasonably be anticipated at the time the
      purported "assignment" occurred.

H.    That a computation of the exemptions to which the Petitioner
      is entitled establishes that the Petitioner is entitled to
      exemptions in the amount of $5,712.00 for the tax year
      ending December 31, 1996 based on his income and the
      dollar limit for his filing status.

I.      That a computation of the exemptions to which the Petitioner is entitled establishes that the Petitioner is entitled to exemptions in the amount of $9,275.00 for the tax year ending December 31, 1997 based on his income and the dollar limit for his filing status.

J.      That a computation of the alternative minimum tax to which the Petitioner is subject establishes that the Petitioner is subject to an alternative minimum tax in the amount of $1,372.00 for the tax year ending December 31, 1996.

K.      That a computation of the alternative minimum tax to which the Petitioner is subject establishes that the Petitioner is not subject to an alternative minimum tax for the tax year ending December 31, 1997.

L.      That a computation of the alternative minimum tax to which the Petitioner is subject establishes that the Petitioner is subject to an alternative minimum tax in the amount of $4,456.00 for the tax year ending December 31, 1998.

M.      That a computation of the foreign tax credit to which the Petitioner is entitled establishes that the Petitioner is entitled to a foreign tax credit in the amount of $3,714.00 as a result of taxes paid to foreign countries and/or possessions of the United States in the tax year ending 1998.

N.    That the Petitioner is not subject to an addition to tax pursuant to Internal Revenue Code section 6651(a)(1) for the tax year ending December 31, 1996 because there is no deficiency in tax for such tax year and, in the alternative, because reasonable cause and good faith exist such that the addition to tax pursuant to Internal Revenue Code section 6651(a)(1) should not be imposed.

O.    That the Petitioner is not subject to an addition to tax pursuant to Internal Revenue Code section 6651(a)(1) for the tax year ending December 31, 1997 because there is no deficiency in tax for such tax year and, in the alternative, because reasonable cause and good faith exist such that the addition to tax pursuant to Internal Revenue Code section 6651(a)(1) should not be imposed.

P.    That the Petitioner is not subject to an addition to tax pursuant to Internal Revenue Code section 6651(a)(2) for the tax years ending December 31, 1996 and December 31, 1997 because there is no deficiency in tax for such tax years and, in the alternative, because reasonable cause and good faith exist such that the addition to tax pursuant to Internal Revenue Code section 6651(a)(2) should not be imposed.

Q.    That the Petitioner is not subject to an accuracy related penalty pursuant to Internal Revenue Code section 6662 for

the tax year ending December 31, 1996 because there is no deficiency in tax for such tax year and, in the alternative, because reasonable cause and good faith exist such that the addition to tax pursuant to Internal Revenue Code section 6662 should not be imposed.

R.    That the Petitioner is not subject to an accuracy related penalty pursuant to Internal Revenue Code section 6662 for the tax year ending December 31, 1997 because there is no deficiency in tax for such tax year and, in the alternative, because reasonable cause and good faith exist such that the addition to tax pursuant to Internal Revenue Code section 6662 should not be imposed.

S.    That the Petitioner is not subject to an accuracy related penalty pursuant to Internal Revenue Code section 6662 for the tax year ending December 31, 1998 because there is no deficiency in tax for such tax year and, in the alternative, because reasonable cause and good faith exist such that the addition to tax pursuant to Internal Revenue Code section 6662 should not be imposed.

6.    The issuance of the Notice of Deficiency by the Commissioner is barred by the statute of limitations for the tax year ending 1996.

**WHEREFORE**, the Petitioner respectfully prays that this Court:

1.  Find that the Commissioner's determinations as set forth in the Notice of Deficiency are incorrect;

2.  Find that the Petitioner is not subject to additions to tax pursuant to Internal Revenue Code section 6651(a)(1) or (a)(2);

3.  Find that the Petitioner is not subject to any penalties pursuant to Internal Revenue Code section 6662; and

4.  Grant the Petitioner any additional relief, including, but not limited to, costs and attorneys fees, as the Court may find appropriate.

Respectfully submitted,

BRIAN C. BERNHARDT (BB 0450)
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, VA 23219-4030
(804) 775-1000
*Co-Counsel for Petitioner*

CRAIG D. BELL (~~BB 05020~~) B C 0520
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, VA 23219-4030
(804) 775-1000
*Co-Counsel for Petitioner*

DOUGLAS W. CHARNAS (CD 0512)
McGuireWoods LLP
Washington Square
1050 Connecticut Avenue N.W., Suite 1200
Washington, DC 20036-5317
(202) 857-1700
*Co-Counsel for Petitioner*

Dated: September 17, 2004

# EXHIBIT 21

## Jonathon Moore

| | |
|---|---|
| **From:** | Jonathon R. Moore [jmoore@mooreandbruce.com] |
| **Sent:** | Tuesday, September 28, 2004 3:54 PM |
| **To:** | 'Charnas, Douglas W.' |
| **Cc:** | James M. De May (gila@yellowmesa.com); Charles M. Bruce, Esq. (Charles M. Bruce, Esq.) |

**Subject:** RE: James De May [Our File No. 2037000-0001]

Quite incredible. I do not know what the basis might be for a different valuation at the time of the gift, since the entity in which the shares represented an ownership interest had negative net worth and gloomy prospects, which only worsened in the months following the gift.

