# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                               )

**JAMES MICHAEL DE MAY** *et al.*,    )
                               )

        **Plaintiffs,**          )

                               )

        **v.**                  )    **Civil Action No. 08-845 (ESH)**

                               )

**MOORE & BRUCE, LLP** *et al.*,      )

                               )

        **Defendants.**        )
_____)

## MEMORANDUM OPINION AND ORDER

Plaintiffs James De May, his wife Anne Schrader-De May, and the De May Family Trust have sued their lawyers Charles Bruce and Jonathon Moore, and their firm Moore & Bruce, LLP, for legal malpractice (Count I), breach of fiduciary duty with respect to Bruce's work for the Family Trust and the charitable trust -- the Optimay Foundation (Count II), and constructive fraud relating to defendants' alleged misrepresentations regarding the tax implications of their work for De May, his wife and four foreign trusts (Count III).

The central dispute underlying this litigation relates to defendants' creation of these four offshore trusts in 1996-1998, which were designed by defendants to reduce De May's income tax liability.  Nonetheless, during an audit that began in 1999, the IRS rejected defendants' legal position, and ultimately De May entered into consent judgments with the IRS in November 2005 for $6 million, plus interest, for unpaid income taxes, and in July 2006 for gift taxes.

On May 15, 2008, plaintiffs filed suit.  In response defendants have filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment arguing that plaintiffs' claims are barred by D.C.'s three-year statute of limitations; constructive fraud must fail as a matter of law;

the De May Family Trust is not a real party in interest; and De May cannot recover for taxes actually owed to the IRS.  Plaintiffs have opposed this motion and, as to the statute of limitations, they invoke the continuous representation doctrine to toll the statute of limitations. As explained more fully below, the Court will deny defendants' motion with respect to the legal malpractice and breach of fiduciary duty claims, finding that the claims are timely given defendants' continuous representation of plaintiffs through at least 2006.  However, it will grant defendants' motion with respect to the constructive fraud count and the De May Family Trust.

## BACKGROUND

Before the Court can set forth the facts that are relevant to the instant motion, it bears noting that defendants filed a Statement of Undisputed Material Facts (*see* Defs.' SJ Mem. at 4-11), which plaintiffs have failed to dispute properly as required by LcvR 7(h).[1]  Instead, plaintiffs have offered a Counter-Statement of Facts (*see* Pls.' Opp'n at 2-8) that sets forth a host of additional facts that are based on the complaint, the affidavits of the plaintiffs and of Douglas Charnas, a McGuireWoods attorney who represented the De Mays during the IRS audit and Tax Court litigation, and correspondence from the defendants to De May, Charnas and others.  As a result, the Court is not confronted by any material disputed issues of fact; rather, the parties focus on different facts.  Defendants emphasize the facts relating to the IRS audit and Tax Court litigation and attempt to draw a sharp contrast between defendants' involvement in the creation of the trusts in 1996-1998 (*i.e.*, the alleged malpractice) and their involvement in the IRS audit (*i.e.*, the litigation) in order to argue that these are separate proceedings.  In contrast, plaintiffs

---

[1]Although plaintiffs provided a document that is styled as a "Statement of Material Facts as to Which There is a Genuine Issue," it was nothing more than a list of issues, rather than the required specification of disputed facts with references to the record. (*See* Pls.' Opp'n at 20-21.)

focus on the multifaceted nature of defendants' legal work, as well as Bruce's work as trustee for

two of the trusts, in order to argue that defendants continuously represented De May in tax-

related work until at least late 2005 and represented the plaintiffs as their personal lawyers and

as lawyers and trustees for the trusts until at least 2006.  Therefore, despite the lack of a

statement of disputed issues of fact, the Court is able to set forth the facts relevant to this dispute

based on the parties' submissions and to decide the legal question of whether plaintiffs' claims

are barred by the statute of limitations or are saved by the application of the continuous

representation doctrine.  These facts can easily be divided according to the three categories of

work that defendants performed for plaintiffs -- 1) the creation of the four trusts; 2) the

administration of the trusts; and 3) the IRS audit and Tax Court litigation.

## I.      DEFENDANTS' REPRESENTATION OF PLAINTIFFS

### A.  Creation of the Trusts

James Michael De May founded a German technology company.  (De May Aff.¶ 3.)  By

the mid-1990's, De May was seeking capital for his growing business.  (*Id*.)  In the summer of

1995, De May met Jonathon R. Moore and Charles M. Bruce of the law firm of Moore & Bruce,

LLP (collectively "Moore & Bruce" or "defendants").  (*Id*.)  Bruce told De May that his firm

specialized in international taxation, estate planning and foreign trusts.  (*Id*. ¶ 4.)  Later in 1995,

Moore & Bruce incorporated De May's business in Delaware under the name of the Optimay

Corporation ("Optimay"), and the law firm helped the company raise money from outside

investors.  (*Id*. ¶¶ 3,5.)  At this time, Moore and Bruce became personally involved in Optimay's

operations:  Bruce became a Board member and a legal advisor to De May in his capacity as

CEO, while Moore became Chief Counsel for the company.  (*Id*. ¶ 5.)

By 1996, De May began to plan for the eventual sale of Optimay.  (De May Aff. ¶ 6.)

Moore & Bruce advised De May on a strategy designed to reduce the amount of tax that he

would owe in the event of a sale of the company.  (*Id*.; Charnas Aff. ¶ 3.)  According to the plan,

Moore & Bruce would create four foreign trusts to hold shares of Optimay stock.  (De May Aff.

¶ 6.)  Based on Moore & Bruce's advice, De May believed that he would not have to pay capital

gains taxes from the sale of Optimay stock owned by these trusts.  (Charnas Aff. ¶¶ 3,5.)