We will do nothing further at this end pending your evaluation of the implications of proposing some value for the stock.

REGARDS!!!!!!!!!!!

     -----Original Message-----
     **From:** Charnas, Douglas W. [mailto:dcharnas@mcguirewoods.com]
     **Sent:** Tuesday, September 28, 2004 2:59 PM
     **To:** jmoore@mooreandbruce.com
     **Subject:** James De May [Our File No. 2037000-0001]

     Dear Jonathon,

        Benita Alexandre scheduled a conference call with me last week to discuss Jim's gift tax issues. We had our conference call, which was unpleasantly short. Bottom line - the IRS is sticking with its initial position. She did say she would entertain a stock value less than $6.60 per share, but it was only after pushing her.

        I spoke with Jim. I need to decide whether to move on to Appeals or consider going back to Ms. Alexandre with a value on the stock. I also need to determine whether any of the theories upon which the IRS is attributing to Jim the gain on the Trusts' sale of stock is inconsistent with him having made a gift in 1996. I will let you know as soon as I reach some preliminary decisions.

        Regards, Douglas


     Douglas W. Charnas, Esq.
     McGuireWoods LLP
     Washington Square
     1050 Connecticut Avenue, N.W.
     Suite 1200
     Washington, DC 20036-5317
     202.857.1757 (Direct Line)
     202.828.2980 (Direct Fax)
     dcharnas@mcguirewoods.com
     www.mcguirewoods.com

     *This e-mail may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

# EXHIBIT 22

RECEIVED
PETITIONS

FILED
U.S. TAX COURT

UNITED STATES TAX COURT

2005 NOV 22 PM 12: 13

2005 NOV 22 PM 12: 35

JAMES M. DE MAY,
UNITED STATES
T/Petitioner

DEPUTY CLERK

22158-05

vs.

Docket No. _____

COMMISSIONER OF INTERNAL
REVENUE,

Respondent.

## PETITION

The above-named Petitioner hereby petitions for a re-determination of the

deficiency of tax as set forth by the Commissioner of Internal Revenue in his

Notice of Deficiency dated August 31, 2005, and as the basis for his case alleges

the following:

1.     The Petitioner is an individual whose mailing address is P.O. Box
**Address Used By Court**
31310, Santa Fe, New Mexico 87594-1310.     The Petitioner's taxpayer

identification number is 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.

2.     The Notice of Deficiency, a copy of which is attached hereto as

Exhibit 1, was purportedly mailed to the Petitioner on August 31, 2005 and was

issued by the Office of the Internal Revenue Service located in St. Louis, MO.

3.     The deficiency and additions to tax, as determined by the

Commissioner, and all of which are in dispute, are shown below:

| Tax Year | Deficiency | Section 6651(a)(1) Addition to Tax | Section 6651(a)(2) Addition to Tax |
|------|------------|------------------|------------------|
| 1996 | $2,752,817.15 | $688,204.29 | Unstated |
| 1999 | $45,500.00 | $11,875.00 | Unstated |

**SERVED Nov 29 2005**

4.    The Commissioner's determination of tax and additions to tax, as set forth in the Notice of Deficiency, is based upon the following errors:

A.    That for the tax year ending December 31, 1996, the date-of-gift fair market value as of February 12, 1996, of a share of Optimay Corporation was $6.66, instead of $0.00, resulting in a taxable gift of $1,332,000.00 upon Petitioner's transfer of 200,000 shares of said stock to the Anne Schrader-DeMay Trust and a taxable gift of $4,776,758.46 upon Petitioner's transfer of 717,231 shares of said stock to the DeMay Family Trust.

B.    That for the tax year ending December 31, 1999, the date-of-gift fair market value of the life estate interest in the condominium Petitioner transferred to his parents was $140,000, instead of $84,564.

5.    The facts upon which the Petitioner relies as the basis for his case are as follows:

A.    That for the tax year ending December 31, 1996, the date-of-gift fair market value as of February 12, 1996, of a share of Optimay Corporation was $0.00. Optimay GmbH, the shares of which were the sole asset of the Optimay Corporation, was insolvent on February 12, 1996 and had no value.

B.    That for the tax year ending December 31, 1999, the date-of-gift fair market value of the life estate interest in the

-2-

condominium Petitioner transferred to his parents was $84,564. Petitioner did not transfer a fee interest in the condominium to his parents. Rather, he transferred a life estate to his parents and retained a remainder interest. At the time of the transfer, Petitioner's father was 73 years of age and Petitioner's mother was 68 years of age.