In February 1996, Moore & Bruce initiated this plan by creating four offshore trusts: the

Optimay Foundation ("Foundation");[2] the Anne Schrader-De May Trust ("ASDM Trust"); the

De May Family Trust ("Family Trust"); and the De May - Optimay Comp Trust ("DM-OC

Trust").  (De May Aff. ¶ 6; Pls.' Exh. 3(C).)  The settlor of the trusts was De May and the

beneficiaries included, among others, members of De May's family.  (Charnas Aff. ¶ 3.)  Soon

after these trusts were created, and based on the advice of Moore & Bruce, De May moved

Optimay stock into each of the trusts.  (Charnas Aff. ¶ 3.)  In a related transaction, De May

exchanged some Optimay stock and cash for a stake in Risk Capital Bermuda Fund, L.P. ("Risk

Capital") in December 1997.  (Defs.' Exh. 4.)

On April 9, 1998, Moore & Bruce amended the terms of the ASDM Trust and the Family

Trust and terminated the DM-OC Trust.  (Compl. ¶¶ 34-36; Defs.' Facts ¶¶ 7-9.)  On April 16,

1998, just one week after these amendments, De May sold Optimay to a subsidiary of Lucent

Technologies ("Lucent") for at least $65 million, resulting in a large profit (at least $20 million)

for De May and the trusts.  (Compl. ¶¶ 40-41; Defs.' Facts ¶ 10.)

---

[2]The Optimay Foundation subsequently became known as the Vaterstetten Foundation.
Here, the Court will use the term "Foundation" to refer to both.

*B.  Moore & Bruce's Administration of Plaintiffs' Trusts*

In addition to creating the trusts, Moore & Bruce was also intimately involved in their administration from the very beginning.  (Pls.' Exh. 1(A).)  Charles Bruce was the key figure, serving as a fiduciary for four separate trusts, with his firm doing much of the legal work relating to the establishment of the trusts.  (Pls.' Exh. 1(A); De May Aff. ¶ 6.)  The firm's legal work for the trusts continued until April 2006.  (Pls.' Exh. 1(F).)

Bruce's most extensive role was with the Family Trust, where he was Chairman of the Committee of Trust Advisors.  (Pls.' Exh. 1(A).)  He was also trustee of the August 5 Trust, which was a subpart of the Family Trust.  (*Id.*)  Bruce held this position at the August 5 Trust until December 2006.  (Pls.' Exh. 2(G).)  While serving in these roles, Bruce amended the Family Trust, and he appointed CGI Corporate Services Limited ("CGI") as trustee.  (Schrader-De May Aff. ¶ 3; Charnas Aff. ¶ 15.)  Bruce was also instrumental in the Family Trust's 2006 litigation brought by CGI in the Isle of Man.  In this litigation, CGI, the new trustee, challenged certain actions that had been taken by the previous trustees and by Bruce.  (Charnas Aff. ¶ 15.)  Bruce was active in many facets of this litigation.  In May 2006, he wrote to CGI's counsel asking that it withdraw its petition.  (Pls.' Exh. 1(A).)  In July of that year, he had a lengthy discussion about the case with De May and his wife, and in October he drafted affidavits for the couple.[3]  (Pls'. Exhs. 2(D), 2(E).)

_____

[3]In conjunction with this litigation, Bruce wrote on May 14, 2006, to counsel for CGI, describing his relationship and that of his firm with the De Mays:

> Moore & Bruce has represented the De May family for over ten years.  We have represented the De May Family Trust and predecessor trusts since their inception.  Our representation of the De May Family Trust was recently confirmed in a retainer letter

Bruce was very involved in the other trusts as well.  He was co-trustee of the ASDM

Trust until Anne Schrader-De May asked him to resign in April 2007.  (Schrader-De May Aff. ¶

3; Pls.' Exh. 2(A).)  His work for the ASDM Trust included amending the trust agreement and

reviewing the trust's tax returns.  (Schrader-De May Aff. ¶ 3; Pls.' Exh. 2(C).)  Bruce was also

co-trustee of the Foundation until at least May 2006.  (Pls.' Exh. 1(A).)

While Bruce played the lead role in administering the trusts, Jonathon Moore was

instrumental in a transaction involving De May's home in New Mexico.  Moore & Bruce

advised De May and his wife that it would be advantageous for their home to be owned by a

---

> signed by CGI.  I am the Chairman of the Committee of Trust
> Advisors of that trust.  I am trustee of the Trust dated 5 August
> 1998, which in turn benefits the De May Family Trust; the only
> asset of this trust is a bank account at Rahn & Bodmer Bank;
> monies in the account are used to benefit the ultimate beneficiaries
> and, incidentally, to pay CGI's fees and costs.  I am also a co-
> trustee, together with the Bank of America, N.A., of the Anne
> Schrader De May Trust, a US trust benefitting Anne Schrader De
> May.  Additionally, I am a co-trustee of the Vaterstetten
> Foundation (Barbados), formerly called the Optimay Foundation.

(Pls.' Exh. 1(A).)

Douglas Charnas, tax counsel from McGuireWoods, also drafted an e-mail to the
trustee's counsel on May 26, 2006, explaining the roles of the lawyers in the Isle of Man
litigation:

> Regarding who will represent whom, Moore & Bruce, LLP
> (Charles Bruce and Jonathon Moore) will represent Jim and Anne
> De May and their children and Vaterstetten Trust. . . .
> McGuireWoods will advise the Trust and the De May Family with
> respect to US tax issues and I will try to be helpful in assisting
> with the resolution of these issues [as] quickly and with as little
> expense as possible.

(Pls.' Exh. 3(J).)

corporation, which would in turn be owned by the Family Trust.  (De May Aff. ¶ 9.)  Based on this advice, Moore & Bruce created Coyote Trails, Inc. ("Coyote Trails"), which is wholly owned by the Family Trust.  (*Id.*)  Moore did the legal work and served as the president and sole director of Coyote Trails until at least May 2006, when he advised De May on the possible sale or mortgage of his home.[4]  (Pls.' Exhs. 1(B), 1(F).)