WHEREFORE, the Petitioner respectfully prays that this Court:

1. Find that the Commissioner's determinations as set forth in the Notice of Deficiency are incorrect;

2. Find that the Petitioner is not subject to additions to tax pursuant to Internal Revenue Code section 6651(a)(1) or (a)(2); and

3. Grant the Petitioner any additional relief, including, but not limited to, costs and attorneys fees, as the Court may find appropriate.

Respectfully submitted,

*James Michael De May*

JAMES MICHAEL DE MAY
P.O. Box 31310
Santa Fe, NM 87594
(505) 992-8213

Dated: November 17, 2005

-3-

| Form 4089<br>(Rev. 1- 83) | Department of the Treasury – Internal Revenue Service<br>**NOTICE OF DEFICIENCY** | Symbols    AUG 3 1 2005<br>S:C:CP:TS:W:Area 9:Group 5 |

**Name, SSN or EIN, and Address of Taxpayer(s)**

James M. De May, Donor                    SSN: 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
272 T Tano Road
Santa Fe, New Mexico 87501-7025

| Kind of Tax | [X] Copy to Authorized Representative<br>Douglas W. Charnas, Attorney at Law<br>1060 Connecticut Avenue, N.W., Suite 1200<br>Washington, D.C. 20036-3317 |
| --- | --- |
| **GIFT** | |

| | **Deficiency** | |
| --- | --- | --- |
| **Calendar Year Ending** | **Increase in Tax** | **Penalties**<br>Addition to Tax Under Section 6651(a)(1)<br>An Amount Under Section 6651(a)(2)to be Determined |
| December 31, 1996 | $2,752,817.15 | $688,204.29 |
| December 31, 1999 | $47,500.00 | $11,875.00 |

**See the attached explanation for the above deficiencies**

**I consent to the immediate assessment and collection of the deficiencies (increase in tax and penalties) shown above, plus any interest provided by law.**

| Your<br>Signature | .................................................. | ....................................<br>(Date Signed) |
| --- | --- | --- |
| Spouse's Signature,<br>If a Joint Return<br>Was Filed | .................................................. | ....................................<br>(Date Signed |
| Taxpayer's<br>Representative<br>Sign Here | .................................................. | ....................................<br>(Date Signed) |
| Corporate<br>Name: | .......................................................................................... | |

| Corporate<br>Officers<br>Sign Here | ..........................................<br>(Signature) | ...................<br>(Title) | ............................<br>(Date Signed) |
| --- | --- | --- | --- |
| | ..........................................<br>(Signature) | ...................<br>(Title) | ............................<br>(Date Signed) |

Note:

If you consent to the assessment of the amounts shown in this waiver, please sign and return it in order to limit the accumulation of interest and expedite our bill to you. Your consent will not prevent you from filing a claim for refund (after you have paid the tax) if you later believe you are entitled to a refund. It will not prevent us from later determining, if necessary, that you owe additional tax; nor will it extend the time provided by law for either action.

If you later file a claim and the Internal Revenue Service disallows it, you may file suit for refund in a district court or in the United States Claims Court, but you may not file a petition with the United States Tax Court

**Who Must Sign**

If this waiver is for any year(s) for which you filed a

joint return, both you and your spouse must sign the original and duplicate of this form. Sign your name exactly as it appears on the return. If you are acting under power of attorney for your spouse, you may sign as agent for him or her.

For an agent or attorney acting under a power of attorney, a power of attorney must be sent with this form if not previously filed. For a person acting in a fiduciary capacity (executor, administrator, trustee), file Form 56, Notice Concerning Fiduciary Relationship, with this form if not previously filed.

. For a corporation, enter the name of the corporation followed by the signature and title of the officer(s) authorized to sign.

If you agree, please sign one copy and return it; keep the other copy for your records.

Form 4089(Rev. 1-83)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division

JAMES MICHAEL De MAY, *et al*,         :
                                       :
          Plaintiffs,                  :
                                       :
     v.                                :     1:08cv845
                                       :     Judge Ellen S. Huvelle
MOORE & BRUCE, LLP, *et al*.,          :
                                       :
          Defendants.                  :

## ORDER

     Upon consideration of Defendants Moore & Bruce, LLP, Charles M. Bruce, and Jonathon R. Moore's Motion to Dismiss or in the Alternative Motion for Summary Judgment, any Opposition thereto, and the record herein, it is this _____ day of _____, 2008;

     ORDERED, that Defendants' Motion is hereby GRANTED; and it is further

     ORDERED, that Plaintiffs' Complaint is DISMISSED WITH PREJUDICE.

     SO ORDERED.


                                 _____
                                 Judge Ellen S. Huvelle

Copies to:

Paul J. Maloney, Esquire
Nat P. Calamis, Esquire
Carr Maloney, P.C.
1615 L Street, N.W., Suite 500
Washington, D.C.  20036
***Attorneys for Defendants***

Christopher G. Hoge, Esquire
Crowley, Hoge & Fein, P.C.
1710 Rhode Island Avenue, N.W.
Seventh Floor
Washington, D.C.  20036
***Attorney for Plaintiffs***