### C.  IRS Audit and Tax Court Litigation

In June 1999 the IRS began its audit of De May's taxes for the years 1993 through 1998.  (Bruce Aff. ¶ 4.)  This audit was not unexpected, since, as defendants admit, an audit was contemplated by the parties as early as December 1998.  (Defs.' Reply at 3; Defs.' Exh. 2.)  As part of the audit, the IRS issued Information Document Requests to De May, and Jonathon Moore assisted in responding to these requests.  (Bruce Aff. ¶ 4.)

In June 2002 the IRS began issuing a series of five position statements, called Explanations of Items, addressing the tax consequences of De May's trusts.  The first, dated June 10, 2002, concluded that income realized by the Family Trust from the Optimay sale was attributable to De May.  (Defs.' Exh. 3.)  The second and third, dated June 24, concluded that De May's transfer of Optimay stock to Risk Capital constituted a taxable event, and that income realized by the ASDM Trust from the Optimay sale was attributable to De May.  (Defs.' Exh. 4.) The fourth, dated July 2, determined that De May was required to pay an excise tax for the Optimay stock he transferred to the Foundation.  (Defs.' Exh. 6.)  The last statement, dated

---

[4]According to Moore & Bruce's billing statement for December 27, 2005, Moore had a telephone conference with Charnas regarding the IRS settlement with De May that had occurred the prior month and the opinion of New Mexico counsel as to whether the family home was vulnerable to attachment in satisfaction of the IRS's judgment.  (De May Aff. ¶14; Pls.' Exh. 1(F).)

November 8, found that income realized by the Foundation and the DM-OC Trust from the Optimay sale was attributable to De May.  (Defs.' Exh. 12.)

On July 16, 2002, De May wrote to Bruce to inform him to "hold off doing any further work on my tax situation" until he had a chance to meet with attorneys at McGuireWoods. (Defs.' Exh. 7.)  On July 19, De May spoke with Douglas W. Charnas of McGuireWoods about the IRS audit.  (Charnas Aff. ¶ 3.)  That same day, De May informed Bruce of his decision to "engage[] Douglas Charnas of McGuireWoods to also represent me in connection with the pending IRS audit."  (Defs.' Exh. 8.)  He told Bruce that Charnas would "take over the primary role in communicating with the IRS on this matter," but asked that Moore & Bruce "co-operate fully with Doug in getting him up to speed on all developments in the audit to date."  (*Id.*)  De May also thanked Moore & Bruce "in advance for . . . working with Doug and the other McGuireWoods lawyers in a cooperative and efficient manner to bring the audit to the best possible conclusion."  (*Id.*)

As a result, even though McGuireWoods assumed the lead counsel role in the IRS audit in July 2002, Moore & Bruce continued to work on the audit as well.  (De May Aff. ¶ 10.)  De May felt that it was important to have Moore & Bruce involved in the litigation because, as the drafter of the trust agreements that were at the heart of the case, it possessed useful knowledge and documents.  (Charnas Aff. ¶ 8.)  Charnas also thought that Moore & Bruce would be helpful with litigation strategy.  (*Id.*)  Consistent with this role, during the summer and fall of 2002, Charnas had several telephone conversations with Bruce about the audit.  (*Id.* ¶ 5.)  In December, De May met with Charnas and Bruce at the offices of Moore & Bruce.  (*Id.*)  At this meeting, Bruce explained the history of the trusts, and he argued that De May should not be personally

liable for the capital gains on Optimay stock held by the trusts.  (*Id*.)

In 2004, the IRS Office of Chief Counsel issued a report upholding the conclusions reached in the Explanations of Items.  (Defs.' Exh. 18.)  On July 23, 2004, the IRS sent an official deficiency notice to De May, informing him that he owed over $12 million for unpaid income taxes and penalties.  (Defs.' Exh. 19.)  Charnas, on De May's behalf, filed a petition in the United States Tax Court contesting this deficiency on September 17, 2004.  (Defs.' Exh. 20.) Defendants never entered their appearance in the Tax Court.  (Bruce Aff. ¶ 9.)  On August 31, 2005, the IRS issued another deficiency notice for nearly $3 million for gift taxes.[5]  (Defs.' Exh. 22.)  This deficiency resulted from the determination that the gift market value of the Optimay stock transferred to the trusts in February 1996 was $6.66 per share, not zero, as Moore & Bruce had advised.  (*Id*.)  De May filed a second petition in Tax Court contesting the gift tax deficiency on November 17, 2005.  (*Id*.)  Again, only McGuireWoods entered an appearance on De May's behalf.  (Bruce Aff. ¶ 10.)

In August and September of 2005, around the time of the second deficiency notice, Moore & Bruce continued to assist with the Tax Court litigation.  On August 24, Bruce wrote Charnas with suggested responses to interrogatories that had been sent by the IRS.  (Pls.' Exh. 3(A).)  Two days later, Moore sent his comments regarding the interrogatory responses.  (Pls.' Exh. 3(C).)  On September 2, Bruce wrote a lengthy memo addressing De May's questions about the trusts and his requests for trust documents.  (Pls.' Exh. 3(D).)  In this memo, Bruce explained that the purpose of these actions in August 1998 was to "avoid[] triggering taxable income for

---

[5]Moore had consulted with Charnas regarding gift tax issues as early as September 28, 2004.  (Defs.' Exh. 21.)

you when the family moved to the US." (*Id.*)  In October 7, 2005, Moore & Bruce agreed to provide affidavits for use in the Tax Court litigation relating to Bruce's advice to De May "that [he] would not be subject to tax on the gain realized by the Optimay Foundation Trust when it sold the Optimay stock to Lucent." (Pls.' Exh. 4.)

Bruce was also involved in the tax litigation through his fiduciary roles with the trusts. On August 24, 2005, Bruce addressed IRS questions about the migration of the ASDM Trust and Family Trust from Bermuda to the Isle of Man. (Pls.' Exh. 3(A).)  Relying on his administrative duties for both trusts, he answered detailed questions about certain trust transactions. (*Id.*)  The next day, he conducted an unsuccessful search for trust documents relating to the migrations. (Pls.' Exh. 3(B).)

In another example, on September 5, 2005, Bruce wrote a memo to CGI, Charnas, De May and Moore about how the tax litigation would affect the trusts. (Pls.' Exh. 3(E).)  After reviewing his fiduciary roles at the various trusts, Bruce raised the question of having the Family Trust pay some of the legal fees associated with De May's income tax case before the Tax Court. (*Id.*)  He also suggested that CGI, trustee of the Family Trust, would need to spend "a significant amount of time organizing the trust file and filling in any gaps that may exist." (*Id*. at 3.)  In this memo, Bruce reviewed the history of the tax litigation and discussed Moore & Bruce's role in the audit in terms of assisting Charnas with information and strategy and responding to IRS interrogatories.  In addition, he reviewed his firm's additional work on behalf of plaintiffs:

> Moore & Bruce, LLP represents the De May family as to tax and related matters and the De May Family Trust, which benefits the family.  In the past, the firm represented both Jim De May and Optimay Corporation; Jonathon Moore, my partner at Moore & Bruce, LLP, served as General Counsel to Optimay Corporation for a period before its sale to Lucent Technologies.  I

> serve as Chairman of the Committee of Trust Advisors of the De
> May Family Trust and as Trustee of a sub-trust of this trust (called
> Trust Dated 5 August 1998). . . . Separately, I serve as co-trustee
> of a trust benefitting Anne Schrader De May and of a charitable
> foundation created by Jim De May.

> *        *        *        *

> Moore & Bruce, LLP apparently will be asked to do some
> work in connection with Jim's tax case and some in assisting the
> trustee with respect to the trust administration.  As to the former, it
> appears that it will be in the same position as McGuireWoods and,
> as to the latter, the same position as CGI.

(Pls.' Exh. 3(E) at 2-3.)

De May eventually decided to settle with the IRS.  In November 2005, he entered into a

consent judgment for his income tax liability.  He agreed to pay $6 million for past due taxes,

although the current balance is now $7.5 million including interest.  (Defs.' Facts ¶ 34; Compl. ¶

68.)  In July 2006, De May entered into a separate consent judgment for his gift tax liability.  De

May acknowledged the liability, but since the amount of the gift tax was less than the lifetime

exclusion allowance, there was no actual tax due.[6]  (Defs.' Facts ¶ 35; Compl. ¶ 69.)  Neither

Moore nor Bruce was involved in advising De May with respect to the settlements.  (Bruce Aff.

¶ 11; Moore Aff. ¶ 10.)

---

[6] Even after the settlement of the income tax case, Moore & Bruce performed legal work
for De May and the Family Trust that related to tax matters, including the interrelationship of the
tax settlement with the administration of the trusts.  (*See, e.g.*, Pls.' Exh. 1(F) - Feb. 15, 2006 -
Bruce's conference call with an accountant regarding "need to make changes in light of
settlement of income tax case"; Feb. 20-21, 2006 - references to work related to gift tax matter;
Apr. 13, 2006 - inquiry from an accountant for the trust regarding deductibility of De May's
legal fees for the tax case.)

## II.     CURRENT LITIGATION

### A.     *Plaintiffs' Complaint*

On May 15, 2008, plaintiffs sued defendants for legal malpractice (Count I) and constructive fraud (Count III).  They also sued Bruce for breach of fiduciary duty (Count II).

In Count I, the gravamen of plaintiffs' claims involve the creation and amendment of the four trusts during the period from 1996 to 1998.  Specifically, plaintiffs claim that defendants knew, or should have known, that the trusts they created would not achieve the desired tax benefits for De May.  (Compl. ¶ 78(a).)  According to plaintiffs, defendants were also negligent in their attempt to convert two of the trusts to non-grantor status in 1998.  (Compl. ¶¶ 78(b-c).)  Moreover, in a related transaction, defendants allegedly failed to advise plaintiffs that the transfer of Optimay stock to Risk Capital in 1997 would be a taxable event.  (Compl. ¶ 78(h).)

Other allegations focus on the administration of the trusts.  Defendants allegedly failed to preserve some trust documents, while back-dating others.  (Compl. ¶¶ 78(d,j).)  Plaintiffs further claim that defendants executed trust transactions without prior notice or approval, caused distributions in violation of trust provisions, and selected trustees who failed to act in the best interests of the trusts.  (Compl. ¶¶ 78(k,l,o).)

Plaintiffs also allege malpractice with respect to various IRS filings (Compl. ¶¶ 78(e-g)), defendants' responses to IRS inquiries (Compl. ¶ 78(i)), and Coyote Trails.  (Compl. ¶ 78(m).)  Finally, plaintiffs claim that defendants failed to advise them of their conflict of interest.  (Compl. ¶ 78(p).)

In Count II, plaintiffs allege that Bruce breached his fiduciary duty.  In his capacity as Chairman of the Committee of Trust Advisors for the Family Trust, and as co-trustee of the

Foundation, Bruce "regularly made decisions which benefitted himself, his law firm and his business colleagues, and harmed the beneficiaries." (Compl. ¶ 82.)  Specifically, plaintiffs allege that Bruce approved payments of "substantial" legal fees for his law firm for services that were unsatisfactory, he authorized trustee fees for himself and his colleagues that were unnecessary and excessive, and he amended trusts and moved their locations without plaintiffs' knowledge or consent.  (*Id.*)

In Count III, plaintiffs accuse defendants of constructive fraud, claiming that defendants represented to De May that he would not be personally liable for income realized by the trusts from the sale of Optimay and that the transfer of assets from the Family Trust to Risk Capital would not be a taxable event.  (Compl. ¶ 87.)  Defendants allegedly made these representations recklessly, and continued to make them even after the IRS had issued statements showing that they were false in order to collect "unnecessary and excessive" attorneys' and trustees' fees. (Compl. ¶¶ 88-90.)

Plaintiffs claim that defendants' conduct led to a host of injuries.  Under the terms of the income tax consent judgment, plaintiffs currently owe the IRS approximately $7.5 million. (Compl. ¶ 79(a).)  While there is no explicit cost related to the gift tax liability, the consent judgment had the effect of reducing De May's lifetime exemption for estate and gift taxes. (Compl. ¶ 79(c).)  Other alleged injuries include the loss of a tax exemption worth more than $1 million (Compl. ¶ 79(b)); excessive attorneys' and trustees' fees (Compl. ¶ 79(d)); diminishment of the value of the Family Trust (Compl. ¶ 79(e)); De May's loss of access to the proceeds from the sale of Optimay and loss of income from the proceeds (Compl. ¶¶ 79(f,h)); De May's difficulties in selling or refinancing his home because of its ownership by Coyote Trails (Compl.

¶ 79(g)); and severe psychological and emotional distress. (Compl. ¶ 79(i).)

      B.    *Defendants' Summary Judgment Motion*

Before the Court is defendants' motion for summary judgment.[7]  Defendants' motion raises four points.  First, they argue that, because their allegedly negligent work on the trusts had concluded by 1998, all of plaintiffs' claims are barred by the statute of limitations.  Second, they assert that the Family Trust is not a valid party.  Third, they contend that the constructive fraud claim does not state a cause of action.  Fourth, they claim that plaintiffs are not entitled to recover for taxes that were owed.

In response, plaintiffs rely on the continuous representation rule.  Under plaintiffs' theory, defendants' initial work in creating the trusts and their subsequent work administering the trusts and defending plaintiffs during the IRS audit and the tax case, were all part of a continuous representation that tolled the statute of limitations.  Defendants respond by arguing that the creation of the trusts was distinct from their subsequent IRS work, and therefore, the continuous representation rule does not apply here.  In the alternative, defendants maintain that, even if the rule applies to this situation, it does not extend to the appeal (*i.e.*, the Tax Court litigation).  Both parties agree that District of Columbia law applies.  (Defs.' SJ Mem. at 13; Pls.' Opp'n at 9.)

---

[7]Defendants have filed a motion to dismiss, or in the alternative, a motion for summary judgment.  Because the parties rely on materials outside of the complaint, the Court must treat this as a motion for summary judgment.  *See* Fed. R. Civ. P. 12(d).

## ANALYSIS

**I.      COUNT I:  LEGAL MALPRACTICE**

Defendants claim that plaintiffs' legal malpractice claims are barred by the statute of limitations.  In the District of Columbia, the statute of limitations for a legal malpractice claim is three years.  D.C. Code § 12-301(8) (2001).  Given that the complaint was filed on May 15, 2008, the starting point for the statute of limitations period is May 15, 2005.  However, under the discovery rule, the statute of limitations does not begin to run until the plaintiff knows, or by the exercise of reasonable diligence should know, of "(1) an injury, (2) its cause, and (3) some evidence of wrongdoing."  *Wagner v. Sellinger*, 847 A.2d 1151, 1154 (D.C. 2004) (citing *Bussineau v. President and Dirs. of Georgetown Coll.*, 518 A.2d 423, 435 (D.C. 1986)).  Defendants argue that the IRS Explanations of Items, which plaintiffs started receiving in June 2002, put them on notice of a potential injury regarding De May's personal income tax that had been caused by defendants' malpractice.  (Defs.' SJ Mem. at 17.)  Because the Explanations of Items were received before May 15, 2005, defendants contend that the legal malpractice claim is time-barred.  (*Id*. at 17-18.)  Similarly, defendants contend that plaintiffs' claims regarding De May's gift tax liability are barred by the statute of limitations since he was on notice when he received the January 14, 2004 "Discussion Draft" regarding the IRS's position that De May owed gift taxes of over $2.7 million.  (*Id*. at 24; Defs.' Exh. 17.)

Plaintiffs do not contest defendants' arguments about the discovery rule.  (Pls.' Opp'n at 9.)  Instead, plaintiffs argue that their claim is timely under the continuous representation doctrine, which provides an exception to the discovery rule.  (*Id*. at 9-10.)  The continuous representation rule states:

> when the injury to the client may have occurred during the period
> the attorney was retained, the malpractice cause of action does not
> accrue until the attorney's representation concerning the particular
> matter in issue is terminated.

*R.D.H. Communications v. Winston*, 700 A.2d 766, 768 (D.C. 1997) (quoting *Weisberg v.*

*Williams, Connolly & Califano*, 390 A.2d 992, 995 (D.C. 1978)).  According to plaintiffs, they

retained defendants to "oversee the overall management of the De May assets acquired through

the sale of Optimay, and their actions through at least May 2006 were in furtherance of this

objective."  (Pls.' Opp'n at 11.)  In other words, plaintiffs argue that defendants' legal work,

which included creating, amending, and administering the trusts, as well as defending the

validity of the trusts against the IRS, comprised "the particular matter in issue."  *Winston*, 700

A.2d at 768.  Under this view, defendants' representation did not end until at least May 2006.

(Pls.' Opp'n at 13.)

Defendants have three responses to plaintiffs' continuous representation argument.  First,

they claim that their later work for plaintiffs, which involved the audit, the Tax Court litigation

and the administration of the trusts, was distinct from their earlier work in creating and amending

the trusts.  (Defs.' SJ Mem. at 20.)  Second, they argue that the continuous representation rule

does not include their work on the Tax Court litigation because the rule does not cover appeals.

(*Id*. at 22-23.)  Finally, they claim that the policy rationales underlying the rule do not support its

application in this case.  (*Id*. at 23-24.)  The Court rejects each of these arguments.

A.  *The Scope of a Matter Under the Continuous Representation Rule*

The continuous representation rule ceases to apply when "the attorney's representation

concerning the particular matter at issue is terminated."  *Bradley v. Nat'l Ass'n of Securities*

*Dealers Dispute Resolution, Inc*., 433 F.3d 846, 850 (D.C. Cir. 2005).  While there is little

guidance in this jurisdiction regarding what the "particular matter in issue" is, *Winston*, 700 A.2d

at 768, courts have held that "subsequent general representation of the plaintiffs regarding

matters unrelated to [the initial transaction] does not warrant the application of the doctrine."

*Dignelli v. Berman*, 741 N.Y.S.2d 66, 68 (N.Y. App. Div. 2002).  *See also Batsys v. Rothschild*,

No. 04-5504, 2005 WL 3059596, at *1 (2d Cir. Nov. 16, 2005) (the subject of the malpractice

claim -- the drafting of a prenuptial agreement -- was unrelated to the subsequent estate planning

advice provided by the lawyers);  *Greene v. Morgan, Theeler, Cogley & Petersen*, 575 N.W.2d

457, 460 (S.D. 1998) (the continuous representation in terms of providing estate planning and

asset protection advice did not relate to the alleged negligent act involving the antenuptial

agreement).

　　　Applying these cases, defendants argue that the creation of the four trusts was separate

and distinct from the work they did to assist Charnas with the tax audit and Tax Court litigation

and therefore the continuous representation rule does not apply.  Defendants' position, however,

does not accord with the facts or the allegations in the complaint.  Most importantly, defendants'

primary purpose for creating and structuring the trusts in the way that they did was to reduce De

May's tax liability, and all concerned realized that an IRS audit was likely.  In fact, defendants

anticipated an audit as early as December 1998, when they were discussing the consequences of

some recent trust transactions.  (Defs.' Reply at 3; Defs.' Exh. 2.)  In effect, defendants'

structuring of the transfer of stock to the trusts was the focus of the IRS's challenge.  Moreover,

as a result of the firm's involvement in the trust work, both as the architect of the trusts and the

administrator of the trusts, Moore & Bruce was essential to the IRS audit and the Tax Court

litigation.  (Charnas Aff. ¶ 8.)  Both Bruce and Moore had to provide assistance to Charnas, draft

17

responses to IRS interrogatories and submit affidavits to the IRS on De May's behalf.  They
continued this work until at least November 2005.

Unlike the cases relied on by defendants (*see* Defs.' SJ Mem. at 21-22), this is not a
situation where the lawyer's general representation is separate and distinct from the alleged
malpractice.  Rather, defendants' roles in creating and amending the trusts, administering the
trusts, and defending the trusts against the IRS were all inextricably intertwined and without
interruption for almost a decade.  Contrary to defendants' narrow view of the facts, these roles
overlapped.  At the core, they all related to the trusts and defendants' attempt to structure these
trusts to minimize plaintiffs' tax burden.  Because of their multiple roles, defendants were
involved in the tax work for De May and the trusts, whether it be tax planning or IRS work
relating to the trusts, continuously from 1996 until at least 2005 or later.

Given these facts, defendants' reliance on *Wagner* is misplaced.  There, the issue was not
defining the scope of the matter, but rather when an injury is cognizable.  In that regard, the
Court observed that the statute begins to run when the attorney negligently drafts a document,
not when the plaintiff loses on the merits defending the contract in a lawsuit.  *Id.* at 1157 n.9.
The court was not drawing any distinction between the contract drafting and the litigation for
purposes of defining the scope of representation, nor was it addressing the continuous
representation rule, for, unlike this case, there was no suggestion in *Wagner* that the lawyers who
drafted the contract were also representing plaintiffs in the litigation.  Finally, the facts relating
to defendants' legal work cannot be conveniently divided into transactional work versus
litigation given the extensive overlap between these functions.

Similarly, defendants' attempt to distinguish the case relied on by plaintiffs, *Greene v.*

18

*Greene*, 436 N.E.2d 496 (N.Y. 1982), is unpersuasive.  (*See* Defs.' Reply at 11.)  In *Greene*, as

in this case, the attorney drafted a trust agreement for plaintiff in 1969 and then served as co-

trustee for the trust until 1977.  *Id*. at 498.  The court found that the creation and management of

the trust were "part of a course of continuous representation concerning the same or a related

problem."[8]  *Id*. at 501.  That same analysis would apply here, especially given the allegations in

the complaint that defendant committed malpractice not only with respect to the creation of the

trusts in 1996-1998, but also in terms of their work on the trusts after their creation and during

the course of the IRS audit.[9]  (*See, e.g.*, Compl. ¶ 78.)

   B.  *Appeals and the Continuous Representation Rule*

   Defendants argue that the initiation of an appeal automatically severs what would

otherwise be a continuous representation.  (Defs.' SJ Mem. at 22-23.)  As a result, they argue

that the continuous representation rule does not apply to any litigation work done after De May

filed his Tax Court petitions in the income tax case in September 2004 and in the gift tax case in

November 2005.  In making this argument, defendants rely on dicta in *Bradley*, where the D.C.

Circuit observed that "the court in *Winston* also set an outer bound on the duration of the

'specific dispute' -- it does not include appeals."  *Bradley*, 433 F.3d at 851 (quoting *Winston*,

700 A.2d at 770-71).

_____

   [8]When the D.C. Court of Appeals first considered whether to adopt the continuous
representation rule in *Winston*, it embraced the reasoning set forth in *Greene* regarding the
underlying policies that favor its application.  *Winston*, 700 A.2d at 769.

   [9]Defendants appear to have conveniently ignored these allegations when trying to argue
that all the malpractice occurred in the 1996-1998 time frame.  On the contrary, the complaint is
replete with claims of malpractice that relate to the administration of the trusts after 1998, as
well as the tax audit and Tax Court litigation.  (Compl. ¶ 78.)

In response, plaintiffs argue only that there "was never any appeal."  (Pls.' Opp'n at 16.) Although the Court need not resolve the issue, the documentation provided by defendants in their reply (*see* Defs.' Exh. 23) convincingly demonstrates that when De May filed his petitions in Tax Court, he was filing an "appeal" of the IRS notices of deficiency.  The problem with defendants' contention is, however, that no matter how one interprets the language in *Bradley*, it does not apply to this case to stop the running of the continuous representation doctrine where the lawyers are still actively involved in representing their clients on appeal.

In this regard, it is important to note that the cases upon which defendants (and *Bradley*) rely do not decide whether the continuous representation rule extends to appeals; rather, the issue is whether a cause of action for malpractice accrues only after an appeal is exhausted.  In *Knight v. Furlow*, 553 A.2d 1232, 1236 (D.C. 1989), the Court of Appeals held that "resolution of an appeal is not the critical event for ripeness of a legal malpractice claim."  It reaffirmed this holding in *Winston*, 700 A.2d at 771 ("this court has rejected an exhaustion of appeals rule") (citing *Knight*).  These cases merely rejected the exhaustion of appeals rule, which is not at issue here.  They did not say that an appeal automatically terminates a continuous representation, especially when the attorney who committed the alleged malpractice also continued to work on the subsequent appeal.

While the quote from *Bradley*  -- "The court in *Winston* also set an outer bound on the duration of the 'specific dispute' -- it does not include appeals."  -- may seem to support defendants' argument, the case is inapposite for two reasons.  First, as noted, *Bradley* is relying on cases that were limited to the exhaustion of appeals rule, not the question of whether an appeal automatically terminates a continuous representation.  *See id.*, 433 F.3d at 851 (referring

to discussions of the exhaustion of appeals rule in *Winston* and *Knight*).  Second, *Bradley* was

not a case where the same attorney was involved in both the alleged malpractice and the

subsequent appeal, so it is factually distinguishable from this situation.[10]  Therefore, none of the

cases relied on by defendants argue for the Court to decline to apply the continuous

representation doctrine to the Tax Court litigation in which it is undisputed that defendants

continued to work on the litigation until at least November 2005.

### C.  Policy Rationales for the Continuous Representation Rule

Defendants' final argument against the application of the continuous representation rule

is based on the rule's policy:

> A primary policy rationale for the rule is to permit attorneys who
> have allegedly acted negligently an opportunity to correct and/or
> mitigate their mistakes. . . . since defendants had no opportunity to
> mitigate or correct any alleged mistakes that were made with
> respect to the representation of Mr. De May, the continuous
> representation rule does not apply to them.

(Defs.' SJ Mem. at 23-34.)

However, this argument is flawed.  First, while giving attorneys the opportunity to

correct their mistakes was an important justification for the rule, the primary motivation was to

protect clients, not attorneys.  *See Winston*, 700 A.2d at 768 ("The rule's primary purpose is to

avoid placing a client in the untenable position of suing his attorney while the latter continues to

represent him.")  As explained above, defendants' trust work was inextricably linked to their role

---

[10]Nor is defendants' citation to *Gallucci v. Schaffer*, 507 F. Supp. 2d 85 (D.D.C 2007), of
any help.  Although *Gallucci* cites the language from *Bradley* and *Winston*, 507 F. Supp. 2d at
91, the case does not have to decide whether the continuous representation rule ends with an
appeal, since the court found that since the client had had no contact with the lawyer between
1976 and 2002, there was no continuous representation and plaintiff's cause of action accrued
when he had evidence of the lawyers' wrongdoing in 2001.  *Id*. at 90.

in the tax litigation.  Plaintiffs reasonably believed that defendants' experience with the trusts would be helpful for the tax litigation.  (Charnas Aff. ¶ 8.)  The continuous representation doctrine is meant to honor a client's decision to stay with his current counsel notwithstanding indications of malpractice.  *See Winston*, 700 A.2d at 769 ("[a client's] decision to stay the course with [his attorney] is not one this court should second-guess in relation to the statute of limitations issue").

Second, defendants' assertion that they "had no opportunity to mitigate or correct any alleged mistakes" (Defs.' SJ Mem. at 24) is based on an overly narrow reading of the complaint. Defendants argue that they did not have the ability to correct mistakes because McGuireWoods was lead counsel in the tax litigation.  (*Id*. at 23-24.)  However, assuming *arguendo* that this is true, it ignores plaintiffs' allegations of malpractice in situations where Moore & Bruce had full control.  For example, plaintiffs allege that defendants failed to preserve trust documents. (Compl. ¶ 78(d).)  Document management was under defendants' purview, and as late as August 2005, defendants were trying to locate the relevant documents.  (Pls.' Exh. 3(B).)  In another example, plaintiffs allege malpractice with respect to Coyote Trails' ownership of the De May home.  (Compl. ¶ 78(m).)  Again, Moore was the key figure for Coyote Trails, not McGuireWoods, and Moore was advising De May on this issue as late as May 2006.  (Pls.' Exhs. 1(B), 1(F).)  Therefore, defendants' policy arguments cannot withstand scrutiny.

## II.    COUNT II: BREACH OF FIDUCIARY DUTY

Plaintiffs claim that Charles Bruce breached his fiduciary duty to the Family Trust and the Foundation.  (Compl. ¶ 82.)  They allege that Bruce "regularly made decisions which benefitted himself, his law firm and his business colleagues, and harmed the beneficiaries."  (*Id*.)

According to plaintiffs, Bruce authorized "excessive" trustee fees for himself, approved "substantial" legal fees for his firm despite its inadequate work, and modified the Family Trust and the Foundation without plaintiffs' knowledge or consent.  (*Id*.)  These actions allegedly benefitted Bruce and his law firm at the expense of the trust beneficiaries.  (*Id*.)

Again, the Court must determine whether the continuous representation doctrine applies to Bruce's fiduciary work for the trusts.  In *Bradley*, the D.C. Circuit discussed when the continuous representation rule can be extended to contexts other than the attorney/client relationship.  *Bradley*, 433 F.3d at 850.  It emphasized two factors: whether the relationship is one involving trust, and whether it could be harmful to force the client to terminate the relationship in order to sue for malpractice.  *Id*.  In *Bradley*, the D.C. Circuit assumed that the continuous representation rule would apply to arbitral malpractice claims even though only one factor, a potential harm from disrupting the relationship, was present.  *Id*.  In this case, however, both factors are present: trust is inherent in the relationship between a trustee and a beneficiary, and it could be harmful to force a beneficiary to disrupt his relationship with his trustee.  Accordingly, the Court finds that the continuous representation rule applies to the trustee/beneficiary relationship.

Having concluded that the continuous representation doctrine applies to this claim, the only remaining question is whether Bruce's work on the trusts was continuous.  *See Winston*, 700 A.2d at 768.  Plaintiffs allege that Bruce became Vice Chairman of the Family Trust and co-trustee of the Foundation upon their inception in February 1996.  (Compl. ¶¶ 21, 23.)  By Bruce's own admission, he held fiduciary roles with respect to these trusts until at least May 2006.  (Pls.' Exh. 1(A).)  Defendants do not suggest that Bruce's fiduciary duties were

23

interrupted during this period, nor do they claim that there was a material change in the nature of these duties.  Instead, they rely on the same argument that they used in attacking the legal malpractice claim -- that their work in creating and amending the trusts was distinct from their subsequent work.  (Defs.' SJ Mem. at 29.)  However, this argument misses the point entirely. This claim is based on Bruce's ongoing fiduciary responsibilities, not any one-time errors that may have occurred when the trusts were created.  All of the alleged misconduct during his ten-year relationship with these trusts was necessarily connected to his duty to manage the trusts for the best interests of the beneficiaries.  Therefore, this claim is timely under the continuous representation rule.

## III.   COUNT III:  CONSTRUCTIVE FRAUD CLAIM

Plaintiffs' constructive fraud charge fails to state a claim for which relief can be granted. Fed R. Civ. P. 12(b)(6).  Plaintiffs correctly argue that constructive fraud need not involve any intentional misrepresentation.  (Pls.' Opp'n at 18.)  *See also Rick v. United States*, 161 F.2d 897, 899 (D.C. 1947) ("neither actual dishonesty nor intent to deceive is the essential element; and negligence so gross as to deceive might be such fraud").  However, the real question is whether legal advice can be characterized as a false representation, not whether the false representation must have been intentional.  (Defs.' SJ Mem. at 30-31.)

Fraud entails a false representation of a material fact.  *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1074 n.22 (D.C. 2008) (citing *Bennett v. Kiggins*, 377 A.2d 57, 59-60 (D.C. 1977)).  As plaintiffs acknowledge, constructive fraud also requires a factual misrepresentation.  (Pls.' Opp'n at 18.)  *See also Nguyen v. Voorthuis Opticians, Inc.*, 478 F.Supp.2d 56, 64 (D.D.C. 2007) ("Constructive fraud differs from actual fraud only in that

the misrepresentation of material fact is not made with the intent to mislead, but is made innocently or negligently.") (internal quotations and citations omitted).  However, the constructive fraud claim in this case is based on legal opinions rather than factual assertions. (Compl. ¶ 87.)  Plaintiffs have not offered any support for the proposition that erroneous legal advice can constitute a factual misrepresentation, nor has the Court's research unearthed such a case.  Therefore, the constructive fraud claim in Count III will be dismissed.

## IV.    OTHER ISSUES

### A.  *De May Family Trust as a Party*

Defendants argue that claims brought by the De May Family Trust should be dismissed because the trustee, not the trust, is the proper party in interest.  (Defs.' SJ Mem. at 28.)  *See also* Fed. R. Civ. P. 17(a)(1)(E).  Plaintiffs concede this point, and ask for leave to amend their complaint by making the trustee the named plaintiff.  (Pls.' Opp'n at 16.)  However, any such request can only be made as part of a Rule 15(a) motion.  *See* Fed. R. Civ. P. 15(a); LCvR 7(i). The Court will therefore dismiss the De May Family Trust as a plaintiff.

### B.  *Proximate Causation*

Finally, defendants argue that plaintiffs cannot recover damages for taxes that were unavoidable, or interest on such taxes, because "De May would have owed these taxes regardless of whether or not Defendants had ever represented him."  (Defs.' SJ Mem. at 32.)  According to defendants, the $6 million settlement, and the interest on this settlement, are not recoverable because they were unavoidable.  (*Id*. at 33.)

Plaintiffs acknowledge that they cannot recover damages for unavoidable taxes.  (Pls.' Supp. Opp'n at 1-2.)  However, they contend that the unavoidable portion is the amount De May

would have paid had he received sound advice, not the settlement amount:  "The measure of damages in this case would be the difference between the amount of the consent judgment, plus interest, and the amount [De May] should have paid if the matter had been properly handled."  (*Id*. at 3.)

In *Dalo v. Kivitz*, 596 A.2d 35, 41-42 (D.C. 1991), the Court of Appeals articulated the proximate causation standard for legal malpractice claims:

> As with any tort action, legal malpractice liability is predicated on a finding that the injury was proximately caused by the breach of duty.  Proximate cause exists when there is a "substantial and direct causal link" between the attorney's breach and the injury sustained by the client.  A defendant "will be held responsible for the damages which result despite the entry of another act in the chain of causation" if that subsequent act reasonably could have "been anticipated and protected against."  By contrast, an intervening act not reasonably foreseeable (sometimes referred to as a "superseding cause") breaks the chain of causation and relieves the wrongdoer of liability.

*Id*. at 41-42 (internal citations omitted).  Under *Dalo*, the question is what portion of plaintiffs' taxes was unavoidable and what portion can be attributed to defendants' alleged malpractice. There is a genuine factual dispute over this question, as defendants assume that the consent judgment and interest were all unavoidable, while plaintiffs argue that they would have paid lower taxes if they had not received bad advice.  (Defs.' SJ Mem. at 32-33; Pls.' Supp. Opp'n at 2-3.)  This is a factual question best left for a jury.

**CONCLUSION**

For the reasons stated above, it is hereby

**ORDERED** that defendants' motion for summary judgment is **DENIED** with respect to Counts I and II, but **GRANTED** with respect to Count III.  It is further

**ORDERED** that the De May Family Trust is **DISMISSED** as a plaintiff in this case.  It is further

**ORDERED** that an initial scheduling conference is set for December 3, 2008 at 9:45 a.m.

**SO ORDERED**.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

DATE:    November 6, 2008